**ORAL ARGUMENT NOT YET SCHEDULED**

No. 25-5302

IN THE

# United States Court of Appeals
# for the District of Columbia Circuit

MEDIA MATTERS FOR AMERICA,

*Plaintiff-Appellee,*

v.

FEDERAL TRADE COMMISSION, *et al.,*

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Columbia, No. 1:25-cv-01959-SLS
Hon. Sparkle L. Sooknanan, J.

## BRIEF FOR *AMICI CURIAE* NEWS AND MEDIA ORGANIZATIONS IN SUPPORT OF PLAINTIFF-APPELLEE

BRUCE D. BROWN
LISA ZYCHERMAN
GABRIEL ROTTMAN
MARA GASSMANN
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
1156 15th Street NW, Ste. 1020
Washington, DC 20005
(202) 795-9300
bruce.brown@rcfp.org

JOHN LANGFORD
  *Counsel of Record*
DAVID A. SCHULZ
MEDIA FREEDOM &
  INFORMATION ACCESS CLINIC
YALE LAW SCHOOL
127 Wall Street
New Haven, CT 06511
(919) 619-9819
john.langford@ylsclinics.org

*Counsel for News and Media
Organizations as Amici Curiae*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES AND CORPORATE DISCLOSURE STATEMENT

Except for the following, all parties, intervenors, and *amici* appearing in this court are listed in the Briefs for Appellant and Appellee:

1. The Associated Press

2. The Atlantic Monthly Group LLC

3. The Center for Investigative Reporting

4. The Guardian U.S.

5. The McClatchy Company, LLC

6. National Newspaper Association

7. National Press Photographers Association

8. The New York Times Company

9. Newsday LLC

10. Online News Association

11. Pro Publica, Inc.

12. Radio Television Digital News Association

13. Reporters Committee for Freedom of the Press

14. The Seattle Times Company

15. Society of Professional Journalists

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 28(a)(1)(A), *amici curiae* certify as follows:

The Associated Press is a global news agency organized as a mutual news cooperative under the New York Not-For-Profit Corporation law. It is not publicly traded.

The Atlantic Monthly Group LLC is a privately-held media company, owned by Emerson Collective and Atlantic Media, Inc. No publicly held corporation owns 10% or more of its stock.

The Center for Investigative Reporting, Inc. is a California non-profit public benefit corporation that is tax-exempt under section 501(c)(3) of the Internal Revenue Code. It has no statutory members and no stock.

Guardian US's legal entity is Guardian News & Media LLC, a company incorporated in Delaware, whose registered office is in New York. Guardian News & Media LLC's parent corporation is Guardian News & Media Limited, a private company. No publicly held corporation owns 10% or more of Guardian US's stock.

The McClatchy Company, LLC is privately owned by certain funds affiliated with Chatham Asset Management, LLC and does not have publicly traded stocks.

National Newspaper Association is a non-stock nonprofit Florida corporation. It has no parent corporation and no subsidiaries.

National Press Photographers Association is a 501(c)(6) nonprofit organization with no parent company. It issues no stock.

The New York Times Company is a publicly traded company and has no affiliates or subsidiaries that are publicly owned. No publicly held company owns 10% or more of its stock.

Newsday LLC is a Delaware limited liability company whose members are Tillandsia Media Holdings LLC and Newsday Holdings LLC. Newsday Holdings LLC is an indirect subsidiary of Cablevision Systems Corporation. Cablevision Systems Corporation is (a) directly owned by Altice USA, Inc., a Delaware corporation which is publicly traded on the New York Stock Exchange and (b) indirectly owned by Altice N.V., a Netherlands public company.

Online News Association is a not-for-profit organization. It has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

Pro Publica, Inc. ("ProPublica") is a Delaware nonprofit corporation that is tax-exempt under section 501(c)(3) of the Internal Revenue Code. It has no statutory members and no stock.

Radio Television Digital News Association is a nonprofit organization that has no parent company and issues no stock.

The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

The Seattle Times Company: The McClatchy Company, LLC owns 49.5% of the voting common stock and 70.6% of the nonvoting common stock of The Seattle Times Company.

Society of Professional Journalists is a non-stock corporation with no parent company.

Dated: February 23, 2026                      /s/ *John Langford*
                                              John Langford

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES AND CORPORATE DISCLOSURE STATEMENT ..................... i

TABLE OF CONTENTS ................................................................. v

TABLE OF AUTHORITIES .................................................... vi

GLOSSARY.................................................................................. xii

INTEREST OF *AMICI CURIAE* ............................................. 1

BACKGROUND AND SUMMARY ........................................... 2

ARGUMENT ................................................................................. 6

I.    The FTC Targets Press Activity Protected by the First Amendment ........................................................................ 6

II.   A Retaliatory Investigation of Press Activity Is Uniquely Dangerous and Cannot Survive First Amendment Scrutiny ....... 12

III.  The FTC's Civil Investigative Demand Violates the Qualified Reporter's Privilege on Its Face ...................................... 22

    A.    The First Amendment Requires Courts to Scrutinize Overbroad Investigative Demands That Chill Newsgathering Before Ordering Compliance ...................... 23

    B.    The FTC's CID Seeks Broad Categories of Information Protected by the Reporter's Privilege ................................... 26

    C.    The FTC Has Not Satisfied the Standards Required to Overcome the Reporter's Privilege ....................................... 28

CONCLUSION ......................................................................... 32

# TABLE OF AUTHORITIES

## Cases

*Ams. for Prosperity Found. v. Bonta,*
   594 U.S. 595 (2021) .................................................................... 16

*Anderson v. Davila,*
   125 F.3d 148 (3d Cir. 1997) ...................................................... 21

*Aref v. Lynch,*
   833 F.3d 242 (D.C. Cir. 2016) ............................................. 13, 19

*Austin v. Mich. Chamber of Com.,*
   494 U.S. 652 (1990) .................................................................... 11

*Bailey v. Ramos,*
   125 F.4th 667 (5th Cir. 2025) ................................................... 20

*Baird v. Gotbaum,*
   792 F.3d 166 (D.C. Cir. 2015) .................................................. 23

*Bart v. Telford,*
   677 F.2d 622 (7th Cir. 1982) ..................................................... 17

*Beckwith v. City of Daytona Beach Shores,*
   58 F.3d 1554 (11th Cir. 1995) ................................................... 21

*Branzburg v. Hayes,*
   408 U.S. 665 (1972) ........................... 8, 9, 11, 13, 14, 18, 22, 23

*Carey v. Hume,*
   492 F.2d 631 (D.C. Cir. 1974) ............................................. 28, 31

*Chen v. Fed. Bureau of Investigation,*
   153 F.4th 1289 (D.C. Cir. 2025) ............................................... 23

*Citizens United v. Fed. Election Comm'n,*
   558 U.S. 310 (2010) .................................................................... 11

*Clark v. Library of Congress*,
  750 F.2d 89 (D.C. Cir. 1984) .................................................. 21

*Crawford-El v. Britton*,
  93 F.3d 813 (D.C. Cir. 1996) ................................................ 17

*Crawford-El v. Britton*,
  523 U.S. 574 (1998) ...................................................... 13, 17

*Estate of Klieman v. Palestinian Authority*,
  18 F. Supp. 3d 4 (D.D.C. 2014) ............................................ 31

*Estes v. Texas*,
  381 U.S. 532 (1965) ....................................................... 6, 10

*First Nat'l Bank of Bos. v. Bellotti*,
  435 U.S. 765 (1977) .......................................................... 11

*Gibson v. Fla. Legis. Investigation Comm.*,
  372 U.S. 539 (1963) .......................................................... 16

*Goldberg v. Amgen, Inc.*,
  123 F. Supp. 3d 9 (D.D.C. 2015) ................................. 26, 31, 32

*Gordon v. New York City Bd. of Educ.*,
  232 F.3d 111 (2d Cir. 2000) ............................................... 21

*Grosjean v. Am. Press Co.*,
  297 U.S. 233 (1936) ........................................................... 7

*Hartman v. Moore*,
  547 U.S. 250 (2006) .......................................................... 15

*Houchins v. KQED, Inc.*,
  438 U.S. 1 ......................................................................... 8

*Hous. Cmty. Coll. Sys. v. Wilson,*
  595 U.S. 468 (2022)............................................................... 12

*Hutira v. Islamic Republic of Iran,*
  211 F. Supp. 2d 115 (D.D.C. 2002)........................................ 26

*In re Slack,*
  768 F. Supp. 2d 189 (D.D.C. 2011)................................... 26, 31

*In re Subpoena to Jeffrey Goldberg,*
  693 F. Supp. 2d 81 (D.D.C. 2010)........................................ 26

*Lee v. Dep't of Just.,*
  401 F. Supp. 2d 123 (D.D.C. 2005)....................................... 28

*Lee v. Dep't of Justice,*
  413 F.3d 53 (D.C. Cir. 2005)................................................. 31

*Lovell v. City of Griffin,*
  303 U.S. 444 (1938).............................................................. 11

*Media Matters for Am. v. FTC,*
  No. 25-5302, 2025 WL 2988966
  (D.C. Cir. Oct. 23, 2025) ............................. 20, 21, 26, 27, 28

*Media Matters for Am. v. FTC,*
  805 F. Supp. 3d 105 (D.D.C. 2025)................... 5, 21, 28, 29, 30

*Media Matters for Am. v. Paxton,*
  732 F. Supp. 3d 1 (D.D.C. 2024)..................................... 27, 30

*Media Matters for Am. v. Paxton,*
  138 F.4th 563 (D.C. Cir. 2025) ............... 4, 5, 6, 11, 12, 27, 28

*Mia. Herald Publ'g Co. v. Tornillo,*
  418 U.S. 241 (1974)............................................................. 10

*Mills v. Alabama,*
   384 U.S. 214 (1966) .................................................................. 7

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue,*
   460 U.S. 575 (1983) .................................................................. 7

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,*
   429 U.S. 274 (1977) ................................................................ 20

*Nat'l Ass'n for Advancement of Colored People v. Alabama ex rel. Patterson,*
   357 U.S. 449 (1958) ................................................................ 16

*Nieves v. Bartlett,*
   587 U.S. 391 (2019) ................................................................ 20

*Nixon v. Warner Commc'ns,*
   435 U.S. 589 (1978) .................................................................. 6

*O'Donnell v. Barry,*
   148 F.3d 1126 (D.C. Cir. 1998) .............................................. 20

*Perry v. Sindermann,*
   408 U.S. 593 (1982) ................................................... 12, 13, 14

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.,*
   413 U.S. 376 (1973) .................................................................. 9

*Quincy Cable TV, Inc. v. FCC,*
   768 F.2d 1434 (D.C. Cir. 1985) ................................................ 9

*Reps. Comm. for Freedom of the Press v. Am. Tel. & Tel. Co.,*
   593 F.2d 1030 (D.C. Cir. 1978) ............................... 13, 14, 15, 18, 19, 22

*Richmond Newspapers, Inc. v. Virginia,*
   448 U.S. 555 (1980) .................................................................. 8

ix

*Rutan v. Republican Party of Illinois,*
497 U.S. 62 (1990).................................................................. 17

*Sec. & Exch. Comm'n v. McGoff,*
647 F.2d 185 (D.C. Cir. 1981)................................................ 23

*Sherrill v. Knight,*
569 F.2d 124 (D.C. Cir. 1977).......................................... 9, 14

*Smith v. Daily Mail Publ'g Co.,*
443 U.S. 97 (1979).......................................................... 10, 11

*Tao v. Freeh,*
27 F.3d 635 (D.C. Cir. 1994)................................................ 17

*Thompson v. District of Columbia,*
832 F.3d 339 (D.C. Cir. 2016)............................................... 20

*Thornhill v. Alabama,*
310 U.S. 88 (1940)................................................................ 10

*Time, Inc. v. Hill,*
385 U.S. 374 (1967)................................................................ 7

*Toolasprashad v. Bureau of Prisons,*
286 F.3d 576 (D.C. Cir. 2002)............................................... 17

*Tripp v. Dep't of Defense,*
284 F. Supp. 2d 50 (D.D.C. 2003)........................................ 26

*U.S. Commodity Futures Trading Comm'n v. McGraw-Hill Cos., Inc.,*
390 F. Supp. 2d 27 (D.D.C. 2005).......................... 25, 26, 27

*United States v. Cuthbertson,*
630 F.2d 139 (3d Cir. 1980)................................................. 27

*United States v. Hubbard,*
493 F. Supp. 202 (D.D.C. 1979)........................................... 11

*United States v. LaRouche Campaign*,
    841 F.2d 1176 (1st Cir. 1988) ........................................ 24, 25

*Watkins v. United States*,
    354 U.S. 178 (1957) ................................................................ 16

*Webster v. Dep't of Army*,
    911 F.2d 679 (Fed. Cir. 1990) .............................................. 21

*Zerilli v. Smith*,
    656 F.2d 705 (D.C. Cir. 1981) .................................. 23, 24, 26, 28, 30, 31

*Ziglar v. Abbasi*,
    582 U.S. 120 (2017) ................................................................ 16

**Statutes**

15 U.S.C. §§ 44–45 .................................................................. 32

U.S. Const. amend. I ................................................................. 6

**Federal Rules**

Federal Rule of Civil Procedure 45(d)(3)(A)(iii) ..................................... 25

Federal Rule of Appellate Procedure 26.1 ............................................. 1

**Other Authorities**

2 Zechariah Chafee, *Government and Mass Communications* (1947) ... 10

David Anderson, *The Origins of the Press Clause*,
    30 UCLA L. Rev. 455 (1983) .................................................... 8

Floyd Abrams et al., *The Press Clause: The Forgotten First Amendment*,
    5 J. Free Speech L. 561 (2024) .......................................... 7, 9

Order, *In re Civil Investigative Demand to Media Matters for America*,
No. 251-0061 (July 25, 2025) ................................................................ 30

RonNell Andersen Jones, *Press Speakers and the First Amendment
Rights of Listeners*,
90 U. Colo. L. Rev. 499 (2019) ............................................................ 7

Sonja West, *Awakening the Press Clause*,
58 UCLA L. Rev. 1025 (2011) ............................................................ 9

Sonja West, *The Stealth Press Clause*,
48 Ga. L. Rev. 729 (2014) .................................................................. 8

## GLOSSARY

App.        Appendix to Brief for Appellants

CID         Civil Investigative Demand

FTC         Federal Trade Commission

Gov. Br.    Brief for Appellant

## INTEREST OF *AMICI CURIAE*

*Amici* are fifteen news organizations and other media organizations that defend press freedom, which share an outsized interest in preventing government actors from issuing investigative demands that punish and chill constitutionally protected press activity. *See* Addendum.

Every day, news organizations investigate and report on government officials and private parties to inform their readers about matters of public concern. Much of their daily news coverage unearths and publicizes information that powerful individuals and entities would prefer remained out of sight. They thus rely on the protections of the First Amendment, secure in the knowledge that they will not be subjected to wide-ranging government investigations for doing their jobs.

In this case, the Federal Trade Commission ("FTC") claims novel authority to issue sweeping investigative demands to a media organization. Though its exact legal theory is hard to pin down, the agency seems to contend that Media Matters, simply by writing about advertisements appearing on social media and advertisers' business decisions, has either itself participated in an advertising boycott or otherwise opened itself to regulatory scrutiny. Either way, its actions

here target quintessential press activity protected by the First Amendment. And their sweep and intrusiveness are without recent precedent: *Amici* are aware of no prior instance in which a federal agency has invoked such a theory to demand records about a media organization's editorial decision-making, sources, and finances. Left unchecked, the FTC's theory poses serious risks to news organizations' ability to gather and disseminate the news.

*Amici* submit this brief to highlight how retaliatory and overbroad investigations—regardless of political valence—erode the press freedom that the First Amendment guarantees.

## BACKGROUND AND SUMMARY

In October 2022, Elon Musk—then and now, the wealthiest person in the world—purchased Twitter, a large and influential social media platform, which he renamed X. *See* App. 212. Mr. Musk immediately altered X's content moderation practices to relax restrictions on certain speech. *See* App. 212. Published studies reported a dramatic rise in the number of posts on the platform containing what they categorized as racist and homophobic slurs, as well as posts containing alleged antisemitic references to Jews and Judaism. *See id.* European regulators

announced that X may not be in compliance with the European Digital Services Act. The Anti-Defamation League and other public-interest organizations lobbied Mr. Musk to reverse course, and advertisers paused or reduced spending on X.

All of this was newsworthy. Many of the undersigned *Amici* regularly reported these developments beginning in 2022 and continuing throughout 2023.[1] As one of the *Amici* observed, such a stark shift on one of the nation's largest social media platforms has significant "societal implications."[2]

---

[1] *E.g.*, Steven Lee Meyers, Stuart A. Thompson & Tiffany Hsu, *The Consequences of Elon Musk's Ownership of X*, N.Y. Times (Oct. 27, 2023), https://www.nytimes.com/interactive/2023/10/27/technology/twitter-x-elon-musk-anniversary.html; Lisa Friedman & Ryan Mac, *White House Condemns Elon Musk for Spreading "Antisemitic and Racist Hate*," N.Y. Times (Nov. 17, 2023), https://www.nytimes.com/2023/11/17/us/politics/elon-musk-antisemitism-white-house.html; Stuart A. Thompson, *Antisemitic Campaign Tries to Capitalize on Elon Musk's Twitter Takeover*, N.Y. Times (Oct. 28, 2022), https://www.nytimes.com/live/2022/10/28/business/elon-musk-twitter#musk-twitter-antisemitism; Jeff Kao & Priyanjana Bengani, *How Verified Accounts on X Thrive While Spreading Misinformation About the Israel-Hamas Conflict*, ProPublica (Dec. 20, 2023), https://www.propublica.org/article/x-verified-accounts-misinformation-israel-hamas-conflict.

[2] Sheera Frenkel & Kate Conger, *Hate Speech's Rise on Twitter Is Unprecedented, Researchers Find*, N.Y. Times (Dec. 2, 2022),

Media Matters, too, published stories concerning the changes on X. *See* App. 212. It focused on how these changes affected advertisers, reporting on the appearance of advertisements in proximity to what Media Matters called "hateful content." App. 212. What transpired in response is well documented in the district court's opinion. In November 2023, Elon Musk threatened to file a "thermonuclear" lawsuit against Media Matters for "curating" its coverage to find what Musk called "rare" instances of ads appearing next to unseemly content; the next day, Stephen Miller encouraged state attorneys general to investigate Media Matters for fraud, and two days later the Texas attorney general issued a broad civil investigative demand ("CID") to Media Matters, seeking all internal and external communications about its coverage of Mr. Musk, as well as its sources of income and expenditures. *See id.* at 208, 212–14; *see also id.* at 54–60. The Missouri attorney general followed suit in March 2024, issuing a nearly identical CID. *See id.* at 62–68.

In May 2025, this Court upheld a preliminary injunction barring enforcement of the Texas CID. *Media Matters for Am. v. Paxton*, 138

---

https://www.nytimes.com/2022/12/02/technology/twitter-hate-speech.html.

4

F.4th 563 (D.C. Cir. 2025). It held that the demand was likely issued in retaliation for Media Matters's First Amendment-protected "newsgathering activities" and imposed "special burdens" on those activities. *Id.* at 581.

Yet, just ten days before that decision, the Federal Trade Commission ("FTC") issued its own broad CID, seeking Media Matters's internal and external communications about its coverage of Mr. Musk, as well as Media Matters's financial records. *See* App. 70–88. It is even broader than the Texas and Missouri CIDs. Below, the district court enjoined the FTC's investigation, holding that the FTC's CID was also likely issued in retaliation for Media Matters's "newsgathering and reporting." *See Media Matters for Am. v. FTC*, 805 F.Supp.3d 105, 111 (D.D.C. 2025).

*Amici* submit this brief to explain that the FTC's CID violates the First Amendment's protection of press activity for two independent reasons. First, retaliatory investigations of protected press activity are unconstitutional, and both the Supreme Court and this Court have made clear that courts must screen out investigative demands issued in bad faith. Second, the FTC's CID contravenes the First Amendment qualified

reporter's privilege, which independently prohibits overbroad investigative demands to the press irrespective of the government's motivation. This Court should affirm the district court's injunction against the FTC's unconstitutional investigation.

## ARGUMENT

### I. The FTC Targets Press Activity Protected by the First Amendment

The government concedes that Media Matters engaged in "some protected First Amendment conduct," Gov. Br. 37, slipping past the key fact that the CID does not merely target protected speech—it specifically targets a "media organization" for its "news reporting on a public figure," *Media Matters for Am. v. Paxton*, 138 F.4th 563, 584 (D.C. Cir. 2025). In doing so, the FTC takes aim at core press functions, implicating the First Amendment's Press Clause protections, in addition to those of the Speech Clause.

The Press Clause of the First Amendment safeguards the "freedom . . . of the press" separately from the freedom of speech. U.S. Const. amend. I. This distinct constitutional protection reflects the fundamental role the press plays in a functioning democracy as "the information-gathering agent of the public." *Nixon v. Warner Commc'ns*, 435 U.S. 589,

609 (1978); *see also, e.g.*, *Estes v. Texas*, 381 U.S. 532, 539 (1965). "[A]n informed public is the essence of working democracy," and an informed public requires "an untrammeled press" serving as a "vital source of public information." *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 585 (1983) (quoting *Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936)). Without the press unearthing, organizing, and disseminating information about matters of public concern, civic debate and the political processes that enable democratic self-government could not function. It is the guarantee of a free press that "assures the maintenance of our political system and an open society." *Time, Inc. v. Hill*, 385 U.S. 374, 389 (1967).

The Framers of our Constitution recognized that "a free and vibrant press capable of disseminating knowledge" was necessary for their experiment in self-government to succeed. Floyd Abrams et al., *The Press Clause: The Forgotten First Amendment*, 5 J. Free Speech L. 561, 616 (2024). They "thoughtfully and deliberately" provided constitutional protection to the press because they understood that scrutiny of powerful actors would invite government retaliation and suppression. *Mills v. Alabama*, 384 U.S. 214, 218–19 (1966); *see* RonNell Andersen Jones,

*Press Speakers and the First Amendment Rights of Listeners*, 90 U. Colo. L. Rev. 499, 543–44 (2019). Indeed, "[f]reedom of the press—not freedom of speech—was the primary concern" of the Framers, who saw press freedom as the "bulwark of Liberty" that had to be protected to restrain government's "natural tendency toward tyranny and despotism." David Anderson, *The Origins of the Press Clause*, 30 UCLA L. Rev. 455, 533 (1983); *see also* Sonja West, *The Stealth Press Clause*, 48 Ga. L. Rev. 729, 753 (2014).

Given the "structural role" of the press "in securing and fostering our republican system of self-government," *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 587 (1980) (Brennan, J. concurring), the Supreme Court has recognized three key activities traditionally performed by the press as falling within the protection of the First Amendment when undertaken to inform the public: newsgathering, editorial decision-making, and publication.[3]

---

[3] Although the Court has generally grouped these press rights alongside broader free expression protections within the Speech Clause, or without grounding them in a specific clause of the First Amendment, *Amici* submit that the Press Clause must have independent force.

*First*, there is "an undoubted right to gather news 'from any source by means within the law.'" *Houchins v. KQED, Inc.*, 438 U.S. 1, 11 (quoting *Branzburg v. Hayes*, 408 U.S. 665, 681–82 (1972)); *see also Branzburg*, 408 U.S. at 707. The Founders recognized that without someone to unearth information, citizens cannot hold public officials accountable through the electoral process. *See* Sonja West, *Awakening the Press Clause*, 58 UCLA L. Rev. 1025, 1042–43 (2011) (describing the democracy-enabling role of the press); Abrams et al., *supra*, at 616. Accordingly, "[n]ot only newsmen and the publications for which they write, but also the public at large have an interest protected by the first amendment in assuring that restrictions on newsgathering be no more arduous than necessary." *Sherrill v. Knight*, 569 F.2d 124, 129–30 (D.C. Cir. 1977).

*Second*, the First Amendment "jealously" protects editorial decision-making, "guard[ing] against governmental intrusions into the editorial function." *Quincy Cable TV, Inc. v. FCC*, 768 F.2d 1434, 1453 (D.C. Cir. 1985); *see Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 391 (1973) (reaffirming "unequivocally the protection afforded to editorial judgment"). The "exercise of editorial control and

judgment," such as the "choice of material to go into a newspaper . . . and treatment of public issues and public officials," is how the press "set[s]" facts "in their context" using "interpretation" and "selection." *Mia. Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 & n.24 (1974) (quoting 2 Zechariah Chafee, *Government and Mass Communications* 633 (1947)). If the First Amendment guarantee of the freedom of the press is to hold any weight, these "crucial process[es]"—"whether fair or unfair"—must not be determined by government regulators. *Id.* at 258. Otherwise, "editors might well conclude that the safe course is to avoid controversy[, . . . and] political and electoral coverage would be blunted or reduced." *Id.* at 257.

*Third*, the First Amendment protects the publication of "lawfully obtain[ed] truthful information about a matter of public significance." *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 103 (1979). The press's ability to disseminate carefully gathered and editorially arranged information is a "mighty catalyst in awakening public interest in governmental affairs, exposing corruption among public officers and employees and generally informing the citizenry of public events and occurrences." *Estes*, 381 U.S. at 539; *see Thornhill v. Alabama*, 310 U.S.

10

88, 102 (1940) (indicating that the press fulfills the "public need for information and education with respect to the significant issues of the times"). Government officials "may not constitutionally punish publication of [such] information, absent a need to further a state interest of the highest order." *Smith*, 443 U.S. at 103.

The protection of these functions is not limited to the "institutional press." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 352 (2010) (quoting *Austin v. Mich. Chamber of Com.*, 494 U.S. 652, 691 (1990) (Scalia, J., dissenting)). The First Amendment "belongs to all who exercise its freedoms." *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 802 (1977) (Burger, C.J., concurring). The First Amendment protects press functions and activities rather than confining its reach to traditional "newspapers and periodicals." *Branzburg*, 408 U.S. at 704 (quoting *Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938)); *see also United States v. Hubbard*, 493 F.Supp. 202, 205 (D.D.C. 1979) ("[T]he reporter's privilege must encompass all news gathering efforts, not simply those for newspapers . . . .").

As this Court has already made clear, Media Matters was "obviously engaged" in protected activity when it "report[ed] on a public

11

figure and alleged political extremism on a popular social media platform." *Paxton*, 138 F.4th at 584. By gathering, compiling, analyzing, selecting, interpreting, and reporting information, Media Matters engaged in the very activities that traditional press organizations—including many of the *Amici*—undertake every day.

On its face, the FTC's CID targets core protected press activities, not merely protected speech. It seeks information about newsgathering and editorial processes and punishes the publication of information about a matter of public concern, threatening both the dissemination of information of public concern and the predicate processes integral to it. This Court should confirm that Media Matters' reporting activities are protected under both the Speech and Press Clauses of the First Amendment.

## II. A Retaliatory Investigation of Press Activity Is Uniquely Dangerous and Cannot Survive First Amendment Scrutiny

"The First Amendment generally 'prohibits government officials from subjecting individuals to retaliatory actions after the fact for having engaged in protected speech.'" *Media Matters for Am. v. Paxton*, 138 F.4th 563, 570 (D.C. Cir. 2025) (quoting *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022)); *see also Perry v. Sindermann*, 408 U.S. 593, 597

(1982). This Circuit's ordinary test for retaliation requires a plaintiff to show that "(1) he engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (internal quotation marks omitted). The goal of this analysis is to ensure that the government does not "produce a result which it could not command directly," indirectly "penaliz[ing] and inhibit[ing]" the exercise of First Amendment-protected expression it could never outright prohibit. *Sindermann*, 408 U.S. at 597 (cleaned up); *Crawford-El v. Britton*, 523 U.S. 574, 589 n.10 (1998) ("[R]etaliation offends the Constitution" because "it threatens to inhibit exercise of the protected right."). *Amici* submit that, consistent with the text and history of the First Amendment, *see supra* at 8, the retaliation analysis for bad faith investigations of press activity should be informed by the Press Clause, independent of the Speech Clause.

Retaliatory investigations of press activity are particularly dangerous because "[o]fficial harassment of the press" works two harms

at once. *Branzburg v. Hayes*, 408 U.S. 665, 707 (1972). By placing a "[s]pecial burden on information-gathering," *Reps. Comm. for Freedom of the Press v. Am. Tel. & Tel. Co.*, 593 F.2d 1030, 1064 (D.C. Cir. 1978), bad-faith investigations of press activity injure "[n]ot only newsmen and the publications for which they write, but also the public at large," which newsgatherers aim to inform. *Sherrill v. Knight*, 569 F.2d 124, 129–30 (D.C. Cir. 1977). Investigations that aim to "harass[]," *Branzburg*, 408 U.S. at 707, "obstruct," *Reps. Comm. for Freedom of the Press*, 593 F.2d at 1064—as well as to "penalize[]," *Sindermann*, 408 U.S. at 597—protected press activity are unconstitutional and "have no justification," *Branzburg*, 408 U.S. at 707.

Because bad-faith investigations of press activity effect obvious and outsized harm, the Supreme Court in *Branzburg* made clear that subpoenas issued in furtherance of such investigations "*are subject*" to "motions to quash." 408 U.S. at 707 (emphasis added). Courts must stop government investigations of press activity "instituted or conducted other than in good faith" because the government "must operate within the limits of the First Amendment." *Id.* at 707–8.

14

Six years later, this Court clarified in *Reporters Committee for Freedom of the Press* that if demands investigating press activity are "issued in bad faith," the *Branzburg* "Court did not contemplate case-by-case [b]alancing at all." 593 F.2d at 1061. In the case of bad-faith investigations, there is "no legitimate Government interest [t]o balance against the journalist's interests." *Id.* Instead of balancing, the role of courts is to "screen[] out bad faith subpoenas" and other compulsory investigative tools aimed at harassing, obstructing, or punishing protected press activity. *Id.*

This line of precedent carries three important implications for the Court's retaliation analysis in this case.

*First*, it easily dispenses the government's suggestion that Media Matters lacks a cognizable claim. Gov. Br. at 51–52. The government's argument is premised on a footnote in the Supreme Court's decision in *Hartman v. Moore*, in which the Court noted that "[w]hether the expense or other adverse consequences of a retaliatory investigation would ever justify recognizing such an investigation as a distinct constitutional violation is not before us." 547 U.S. 250, 262 n.9 (2006). Beyond the Supreme Court's explicit reservation of judgment on the issue, *Hartman*

arose as a *Bivens* action for damages, not a request for injunctive relief. *Id.* at 251. While the Supreme Court has yet to determine whether investigations that violate the First Amendment give rise to damages actions,[4] it has regularly *enjoined* government investigations on First Amendment grounds. *E.g.*, *Nat'l Ass'n for Advancement of Colored People v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958); *see also Gibson v. Fla. Legis. Investigation Comm.*, 372 U.S. 539 (1963); *Watkins v. United States*, 354 U.S. 178 (1957); *cf. Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021). Lest there be any doubt, *Branzburg* and this Court's decision in *Reporters Committee for Freedom of Press* make clear that courts not only may, but *must*, enjoin retaliatory investigations of protected press activity.

*Second*, contrary to the government's suggestion, Gov. Br. at 51–53, the recipient of a government investigative demand directed at press

---

[4] The Supreme Court is generally reluctant to recognize new *Bivens* claims, which may well explain its reticence to resolve the question of whether a plaintiff may bring a *damages* action for being investigated in retaliation for protected speech in *Hartman. See Ziglar v. Abbasi*, 582 U.S. 120, 135 (2017) ("[T]he Court has made clear that expanding the *Bivens* remedy is now a disfavored judicial activity.") (internal quotation marks omitted).

activity need not demonstrate any chilling effect, subjective or objective, to prevail on a retaliation claim. Developed in the context of public-employee retaliation claims, the purpose of the "ordinary firmness" prong—prong two from *Aref*—is to weed out acts so trivial as to have no realistic impact on First Amendment rights. *See Crawford-El v. Britton*, 93 F.3d 813, 826 (D.C. Cir. 1996) ("It would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise—for example, a supervisor frowning at an employee in retaliation would not constitute sufficient injury.") (internal quotation marks omitted), *vacated on other grounds*, 523 U.S. 574 (1998); *see also Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 585 (D.C. Cir. 2002).[5]

---

[5] Even in the employment context, however, "the effect on freedom of speech of retaliations 'need not be great in order to be actionable.'" *See Crawford-El v. Britton*, 93 F.3d 813, 826 (D.C. Cir. 1996) (quoting *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)). The Supreme Court itself has noted that even failing to hold an employee birthday party can amount to a First Amendment violation if done in retaliation for protected speech. *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 75 n.8 (1990); *Tao v. Freeh*, 27 F.3d 635, 639 (D.C. Cir. 1994).

An ordinary-firmness analysis, however, has no place in adjudging the constitutionality of investigations into protected press activity. *Branzburg* and *Reporters Committee for Freedom of the Press* make clear that bad-faith demands to investigate protected press activity are always unconstitutional and must be screened out; it follows *a fortiori* that receipt of a government investigative demand satisfies the second prong of ordinary retaliation analysis irrespective of any subjective or objective chilling effect. Because there is "*no* justification" for bad-faith investigations of protected press activity, *Branzburg*, 408 U.S. at 707–08 (emphasis added), the government may not pursue bad faith investigations at all, no matter how trivial or how chilling. (Of course, here, Media Matters *has* demonstrated chilling.) To hold otherwise would be to engage in precisely the sort of balancing analysis *Branzburg* forecloses. *See Reps. Comm. for Freedom of the Press*, 593 F.2d at 1061.[6]

---

[6] In *Reporters Committee for Freedom of the Press*, reporters sought "extraordinary prospective relief," requesting an injunction not against the government but against telephone companies which would have required the companies to inform the reporters that their phone records had been subpoenaed before turning over billing records to law-enforcement officials. *Reps. Comm. for Freedom of the Press*, 593 F.2d at 1064. This Court was deeply skeptical of undertaking "anticipatory . . . superintend[ence]" of subpoenas, especially because ten of the fifteen plaintiffs could not demonstrate that their records had ever

The only question is whether an investigation of press activity is being conducted in bad faith.[7]

*Third*, as for the third prong of the *Aref* test, ordinary retaliation doctrine, buttressed by *Branzburg* and *Reporters Committee for Freedom of the Press*, bars the government's claim that Media Matters must prove

---

been subpoenaed before, and the remaining five plaintiffs had not demonstrated that any of their records were ever subpoenaed in bad faith. *Id.* at 1064–65; *see id.* at 1066–67. Even then, the Court did not foreclose the possibility of such an extraordinary injunction. Instead, it remanded the case for a determination of whether there was a clear and imminent threat of bad-faith subpoenas going forward. *Id.* at 1071. It is against this backdrop that the Court's somewhat equivocal recognition that "bad faith use of [investigative] techniques *may* constitute an abridgment of the First Amendment rights of the citizens at whom they are directed" must be read. *Id.* (emphasis added). This case is obviously different, arising from a demand that has already been issued directly to plaintiffs engaged in protected press activity. This case presents exactly the kind of "case-by-case" posture for which courts must provide a "[s]creening remedy." *Id.* at 1061.

[7] In other words, in cases challenging retaliatory investigative demands which, as here, are obviously based on protected press activity, only the third prong of the ordinary *Aref* test matters. The first prong, requiring that the conduct be protected by the First Amendment, *Aref*, 833 F.3d at 258, is clearly met for press activity, which is independently constitutionally protected. *See supra*, Section I. The second prong, which typically requires a party to show that "the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again," *Aref*, 833 F.3d at 258, is also always satisfied, because any investigative demand issued in bad faith based on protected press activity violates the First Amendment.

bad faith was the but-for cause of the CID's issuance in order to obtain a preliminary injunction. *See* Gov. Br. at 37–38. Even in ordinary retaliation claims, it is the *government* that bears the ultimate burden of demonstrating that unconstitutional animus was *not* the but-for cause of its actions. *Thompson v. District of Columbia*, 832 F.3d 339, 347 (D.C. Cir. 2016). A plaintiff's burden is simply to make a *prima facie* case of unlawful retaliation by showing that the government's alleged unconstitutional animus was "*a* motivating factor." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977) (cleaned up and emphasis added); *see, e.g.*, *Nieves v. Bartlett*, 587 U.S. 391, 404 (2019); *O'Donnell v. Barry*, 148 F.3d 1126, 1133 (D.C. Cir. 1998). Upon that showing, the burden shifts to the government, and "a plaintiff can recover compensatory damages for a defendant's unconstitutional conduct unless the *defendant* shows that the injury would have occurred anyway." *Thompson*, 832 F.3d at 347 (emphasis in original).

The ordinary burden-shifting regime recognizes that the government is almost always in the "best position to prove an alternative, permissible justification for its adverse" action. *Thompson*, 832 F.3d at 347. Because "direct evidence of an improper motive is usually difficult,

if not impossible, to obtain," "[c]ircumstantial evidence is equally as probative as direct evidence in proving illegitimate intent." *Media Matters for Am. v. FTC*, No. 25-5302, 2025 WL 2988966, at *8 (D.C. Cir. Oct. 23, 2025) (quoting *Bailey v. Ramos*, 125 F.4th 667, 685 (5th Cir. 2025)); *see also Clark v. Library of Congress*, 750 F.2d 89, 101–02 (D.C. Cir. 1984); *Webster v. Dep't of Army*, 911 F.2d 679 (Fed. Cir. 1990). As the district court rightly noted, plaintiffs may carry their *prima facie* burden through evidence of "the defendant's expression of opposition to the protected speech[] and evidence that the defendant proffered false or pretextual explanations for the adverse action." *Media Matters for Am. v. FTC*, 805 F.Supp.3d 105, 134 (D.D.C. 2025).[8]

When the government investigates protected press activity, *Branzburg* and *Reporters Committee for Freedom of the Press* fortify the ordinary burden-shifting framework. Because courts must screen out

---

[8] Even under the ordinary retaliation framework, Media Matters has done more than enough to carry its burden. *Media Matters for Am.*, No. 25-5302, 2025 WL 2988966, at *8; *see Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000); *Anderson v. Davila*, 125 F.3d 148, 163 (3d Cir. 1997); *compare with Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1566 (11th Cir. 1995). If the evidence in the preliminary record in this case is insufficient, *Amici* could likely *never* secure meaningful relief from unconstitutional, bad-faith investigations.

bad-faith investigations that amount to official harassment of press activity, the rule that a plaintiff need only show that unconstitutional animus was a motivating factor in the government's investigation is especially important. To require more would allow the government to impose an unconstitutional "special burden" on gathering, organizing, and publishing information merely by being especially strategic. *Reps. Comm. for Freedom of the Press*, 593 F.2d at 1064. Because there can be "no justification" for bad-faith investigations of protected press activity, *Branzburg*, 408 U.S. at 707–08, a finding that a plaintiff is likely to succeed in showing that unconstitutional animus was a motivating factor of the underlying investigation should end the inquiry on whether a preliminary injunction is in order. The First Amendment, with its protections under the Speech and Press Clauses, puts a heavy constitutional thumb on the scale in cases like this.

## III. The FTC's Civil Investigative Demand Violates the Qualified Reporter's Privilege on Its Face

Because the district court and this Court have thus far enjoined the FTC's investigation into Media Matters on retaliation grounds, neither has yet squarely addressed the application of the qualified reporter's privilege. Before ordering compliance with the CID, some court would

need to determine whether the privilege applies and, if so, whether the FTC has met its burden to overcome it. *See* Fed. R. Civ. P. 45(d)(3)(A)(iii) (directing courts to quash subpoenas that require "disclosure of privileged or other protected matter, if no exception or waiver applies"). The reporter's privilege recognizes that even good-faith investigations of the press burden and chill speech, such that, at least in civil discovery, investigative demands must accommodate First Amendment interests. Because the FTC's CID violates the privilege on its face, that inquiry provides an independent ground to affirm the district court's preliminary injunction, irrespective of the government's motives. *See Baird v. Gotbaum*, 792 F.3d 166, 171 (D.C. Cir. 2015).

### A. The First Amendment Requires Courts to Scrutinize Overbroad Investigative Demands That Chill Newsgathering Before Ordering Compliance

The D.C. Circuit has long recognized a First Amendment "qualified reporter's privilege" in civil discovery. *See Zerilli v. Smith*, 656 F.2d 705, 711 (D.C. Cir. 1981) (citing *Branzburg v. Hayes*, 408 U.S. 665, 681, 707 (1972)); *Sec. & Exch. Comm'n v. McGoff*, 647 F.2d 185, 191-92 (D.C. Cir. 1981) (applying the privilege in response to civil administrative subpoenas). The privilege protects against—at minimum—compelled

disclosures that interfere with core press functions, including good-faith demands for source-related information, *Chen v. Fed. Bureau of Investigation*, 153 F.4th 1289, 1291 (D.C. Cir. 2025), and "documentation relating solely to 'editorial policy' or news gathering," *McGoff*, 647 F.2d at 191. As this Court explained in recognizing the privilege, even in a good-faith investigation, compelling disclosure of a source's identity "may significantly interfere with" First Amendment-protected newsgathering. *Zerilli*, 656 F.2d at 711. When journalists' ability to gather news is impaired in that way, "the press' function as a vital source of information is weakened." *Id.*

The reporter's privilege operates as a prophylactic guard against chilling that cannot be repaired after the fact. "[I]f disclosure of outtakes, notes, and other unused information . . . becomes routine and casually, if not cavalierly, compelled," the editorial judgment of *all* outlets engaging in press activity would be severely limited. *See United States v. LaRouche Campaign*, 841 F.2d 1176, 1182 (1st Cir. 1988). Once reporters and sources understand that internal materials may be demanded and scrutinized, sources self-censor; reporters avoid sensitive avenues; and editorial deliberations change—long before any court can "filter" what

24

has already been demanded. Even if the materials are later clawed back or excluded from evidence, the damage has been done.

For this reason, the reporter's privilege guards against even good-faith investigative demands that are overbroad in civil proceedings. The very issuance of a broad demand to investigate press activity, untethered to a clearly defined evidentiary need, creates a "lurking and subtle threat to journalists." *LaRouche Campaign*, 841 F.2d at 1182. The harm occurs at the moment of compelled disclosure: it forces journalists to map their investigations and editorial decision-making for the government and exposes the relationships, confidential or not, that make reporting possible.

A "broad range of news gatherers" may invoke the privilege. *See, e.g.*, *U.S. Commodity Futures Trading Comm'n v. McGraw-Hill Cos., Inc.*, 390 F.Supp.2d 27, 32 (D.D.C. 2005). In *McGraw-Hill Companies*, for example, the Commodity Futures Trading Commission issued a subpoena to Platts, a commodity-price reporter, regarding its evaluation of extra-market factors in valuing natural gas. *Id.* at 30–32. Although the court noted that "Platts may not be involved in what is most commonly considered traditional news gathering," *id.* at 32, it held that Platts could

25

nevertheless invoke the reporter's privilege because its evaluations constituted "editorial judgments." *Id.*

Unlike other privileges, the reporter's privilege need not be "invoke[d] . . . on a question-by-question basis before obtaining protection from the court." *Goldberg v. Amgen, Inc.*, 123 F.Supp.3d 9, 22 (D.D.C. 2015). Instead, due to "the preferred position of the First Amendment and the importance of a vigorous press," *Goldberg*, 123 F.Supp.3d at 15 (quoting *Zerilli*, 656 F.2d at 712), courts in the D.C. Circuit frequently quash subpoenas that violate the reporter's privilege on their face. *See, e.g.*, *Goldberg*, 123 F.Supp.3d at 19; *In re Slack*, 768 F.Supp.2d 189, 195 (D.D.C. 2011); *In re Subpoena to Jeffrey Goldberg*, 693 F.Supp.2d 81, 83 (D.D.C. 2010); *Tripp v. Dep't of Defense*, 284 F.Supp.2d 50, 54-57 (D.D.C. 2003); *Hutira v. Islamic Republic of Iran*, 211 F.Supp.2d 115, 121 (D.D.C. 2002).

## B. The FTC's CID Seeks Broad Categories of Information Protected by the Reporter's Privilege

As this Court observed in denying the motion for stay, the CID requires Media Matters to disclose information that may implicate the reporter's privilege. *See Media Matters for Am. v. FTC*, No. 25-5302, 2025 WL 2988966, at *10 (D.C. Cir. Oct. 23, 2025). It demands core

26

"journalistic analysis and judgment" from Media Matters, *McGraw-Hill Cos., Inc.*, 390 F.Supp.2d at 32, including its internal source-evaluation methods, its communications about content labeling, and the datasets underlying its analyses of social-media advertising.

Media Matters's reporting and commentary on matters of public concern place its editorial work product squarely within these protections. Just like the institutional press, Media Matters must preserve the integrity of its internal processes in order to effectively inform the segment of the public it serves. And, even if some of its activities might fall outside "what is most commonly considered traditional news gathering," it indisputably exercises "editorial judgment[]." *Id.*

Even if the government's motives were entirely benign, permitting the FTC's sweeping demand to proceed without first resolving the privilege question would inflict precisely the sort of unconstitutional intrusion that the reporter's privilege guards against. *See Media Matters for Am. v. Paxton*, 732 F.Supp.3d 1, 28 (D.D.C. 2024), *aff'd*, 138 F.4th 563 (D.C. Cir. 2025) (quoting *United States v. Cuthbertson*, 630 F.2d 139, 147 (3d Cir. 1980)) ("The compelled production of a reporter's resource

materials can constitute a significant intrusion [into the newsgathering and editorial processes that] may substantially undercut the public policy in favor of the free flow of information to the public."). Indeed, as the District Court found, the mere issuance of the CID has already disrupted Media Matters's reporting. *Media Matters for Am. v. FTC*, 805 F.Supp.3d 105, 118, 131 (D.D.C. 2025); *Media Matters for Am.*, No. 25-5302, 2025 WL 2988966, at *4; *see also Paxton*, 138 F.4th at 581.

Nor would the harm of permitting the FTC to proceed stop with Media Matters. The FTC's CID provides a roadmap for investigative demands that impermissibly burden First Amendment-protected activity—particularly when coverage is disfavored by public officials or other powerful actors with their ear. If overbroad demands like this one are permitted, the same playbook could be used against other news organizations, eroding the independence central to a free press.

## C.    The FTC Has Not Satisfied the Standards Required to Overcome the Reporter's Privilege

The FTC bears a "heavy burden" to overcome the reporter's privilege. *See Lee v. Dep't of Just.*, 401 F.Supp.2d 123, 132 (D.D.C. 2005). To do so, the FTC must demonstrate that (1) the information it seeks is "crucial to [its] case" and goes to "the heart of the matter"; and that (2) it

has "exhausted every reasonable alternative source of information." *Zerilli*, 656 F.2d at 713 (quoting *Carey v. Hume*, 492 F.2d 631, 636 (D.C. Cir. 1974)). The FTC has made no such showing.

*First*, the FTC's "sweeping" demand seeks information that appears wholly irrelevant in its investigation into alleged antitrust violations by advertisers. *Media Matters for Am.*, 805 F.Supp.3d at 111. For example, Media Matters's editorial work product—including its internal evaluations of a source's credibility—has nothing to do with whether any illegal "collusion or coordination" occurred "with any other market participant," as the CID purports to investigate. *Id.* at 137. This mismatch between the information sought and the purported aim of the investigation is reason enough to quash the CID.

*Second*, in an effort to demonstrate a lack of bad faith, the FTC repeatedly highlights that it took *no* action to tailor its CID to Media Matters. Instead, the FTC argues, it issued the same default, broad subpoena it would issue to any private company. *E.g.*, Gov. Br. at 53 ("The scope of the CID is standard for FTC investigations . . . ."); *id.* at 18 ("The asserted harms Media Matters relies on are themselves generic and unexceptional, and any recipient of an FTC CID could make the same

29

claims."); *id.* at 48 ("[T]he CID's scope is far from unusual."); *see also id.* at 18 ("[T]he scope of the CID at issue here is no broader than other CIDs in this or earlier investigations."). While the FTC might issue similar subpoenas in antitrust cases against healthcare providers and wine retailers, *see id.* at 40 n.12, the reporter's privilege recognizes that administrative subpoenas uniquely burden First Amendment interests when directed against organizations' protected press activities. *See Zerilli*, 656 F.2d at 711. At a minimum, the reporter's privilege requires the FTC to limit its subpoena to information "crucial to [its] case," *Zerilli*, 656 F.2d at 713, and the FTC's demand plainly has not done so. *Cf. Paxton*, 732 F.Supp.3d at 29 (noting that a similar CID issued by a state attorney general was especially burdensome when infringing on First Amendment interests).

Indeed, as the District Court observed, the FTC has failed to even articulate "*why* they have 'reason to believe' that Media Matters has 'information relating to the use of . . . lists to coordinate ad placement.'" *Media Matters for Am.*, 805 F.Supp.3d at 137 (quoting Defs.' Opp'n at 28). Despite multiple rounds of briefing, the FTC has steadfastly refused to articulate its rationale, under the mistaken assumption that Media

Matters bears the evidentiary burden here. *See, e.g.*, Order, *In re Civil Investigative Demand to Media Matters for America*, No. 251-0061, at 7–8 (FTC, July 25, 2025). But as this Court has frequently instructed, the subpoena issuant (here, the FTC) bears the burden to overcome the reporter's privilege. *E.g.*, *Zerilli*, 656 F.2d at 711–14; *Lee v. Dep't of Justice*, 413 F.3d 53, 59–61 (D.C. Cir. 2005).

*Third*, the FTC has not come close to exhausting every reasonable alternative source to prove its purported antitrust claim. "[C]ompelled disclosure from the newsman himself" must be "the end, and not the beginning, of the inquiry." *Zerilli*, 656 F.2d at 713. The burden to provide "specific details" of the efforts it has taken to exhaust alternative sources rests with the subpoenaing party. *In re Slack*, 768 F.Supp.2d at 197. And this requirement is "clearly very substantial." *Zerilli*, 656 F.2d at 714; *see, e.g.*, *Carey v. Hume*, 492 F.2d 631, 639 (D.C. Cir. 1974) (suggesting that only as many as sixty depositions may be sufficient); *Estate of Klieman v. Palestinian Authority*, 18 F.Supp.3d 4, 6 (D.D.C. 2014) (finding that, until there is certainty that alternative sources will not suffice, a discovery order may not proceed); *Goldberg*, 123 F.Supp.3d at 19 (finding that the deposition of three analysts is insufficient).

And yet, the FTC has not demonstrated—or even explained—that it could not obtain material crucial to its antitrust case from other sources. Instead, the FTC directed its initial investigative efforts against Media Matters.[9] "Such complete lack of effort at exhausting alternative avenues is plainly insufficient to abrogate the reporter's privilege." *Goldberg*, 123 F.Supp.3d at 19. The FTC's choice to target Media Matters flips the exhaustion requirement on its head, and the First Amendment bars that choice. Thus, even if this Court does not affirm the district court's opinion in full, it should require the district court to resolve the privilege question on remand before compelling compliance.

## CONCLUSION

For the reasons above, this Court should affirm the district court's order enjoining the FTC's CID.

Dated: February 23, 2026                    Respectfully Submitted,

                                                         /s/ *John Langford*

---

[9] This choice is even more striking given that, unlike the other sixteen eventual targets of the FTC's investigation, Media Matters is outside the FTC's enforcement jurisdiction as a nonprofit corporation. *See* 15 U.S.C. §§ 44–45.

BRUCE D. BROWN
LISA ZYCHERMAN
GABRIEL ROTTMAN
MARA GASSMANN
REPORTERS COMMITTEE FOR
 FREEDOM OF THE PRESS
1156 15th Street NW, Ste. 1020
Correspondents' Association
Washington, DC 20005
Telephone: 202.795.9300
bruce.brown@rcfp.org

JOHN LANGFORD*
 *Counsel of Record*
DAVID A. SCHULZ
MEDIA FREEDOM &
 INFORMATION ACCESS CLINIC
YALE LAW SCHOOL†
127 Wall Street
New Haven, CT 06511
(919) 619-9819
john.langford@ylsclinics.org

*Counsel for News and Media
Organizations as Amici Curiae‡*

---

* Yale Law School students Hannah Berkman ('26), Melanie Geller ('28), Raymond Perez ('26), and Tess Solomon ('27) contributed significantly to the drafting, editing, and preparation of this brief.

† The views expressed herein do not purport to represent the institutional views of Yale Law School, if any.

‡ No party's counsel authored this brief in whole or in part; neither any party nor any party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person—other than the amici curiae, their members, or their counsel—contributed money that was intended to fund preparing or submitting this brief.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 6,472 words excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font. This brief complies with the virus scan requirements required by Local Rule 28A(h)(2) and is virus-free.

February 23, 2026                    /s/ *John Langford*
                                     John Langford

## CERTIFICATE OF SERVICE

I certify that on February 23, 2026, I electronically filed the foregoing Notice with the United States Court of Appeals for the District of Columbia Circuit, using the appellate CM/ECF system. All parties are registered CM/ECF users, and service upon them will be accomplished by the appellate CM/ECF system.

Date: February 23, 2026              /s/ John Langford
                                     John Langford

## ADDENDUM: INDIVIDUAL STATEMENTS OF INTEREST OF *AMICI CURIAE*

The Associated Press ("AP") is a news cooperative organized under the Not-for-Profit Corporation Law of New York. The AP's members and subscribers include the nation's newspapers, magazines, broadcasters, cable news services and Internet content providers. The AP operates from 280 locations in more than 100 countries. On any given day, AP's content can reach more than half of the world's population.

The Atlantic Monthly Group LLC is the publisher of The Atlantic and TheAtlantic.com. Founded in 1857 by Oliver Wendell Holmes, Ralph Waldo Emerson, Henry Wadsworth Longfellow and others, The Atlantic continues its 160-year tradition of publishing award-winning journalism that challenges assumptions and pursues truth, covering national and international affairs, politics and public policy, business, culture, technology and related areas.

The Center for Investigative Reporting, Inc. is the nation's oldest nonprofit investigative newsroom in the country that runs the brands Mother Jones, Reveal, and CIR Studios. Mother Jones is a reader-supported news magazine and website known for ground-breaking investigative and in-depth journalism on issues of national and global

significance. Reveal produces investigative journalism for the Reveal national public radio show and podcast, and CIR Studios produces feature length documentaries distributed on Netflix, Hulu and other streaming channels. Reveal often works in collaboration with other newsrooms across the country.

Guardian US is the New York City-based American online presence, through the website https://www.theguardian.com/us, of the British print newspaper The Guardian and its website theguardian.com. Launched in September 2011, Guardian US covers American and international news for an online, global audience. Guardian US is renowned for the Paradise Papers investigation and other award-winning work including the NSA revelations, Panama Papers and The Counted investigations. The website theguardian.com is one of the world's leading English-language newspaper websites and operates two international online editions of the Guardian - Guardian US (Guardian News & Media LLC) and Guardian Australia (GNM Australia PTY Ltd). Traffic from outside the UK now represents around two-thirds of the Guardian's total digital audience.

The McClatchy Company, LLC is a publisher of iconic brands such as the Miami Herald, The Kansas City Star, The Sacramento Bee, The Charlotte Observer, The (Raleigh) News & Observer, and the Fort Worth Star-Telegram. McClatchy operates media companies in 30 U.S. markets in 16 states, providing each of its communities with high-quality news and advertising services in a wide array of digital and print formats. McClatchy is headquartered in Sacramento, California.

National Newspaper Association is a 2,000 member organization of community newspapers founded in 1885. Its members include weekly and small daily newspapers across the United States. It is based in Pensacola, FL.

The National Press Photographers Association ("NPPA") is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in its creation, editing and distribution. NPPA's members include television and still photographers, editors, students and representatives of businesses that serve the visual journalism industry. Since its founding in 1946, the NPPA has vigorously promoted the constitutional rights of journalists as well as freedom of the press in all its forms, especially as it relates to visual journalism. The submission of

this brief was duly authorized by Mickey H. Osterreicher, its General Counsel.

The New York Times Company is the publisher of The New York Times and operates the news website nytimes.com.

Newsday LLC ("Newsday") is the publisher of the daily newspaper, Newsday, and related news websites. Newsday is one of the nation's largest daily newspapers, serving Long Island through its portfolio of print and digital products. Newsday has received 19 Pulitzer Prizes and other esteemed awards for outstanding journalism.

The Online News Association is the world's largest association of digital journalists. ONA's mission is to inspire innovation and excellence among journalists to better serve the public. Membership includes journalists, technologists, executives, academics and students who produce news for and support digital delivery systems. ONA also hosts the annual Online News Association conference and administers the Online Journalism Awards.

Pro Publica, Inc. ("ProPublica") is an independent, nonprofit newsroom that produces investigative journalism in the public interest. It has won six Pulitzer Prizes, most recently a 2020 prize for national

reporting, the 2019 prize for feature writing, and the 2017 gold medal for public service. ProPublica is supported almost entirely by philanthropy and offers its articles for republication, both through its website, propublica.org, and directly to leading news organizations selected for maximum impact. ProPublica has extensive regional and local operations, including ProPublica Illinois, which began publishing in late 2017 and was honored (along with the Chicago Tribune) as a finalist for the 2018 Pulitzer Prize for Local Reporting, an initiative with the Texas Tribune, which launched in March 2020, and a series of Local Reporting Network partnerships.

Radio Television Digital News Association ("RTDNA") is the world's largest and only professional organization devoted exclusively to electronic journalism. RTDNA is made up of news directors, news associates, educators and students in radio, television, cable and electronic media in more than 30 countries. RTDNA is committed to encouraging excellence in the electronic journalism industry and upholding First Amendment freedoms.

The Reporters Committee for Freedom of the Press is an unincorporated nonprofit association. The Reporters Committee was

founded by leading journalists and media lawyers in 1970 when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources. Today, its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists.

The Seattle Times Company, locally owned since 1896, publishes the daily newspaper The Seattle Times, together with the Yakima Herald-Republic and Walla Walla Union-Bulletin, all in Washington state.

Society of Professional Journalists ("SPJ") is dedicated to improving and protecting journalism. It is the nation's largest and most broad-based journalism organization, dedicated to encouraging the free practice of journalism and stimulating high standards of ethical behavior. Founded in 1909 as Sigma Delta Chi, SPJ promotes the free flow of information vital to a well-informed citizenry, works to inspire and educate the next generation of journalists and protects First Amendment guarantees of freedom of speech and press.