ORAL ARGUMENT SCHEDULED FOR APRIL 13, 2026

No. 25-5302

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

MEDIA MATTERS FOR AMERICA,

*Plaintiff-Appellee,*

v.

FEDERAL TRADE COMMISSION, *et al.*,

*Defendant-Appellants.*

———————————

On Appeal from the United States District Court
for the District of Columbia, No. 1:25-cv-01959-SLS

BRIEF OF *AMICI CURIAE*
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION,
AMERICAN CIVIL LIBERTIES UNION, AND AMERICAN CIVIL
LIBERTIES UNION OF THE DISTRICT OF COLUMBIA
IN SUPPORT OF PLAINTIFF-APPELLEE
MEDIA MATTERS FOR AMERICA

Robert Corn-Revere
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE
Suite 340
Washington, DC 20003
(215) 717-3473
bob.corn-revere@fire.org

*Counsel for* Amici Curiae

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES AND CORPORATE DISCLOSURE STATEMENT

All parties, intervenors, and *amici* appearing before the district court and in this Court; references to the rulings at issue; and any related cases are listed in the parties' briefs.

The Foundation for Individual Rights and Expression, the American Civil Liberties Union, and the American Civil Liberties Union of the District of Columbia were not *amici* in the district court but are *amici* in this Court.

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for *amici curiae* certifies that (1) *amici* do not have any parent corporations and (2) no publicly held companies hold 10% or more of the stock or ownership interest in any *amici*. *Amici* are nonprofit corporations exempt from income tax under Section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3).

Dated: February 23, 2026

/s/ *Robert Corn-Revere*

Robert Corn-Revere
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION

*Counsel for* Amici Curiae

i

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES AND CORPORATE DISCLOSURE STATEMENT ..................... i

TABLE OF AUTHORITIES ................................................................ iii

INTEREST OF *AMICI CURIAE* ................................................. 1

INTRODUCTION AND SUMMARY ............................................. 2

BACKGROUND ......................................................................... 4

ARGUMENT ............................................................................. 8

I.    The First Amendment Bars Government Retaliation for Disfavored Speech. ........................................................... 8

II.   The District Court Correctly Found First Amendment Retaliation on Undisputed Record Evidence. ................... 9

III.  The FTC's Tactics of Intimidating Media Matters and Its Journalism with a Coercive "Investigation" Reflect an Increasing Nationwide Trend ...................................... 12

IV.   The Founders Intended the First Amendment to Prohibit Government Retaliation Against Dissent. ...................... 15

CONCLUSION ......................................................................... 17

# TABLE OF AUTHORITIES

## Cases

*Aref v. Lynch*,
  833 F.3d 242 (D.C. Cir. 2016) ................................................................ 10

*Backpage.com, LLC v. Dart*,
  807 F.3d 229 (7th Cir. 2015) ................................................................ 11

*Bantam Books, Inc. v. Sullivan*,
  372 U.S. 58 (1963) ............................................................................ 2, 8

*Disinformation Index, Inc. v. FTC*,
  No. 1:25-cv-4137 (D.D.C. filed Nov. 25, 2025)...................................... 13

*First Choice Women's Res. Ctrs., Inc. v. Platkin*,
  No. 24-781, 2025 WL 1678987 (U.S. June 16, 2025) ........................... 13

*Hartman v. Moore*,
  547 U.S. 250 (2006) ............................................................................. 8

*McIntyre v. Ohio Elections Comm'n*,
  514 U.S. 334 (1995) ........................................................................... 15

*Media Matters for Am. v. Bailey*,
  No. 24-cv-147, 2024 WL 3924573 (D.D.C. Aug. 23, 2024) ................. 5, 6

*Media Matters for Am. v. FTC*,
  805 F. Supp. 3d 105 (D.D.C. Aug. 15, 2025).............. 3, 4, 5, 6, 7, 10, 11

*Media Matters for Am. v. FTC*,
  No. 25-5302, 2025 WL 2988966 (D.C. Cir. Oct. 23, 2025) .................... 7

*Media Matters for Am. v. Paxton*,
  138 F.4th 563 (D.C. Cir. 2025)............................................................. 6

*Media Matters for Am. v. Paxton*,
  732 F. Supp. 3d 1 (D.D.C. 2024) ......................................................... 5

*Media Matters for Am. v. Paxton*,
  No. 24-7141, 2025 WL 492257 (D.C. Cir. Feb. 13, 2025)...................... 6

*Media Matters for Am. v. X Corp.*,
No. 25-cv-02397-VC, 2025 WL 1084715 (N.D. Cal. Apr. 10, 2025) ....... 5

*Murthy v. Missouri*,
603 U.S. 43 (2024) ................................................................................ 1

*N.Y. Times Co. v. Sullivan*,
376 U.S. 254 (1964) ............................................................................ 14

*Nat'l Rifle Ass'n v. Vullo*,
602 U.S. 175 (2024) ................................................................... 1, 2, 8

*NewsGuard Techs., Inc. v. FTC*,
Civil Case No. 1-26-cv-353 (D.D.C. filed Feb. 6, 2026) ............... 1, 4, 12

*Reps. Comm. for Freedom of Press v. Am. Tel. & Tel. Co.*,
593 F.2d 1030 (D.C. Cir. 1978) ............................................................ 9

*Roberts v. Pollard*,
393 U.S. 14 (1968) ................................................................................ 9

*Smith v. California*,
361 U.S. 147 (1959) ......................................................................... 8, 9

*Sweezy v. New Hampshire*,
354 U.S. 234 (1957) .............................................................................. 9

*Virginia v. Am. Booksellers Ass'n*,
484 U.S. 383 (1988) .............................................................................. 8

*White v. Lee*,
227 F.3d 1214 (9th Cir. 2000) ............................................................ 10

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*,
784 F. Supp. 3d 127 (D.D.C. 2025) ...................................................... 2

## Other Authorities

Collins et al., *First Things First: A Modern Coursebook on Free
Speech Fundamentals* (Jackie Farmer ed., 2019) ................................ 15

*Crown v. John Peter Zenger, 1735*, Hist. Soc'y of the N.Y. Cts. ............. 16

Harry Kalven Jr., *The New York Times Case: A Note on "The Central Meaning of the First Amendment"*, 1964 Sup. Ct. Rev. 191 ...................................................................................... 17

*John Peter Zenger*, Free Speech Ctr. at Middle Tenn. State Univ. (July 2, 2024) ........................................................... 16

Kendra Barnett, *EXCLUSIVE: FTC Probe Expands to IAS Over Alleged Ad Boycotts, Lawsuit Reveals*, Adweek (Feb. 7, 2026) ........... 13

Kenneth P. Vogel et al., *Under Siege From Trump and Musk, a Top Liberal Group Falls Into Crisis*, N.Y. Times (July 25, 2025) ....... 11

Michael Kent Curtis, *Free Speech, "The People's Darling Privilege": Struggles for Freedom of Expression in American History* (2000) .................................................................. 15, 16

*New York Weekly Journal*, Lower Manhattan Historical Association .................................................................... 16

Press Release, Off. of Att'y Gen. of Mo., *Attorney General Bailey Fights To Expose Big Tech Censorship of President Trump as AI Chatbots Produce Fake News* (July 9, 2025) ......................... 14

Press Release, Off. of Att'y Gen., *Attorney General James Uthmeier Launches Investigation into Sexualized Performance Advertised to Children; Issues Subpoena to Linda Moore, Vice Mayor of Vero Beach and Owner of Kilted Mermaid* (July 22, 2025) ...................................................................... 13

Press Release, Off. of N.Y. State Att'y Gen., *Attorney General James Calls on Social Media Platforms to Provide Answers After Terrorist Attacks in Israel Spark Violent Threats Online* (Oct. 13, 2023) ...................................................................... 14

Scott Bomboy, *On This Day, an Early Victory for the Free Press*, Nat'l Const. Ctr. (Aug. 4, 2024) ......................................... 16

v

## INTEREST OF *AMICI CURIAE*[1]

The Foundation for Individual Rights and Expression (FIRE) is a nonpartisan nonprofit that defends the rights of all Americans to free speech and free thought. Since 1999, FIRE has successfully defended First Amendment rights nationwide without regard to speakers' political views. *See*, *e.g.*, Br. *Amici Curiae* FIRE et al. Supp. Pet'r, *Nat'l Rifle Ass'n of. Am. v. Vullo*, 602 U.S. 175 (2024) (No. 22-842); Br. *Amici Curiae* FIRE et al. Supp. Resp'ts, *Murthy v. Missouri*, 603 U.S. 43 (2024) (No. 23-411). And FIRE is currently defending another target of the FTC's campaign to punish disfavored speech through crushing investigatory demands. *See NewsGuard Techs., Inc. v. FTC*, No. 1-26-cv-353 (D.D.C. filed Feb. 6, 2026). FIRE has a strong interest in protecting speakers from retaliation by government officials, whether directly or by regulatory actions.

The American Civil Liberties Union ("ACLU") is a nationwide, nonprofit organization that since 1920 has sought to protect the civil liberties and civil rights of all Americans. The ACLU of the District of

---

[1] All parties consent to this brief's filing. No counsel for a party authored this brief and no person, other than *amici*, their members, or their counsel contributed money intended to fund this brief's preparation or submission.

1

Columbia ("ACLU-DC") is the ACLU's Washington, D.C. affiliate. The ACLU and ACLU-DC have frequently appeared, as counsel to parties or as *amici curiae*, in many consequential First Amendment cases, including those involving retaliation. *See, e.g.*, *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024) (counsel); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, 784 F. Supp. 3d 127 (D.D.C. 2025) (amicus).

## INTRODUCTION AND SUMMARY

Just two terms ago, the Supreme Court unanimously reaffirmed that "[g]overnment officials cannot attempt to coerce private parties … to punish or suppress views that the government disfavors." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 180 (2024). The First Amendment bars using the government's "power to investigate" to pressure publications that, in its view, publish objectionable material. *Id*. at 188. Coercive government investigations impermissibly suppress speech rights as much as outright proscriptions, and First Amendment protections fully apply in either case. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963).

Yet the Federal Trade Commission initiated a pretextual investigation to punish Media Matters, whose articles and perspective the current Administration and its allies dislike. The district court therefore preliminarily enjoined the FTC's investigation as part of a coordinated effort—involving other investigations by state attorneys general and a malicious campaign of baseless litigation—to crush a disfavored speaker and perceived political opponents. *Media Matters for Am. v. FTC* ("PI Order"), 805 F. Supp. 3d 105, 111 (D.D.C. Aug. 15, 2025).

This case starkly illustrates how government investigations intimidate through procedural burdens and threats that themselves punish exercises of First Amendment rights. Allowing the FTC to pursue its investigation during the pendency of this case would continue to chill speech and journalism. Media Matters is living that reality now. The weaponization of broad FTC investigative powers not only caused Media Matters to back off newsgathering and reporting but threatens its very existence.

This case is not an outlier. The FTC itself is currently using the same playbook in a series of burdensome "investigations" of advertising agencies and news rating organizations to censor speech the Commission

3

doesn't like. FIRE is representing one such organization, NewsGuard, in a lawsuit filed two weeks ago.[2] Moreover, government officials nationwide increasingly use burdensome investigations, subpoenas, and CIDs to target publications, platforms, and others for their views. The message is clear: Officials will pursue political opponents and attack their speech by any means—unless courts intervene.

The preliminary injunction here is a well-founded judicial intervention, and this Court should affirm the district court's decision.

## BACKGROUND

Media Matters for America is a research and journalistic nonprofit dedicated "to monitoring and correcting misinformation in U.S. media." PI Order, 805 F. Supp. 3d at 113.[3] After Media Matters published articles reporting on increased "extremist and racist rhetoric" on X and about major companies' ads appearing adjacent to "pro-Nazi content," then-new owner Elon Musk took offense and promised "a thermonuclear lawsuit against Media Matters." *Id.*

---

[2] *NewsGuard Techs., Inc. v. FTC*, Civil Case No. 1-26-cv-353 (D.D.C. filed Feb. 6, 2026).

[3] The pleadings below and the PI Order address this background at length. This summary provides context for *amici*'s arguments.

X Corp. made good on Musk's threat, suing Media Matters in Texas federal court and (through subsidiaries) in Ireland and Singapore. *Id.* at 114. A California federal court preliminarily enjoined X Corp.'s lawsuit campaign, recognizing it appeared designed more to bully Media Matters and inflict financial hardship than to pursue legitimate claims. *Id.* at 115; *see Media Matters for Am. v. X Corp.*, No. 25-cv-02397-VC, 2025 WL 1084715, at *1 (N.D. Cal. Apr. 10, 2025), *vacated and remanded*, No. 25-2463, 2025 WL 3688854, at *2–3 (9th Cir. Dec. 19, 2025) (without reaching merits, vacating preliminary injunction based on forum-selection-clause issue).

Meanwhile, President Trump's senior advisor Stephen Miller (now White House Deputy Chief of Staff for Policy) tweeted about Media Matters, effectively urging state attorneys general to target it. PI Order, 805 F. Supp. 3d at 114. Texas's and Missouri's AGs answered the call and launched civil investigations with onerous demands of Media Matters. *Id.* The United States District Court for the District of Columbia preliminarily enjoined both AGs on grounds the proceedings likely amounted to First Amendment retaliation, *id.* at 114–15; *see Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1 (D.D.C. 2024); *Media Matters*

5

*for Am. v. Bailey*, No. 24-cv-147, 2024 WL 3924573 (D.D.C. Aug. 23, 2024), and this Court affirmed as to Texas, *Media Matters for Am. v. Paxton*, 138 F.4th 563, 584 (D.C. Cir. 2025).[4]

Undeterred, FTC Chairman Andrew Ferguson announced the Commission would investigate purported "tech [platform] censorship" and "advertiser boycotts." PI Order, 805 F. Supp. 3d at 134, 136 (alteration in original). In numerous public statements, Ferguson, senior FTC staffers he hired, and other allies made clear the investigation was partisan and retributive, aimed at "progressives" and "leftists" "fighting 'disinformation'" and allegedly seeking to "silence conservative voices." *Id.* at 134–35.

The FTC issued a broad CID to Media Matters in May 2025 that demanded information on a wide variety of expressive matters, including information about decisions of platforms, publishers, and advertisers concerning misinformation or false or misleading content; Media

---

[4] Media Matters had previously settled and dismissed its claims against the Missouri Attorney General. PI Order, 805 F. Supp. 3d at 114; *see also Media Matters for Am. v. Paxton*, No. 24-7141, 2025 WL 492257 (D.C. Cir. Feb. 13, 2025) (dismissing appeal in that case).

Matters' newsgathering and editorial decisions; its programs, policies and objectives; all its financials; and much more. *See id.* at 116–17.

Media Matters sued again, initiating this lawsuit, and again sought and won a preliminary injunction. In a thorough opinion applying the likelihood-of-success standard, the court concluded "[t]his case presents a straightforward First Amendment violation." *Id.* at 111.

The FTC appealed, Dkt. No. 36, and simultaneously moved the district court to stay the order pending appeal, Dkt. No. 37. Observing that the government offered nothing but a rehash of prior failed arguments, the district court denied a stay. Dkt. No. 41. This Court also denied a stay pending appeal. *Media Matters for Am. v. FTC* ("Stay Op."), No. 25-5302, 2025 WL 2988966, at *1 (D.C. Cir. Oct. 23, 2025). Noting the "unusual and unprecedented array of facts" arising from the government's "sweeping and unexplained" investigatory demands, resulting in "existing and continuing First Amendment harms" to Media Matters, this Court concluded the government was unlikely to succeed. *Id.* at *4, *6, *9.

The FTC now asks this Court to reverse the district court's grant of a preliminary injunction, FTC Br. 3, so it can continue its "investigation"

and pursuit of Media Matters—actions shown to be impermissible First Amendment retaliation. Because the process of an unlawful retaliatory investigation causes irreparable First Amendment harm in and of itself, *amici* write to emphasize the importance of protecting freedom of speech in this case, urging that the Court affirm.

## ARGUMENT

### I.    The First Amendment Bars Government Retaliation for Disfavored Speech.

The Court should affirm the preliminary injunction entered by the district court because the "law is settled that … the First Amendment prohibits government officials from subjecting an individual to retaliatory actions … for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (cleaned up). This is true regardless of the form retaliation takes. Government officials have employed any number of legal devices to restrict or censor speech, but the Supreme Court has made clear officials "cannot do indirectly what [they are] barred from doing directly." *Vullo*, 602 U.S. at 190; *see Bantam Books*, 372 U.S. at 67–69.

Retaliatory government actions—whether direct or indirect, formal or informal—chill speech and cause self-censorship. *See, e.g.*, *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988); *Smith v. California*, 361

U.S. 147, 150–51 (1959) (inhibiting expressive freedom occurs "by making the individual more reluctant to exercise it"); *Sweezy v. New Hampshire*, 354 U.S. 234, 245 (1957) ("It is particularly important that … compulsory process be carefully circumscribed" when it "tends to impinge upon such highly sensitive areas as freedom of speech or press.").

As the Supreme Court has affirmed, investigatory subpoenas can alone infringe First Amendment rights. *Roberts v. Pollard*, 393 U.S. 14 (1968), *aff'g summarily*, 283 F. Supp. 248, 258 (E.D. Ark.) (enjoining on First Amendment grounds subpoenas seeking donor identities). Subpoenas and other investigative techniques that may be "otherwise legitimate" transgress First Amendment rights if governments use them "to harass [media organizations] in their journalistic information-gathering activities." *Reps. Comm. for Freedom of Press v. Am. Tel. & Tel. Co.*, 593 F.2d 1030, 1064, 1067 (D.C. Cir. 1978).

## II.  The District Court Correctly Found First Amendment Retaliation on Undisputed Record Evidence.

The district court correctly held under preliminary injunction standards, and on an extensive record, that the FTC's targeting of Media Matters with oppressive investigative demands plainly constitutes First Amendment retaliation. The court recounted numerous statements by

officials about the avowed purpose to target Media Matters and other "progressives" and "leftists" by investigating "advertiser boycotts" of X and other platforms. *See* PI Order, 805 F. Supp. 3d at 115–16, 134–35. The FTC does not dispute these facts, arguing instead about official "decisionmakers." *See* FTC Br. 13–16, 44–47.

First Amendment retaliation exists when the government's action suffices to "deter a person of ordinary firmness" from exercising expressive rights in future, and a causal link to the speech exists. *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016); *see also White v. Lee*, 227 F.3d 1214, 1228–29 (9th Cir. 2000). As the district court held, this is especially concerning when investigatory powers target newsgathering, reporting, and editorial decisions. PI Order, 805 F. Supp. 3d at 111, 130; *see also* Stay Op. at *10.

These sweeping FTC investigatory demands are not only enough to deter an organization of "ordinary firmness," they have in fact caused significant damage to Media Matters's First Amendment rights. It has backed off researching and reporting about government entities, X Corp., Mr. Musk, and conservative media—not to mention shying away from

reporting about the FTC's investigation itself. PI Order, 805 F. Supp. 3d at 131.

Media Matters also saw donors cease giving, incurred millions of dollars in legal fees, and laid off staff.[5] Whether or not the FTC ever succeeds in court—and even if its investigation never culminates in action—forcing the organization to contend with the investigations is achieving the FTC's censorial aim. *Backpage.com, LLC v. Dart*, 807 F.3d 229, 231 (7th Cir. 2015) (threat of abuse of power "is actionable and thus can be enjoined even if it turns out to be empty").

The process is the punishment—for as long as the FTC can draw it out. Having failed in casting about for a reason, *any* reason, to delay reaching the merits of Media Matters' First Amendment claim,[6] then seeking to further prolong the process by having the preliminary injunction stayed, the FTC now seeks reversal of the preliminary

---

[5] Kenneth P. Vogel et al., *Under Siege From Trump and Musk, a Top Liberal Group Falls Into Crisis*, N.Y. Times (July 25, 2025), https://www.nytimes.com/2025/07/25/us/politics/media-matters-musk-crisis.html; *see also* PI Order, 805 F. Supp. 3d at 118, 131 (summarizing harm).

[6] *See* PI Order, 805 F. Supp. 3d at 112, 119–29 (rejecting FTC's arguments, among others, that the FTC Act and Administrative Procedure Act preclude Media Matters' constitutional challenge).

injunction so that it can continue its campaign of unconstitutional retaliation while the litigation proceeds in district court. This Court should not allow that.

## III. The FTC's Tactics of Intimidating Media Matters and Its Journalism with a Coercive "Investigation" Reflect an Increasing Nationwide Trend.[7]

The FTC's campaign targeting Media Matters and its speech through a crushing "investigation" is not an isolated instance. The FTC's CID to Media Matters is just one of many the Commission has issued and pursued against advertisers, ad agencies, news rating services, and other journalistic organizations that report about online disinformation. In addition to Media Matters, the FTC issued a similarly onerous CID to NewsGuard Technologies, Inc., a service that publishes nonpartisan ratings of news sites based on defined journalistic criteria. NewsGuard brought suit two weeks ago and has moved for a preliminary injunction.[8] Using the same tactic, the FTC has also pursued Global Disinformation Index, a nonprofit news review service; Integrated Ad Science, Inc., a

---

[7] *Amici* ACLU and ACLU-DC do not here express a position on the specific examples discussed in this section.

[8] Complaint, *NewsGuard Techs., Inc. v. FTC*, No. 1:26-cv-353 (D.D.C. Feb. 6, 2026), Dkt. No. 1; Mot. for Prelim. Inj., *id.*, Dkt. No. 11.

brand safety platform; and reportedly a total of at least sixteen other media credibility and news rating organizations.[9]

Government officials are increasingly mirroring the FTC to suppress speech they cannot target directly—and on a bipartisan basis. New Jersey's AG used investigative demands to target crisis pregnancy centers,[10] while Florida's AG used a similar approach against restaurants for hosting drag shows.[11] New York's AG sees offensive social media posts and demands that platforms tell her how they're addressing it.[12] And the

---

[9] Kendra Barnett, *EXCLUSIVE: FTC Probe Expands to IAS Over Alleged Ad Boycotts, Lawsuit Reveals*, Adweek (Feb. 7, 2026), https://www.adweek.com/media/exclusive-ftc-probeexpands-to-ias-over-alleged-ad-boycotts-lawsuit-reveals. Global Disinformation Index has also sued the FTC. *See Disinformation Index, Inc. v. FTC*, No. 1:25-cv-4137 (D.D.C. filed Nov. 25, 2025).

[10] *First Choice Women's Res. Ctrs., Inc. v. Platkin*, No. 24-781 (U.S. argued Dec. 2, 2025).

[11] Press Release, Off. of Att'y Gen., *Attorney General James Uthmeier Launches Investigation into Sexualized Performance Advertised to Children; Issues Subpoena to Linda Moore, Vice Mayor of Vero Beach and Owner of Kilted Mermaid* (July 22, 2025), https://www.myfloridalegal.com/newsrelease/attorney-general-james-uthmeier-launches-investigation-sexualized-performance.

[12] Press Release, Off. of N.Y. State Att'y Gen., *Attorney General James Calls on Social Media Platforms to Provide Answers After Terrorist Attacks in Israel Spark Violent Threats Online* (Oct. 13, 2023),

Missouri AG issued his own demands to large-language-model chatbots to ask why they produce outputs disfavoring President Trump.[13]

Regardless of partisan affiliation, the First Amendment prohibits government officials using investigative powers to target disfavored speech. Dissent is vital to America's political traditions, and the First Amendment "presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Whether by direct censorship or, as here, by retaliatory deployment of the federal administrative state, the First Amendment was ratified to guard against the government's efforts to punish its critics.

---

https://ag.ny.gov/press-release/2023/attorney-general-james-calls-social-media-platforms-provide-answers-after.

[13] Press Release, Off. of Att'y Gen. of Mo., *Attorney General Bailey Fights To Expose Big Tech Censorship of President Trump as AI Chatbots Produce Fake News* (July 9, 2025), https://ago.mo.gov/attorney-general-bailey-fights-to-expose-big-tech-censorship-of-president-trump-as-ai-chatbots-produce-fake-news/.

## IV. The Founders Intended the First Amendment to Prohibit Government Retaliation Against Dissent.

Criticizing the government is an American tradition.[14] Colonial Americans, the Revolution's patriots, and the Founders relied on expression as a political tool and a vehicle for dissent.[15] The generation that adopted the First Amendment knew from experience that permitting the government to ruin its critics would be fatal to the freedoms they fought to secure—and the Founders would recognize in the FTC's attack on Media Matters an echo of the Crown's prosecution of dissent.

In 1734, for example, British officials arrested printer John Peter Zenger for seditious libel for publishing *The New-York Weekly Journal*, which criticized William Cosby, New York's loyalist governor.[16] Cosby sought to silence Zenger through failed indictments and other means,

---

[14] *See, e.g.*, *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 361–62 (1995) (Thomas, J., concurring) (describing pamphleteering during the Revolutionary and Ratification periods).

[15] Collins et al., *First Things First: A Modern Coursebook on Free Speech Fundamentals* 2–3 (Jackie Farmer ed., 2019).

[16] Michael Kent Curtis, *Free Speech, "The People's Darling Privilege": Struggles for Freedom of Expression in American History* 41 (2000).

including ordering the paper burned and offering rewards for information about its writers.[17] He finally secured Zenger's arrest by proceeding without an indictment from a grand jury.[18]

Zenger's ultimate acquittal ended successful seditious libel prosecutions during the colonial period—the people rejected censorship through such charges and refused to convict.[19] And it influenced the Founders; Gouverneur Morris called Zenger's victory "the germ of American freedom, the morning star of that liberty which subsequently revolutionized America."[20] But before acquittal, Zenger spent nearly a year in jail, and his wife and attorneys kept his newspaper afloat.[21]

---

[17] *New York Weekly Journal*, Lower Manhattan Historical Association, https://www.historiclowermanhattan.org/printinghouserow/new-york-weekly-journal.

[18] *Crown v. John Peter Zenger, 1735*, Hist. Soc'y of the N.Y. Cts., https://history.nycourts.gov/case/crown-v-zenger.

[19] Curtis, *supra* note 16, at 46.

[20] Scott Bomboy, *On This Day, an Early Victory for the Free Press*, Nat'l Const. Ctr. (Aug. 4, 2024), https://constitutioncenter.org/blog/a-huge-free-press-victory-by-the-original-philadelphia-lawyer.

[21] *John Peter Zenger*, Free Speech Ctr. at Middle Tenn. State Univ. (July 2, 2024), https://firstamendment.mtsu.edu/article/john-peter-zenger.

The Founders knew, therefore, that official punishment of disfavored speech imposes a serious, immediate cost, despite eventual vindication in court. So the First Amendment's authors rejected governmental retaliation against dissent just as their predecessors rejected the Crown's prosecution of Zenger. As Madison put it: Without free speech, "'the censorial power' would be in the Government over the people and not 'in the people over the Government.'"[22]

## CONCLUSION

The FTC's retaliation against Media Matters violates the First Amendment. If left unchecked, others will emulate the agency's tactics, leaving expressive rights contingent upon the vagaries of political power. This Court should therefore affirm the preliminary injunction entered by the district court.

---

[22] Harry Kalven Jr., *The New York Times Case: A Note on "The Central Meaning of the First Amendment"*, 1964 Sup. Ct. Rev. 191, 208.

Dated: February 23, 2026

/s/ *Robert Corn-Revere*

Robert Corn-Revere
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE
Suite 340
Washington, DC 20003
(215) 717-3473
bob.corn-revere@fire.org

*Counsel for* Amici Curiae

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

This document complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 3,121 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

Dated: February 23, 2026

*/s/ Robert Corn-Revere*

Robert Corn-Revere
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE
Suite 340
Washington, DC 20003
(215) 717-3473
bob.corn-revere@fire.org

*Counsel for* Amici Curiae

## CERTIFICATE OF SERVICE

The undersigned certifies that on February 23, 2026, an electronic copy of the foregoing was filed with the Clerk of this Court using the CM/ECF system, and that all parties will be served through that system.

/s/ *Robert Corn-Revere*

Robert Corn-Revere
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE
Suite 340
Washington, DC 20003
(215) 717-3473
bob.corn-revere@fire.org

*Counsel for* Amici Curiae