**ORAL ARGUMENT SCHEDULED APRIL 13, 2026**
No. 25-5302

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

# In the United States Court of Appeals
# for the District of Columbia Circuit

───────────

MEDIA MATTERS FOR AMERICA,

*Plaintiff-Appellee,*

v.

FEDERAL TRADE COMMISSION, *et al.*,

*Defendants-Appellants.*

───────────

On Appeal from the United States District Court
for the District of Columbia

───────────

**BRIEF OF THE LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER
LAW AND NINE CIVIL RIGHTS ORGANIZATIONS AS *AMICI CURIAE*
IN SUPPORT OF PLAINTIFF-APPELLEE AND AFFIRMANCE**

Edward G. Caspar
Leah Frazier
Gillian Cassell-Stiga
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005
(202) 662-8600

Brendan Benedict
Michael D. Altebrando
BENEDICT LAW GROUP PLLC
322 G Street NE
Washington, DC 20002
(212) 287-9501
*brendan@benedictlawgroup.com*

*Counsel for* Amici Curiae

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel of record submits this Certificate as to Parties, Rulings, and Related Cases:

### A.     Parties and Amici

Except for the following *amici* and any other *amici* who have not yet entered an appearance in this case, all parties, intervenors, and *amici* appearing before the district court and in this Court are listed in the Government's brief:

1.     The Lawyers' Committee for Civil Rights Under Law

2.     Asian Americans Advancing Justice | AAJC

3.     Feminist Majority Foundation

4.     Hispanic Federation

5.     Japanese American Citizens League

6.     The Leadership Conference on Civil and Human Rights

7.     League of United Latin American Citizens

8.     National Women's Law Center

9.     The Sikh American Legal Defense and Education Fund

10.    United Church of Christ Media Justice Ministry, Inc.,

11.    Cato Institute

12.    Reporters Without Borders, Inc.

13.    Public Knowledge

14.    Project on Government Oversight

15.    Open Vallejo

16.    The National Coalition Against Censorship

17.    MuckRock Foundation,

18.    Local Independent Online News Publishers

19.    Freedom of the Press Foundation

20.    Free Press

21.    First Amendment Coalition

22.    Electronic Frontier Foundation

23.    Defending Rights & Dissent

24.    The Dangerous Speech Project

25.    The Coalition for Independent Technology Research

26.    Center for Investigative Reporting, Inc.

27.    CalMatters

28.    The Press Freedom Defense Fund

29.    The Society for the Rule of Law Institute

30.    American Civil Liberties Union

31.    American Civil Liberties Union of the District of Columbia

32.    The Associated Press

33.    The Atlantic Monthly Group LLC

34.    The Center for Investigative Reporting

35.    The Guardian U.S.

36.    The McClatchy Company, LLC

37.    National Newspaper Association

38.    National Press Photographers Association

39.    The New York Times Company

40.    Newsday LLC

41.    Online News Association

42.    Pro Publica, Inc.

43.    Radio Television Digital News Association

44.    Reporters Committee for Freedom of the Press

45.    The Seattle Times Company

46.    Society of Professional Journalists

### B.    Rulings under Review

References to the rulings at issue appear in the parties' briefs.

## C.    Related Cases

References to any related cases appear in the parties' briefs.

February 23, 2026                    Respectfully submitted,

                                    /s/ *Brendan Benedict*
                                    Brendan Benedict
                                    BENEDICT LAW GROUP PLLC
                                    322 G Street NE
                                    Washington, DC 20002
                                    (212) 287-9501
                                    *brendan@benedictlawgroup.com*

                                    *Counsel for* amici curiae

iv

## CORPORATE DISCLOSURE STATEMENT

*Amici* the Lawyers' Committee for Civil Rights Under Law, Asian Americans Advancing Justice | AAJC, Feminist Majority Foundation, Hispanic Federation, Japanese American Citizens League, The Leadership Conference on Civil and Human Rights, League of United Latin American Citizens, National Women's Law Center, The Sikh American Legal Defense and Education Fund, and United Church of Christ Media Justice Ministry, Inc., are nonprofit civil rights organizations that have issued no stock or stake to the public, and have no parent companies, subsidiaries, or affiliates that issued any stock or stake to the public.

**STATEMENT REGARDING CONSENT TO FILE AND JUSTIFICATION FOR SEPARATE BRIEFING**

All parties consented to the timely and rule-compliant filing of this brief. Pursuant to Circuit Rule 29(d), this brief is necessary for civil rights organizations to share their unique perspectives on the harm that online hate speech and discrimination pose to people of color and the chilling effect that subpoenas or investigatory demands like the one at issue to civil rights nonprofits will have on combating online discrimination. To avoid duplication, these ten civil rights groups have joined together to file this single brief.

February 23, 2026                    Respectfully submitted,

/s/ *Brendan Benedict*
Brendan Benedict
BENEDICT LAW GROUP PLLC
322 G Street NE
Washington, DC 20002
(212) 287-9501
brendan@benedictlawgroup.com

*Counsel for* amici curiae

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..........................................v

STATEMENT REGARDING CONSENT TO FILE AND JUSTIFICATION FOR SEPARATE BRIEFING.................................................................. vi

TABLE OF CONTENTS ....................................................... vii

TABLE OF AUTHORITIES...................................................... viii

GLOSSARY ..................................................................... xi

STATUTES AND REGULATIONS .................................... xii

IDENTITY AND INTEREST OF *AMICI CURIAE* .................................1

SUMMARY OF ARGUMENT...................................................4

ARGUMENT ...................................................................6

I.    Civil Rights Groups Do Not Violate Antitrust Laws When They Advocate for Advertiser Boycotts or for Commercial Actors to Address Online Hate and Discrimination...........................................................6

    A.    Addressing Online Hate Speech Has Surpassing Importance for Black Americans and Other People of Color. .................................6

    B.    The First Amendment Protects Antidiscrimination Boycotts from Antitrust Liability. ...............................................10

II.    Reversal Opens the Floodgates for Retaliation Against Civil Rights Groups that Combat Online Hate Speech...............................................13

    A.    Materials Sought by the CID Far Exceed Antitrust Relevance...........13

    B.    Dragnets Against Civil Rights Nonprofits Chill First Amendment Rights...............................................................16

CONCLUSION ...................................................................20

# TABLE OF AUTHORITIES

## Cases

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ......................................................................15

*CFPB v. Accrediting Council for Indep. Colls. & Sch.*,
  854 F.3d 683 (D.C. Cir. 2017) ................................................ 13, 14, 15

*FTC v. Am. Tobacco Co.*,
  264 U.S. 298 (1924), *abrogated in part by United States v. Morton Salt Co.*,
  338 U.S. 632 (1950) ......................................................................16

*FTC v. Ken Roberts Co.*,
  276 F.3d 583 (D.C. Cir. 2001) ..........................................................13

*FTC v. Superior Court Trial Lawyers Ass'n*,
  493 U.S. 411 (1990) ............................................................10, 11, 12

*FTC v. Texaco, Inc.*,
  555 F.2d 862 (D.C. Cir. 1977) (en banc) ..........................................13

*NAACP v. Claiborne Hardware Co.*,
  458 U.S. 886 (1982) ..................................................................10, 11

*United States v. Morton Salt Co.*,
  338 U.S. 632 (1950) ......................................................................13

## Statutes

15 U.S.C. § 57b-1(c)(2) ....................................................................13

## Books, Articles, and Reports

Anti-Defamation League, Ctr. for Tech. & Soc'y*, Online Hate and Harassment:
  The American Experience 2024* (June 2024), *available at*:
  https://shorturl.at/t7qv8......................................................................6, 7

Magdalena Celuch et al., *Self-Censorship Among Online Harassment Targets: The Role of Support at Work, Harassment Characteristics, and the Target's Public Visibility*, 27(11) Info., Comm. & Soc'y 2171 (Dec. 11, 2023), *available at*: https://shorturl.at/Pzu1y...........................................................................9

Kalyani Chadha et al., *Women's Responses to Online Harassment*, 14 Int'l J. Commc'ns 239 (2020) ..........................................................................10

Yulin Hswen et al., *Association of "#covid19" Versus "#chinesevirus" With Anti-Asian Sentiments on Twitter: March 9–23, 2020*, 111 Am. J. of Pub. Health 956 (May 2021). ........................................................................................8

Brian TaeHyuk Keum, *Impact of Online Racism on Suicide Ideation Through Interpersonal Factors Among Racial Minority Emerging Adults: The Role of Perceived Burdensomeness and Thwarted Belongingness*, 38(5-6) J. Interpersonal Violence 4537 (2022) ......................................................9

Brian TaeHyuk Keum & Matthew J. Miller, *Racism on the Internet: Conceptualization and Recommendations for Research*, 8(6) Psych. of Violence 782 (2018)................................................................................................6

Alyan Layug, et al., *The Impacts of Social Media Use and Online Racial Discrimination on Asian American Mental Health: Cross-sectional Survey in the United States During COVID-19*, 6 JMIR Form. Res. (2022), https://shorturl.at/URFIU ..........................................................................9

Adam M. McCready et al., *Students of Color, Mental Health, and Racialized Aggressions on Social Media*(2021), *available at*: https://shorturl.at/4yKvn .......8

*Russian Active Measures Campaigns and Interference in the 2016 U.S. Election: Russia's Use of Social Media with Additional Views*, S. Rep. No. 116-290, vol. 2 (2020), *available at*: https://shorturl.at/muhWF....................................9

Juan Del Toro & Ming-Te Wang, *Online Racism and Mental Health Among Black American Adolescents in 2020*, 62(1) J. Am. Acad. Child Adolescent Psych. 25 (2023)................................................................................................7

Brendesha Tynes et al., *Trajectories of Online Racial Discrimination and Psychological Functioning among African American and Latino Adolescents*, 91(5) Child Dev. 1577 (2020) ...................................................................7

Emily A. Vogels, Pew Rsch. Ctr., *The State of Online Harassment* (Jan. 13, 2021), https://shorturl.at/JdCy4 ......................................................................7

**Other Authorities**

AAP Pet. to Quash U.S. FTC's CID, Ex. 1 (Feb. 9, 2026), *available at*: https://www.ftc.gov/system/files/ftc_gov/pdf/AAP-PTQ.pdf.............................18

Erica Bryant, *Trump's War on Nonprofits Will Make Us All Less Safe*, Vera Inst. of Just. (June 10, 2025), https://shorturl.at/69aTu ....................................................18

Sheera Frenkel & Kate Conger, *Hate Speech's Rise on Twitter Is Unprecedented, Researchers Find*, N.Y. Times, https://shorturl.at/hb9cj (Dec. 2, 2022)...............8

@Grok, Tweet (Jul. 8, 2025), *available at*: https://archive.ph/YktYp.......................8

Statement of Damon T. Hewitt, *The New Invisible Hand? The Impact of Algorithms on Competition and Consumer Rights*, Hearing Before the Subcomm. on Competition Pol'y, Antitrust & Consumer Rts. of the S. Comm. on the Judiciary, 118th Cong. 16 (Dec. 13, 2023), *available at:* https://shorturl.at/73MFc ......................................................................17

David Ingram, *Verified Pro-Nazi X Accounts Flourish under Elon Musk*, NBC News (Apr. 16, 2024), https://shorturl.at/iJi20 ......................................................8

History, Lawyers' Committee for Civil Rights Under Law https://www.lawyerscommittee.org/history/ (last accessed Feb. 23, 2026).........11

The Leadership Conference on Civil Rights, *An Open Letter to Tech Companies* (Jan. 20, 2026), *available at*: https://shorturl.at/FKjvP ........................................10

Gregory Svirnovskiy, *Trump Deletes Racist Video Depicting Obamas as Monkeys After Bipartisan Backlash*, Politico (Feb. 6, 2026), https://shorturl.at/H7R4s ......7

WPATH Pet. to Quash U.S. FTC's CID, Ex. 1 (Feb. 9, 2026), *available at*: https://www.ftc.gov/system/files/ftc_gov/pdf/WPATH-PTQ.pdf ........................19

## GLOSSARY

CID      Civil Investigative Demand

## STATUTES AND REGULATIONS

All applicable statutes, rules, etc., are contained in the Brief for the

Defendants-Appellants.

## IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

Formed in 1963 at the request of President Kennedy, the **Lawyers'**
**Committee for Civil Rights Under Law** is a nonpartisan, nonprofit organization
using legal advocacy to pursue racial justice. The Lawyers' Committee fights
inside and outside the courts to ensure that Black people and other people of color
have the voice, opportunity, and power to make the promises of American
democracy real.

The Lawyers' Committee's Digital Justice Initiative works at the intersection
of racial justice, technology, data, and privacy. The Initiative combats online hate
and discrimination targeting Black Americans and other communities of color. It
regularly participates as an *amicus* in cases involving online discrimination,
election disinformation, and privacy. *See, e.g.*, *NetChoice, LLC v. Bonta*, No. 23-
2969 (9th Cir. 2023); *NetChoice, LLC v. Paxton*, No. 22-555 (2023), *Moody v.*
*NetChoice*, LLC, No. 22-277 (2023); *Gonzalez v. Google LLC*, 598 U.S. 617
(2023); *Vargas v. Facebook, Inc*., No. 21-16499 (9th Cir. 2023).

---

[1] No counsel for any party authored this brief in whole or part, and no person apart
from *amici* or their counsel contributed money intended to fund the brief's
preparation and submission.

**Asian Americans Advancing Justice | AAJC** ("Advancing Justice-AAJC") is a nonprofit, nonpartisan organization that seeks to empower Asian American communities and to create an equitable society for all.

**Feminist Majority Foundation** is a national organization dedicated to women's economic, legal and political equality and empowerment.

Through advocacy, community programs, and partnerships with nonprofits, **Hispanic Federation** works to uplift millions of children, youth, individuals, and families across over 40 states and territories.

The **Japanese American Citizens League** is a national organization whose ongoing mission is to secure and maintain the civil rights of Japanese Americans and all others who are victimized by injustice and bigotry.

**The Leadership Conference on Civil and Human Rights** is a coalition of more than 240 national organizations fighting to protect, defend, and expand the rights of every person in the United States.

The **League of United Latin American Citizens** ("LULAC") is the nation's oldest and largest Latino civil rights organization. Founded in 1929, LULAC's mission is to improve the lives of Latino families throughout the United Sates and to protect their civil rights in all respects. With more than 575,000 members nationwide, LULAC is committed to advancing the rights and opportunities of Latino Americans through advocacy, community building, and education.

The **National Women's Law Center** ("NWLC") fights for gender justice—in the courts, in public policy, and in our society—working across the issues that are central to the lives of women and girls. NWLC uses the law in all its forms to change culture and drive solutions to the gender inequity that shapes our society and to break down the barriers that harm all of us—especially women of color, LGBTQ people, and low-income women and families.

The **Sikh American Legal Defense and Education Fund** ("SALDEF") is a national civil rights organization dedicated to protecting the constitutional and civil rights of Sikh Americans through public policy, advocacy, and public education.

The United Church of Christ, a mainline protestant denomination, established its Media Justice Ministry in 1959, which is known today as **UCC Media Justice** (United Church of Christ Media Justice Ministry, Inc.). It advocates for equitable, affordable and accountable media and technology to promote a just world for all.

*Amici* share concerns about the harms online hate speech and discrimination present for people of color. As nonprofits, they are also concerned that advocacy opposing online hate speech and discrimination could be subject to retaliatory investigation. *Amici* such as the Lawyers' Committee and the United Church of Christ have defended or participated in boycotts.

## SUMMARY OF ARGUMENT

The prevalence of online discrimination and hate speech poisons life in America, especially for Black people and other people of color. CIDs like the Commission's to Media Matters chill advocacy to combat hate speech and discrimination, and to advance civil rights.

*First*, online racial discrimination and hate speech degrade the quality of life for people of color. (*See* Part I.A.) Black people and other people of color encounter a uniquely high incidence and targeted quality of hateful material about their races. And the frequency and scale of online hate speech continue to climb. Constant exposure to racist slurs, tropes, and stereotypes increases stress, depression, and anxiety for people of color, and it chills their free expression and full participation in American social life. *Amici* like the Lawyers' Committee play a critical role in shedding light on online hate and discrimination, advocating for measures to curb hateful and discriminatory content and educating and engaging with tech platforms and commercial entities that interact with them to foster equal enjoyment of the Internet.

*Second*, antidiscrimination boycotts are categorically protected from antitrust liability by the First Amendment. (*See* Part I.B.) This tradition dates to the Civil Rights era, where the Lawyers' Committee itself defended the NAACP in its boycott of white businesses in Mississippi. While advertiser boycotts are distinct,

4

the underlying legal test is the same: boycotts have antitrust immunity when they are directed toward social and political change rather than profits. When nonprofit organizations like civil rights organizations organize boycotts or encourage measures to address hate and discrimination, their conduct enjoys First Amendment protection.

*Third*, while the Commission claims that the preliminary injunction "undercuts an important investigation" and that the public has an interest "in the vigorous enforcement of the antitrust laws" (FTC Br. 54), much of the material sought from Media Matters is irrelevant to establishing a violation of Section 1 of the Sherman Act; if anything, the FTC's potential liability theory represents "an improper excursion beyond the outer limits of the Sherman Act", *FTC v. Qualcomm Inc.*, 935 F.3d 752, 757 (9th Cir. 2019). The public interest in free and fair competition is not harmed by prohibiting retaliation against a third party not alleged to be a conspirator. (*See* Part II.A.)

*Fourth*, by contrast, the public interest would be significantly harmed by opening the door to a dragnet against civil rights organizations and all those who report on, advocate against, or bring awareness to hate speech on the Internet on the theory that their organizational charts or finances might reveal an agreement reached by others. (*See* Part II.B.) That real and present danger of chilling lawful activity far outweighs whatever speculative benefit could be had from receiving

5

materials responsive to the overbroad CID. The Commission's investigation

vitiates the very free speech rights that it claims the investigation exists to

vindicate. The Court should affirm.

## ARGUMENT

I.    **Civil Rights Groups Do Not Violate Antitrust Laws When They
      Advocate for Advertiser Boycotts or for Commercial Actors to Address
      Online Hate and Discrimination.**

   A.    **Addressing Online Hate Speech Has Surpassing Importance for
         Black Americans and Other People of Color.**

A poisonous current of online hate speech constantly degrades the lives of

Black people in America. The anonymity, scale, and ease of online harassment

make it more common—and more explicit—than face-to-face racial harassment.

*See, e.g.*, Brian TaeHyuk Keum & Matthew J. Miller, *Racism on the Internet:

Conceptualization and Recommendations for Research*, 8(6) Psych. of Violence

782, 783 (2018). And its prevalence is on the rise. *See* Anti-Defamation League,

Ctr. for Tech. & Soc'y, *Online Hate and Harassment: The American Experience

2024* 13 (June 2024), *available at*: https://shorturl.at/t7qv8 (reporting that 56% of

all Americans have experienced online harassment in their lives and 22% have

experienced severe online harassment in the past twelve months, with the annual

figure increasing).

While no group is insulated from this content, Black people and other people

of color encounter a uniquely high incidence and targeted quality of hateful

material about their races. One study of online harassment found that 54% of Black online harassment targets and 47% of Hispanic targets experienced the harassment "due to their race or ethnicity, compared with 17% of White targets." Emily A. Vogels, Pew Rsch. Ctr., *The State of Online Harassment* (Jan. 13, 2021), https://shorturl.at/JdCy4. Another study found the same for 44% of Asian American respondents. *See* Anti-Defamation League, *Online Hate*, at 14. As another example, a pandemic-era study found that 45% of Black adolescents surveyed reported at least one instance of racial discrimination on the Internet in a two-week span. *See* Juan Del Toro & Ming-Te Wang, *Online Racism and Mental Health Among Black American Adolescents in 2020*, 62(1) J. Am. Acad. Child Adolescent Psych. 25, 29 (2023).

This hateful content can include racial epithets, such as stereotypes of Black people as lazy, unintelligent, or criminal, and images depicting Black people as animals. *See* Brendesha Tynes et al., *Trajectories of Online Racial Discrimination and Psychological Functioning among African American and Latino Adolescents*, 91(5) Child Dev. 1577, 1578 (2020). Even the sitting President of the United States unapologetically posted a meme depicting the country's first Black President and First Lady as monkeys. *See* Gregory Svirnovskiy, *Trump Deletes Racist Video Depicting Obamas as Monkeys After Bipartisan Backlash*, Politico (Feb. 6, 2026), https://shorturl.at/H7R4s.

Online platforms like Twitter/X can be megaphones for white supremacists in particular. One report found at least 150 "Premium" subscribers to X regularly posting pro-Nazi material; just seven of these posts reached 4.5 million views. *See* David Ingram, *Verified Pro-Nazi X Accounts Flourish under Elon Musk*, NBC News (Apr. 16, 2024), https://shorturl.at/iJi20. X's artificial intelligence bot, "Grok," called itself "MechaHitler" last year. @Grok, Tweet (Jul. 8, 2025), *available at*: https://archive.ph/YktYp. And after Elon Musk acquired Twitter (rebranding it as X), the number of "slurs against Black Americans" appearing on the site daily increased to 3,876 from 1,282. Sheera Frenkel & Kate Conger, *Hate Speech's Rise on Twitter Is Unprecedented, Researchers Find*, N.Y. Times (Dec. 2, 2022), https://shorturl.at/hb9cj. That's on top of the surge in anti-Asian language during the pandemic, as one recent study found. *See* Yulin Hswen et al., *Association of "#covid19" Versus "#chinesevirus" With Anti-Asian Sentiments on Twitter: March 9–23, 2020*, 111 Am. J. of Pub. Health 956 (May 2021).

These kinds of online discrimination tangibly harm people of color. Psychological effects can include increased stress, depression, and anxiety. *See* Adam M. McCready et al., *Students of Color, Mental Health, and Racialized Aggressions on Social Media* 2-3 (2021), *available at*: https://shorturl.at/4yKvn; *see also* Alyan Layug, et al., *The Impacts of Social Media Use and Online Racial Discrimination on Asian American Mental Health: Cross-sectional Survey in the*

8

*United States During COVID-19*, 6 JMIR Form. Res. 9 (2022),

https://shorturl.at/URFIU (finding that "individual and vicarious forms of online

discrimination experienced during the COVID-19 pandemic were found to be

positively associated with [secondary traumatic stress], depression, and anxiety");

Brian TaeHyuk Keum, *Impact of Online Racism on Suicide Ideation Through*

*Interpersonal Factors Among Racial Minority Emerging Adults: The Role of*

*Perceived Burdensomeness and Thwarted Belongingness*, 38(5-6) J. Interpersonal

Violence 4537, 4553 (2022) (finding that "online racism significantly predicted

suicide ideation").

  These effects, in turn, can chill the exercise of free speech. One study "found

that approximately 18% of professionals targeted with online harassment reported

self-censorship." Magdalena Celuch et al., *Self-Censorship Among Online*

*Harassment Targets: The Role of Support at Work, Harassment Characteristics,*

*and the Target's Public Visibility*, 27(11) Info., Comm. & Soc'y 2171, 2186 (Dec.

11, 2023), *available at*: https://shorturl.at/Pzu1y. Even Russian election

interference has targeted Black Americans specifically to dissuade them "from

participating in the 2016 presidential election". *Russian Active Measures*

*Campaigns and Interference in the 2016 U.S. Election: Russia's Use of Social*

*Media with Additional Views*, S. Rep. No. 116-290, vol. 2, at 59 (2020), *available*

*at*: https://shorturl.at/muhWF. And women are more likely to self-censor or

9

withdraw from platforms after experiencing cyber bullying. *See* Kalyani Chadha et al., *Women's Responses to Online Harassment*, 14 Int'l J. Commc'ns 239, 247-48 (2020).

    *Amici* support the efforts of technology platforms to moderate this content. But if they underinvest in resources to make combating hate speech and discrimination a priority, then public criticism, advocacy, and avoidance are all important strategies to encourage them to act. *See, e.g.*, The Leadership Conference on Civil Rights, *An Open Letter to Tech Companies* (Jan. 20, 2026), *available at*: https://shorturl.at/FKjvP.

### B.    The First Amendment Protects Antidiscrimination Boycotts from Antitrust Liability.

    The background First Amendment principles governing liability for boycotts undertaken for social or political purposes are important in considering the balance of the equities struck by this preliminary injunction and the risk of contagion for civil rights groups that this CID presents, as discussed below (*see* Part II).

    In a series of cases, the Supreme Court has recognized a First Amendment right for consumers to engage in boycotts for political or social purposes. *See FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411 (1990); *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982). *Claiborne Hardware* was a case the Lawyers' Committee litigated through to the Supreme Court. *See* History, Lawyers' Committee for Civil Rights Under Law https://www.lawyerscommittee.org/history/

10

(last accessed Feb. 23, 2026). There, Black citizens boycotted white businesses in Claiborne County, Mississippi, and the businesses sued in State court to recoup their losses. *See Trial Lawyers*, 493 U.S. at 426. Mississippi's Supreme Court upheld the imposition of liability on a tort theory, but rejected reference to State antitrust law, explaining that the "United States Supreme Court has seen fit to hold boycotts to achieve political ends are not a violation of the Sherman Act," which the State law was modeled on. *Claiborne Hardware*, 458 U.S. at 894.

The U.S. Supreme Court reversed the imposition of liability altogether. *Id.* at 934. It explained that while the boycotters "certainly foresaw—and directly intended—that the merchants would sustain economic injury as a result of their campaign", "the purpose" of the boycott "was not to destroy legitimate competition." *Id.* at 914. It held that nonviolent speech "to protest racial discrimination is essential political speech lying at the core of the First Amendment." *Id.* at 915 (cleaned up). The ruling recognized that "[e]quality and freedom are preconditions of the free market, and not commodities to be haggled over within it." *Trial Lawyers*, 493 U.S. at 427. Boycotts designed to achieve "an economic advantage for those who agreed to participate", by contrast, fall outside the First Amendment's protection when they violate Section 1 of the Sherman Act. *Id.* at 426.

To be sure, advertiser boycotts of Twitter/X or other platforms differ from the boycotts of segregation during the Civil Rights era. But as for Sherman Act liability, the First Amendment question remains the same: whether the boycott is directed toward generating an economic advantage for the participants. In the *Trial Lawyers* case, attorneys agreeing with each other not to take court-appointed cases without an increase in the fees compensable for that work sought an economic advantage from their concerted effort—action deemed by the Supreme Court to be unprotected by the First Amendment. *Id.* at 428.

Unlike advertisers that presumably seek to maximize profits in choosing where to place ads, media platforms such as Media Matters that shed light on hate speech, or civil rights groups like the Lawyers' Committee that seek to influence the behavior of advertisers or platforms, have no economic purpose. As nonprofits, they do not "stand to profit financially" at all. *Id.* at 427 (cleaned up). If the Lawyers' Committee or Media Matters were defendants in antitrust suits premised on boycotts for a social or political purpose, there would be no question of their immunity from liability on First Amendment grounds. It is thus vitally important that the Court prevent the Government from achieving through its investigatory powers what it may not achieve in an action seeking to impose antitrust liability. As explained below, even a CID can have a significant chilling effect on the ability to advocate.

12

## II.   Reversal Opens the Floodgates for Retaliation Against Civil Rights Groups that Combat Online Hate Speech.

The sheer magnitude of the CID's overbreadth to advance the stated and defective purpose of the FTC's investigation tilts the balance of equities sharply in favor of Media Matters, given the chilling effect it will have on Media Matters and groups that advocate for civil rights.

### A.   Materials Sought by the CID Far Exceed Antitrust Relevance.

In the related context of an action to enforce a CID, "courts consider only whether '(1) the inquiry is within the authority of the agency, (2) the demand is not too indefinite and (3) the information sought is reasonably relevant.'" *CFPB v. Accrediting Council for Indep. Colls. & Sch.*, 854 F.3d 683, 688 (D.C. Cir. 2017) (quoting *FTC v. Ken Roberts Co.*, 276 F.3d 583, 586 (D.C. Cir. 2001) (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950))) (brackets omitted). Because "an investigating agency is under no obligation to propound a narrowly focused theory of a *possible* future case" in the investigatory phase, "the relevance of the agency's subpoena requests may be measured only against the general purposes of its investigation." *FTC v. Texaco, Inc.*, 555 F.2d 862, 874 (D.C. Cir. 1977) (en banc) (emphasis in original). And so "the validity of a CID is measured by the purposes stated in the notification of purpose." *Accrediting Council*, 854 F.3d at 690; *see also* 15 U.S.C. § 57b-1(c)(2) (requiring FTC CIDs to "state the nature of the conduct constituting the alleged violation which is under investigation

and the provision of law applicable to such violation"). But "broad language used to describe the purpose makes it impossible to apply the other prongs of the *Morton Salt* test." *Accrediting Council*, 854 F.3d at 691 (cleaned up).

That's what happened here. Compare the FTC's language in the "subject of the investigation" section of the CID to Media Matters, as clarified in July 2025 (App.115, App.118), with what this Court found lacking in *Accrediting Council*:

| *Accrediting Council* CID language, 854 F.3d at 686 | Media Matters CID language, App.115, App.118 |
|---|---|
| The purpose of this investigation is to determine whether any entity or person has engaged or is engaging in unlawful acts and practices in connection with accrediting for-profit colleges, in violation of sections 1031 and 1036 of the Consumer Financial Protection Act of 2010, 12 U.S.C. §§ 5531, 5536, or any other Federal consumer financial protection law. | [W]hether any natural persons, partnerships, corporations, associations, or other legal entities . . . are engaging in unfair, anticompetitive, collusive, or exclusionary acts or practices -- including inviting, participating in, or facilitating boycotts or other collusion or coordination -- to withhold, degrade, increase the cost of, or otherwise diminish the quantity of advertising placed on news outlets, media platforms, or other publishers in violation of Section 1 of the Sherman Act . . . or Section 5 of the FTC Act . . . or any other statutes or rules enforced by the Commission . . . . |

As with the CID in *Accrediting Council*, the CID to Media Matters describes its purpose as investigating whether "any" person or entity engaged in unlawful conduct (here specified as unfair or anticompetitive conduct) in connection with a broad industry. The Media Matters CID follows the same formula as the CID this

14

Court rejected in *Accrediting Council*; it only adds abstract examples of potentially unlawful conduct subject to the FTC's investigation. By listing this series of examples after "including," the Media Matters CID offers them as several examples among any "other collusion or coordination" or the violation of "any other statutes or rules enforced by the Commission" subject to its investigation— hardly limiting language.

Additionally, the FTC's modified CID to Media Matters cites a potential violation of Section 1 of the Sherman Act. "[T]he crucial question" under Section 1 "is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express". *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007) (quotations omitted) (cleaned up); *see also id.* at 557 ("A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim".).

But the materials sought from Media Matters go beyond what could show evidence of an agreement. They include "organizational charts from 2018 through the present . . . sufficient to show all Media Matters personnel over the same time period" and, from January 1, 2019 through the present, "all documents relating to efforts by any person to create or advance brand safety tools"; "all documents relating to any complaints that Media Matters received related to its activities, programs, or policies"; "each financial statement, budget, profit and loss statement,

cost center report" and the like "prepared by or for Media Matters"; and more besides. App.118-120. In short, the Commission seeks nothing less than an accounting of all Media Matters personnel, all disputes it has had with any other person or entity, and all of its financials over what is now seven or eight years.

It is hard to imagine how these third-party financials or personnel are "reasonably relevant" to the FTC's stated purpose. *See FTC v. Am. Tobacco Co.*, 264 U.S. 298, 307 (1924) (Holmes, J.) (possibility that tobacco company could have documents "so connected with charges of unfair competition . . . as to be relevant . . . does not warrant a demand for the whole" of information on its activities), *abrogated in part by Morton Salt*, 338 U.S. at 652. In short, the materials sought from Media Matters go far beyond the key question of whether an anticompetitive agreement was formed and even what is relevant to its attenuated antitrust theory.

### B.    Dragnets Against Civil Rights Nonprofits Chill First Amendment Rights.

Vacating the injunction and upholding the CID to Media Matters would invite the government to bring down its considerable might against "policy and advocacy groups", FTC Br. 11—including *amici* and any others that challenge the government, its allies, or its policy objectives.

Take the Lawyers' Committee. Its President and Executive Director testified before the Senate Judiciary Committee's Subcommittee on Competition Policy,

16

Antitrust, and Consumer Rights. He recounted numerous examples of hate speech, discrimination, or algorithmic bias on platforms hosted by Twitter/X, Meta, and Google.[2] If the Commission's limitless theory of investigatory scope were upheld, the Commission could target the Lawyers' Committee with a future CID in this very investigation on the theory that its advocacy against hate speech relates to a group boycott by advertisers of these platforms. As with Media Matters in the absence of an injunction, such a CID could call for the Lawyers' Committee to divert its limited donated resources away from advocacy and toward expensive litigation, document review, and document production—not just of communications purportedly relevant to anticompetitive conduct, but of all its personnel, all its finances, and all the disputes it has had with anyone going back years.

Such a punitive and overbroad CID will have a chilling effect on *amici*'s free speech and petitioning rights. Any civil rights organization subject to such a subpoena may think twice about publishing written advocacy, testifying before government bodies, or communicating with businesses and individuals. Businesses

---

[2] *See* Statement of Damon T. Hewitt, *The New Invisible Hand? The Impact of Algorithms on Competition and Consumer Rights*, Hearing Before the Subcomm. on Competition Pol'y, Antitrust & Consumer Rts. of the S. Comm. on the Judiciary, 118th Cong. 16, 31, 33-35 (Dec. 13, 2023), *available at:* https://shorturl.at/73MFc.

and individuals, in turn, could fear that their communications with civil rights groups would make them targets, too. *See* App.120 (seeking "all communications between Media Matters and any other person regarding any request for Media Matters to label any news, media, sources, outlets, platforms, websites, or other content publisher entities for . . . 'hate speech,'" among other categories).

This risk is more than a mere possibility, and it is not confined to *amici*. Under this administration, the Government has launched investigations or taken regulatory action against law firms, journalistic institutions, universities, "the American Bar Association, the United States Institute of Peace, the Chinese-American Planning Council, NeighborWorks," and others still. Erica Bryant, *Trump's War on Nonprofits Will Make Us All Less Safe*, Vera Inst. of Just. (June 10, 2025), https://shorturl.at/69aTu. The risk is particularly acute for nonprofits, which lack the resources of for-profit businesses and the large endowments of prominent universities. The Commission, for its part, recently issued CIDs to two more nonprofits—the American Academy of Pediatrics ("AAP") and the World Professional Association for Transgender Health ("WPATH")—purportedly an exercise of the Commission's authority to investigate unfair or deceptive practices.[3]

---

[3] *See* AAP Pet. to Quash U.S. FTC's CID, Ex. 1 (Feb. 9, 2026), *available at*: https://www.ftc.gov/system/files/ftc_gov/pdf/AAP-PTQ.pdf; WPATH Pet. to

Allowing CIDs such as the Commission's CID to Media Matters may cripple nonprofit efforts to advocate for the public interest causes. The chilling effect of the Commission's CID would "reduce available content and limit the range of voices participating in debates about matters of public importance, seriously harming free speech"—exactly the concern that the Commission says motivates this investigation in the first place. FTC Br. 17.

Without voices such as the Lawyers' Committee's and those of other civil rights organizations challenging technology platforms when they facilitate the distribution of hateful or discriminatory content, online hate will continue to poison the lives of Black people and other people of color in America. Whatever the merits of the Commission's novel theories on the frontiers of antitrust liability, the equities do not favor that.

---

Quash U.S. FTC's CID, Ex. 1 (Feb. 9, 2026), *available at*:
https://www.ftc.gov/system/files/ftc_gov/pdf/WPATH-PTQ.pdf.

## CONCLUSION

For all these reasons, the Court should affirm the entry of the preliminary injunction.

February 23, 2026                    Respectfully submitted,

                                     /s/ *Brendan Benedict*

Edward G. Caspar                     Brendan Benedict
Leah Frazier                         Michael D. Altebrando
Gillian Cassell-Stiga                BENEDICT LAW GROUP PLLC
LAWYERS' COMMITTEE FOR               322 G Street NE
CIVIL RIGHTS UNDER LAW               Washington, DC 20002
1500 K Street NW, Suite 900          (212) 287-9501
Washington, DC 20005                 *brendan@benedictlawgroup.com*
(202) 662-8600

                *Counsel for* Amici Curiae

20

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(A)(5) because, including the Appendix but excluding the parts of the document exempted by FRAP 32(f) and Circuit Rule 32(e), this document contains 4,236 words. This document complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6) because it has been prepared in proportionally spaced serif typeface (14-point Century Schoolbook and Times New Roman) using Microsoft Word for Office 365.

*/s/ Brendan Benedict*
Brendan Benedict

## CERTIFICATE OF SERVICE

I certify that on February 23, 2026, I served this brief on all parties or their counsel of record through the CM/ECF system.

*/s/ Brendan Benedict*
Brendan Benedict