**ORAL ARGUMENT NOT YET SCHEDULED**

No. 25-5302

IN THE

# United States Court of Appeals
# for the District of Columbia Circuit

MEDIA MATTERS FOR AMERICA,

*Plaintiff-Appellee,*

v.

FEDERAL TRADE COMMISSION, *et al.*,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Columbia, No. 1:25-cv-01959-SLS
Hon. Sparkle L. Sooknanan, J.

## PLAINTIFF-APPELLEE'S BRIEF IN
## OPPOSITION TO MOTION FOR STAY

STEPHEN P. ANTHONY
RYAN K. QUILLIAN
DANA A. REMUS
KUNTAL V. CHOLERA
BRENDEN J. CLINE
BRIGID P. LARKIN
SARAH LEADEM
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C. 20001-4956
202-662-6000

NATHANIEL A.G. ZELINSKY
MARY L. DOHRMANN†
JAMES I. PEARCE††
WASHINGTON LITIGATION GROUP
5335 Wisconsin Ave, NW, Suite 440
Washington, D.C. 20015
202-521-8750
nzelinsky@washingtonlitigationgroup.org

† *Admitted only in New York; practicing under the supervision of D.C. Bar Members.*
†† *Admitted only in New York and North Carolina; practicing under the supervision of D.C. Bar Members.*

*Counsel for Plaintiff-Appellee Media Matters for America*

September 2, 2025                    *Additional counsel listed on inside cover*

KATHERINE M. PEASLEE
SUSMAN GODFREY LLP
401 Union Street, Suite 3000
SEATTLE, WA 98101
206-516-3880

JUSTIN A. NELSON
MATTHEW BEHNCKE
ALEXANDRA FOULKES GRAFTON
SUSMAN GODFREY LLP
1000 Louisiana Street, Suite 5100
Houston, TX 77002-5096
713-651-9366

*Counsel for Plaintiff-Appellee Media Matters for America*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES, AND CORPORATE DISCLOSURE STATEMENT

Plaintiff-Appellee Media Matters for America submits this Certificate as to Parties, Rulings and Related Cases, and Corporate Disclosure Statement:

### A.     Parties and Amici

Media Matters for America was the plaintiff in the district court and is the Appellee before this Court.  The Federal Trade Commission, Andrew N. Ferguson, Mark R. Meador, Melissa Ann Holyoak, and two John Does were defendants in the district court and are Appellants in this Court.

### B.     Rulings Under Review

The district court (Sookanan, J.) issued a preliminary injunction and an accompanying opinion on August 15, 2025.  The district court's opinion granting a preliminary injunction ("Op.") and the opinion denying a stay pending appeal ("Stay Op.") are included in the separately filed Appendix.

### C.     Related Cases

This case has not previously been before this Court or another district court. Two cases involving similar issues and Media Matters were before this Court, *see Media Matters for Am. v. Paxton*, No. 24-7059 (D.C. Cir.) and *Media Matters for Am. v. Bailey*, No. 24-7141 (D.C. Cir.), and the United States District Court for the District of Columbia, *see Media Matters for Am. v. Paxton*, No. 1:24-cv-00147 (D.D.C.), and *Media Matters for Am. v. Bailey*, No. 1:24-cv-00147 (D.D.C.).

## D.     Corporate Disclosure Statement

Media Matters is a not-for-profit research center and media watchdog.  It has no parent company and no publicly-held company has a 10% or greater ownership interest in the entity.

September 2, 2025                    /s/ Nathaniel A.G. Zelinsky
                                     NATHANIEL A.G.  ZELINSKY
                                     5335 Wisconsin Ave, NW, Suite 440
                                     Washington, D.C. 20015
                                     202-521-8750
                                     nzelinsky@washingtonlitigationgroup.org

                                     *Counsel for Media Matters for America*

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................1

STATEMENT OF THE CASE....................................................................5

STANDARD OF REVIEW .........................................................................7

ARGUMENT ..............................................................................................7

I.     Media Matters Is Likely To Prevail On The Merits.........................7

       A.     The Government's *Thunder Basin* Argument Is Meritless..................8

       B.     The Government Likely Engaged In First Amendment
              Retaliation. ...........................................................................14

II.    The Government Will Not Suffer Irreparable Harm. ....................21

III.   The Remaining Factors Strongly Favor Media Matters..............23

CONCLUSION ........................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ams. for Prosperity Found. v. Bonta*,
   594 U.S. 595 (2021)...............................................................................19

*Arch Coal, Inc. v. Acosta*,
   888 F.3d 493 (D.C. Cir. 2018)................................................................8

*Axon Enter., Inc. v. FTC*,
   598 U.S. 175 (2023)................................................................3, 8, 9, 10, 13

*Belle Fourche Pipeline Co. v. United States*,
   751 F.2d 332 (10th Cir. 1984) .............................................................12

*FTC v. Claire Furnace Co.*,
   274 U.S. 160 (1927)..............................................................3, 4, 11, 12

*Gonzalez v. Trevino*,
   60 F.4th 906 (5th Cir. 2023) ...............................................................21

*Jibril v. Mayorkas*,
   101 F.4th 857 (D.C. Cir. 2024)...........................................................20

*KalshiEX LLC v. CFTC*,
   119 F.4th 58 (D.C. Cir. 2024)................................................4, 21, 22

*Keaveney v. SRA Int'l, Inc.*,
   No. 1:13-cv-00855, 2017 WL 1842544 (D.D.C. May 3, 2017).........................20

*League of Women Voters of U.S. v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016)................................................................23

*Media Matters for Am. v. Paxton*,
   138 F.4th 563 (D.C. Cir. 2025).......................................1, 6, 7, 11, 12

*NAACP v. Claiborne Hardware Co.*,
   458 U.S. 886 (1982)..........................................................................16

*Nat'l Rifle Ass'n of Am. v. Vullo*,
   602 U.S. 175 (2024).....................................................................4, 17

*Nken v. Holder*,
    556 U.S. 418 (2009)...................................................................................7

*Reisman v. Caplin*,
    375 U.S. 440 (1964)............................................................................11, 12

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
    592 U.S. 14 (2020)............................................................................10, 23

*Stanford v. Texas*,
    379 U.S. 476 (1965)...............................................................................19

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994).................................................. 2, 3, 7, 8, 9, 10, 11, 12, 13

*Trump v. CASA, Inc.*,
    145 S. Ct. 2540 (2025)........................................................................14, 22

*United States v. Stanchich*,
    550 F.2d 1294 (2d Cir. 1977) .....................................................................17

*W. Va. State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943)..................................................................................1

*Walden v. Ga.-Pac. Corp.*,
    126 F.3d 506 (3d Cir. 1997) .......................................................................19

**Statute**

28 U.S.C. §1331 .........................................................................................8

**Other Authorities**

Dana Mattioli, Rebecca Ballhaus, & Josh Dawsey, *Inside Mark
    Zuckerberg's Failed Negotiations to End Antitrust Case*, WSJ
    (Apr. 15, 2025), https://perma.cc/AGV4-5A46...................................................19

*FTC Commissioner Andrew N. Ferguson for FTC Chairman*,
    Punchbowl News (June 22, 2025), https://perma.cc/A56K-Q4YM.................................15

*Transcript: FTC Chairman Andrew Ferguson Keynote*, Promarket
    (Apr. 17, 2025), https://perma.cc/R8FT-4LLJ ................................................15

## INTRODUCTION

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).[1] But in this appeal, the federal government has attempted what the Constitution forbids.

In November 2023, after Elon Musk purchased X—formerly known as Twitter—Media Matters reported that advertisements were appearing next to antisemitic and pro-Nazi posts. Musk vowed to initiate a "thermonuclear lawsuit against Media Matters," and filed harassing actions around the world. Op. 1. The Missouri and Texas Attorneys General issued extraordinarily broad civil investigatory demands (CIDs) against Media Matters—for the purpose of retaliating against Media Matters for its speech. *Id.* at 1-2.

Courts largely halted those retaliatory efforts. The D.C. district court preliminarily enjoined the states on First Amendment grounds, leading Missouri to settle this February. *See* Op. 43. In April, a federal court enjoined Elon Musk's lawsuit in Ireland and any future international litigation. In May, this Court affirmed the injunction against Texas. *See Media Matters for Am. v. Paxton*, 138 F.4th 563 (D.C. Cir. 2025).

---

[1] Unless noted, internal quotation marks, ellipses, and brackets have been omitted.

Undeterred, in May, the Federal Trade Commission (FTC) launched the next salvo.  Mimicking Missouri and Texas, the FTC issued an even broader CID to investigate so-called "advertiser boycotts."  That justification is intertwined with the campaign against Media Matters: Musk and his allies blame Media Matters for its speech encouraging advertisers to pull ads from X.  The effects of the retaliatory CID were severe.  Media Matters has been forced to modify operations, and organizations refuse to partner with Media Matters, fearing it will disclose sensitive information to the government.  Op. 12-13.

As the district court explained, this "was a straightforward First Amendment violation."  *Id.* at 1.  The timing—coming on the heels of judicial decisions protecting Media Matters—indicated the FTC "wanted to continue the years' long pressure campaign against" the organization.  Op. 43.  The FTC's new chairman had bragged about "standing up to the radical left," and senior staffers had targeted Media Matters in nakedly "ideological terms."  Op. 40-42.  Based on the developed record, the district court issued a preliminary injunction.

For two independent reasons, this Court should deny the FTC's request for a stay pending appeal: (i) the FTC is not likely to prevail on appeal; and (ii) the FTC has not demonstrated irreparable harm.

Start with the FTC's threshold jurisdictional arguments.  Citing *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), the FTC argues that Media Matters

must wait to challenge the retaliatory CID until *after* the FTC sues to enforce it in district court—leaving Media Matters to suffer unconstitutional retaliation in the interim.

As a preliminary matter, this isn't a *Thunder Basin* case. *Thunder Basin* supplies the framework when Congress enacts a scheme for "review *in a court of appeals* following the agency's own review process." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185 (2023) (emphasis added). Even under the FTC's view, this case will end up right back in district court. The FTC just wants the ability to file parallel litigation (perhaps to forum shop)—or maybe never sue and leave the CID hanging overhead.

But there is an even more fundamental reason the FTC's *Thunder Basin* argument fails: Even under *Thunder Basin*, plaintiffs may proceed directly to district court to remedy "here-and-now" constitutional injuries. *Id*. at 185. That describes this case. The FTC's CID caused irreparable constitutional injury to Media Matters: It undermined the organization's operations and caused third parties to shun it. The only way for Media Matters to remedy those First Amendment harms was to sue.

The fact that the CID caused Media Matters irreparable constitutional harm also explains why this case is unlike *FTC v. Claire Furnace Co.*, 274 U.S. 160 (1927), on which the FTC primarily relies. In *Claire Furnace*, the Supreme Court stressed that the plaintiffs had *not* suffered immediate harm on the facts of that case.

3

Meanwhile, post *Claire Furnace* precedent confirms that CID recipients can sue to remedy immediate harms, and this Court recently reached a similar conclusion in *Paxton*.

The FTC next tries to relitigate the facts in an emergency stay posture by plucking pieces of evidence "in isolation" to produce seemingly innocent explanations. *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 178 (2024). None withstands scrutiny. The Court should decline to overturn the district court's factual analysis—which is reviewed for clear error—in an emergency motion.

The Court can additionally deny the stay for an independent reason: The FTC cannot show irreparable harm which "is a necessary prerequisite for a stay." *KalshiEX LLC v. CFTC*, 119 F.4th 58, 64 (D.C. Cir. 2024). The agency's own conduct disproves its claim that it needs to proceed against Media Matters immediately: The FTC previously delayed the CID's return date *indefinitely* pending the outcome of the district court litigation. ECF 39-2 at 2.

This point bears underscoring. The FTC cannot explain why it is so critical to enforce this one CID against this one organization for the brief period in which the appeal is pending. At some point, the word "emergency" must mean something, and there just isn't the kind of emergency that warrants extraordinary relief for the government.

Nor will enforcing the First Amendment *in this one case* grind "civil and criminal investigations" to halt in the ordinary case. Mot. 1. This appeal is anything but typical. The district court issued a preliminary injunction based on a developed record of persecution against Media Matters—which is the latest iteration in a sustained campaign of retaliation found by multiple courts.

The lack of harm to the FTC contrasts sharply with the harm to Media Matters—which suffered ongoing constitutional injuries from the CID. Because the prompt resolution of this matter will help dispel any lingering cloud, Media Matters requests expedited merits briefing, so that this appeal can proceed to a swift conclusion.

The Court should deny the stay.

## STATEMENT OF THE CASE

1. After Elon Musk purchased Twitter, Media Matters covered the rise of extremist content on the platform. Op. 5. One article from November 2023 went viral. It detailed how major companies' advertisements were appearing next to pro-Nazi material. *Id*.

In response, Musk vowed a "thermonuclear lawsuit." *Id*. Missouri and Texas announced investigations, followed by extremely broad CIDs. *Id*. Musk's company sued Media Matters internationally. *Id*. The company also filed suit in the United

States—not in California, as required by X's then-operative terms of service, but in the Northern District of Texas.  ECF 1 at 17.

Except for the matter in the Northern District of Texas, federal courts have not allowed these efforts to proceed.  The D.C. district court preliminarily enjoined Texas's CID in April 2024 and Missouri's in August.  Op. 7.  Missouri settled in February 2025.  *Id.*  In April, a court enjoined Musk's lawsuit in Ireland and any future international lawsuits.  Op. 8.

In May, this Court affirmed the injunction against Texas, explaining that Media Matters suffered critical harms from the retaliation campaign, including "par[ing] back its reporting," and "outside groups" limiting "their collaboration with" the organization.  *Paxton*, 138 F.4th at 581; *see* Op. 12-13; ECF 22-6 at 7-12; ECF 22-7 at 4; ECF 22-8 at 4-7 (harms in this case).

2.  As courts stopped these attacks, the FTC opened a new front and issued its CID in May.  The FTC demanded Media Matters produce documents on all aspects of its operations, including finances, journalistic processes, communications, and associations.  Op. 10-11.  The FTC has never provided a coherent explanation for what it is investigating, other than gesturing to so-called advertiser "boycotts"—*i.e.*, advertisers declining to place ads on a website with extremist content.  *Id.* at 44-45.

After meeting and conferring multiple times with FTC staff, Media Matters filed a petition to quash, which the FTC denied.  ECF 22-5 at 40-44.  Media Matters

separately sought relief from the district court.  In a forty-eight-page decision, the court found the CID was likely motivated by animus and granted a preliminary injunction.

The government appeals and seeks a stay.

## STANDARD OF REVIEW

The FTC must show (1) a "strong" likelihood of success, (2) irreparable injury, (3) that the stay will not "substantially injure the other parties," and (4) that the public interest favors a stay.  *Nken v. Holder*, 556 U.S. 418, 426 (2009).  The merits panel will ultimately review the district court's balancing of the injunction factors "for abuse of discretion, its legal conclusions *de novo*, and factual findings for clear error."  *Paxton*, 138 F.4th at 573.

## ARGUMENT

## I.    MEDIA MATTERS IS LIKELY TO PREVAIL ON THE MERITS.

The FTC cannot show likely success on appeal.  Even if this were a *Thunder Basin* case (it is not), *Thunder Basin* allows a plaintiff to sue in district court to remedy a here-and-now First Amendment injury.  Meanwhile, the district court's

factual findings of animus are supported by a developed record, and the FTC has not demonstrated likely clear error.

### A. The Government's *Thunder Basin* Argument Is Meritless.

1. The district court had jurisdiction under 28 U.S.C. §1331, which provides that district courts "shall have original jurisdiction of all civil actions arising under the Constitution." "The statute is as clear as statutes get," and it includes Media Matters' constitutional claims to halt the retaliatory CID. *Axon*, 598 U.S. at 205 (Gorsuch, J., concurring in the judgment).

As a preliminary matter, this is not a case in which the *Thunder Basin* exception to Section 1331 applies. Under *Thunder Basin*, Congress can implicitly exempt "challenges to" "agency action" from Section 1331 by enacting a "special statutory review scheme." *Id.* at 187 (majority op.). *But see id.* at 205 (Gorsuch, J., concurring in the judgment) (criticizing *Thunder Basin* as "fabricated").

To determine if "Congress intended that a litigant proceed exclusively through a statutory scheme of administrative and judicial review," courts ask whether "such intent is fairly discernible in the statutory scheme." *Arch Coal, Inc. v. Acosta*, 888 F.3d 493, 498 (D.C. Cir. 2018). The principal inquiry is whether Congress "has allocated initial review to an administrative body." *Thunder Basin*, 510 U.S. at 207. Such a statute "typically" provides "review in a court of appeals." *Axon*, 598 U.S.

8

at 185.  If Congress enacted a statutory channeling scheme, courts use a three-factor test to evaluate whether a specific claim must be channeled.  *See infra* pp. 9-10.

Describing *Thunder Basin* demonstrates its inapplicability here.  Everyone agrees this case will end up *in district court*.  The government fails to identify a single case "applying *Thunder Basin* to preclude claims because a statute channels those claims directly to a federal court."  Op. 16.  It bears emphasis: The FTC doesn't dispute this case will end up in district court.  It just wants to initiate parallel litigation (perhaps to forum shop)—or maybe never sue, leaving Media Matters to suffer the FTC's retaliation campaign.  This is not the stuff of *Thunder Basin*.

2.  Regardless, *Thunder Basin* provides an important exception to channeling: A plaintiff like Media Matters can proceed directly to district court under Section 1331 to remedy here-and-now constitutional injuries.

The Court looks to three factors to determine whether a particular claim must be channeled under *Thunder Basin*: whether (1) "precluding district court jurisdiction forecloses all meaningful judicial review of the claim"; (2) "the claim is wholly collateral to the statute's review provisions"; and (3) "the claim is outside the agency's expertise."  *Axon*, 598 U.S. at 186.  Each factor cuts in favor of finding jurisdiction.

When the FTC issued the CID, Media Matters experienced an immediate "here-and-now injury."  *Id*. at 191.  If Media Matters could not sue in district court

9

immediately, that harm would have "escape[d] effective judicial review." *Id.* at 186. The retaliatory CID undermined Media Matters' internal operations and led partner organizations to decline to work with it. Media Matters' First Amendment "rights" would have been "effectively lost if review" was "deferred until after"—if ever— the FTC sued in district court. *Id.* at 192; *see Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) (loss of First Amendment rights "for even minimal periods" is "irreparable").

Media Matters' First Amendment retaliation claim is also "wholly collateral" to whatever review the FTC might conduct before suing itself and falls beyond the FTC's "expertise." These two *Thunder Basin* factors channel to an agency claims that the agency both "customarily handles" and "can apply its distinctive knowledge to." *Axon*, 598 U.S. at 186. Media Matters' First Amendment claim is collateral because it is not a routine objection to "commonplace" agency "procedures" or matters the FTC "regularly adjudicate[s]." *Id.* at 186, 193. The objection goes to the FTC's very "power to proceed at all" against Media Matters. *Id.* at 192. Meanwhile the FTC has no comparative advantage over a federal district court— indeed, the FTC is at a disadvantage—in deciding whether it acted with unconstitutional animus.

3. The FTC primarily argues (at 10) that Media Matters has no here-and-now injury, and thus no need for immediate judicial review, because no "legal

10

consequences can flow from the CID unless the FTC brings an action to enforce the CID." This assertion animates both its argument that Congress enacted a comprehensive statute that precludes Media Matters from suing first, *see* Mot. 8, and its analysis of the three *Thunder Basin* factors, *see* Mot. 10.

But in *Paxton*, in evaluating Media Matters' Article III standing to sue, the Court already rejected the theory that retaliatory CIDs do not impose a here-and-now injury. This Court explained that in the normal CID case, a CID recipient suffers "no injury" until after the agency sues to enforce. *Paxton*, 138 F.4th at 583 (quoting *Reisman v. Caplin*, 375 U.S. 440, 449 (1964)). When an agency issues a CID for a retaliatory purpose, however, the "not self-executing" CID causes immediate constitutional "injuries." *Id*. The FTC attempts to distinguish *Paxton* because that case involved "a state official" acting "pursuant to state law." Mot. 10. But this Court's analysis regarding the harm Media Matters suffered had nothing to do with whether the "not self-executing" CID came from a state agency. *Paxton*, 138 F.4th at 583.

The fact that Media Matters was suffering an ongoing constitutional injury also explains why this case is unlike *FTC v. Claire Furnace Co.*, 274 U.S. 160 (1927). In *Claire Furnace*, the Court held that regulated parties had to wait for the FTC to bring an enforcement action to challenge a CID. But the regulated parties in *Claire Furnace* raised garden-variety administrative law claims, and the Court

11

stressed the parties did not "suffer" injury from the issuance of the CID itself. *Id*. at 174. That routine situation is entirely unlike the here-and-now harm Media Matters faces.

Indeed, *Claire Furnace* is better understood not as a decision anticipating *Thunder Basin* and its administrative channeling doctrine, but as a case anticipating Article III injury and ripeness—which is how this issue was litigated in *Paxton*. The plaintiffs in *Claire Furnace* suffered no immediate Article III injury and their challenge was unripe. In this case and *Paxton*, by contrast, there *is* an immediate Article III injury ripe for judicial review. That is why the post-*Claire Furnace* precedent the FTC cites (at 8) recognizes a plaintiff *can* sue in district court to remedy an "immediate, irreparable injury." *Belle Fourche Pipeline Co. v. United States*, 751 F.2d 332, 335 (10th Cir. 1984); *see Paxton*, 138 F.4th at 583 (similarly distinguishing *Reisman v. Caplin* because Media Matters suffered "ongoing injuries").[2]

In attempting to jam this case into *Thunder Basin*'s second and third factors, the FTC asserts (at 11) the claims here "are exactly the kinds of claims that would be adjudicated in an action to enforce the CID." But that assertion underscores why *Thunder Basin* channeling does not apply at all: The FTC's hypothetical future

---

[2] Moreover, all of the FTC's cases predate *Thunder Basin* and *Axon*, the latter of which confirms parties can immediately sue to remedy here-and-now injuries.

"action to enforce the CID" *will occur in district court*. Neither the FTC's enforcement action nor a decision on its petition to quash (which is not appealable) are ever channeled to appellate review, as in a typical *Thunder Basin* scenario. Similarly, the fact that this case will always end up before the district court disproves the FTC's argument that delaying review will somehow allow it to apply unique "expertise" to evaluate the "breadth and relevance of the CID." Mot. 11-12. No matter what, the district court is the one evaluating everything.

The FTC is likewise wrong to suggest (at 11) that the existence of the "petition to quash" and "meet-and-confer process" implies Congress precluded Media Matters from suing to protect its constitutional rights. Media Matters met and conferred with FTC staff and filed a petition to quash. The question is whether Congress intended that—if the FTC denied the unappealable petition—Media Matters could not receive *any* judicial relief from the FTC's ongoing unconstitutional retaliation. Nothing suggests Congress sought that perverse result.

The FTC's concern (at 8) about bifurcated litigation is misplaced. Because all roads lead to the same place—the district court—the FTC could seek to consolidate an action to enforce the CID before the same district court hearing a constitutional claim. Regardless, in every *Thunder Basin* scenario, the need to address the "here-and-now" constitutional injury always produces the potential for two-track litigation. *Axon*, 598 U.S. at 185. The plaintiff sues in district court to

13

remedy the ongoing harm, and everything else proceeds on a different track.

Finally, the FTC has forfeited or waived underdeveloped arguments (at 12 & n.4) regarding a cause of action. Regardless, the district court explained why there is a cause of action here. Op. 25-31. The FTC's argument regarding equitable relief (at 12 n.4) is likewise half-baked, was never raised below, and is wrong. Courts may issue injunctions to remedy constitutional harm. *Cf. Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2551 (2025).[3]

### B. The Government Likely Engaged In First Amendment Retaliation.

1. The district court correctly concluded that the FTC's CID was likely motivated by a retaliatory animus. The Court should reject the invitation to wade into the facts on limited briefing, particularly when the merits panel will review the district court for clear error.

As the district court explained, the timing of the FTC's CID—coming on the heels of the failed state investigations and the injunction against Musk's international litigation—indicated the FTC "wanted to continue the years' long pressure campaign." Op. 43. Meanwhile, the FTC's selective enforcement betrays its retaliatory motivations. Despite conservative figures promoting so-called advertiser "boycotts," for example of MSNBC, there is no indication that the FTC

---

[3] The FTC waived arguments that "retaliatory investigation claim[s]" are not "cognizable." Mot. 13 n.5.

has pursued anyone on the political right.  *See* ECF 22-1 at 27-28.  Instead, the FTC's new Chairman Andrew Ferguson has done what he promised: target opponents on the left.

Indeed, as the district court detailed, "Ferguson and his colleagues" have characterized "Media Matters and this investigative push in ideological terms."  Op. 40.  Before being selected as Chairman, Ferguson "bolstered his candidacy" in a memo "insisting that he would investigate advertiser boycotts" as part of a promise to "[f]ight wokeness." Op. 40; *FTC Commissioner Andrew N. Ferguson for FTC Chairman*, Punchbowl News (June 22, 2025), https://perma.cc/A56K-Q4YM.  After becoming chairman, and shortly before issuing the CID, Ferguson accused "DNC interest groups" and "advertisers" of engaging "in censorship." *Transcript: FTC Chairman Andrew Ferguson Keynote*, Promarket (Apr. 17, 2025), https://perma.cc/R8FT-4LLJ.   At "minimum," "Ferguson saw the FTC's investigation as having a partisan bent."  Op. 40.  Others have been even more explicit.   Senior FTC staffers decried Media Matters as "stupid and resentful Democrats" and "scum of the earth."  *Id*. at 41-42.

The FTC's justification (or lack thereof) for the CID also reveals the agency's improper purpose.  Op. 44.  The CID initially contained no explanation.  *Id*.  The FTC subsequently said it is investigating so-called advertiser boycotts, specifically whether advertisers "unlawfully *agreed* to use certain lists" of websites to determine

where to place ads.  *Id*. at 45 (emphasis added).  Thus, the FTC's antitrust theory seems to be—although the agency has remained coy—that advertisers may have engaged in an unlawful agreement of some kind.

But the FTC has never explained why it has any "reason to believe that Media Matters has information relating" to advertisers' use of lists—let alone *an unlawful agreement between advertisers*.  *Id*.  Meanwhile, "the sweeping scope of the FTC's CID"—which extends to every aspect of Media Matters' own operations—bears no relationship to the FTC's limited goal of uncovering information about an *agreement between advertisers*.  *Id*.  In other words, even assuming *advertisers* did coordinate amongst themselves (and there is no public evidence of that), *Media Matters* simply engaged in constitutionally protected activity—chronicling abhorrent content on X and calling on companies to withdraw their business.

Regardless, the FTC's justification that it seeks to investigate advertisers is also deeply concerning.  Under landmark Supreme Court precedent, the First Amendment protects the right to engage in politically motivated boycotts as a means of encouraging social change—including to discourage social media sites from tolerating extremist content on their platforms.  *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 911 (1982).  The FTC has offered no meaningful explanation for why its investigation into advertisers is not just an effort to penalize First Amendment activity.  Finally, because Musk and his allies blame Media Matters'

16

coverage for companies not advertising on X, the FTC's proffered explanation regarding so-called advertiser "boycotts" is impossible to disentangle from its retaliation campaign against Media Matters *for its pure advocacy*.

2.    The FTC asks this Court to suspend disbelief about its CID, which mimicked two retaliatory state CIDs.  But courts are "not required to exhibit a naiveté from which ordinary citizens are free." *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.).  This Court should reject the FTC's efforts to view evidence in "isolation," and close its eyes to reality.  *Vullo*, 602 U.S. at 178.

At the outset, the FTC downplays (at 13) the notion that anyone would target Media Matters over "only one piece of protected speech," *i.e.*, the 2023 article about Nazi content on X.  But Media Matters' viral article was a flashpoint, generating so much attention that two states and Musk targeted Media Matters, as multiple courts found.  Moreover, the article is just a piece of Media Matters' well-known efforts to document extremism.  Musk and his allies believe Media Matters uses its speech to "weaponize powerful institutions to censor conservatives."  ECF 1 at 26.  Whether the FTC targeted Media Matters for the 2023 article—or for a combination of that article and Media Matters' other similar expression—the FTC is violating the First Amendment.

The FTC argues (at 17) that the time between the article's publication in 2023 and the federal CID in 2025 implies the CID was necessarily unrelated to the article.

17

But the district court explained that the FTC issued its CID after other efforts to persecute Media Matters had stalled.  Op. 42-43.  That timing suggests that the FTC's CID is an effort to restart or continue the retaliation campaign.  Moreover, contra the FTC's suggestion (at 17-18), Ferguson could not have begun retaliating against Media Matters in 2023 or 2024.  Ferguson only became chairman *in 2025*. He launched the assault on Media Matters shortly thereafter.

Media Matters need not provide express "communication between the FTC" and state officials to demonstrate the FTC intended to restart the stalled harassment campaign.  Mot. 17.  The extremely broad federal CID followed in the footsteps of the broad state CIDs and targeted the same organization, *i.e.*, Media Matters, indicating the former was an effort to effectuate the same goals as the latter.

Contrary to the FTC's argument, that the agency targeted other "advocacy organizations" who *also* engaged in protected speech (*i.e.*, by engaging in advocacy encouraging others not to advertise on certain websites), reinforces rather than disproves the conclusion that it is targeting organizations *for speech*.  Mot. 14. Regardless, the Court should not permit an agency to hide its retaliatory purpose by larding investigations with seemingly innocent targets to disguise improper motives.

The FTC faults the district court for relying on statements from Mike Davis because he "never worked at the FTC."  Mot. 16.  But Davis is "an outside adviser to the Trump administration," Op. 9, who has attended private meetings with the

President and Ferguson to discuss ongoing antitrust litigation.[4]  Nor "was it wrong,"
Mot. 16, for the Court to consider how Ferguson hired individuals who had
previously targeted Media Matters *by name*.  That Ferguson hired individuals with
clear animus is circumstantial evidence of Ferguson's own views and the culture of
animus toward Media Matters.  *Cf. Walden v. Ga.-Pac. Corp.*, 126 F.3d 506, 521
(3d Cir. 1997) (explaining when and how "remarks by non-decisionmakers" can be
"relevant").

The FTC cannot defend the CID's sweeping scope.  The FTC offers no
justification for much of the information it requests, such as documents related to
Media Matters' reporting which raises uniquely serious constitutional concerns.  *Cf.*
*Stanford v. Texas*, 379 U.S. 476, 484 (1965).  Nor does the limited explanation the
FTC provides pass muster.  For example, for the first time on appeal, the FTC claims
that it seeks Media Matters' financials—which could reveal constitutionally
protected information about donors, *see Ams. for Prosperity Found. v. Bonta*, 594
U.S. 595, 606 (2021)—to determine whether Media Matters had "financial
incentives for involvement in a boycott."  Mot. 18.  This forfeited theory is baseless.
It is undisputed that Media Matters does not sell advertisements and only "very
rarely purchases ads on other sites."  ECF 22-5 at 3.  This new argument is also

---

[4] *See* Dana Mattioli, Rebecca Ballhaus, & Josh Dawsey, *Inside Mark Zuckerberg's*
*Failed Negotiations to End Antitrust Case*, WSJ (Apr. 15, 2025),
https://perma.cc/AGV4-5A46.

astounding. Below, the FTC declined to argue that it was investigating Media Matters for violating the law. ECF 27 at 43. Now the agency suggests the opposite. The FTC's shifting explanation is just further indication that the explanation is pretext all the way down.

Nor does the FTC provide reason to believe Media Matters possesses information about *an agreement* amongst advertisers to coordinate ad placement. The FTC (at 19) now points to the fact that "Media Matters' website calls for an advertiser boycott" and "that Media Matters participates in deplatforming and demonetization campaigns." This is astounding. It underscores that the FTC is targeting Media Matters *for its speech*.

The FTC (at 19) pleads that it cannot explain itself because it must maintain "confidential details" of its investigation. But the FTC never sought to provide information pursuant to a protective order, *see Keaveney v. SRA Int'l, Inc.*, No. 1:13-cv-00855, 2017 WL 1842544, at *6 (D.D.C. May 3, 2017), or through *in camera* review, *see Jibril v. Mayorkas*, 101 F.4th 857, 866 (D.C. Cir. 2024). Media Matters does not concede the FTC could meet the standard for those extraordinary measures. The law, however, provides mechanisms to ameliorate a legitimate need for confidentiality.

Finally, the FTC cannot prevail (at 13-14) by invoking a talismanic presumption of regularity. The FTC never raised this argument below and forfeited

it.  Regardless, presumptions can be overcome by evidence.  Few "officials will admit that they abuse the coercive powers of government to punish and silence their critics," and "courts must be vigilant in preventing officers from concocting legal theories to" abuse their power.  *Gonzalez v. Trevino*, 60 F.4th 906, 907 (5th Cir. 2023) (per curiam) (Ho, J., dissenting from denial of en banc review).

## II.    THE GOVERNMENT WILL NOT SUFFER IRREPARABLE HARM.

1.  The Court can deny the stay for an independent reason: The government cannot show "certain and great" irreparable harm.  *KalshiEX*, 119 F.4th at 64.  Indeed, the FTC already paused the CID's return date until after the district court's ruling.  *See* ECF 39-2 at 2.  The agency can hardly claim vital need for a stay now.

For the reasons just discussed, the FTC also cannot "explain *why*" it believes "Media Matters specifically has information relevant to their investigation."  Stay Op. 5.  And the FTC cannot "explain why Media Matters is likely to be in *sole* possession" of that information when it has sought similar information from other organizations.  Stay Op. 5.  Indeed, the FTC's argument that it issued other CIDs rebounds, because it demonstrates that the FTC could secure information it seeks elsewhere.

It bears repeating: The FTC is requesting *emergency relief* from this Court.  But the agency provides no coherent explanation for why it must enforce this one CID *immediately* while this Court considers this appeal.  There just isn't a

21

meaningful emergency.  Instead, one potential explanation for the emergency stay request is that the FTC wishes to be free to engage in forum shopping and file its own action in another court, so that there will then be two cases proceeding simultaneously in two different circuits over the same CID.  This Court should not enable that tactic.

2.  The FTC's arguments are unpersuasive.

*First*, the FTC argues (at 20) any injunction against the government constitutes irreparable harm.  This improperly collapses harm with merits.  The government must independently show "irreparable harm" in every case, separate and apart from the merits.  *KalshiEX*, 119 F.4th at 64.  The Supreme Court's recent decision in *CASA* did not change this.  It stated that "*universal* injunction[s]" cause irreparable harm because they apply to "*nonparties*."  *CASA*, 145 S. Ct. at 2561 (emphasis added).  This isn't a universal injunction case.  Relief is limited to Media Matters.

*Second*, the FTC claims (at 21) it will be difficult to "halt[] a single component" of its investigation.  The Court should reject this conclusory assertion.  The government frequently pauses aspects of investigations when a court quashes a subpoena or CID.  The FTC's related concern that the injunction will "embolden other CID recipients" to challenge the FTC's unlawful action is a "speculative,"

"ill-defined," and "theoretical harm[] that do[es] not warrant the extraordinary remedy of a stay." Stay Op. 5.

*Third*, the FTC complains that it cannot meet and confer with Media Matters before filing suit (which, again, will end back in district court). But the FTC offers no coherent explanation why it will be *irreparably* harmed absent additional efforts to meet-and-confer.

## III. THE REMAINING FACTORS STRONGLY FAVOR MEDIA MATTERS.

The remaining factors disfavor a stay. As the district court recognized, Op. 46, the loss of First Amendment rights "for even minimal periods" is "irreparable." *Roman Cath. Diocese*, 592 U.S. at 19. In arguing otherwise (at 21), the FTC ignores the constitutional harms Media Matter suffers.[5]

There is "no public interest in the perpetuation of unlawful" "action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Indeed, allowing this naked First Amendment violation to proceed threatens "the very foundations of our democracy." Stay Op. 6.

---

[5] The FTC (at 22 n.10) blames Media Matters for publicizing the CID but offers no evidence Media Matters first made its existence known. Regardless, the CID would always have become public via the petition to quash.

23

## CONCLUSION

Appellants' motion should be denied.

September 2, 2025                    Respectfully submitted,

                                   /s/ Nathaniel A.G. Zelinsky

STEPHEN P. ANTHONY                 NATHANIEL A.G. ZELINSKY
RYAN K. QUILLIAN                   MARY L. DOHRMANN†
DANA A. REMUS                      JAMES I. PEARCE††
KUNTAL V. CHOLERA                  WASHINGTON LITIGATION GROUP
BRENDEN J. CLINE                   5335 Wisconsin Ave, NW, Suite 440
BRIGID P. LARKIN                   Washington, D.C. 20015
SARAH LEADEM                       202-521-8750
COVINGTON & BURLING LLP            nzelinsky@washingtonlitigationgroup.org
One CityCenter
850 Tenth Street, NW               † *Admitted only in New York; practicing*
Washington, D.C. 20001-4956        *under the supervision of D.C. Bar*
202-662-6000                       *Members*

JUSTIN A. NELSON                   †† *Admitted only in New York and North*
MATTHEW BEHNCKE                    *Carolina; practicing under the*
ALEXANDRA FOULKES GRAFTON          *supervision of D.C. Bar Members.*
SUSMAN GODFREY LLP
1000 Louisiana Street, Suite 5100
Houston, TX 77002-5096
 713-651-9366

KATHERINE M. PEASLEE
SUSMAN GODFREY LLP
401 Union Street, Suite 3000
SEATTLE, WA 98101
206-516-3880


*Counsel for Plaintiff-Appellee Media Matters for America*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 27(d)(2)(A), I certify that Appellee's Response Brief contains 5,190 words. This Brief also complies with the requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared using Microsoft word 14-point Times New Roman, a proportionally spaced font.

September 2, 2025                    /s/ Nathaniel A.G. Zelinsky
                                     NATHANIEL A.G. ZELINSKY
                                     WASHINGTON LITIGATION GROUP
                                     5335 Wisconsin Ave, NW, Suite 440
                                     Washington, D.C. 20015
                                     202-521-8750
                                     nzelinsky@washingtonlitigationgroup.org

                                     *Counsel for Plaintiff-Appellee*
                                     *Media Matters for America*

## CERTIFICATE OF SERVICE

I hereby certify that, on September 2, 2025, I caused the foregoing to be electronically filed with the Clerk of the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.  All counsel in this case are registered CM/ECF users and will be served by the appellate CM/ECF.


September 2, 2025

/s/ Nathaniel A.G. Zelinsky
NATHANIEL A.G. ZELINSKY
WASHINGTON LITIGATION GROUP
5335 Wisconsin Ave, NW, Suite 440
Washington, D.C. 20015
202-521-8750
nzelinsky@washingtonlitigationgroup.org

*Counsel for Plaintiff-Appellee*
*Media Matters for America*