ORAL ARGUMENT NOT YET SCHEDULED

No. 25-5302

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————————

MEDIA MATTERS FOR AMERICA,

*Plaintiff-Appellee,*

v.

FEDERAL TRADE COMMISSION, *et al.*,

*Defendant-Appellants.*

————————————————

On Appeal from the United States District Court
for the District of Columbia
No. 25-cv-01959-SLS

BRIEF OF *AMICUS CURIAE*
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
IN SUPPORT OF PLAINTIFF-APPELLEE'S OPPOSITION TO
EMERGENCY MOTION FOR STAY PENDING APPEAL

Robert Corn-Revere
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Avenue, SE
Suite 340
Washington, DC 20003
(215) 717-3473
bob.corn-revere@thefire.org

*Counsel for* Amicus Curiae

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for *amicus curiae* Foundation for Individual Rights and Expression certifies that (1) *amicus* does not have any parent corporations, and (2) no publicly held companies hold 10% or more of the stock or ownership interest in *amicus*. *Amicus* is a nonprofit corporation exempt from income tax under Section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3).

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... iii

INTEREST OF *AMICUS CURIAE* ........................................................... 1

INTRODUCTION AND SUMMARY ......................................................... 1

BACKGROUND ...................................................................................... 3

ARGUMENT ........................................................................................... 7

I.  The First Amendment Bars Government Retaliation for Disfavored Speech. ........................................................................ 7

II.  The District Court Correctly Found First Amendment Retaliation on Undisputed Record Evidence. ................................. 8

III.  The FTC's Tactics of Intimidating Media Matters and Its Journalism with a Coercive "Investigation" Reflects an Increasing Nationwide Trend. ................................................... 10

IV.  The Founders Intended the First Amendment To Prohibit Government Retaliation Against Dissent. ...................... 12

CONCLUSION ...................................................................................... 14

# TABLE OF AUTHORITIES

## Cases

*Aref v. Lynch*, 833 F.3d 242 (D.C. Cir. 2016) ............................................. 9

*Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015) ..................... 10

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963) ............................. 2, 7

*First Choice Women's Res. Ctrs., Inc. v. Platkin*, No. 24-781, 2025 WL 1678987 (U.S. June 16, 2025) ....................................................... 10

*Hartman v. Moore*, 547 U.S. 250 (2006) ................................................... 7

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995) ..................... 12

*Media Matters for Am. v. Bailey*, No. 24-cv-147, 2024 WL 3924573 (D.D.C. Aug. 23, 2024) ........................................................................ 5

*Media Matters for Am. v. Paxton*, 138 F.4th 563 (D.C. Cir. 2025) ........... 5

*Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1 (D.D.C. 2024) ........ 4

*Media Matters for Am. v. X Corp.*, No. 25-cv-02397-VC, 2025 WL 1084715 (N.D. Cal. Apr. 10, 2025) ...................................................... 4

*Murthy v. Missouri*, 603 U.S. 43 (2024) ................................................... 1

*N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964) ................................... 12

*Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175 (2024) ................................... 1, 7

*Reps. Comm. for Freedom of Press v. Am. Tel. & Tel. Co.*, 593 F.2d 1030 (D.C. Cir. 1978) .......................................................................... 8

*Roberts v. Pollard*, 393 U.S. 14 (1968) .................................................... 8

*Smith v. California*, 361 U.S. 147 (1959) ................................................. 7

*Sweezy v. New Hampshire*, 354 U.S. 234 (1957) ...................................... 7

*Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383 (1988) .......................... 7

*White v. Lee*, 227 F.3d 1214 (9th Cir. 2000) .............................................. 9

**Other Authorities**

Collins et al., *First Things First: A Modern Coursebook on Free Speech Fundamentals* (Jackie Farmer ed., 2019) ................................ 12

*Crown v. John Peter Zenger, 1735*, Hist. Soc'y of the N.Y. Cts., https://history.nycourts.gov/case/crown-v-zenger ............................... 13

Harry Kalven Jr., *The New York Times Case: A Note on "The Central Meaning of the First Amendment"*, 1964 Sup. Ct. Rev. 191 ................................................................................................... 14

*John Peter Zenger*, Free Speech Ctr. at Middle Tenn. State Univ. (July 2, 2024), https://firstamendment.mtsu.edu/article/john-peter-zenger ........................................................................................... 14

Kenneth P. Vogel et al., *Under Siege From Trump and Musk, a Top Liberal Group Falls Into Crisis*, N.Y. Times (July 25, 2025), https://www.nytimes.com/2025/07/25/us/politics/media-matters-musk-crisis.html ...................................................................................... 9

Michael Kent Curtis, *Free Speech, "The People's Darling Privilege": Struggles for Freedom of Expression in American History* (2000) ...... 13

*New York Weekly Journal*, Lower Manhattan Historical Association, https://www.historiclowermanhattan.org/printinghouserow/new-york-weekly-journal ................................................................................. 13

Press Release, Off. of Att'y Gen. of Mo., *Attorney General Bailey Fights To Expose Big Tech Censorship of President Trump as AI Chatbots Produce Fake News* (July 9, 2025), https://ago.mo.gov/attorney-general-bailey-fights-to-expose-big-tech-censorship-of-president-trump-as-ai-chatbots-produce-fake-news/ ...................................................................................................... 11

Press Release, Off. of Att'y Gen., *Attorney General James Uthmeier Launches Investigation into Sexualized Performance Advertised to Children; Issues Subpoena to Linda Moore, Vice Mayor of Vero*

*Beach and Owner of Kilted Mermaid* (July 22, 2025), https://
www.myfloridalegal.com/newsrelease/attorney-general-james-
uthmeier-launches-investigation-sexualized-performance ................. 11

Press Release, Off. of N.Y. State Att'y Gen., *Attorney General James
Calls on Social Media Platforms to Provide Answers After
Terrorist Attacks in Israel Spark Violent Threats Online* (Oct. 13,
2023),        https://ag.ny.gov/press-release/2023/attorney-general-
james-calls-social-media-platforms-provide-answers-after................. 11

Scott Bomboy, *On This Day, an Early Victory for the Free Press*,
Nat'l        Const.        Ctr.        (Aug.        4,        2024),
https://constitutioncenter.org/blog/a-huge-free-press-victory-by-
the-original-philadelphia-lawyer ......................................................... 14

## INTEREST OF *AMICUS CURIAE*[1]

The Foundation for Individual Rights and Expression (FIRE) is a nonpartisan nonprofit that defends the rights of all Americans to free speech and free thought. Since 1999, FIRE has successfully defended First Amendment rights nationwide without regard to speakers' political views. *See*, *e.g.*, Br. *Amici Curiae* FIRE et al. Supp. Pet'r, *Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175 (2024) (No. 22-842); Br. *Amici Curiae* FIRE et al. Supp. Resp'ts, *Murthy v. Missouri*, 603 U.S. 43 (2024) (No. 23-411). FIRE has a strong interest in protecting speakers from retaliation by government officials, whether directly or by regulatory actions.

## INTRODUCTION AND SUMMARY

Just last Term, the Supreme Court unanimously reaffirmed that "Government officials cannot attempt to coerce private parties … to punish or suppress views that the government disfavors." *Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 180 (2024). The First Amendment bars using the government's "power to investigate" to pressure publications that, in

---

[1] All parties consent to this brief's filing. No counsel for a party authored this brief and no person, other than *amicus* FIRE, its members, or its counsel contributed money intended to fund this brief's preparation or submission.

its view, publish objectionable material. *Id.* at 188. Coercive government investigations impermissibly suppress speech rights as much as outright proscriptions, and First Amendment protections fully apply in either case. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963).

Yet the Federal Trade Commission initiated a pretextual investigation to punish Media Matters, whose articles and perspective the current Administration and its allies dislike. The district court therefore preliminarily enjoined the FTC's investigation as part of a coordinated effort—involving other investigations by state attorneys general and a malicious campaign of frivolous litigation—to crush a disfavored speaker and perceived political opponents. *Media Matters for Am. v. FTC*, No. CV 25-1959 (SLS), 2025 WL 2378009 at *3–4 (D.D.C. Aug. 15, 2025), Dkt. No. 34 ("PI Order").

This case starkly illustrates how government investigations intimidate through procedural burdens and threats that themselves punish exercises of First Amendment rights. Allowing the FTC to pursue its investigation during the pendency of this case would continue to chill speech and journalism. Media Matters is living that reality now. The weaponization of broad FTC investigative powers not only caused Media

Matters to back off newsgathering and reporting but threatens its very existence.

This case is not an outlier. Government officials nationwide increasingly use burdensome investigations, subpoenas, and CIDs to target publications, platforms, and others for their views. The message is clear: Officials will pursue political opponents and attack their speech by any means—unless courts intervene.

The preliminary injunction here is well-founded judicial intervention, and this Court should allow it to stand.

## BACKGROUND

Media Matters for America is a research and journalistic nonprofit dedicated "to monitoring and correcting misinformation in U.S. media." PI Order *2.[2] After Media Matters published articles reporting on increased "extremist and racist rhetoric" on X and about major companies' ads appearing adjacent to "pro-Nazi content," *id.* at *2–3, then-new owner Elon Musk took offense and promised "a thermonuclear lawsuit against Media Matters," *id.* at *3.

---

[2] The pleadings below and the PI Order address this background at length. This summary provides context for *amicus*'s arguments.

X Corp. made good on Musk's threat, suing Media Matters in Texas federal court and (through subsidiaries) in Ireland and Singapore. *Id.* A California federal court preliminarily enjoined X Corp.'s lawsuit campaign, recognizing it appeared designed more to bully Media Matters and inflict financial hardship than to pursue legitimate claims. *Id.* at *4; *see Media Matters for Am. v. X Corp.*, No. 25-cv-02397-VC, 2025 WL 1084715, at *1 (N.D. Cal. Apr. 10, 2025), *appeal docketed*, No. 25-2463 (9th Cir. Apr. 16, 2025).

Meanwhile, President Trump's senior advisor Stephen Miller (now White House Chief of Staff) tweeted about Media Matters, effectively urging state attorneys general to target it. PI Order *3. Texas's and Missouri's AGs answered the call and launched civil investigations with onerous demands of Media Matters. *Id.* The United States District Court for the District of Columbia preliminarily enjoined both AGs on grounds the proceedings likely amounted to First Amendment retaliation, *id.*; *see Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1 (D.D.C. 2024); *Media Matters for Am. v. Bailey*, No. 24-cv-147, 2024 WL 3924573 (D.D.C. Aug.

23, 2024), and this Court affirmed as to Texas, *Media Matters for Am. v. Paxton*, 138 F.4th 563, 584 (D.C. Cir. 2025).[3]

Undeterred, FTC Chairman Andrew Ferguson announced the Commission would investigate purported "tech [platform] censorship" and "advertiser boycotts." PI Order *20. This came just a month after President Trump chose Ferguson to be Chairman. *Id.* In numerous public statements, Ferguson, senior FTC staffers he hired, and other allies made clear the investigation was partisan and retributive, aimed at "'progressives'" and "leftists" "fighting disinformation" and allegedly seeking to "silence conservative voices." *Id.* at *19–20.

The FTC issued a broad CID to Media Matters in May 2025 that demanded information on a wide variety of expressive matters, including information about decisions of platforms, publishers, and advertisers concerning misinformation or false or misleading content; Media Matters' newsgathering and editorial decisions; its programs, policies and objectives; all its financials; and much more. *See id.* at *5.

---

[3] Media Matters had previously settled and dismissed its claims against the Missouri Attorney General. PI Order *3.

Media Matters sued again, initiating this lawsuit, and again sought and won a preliminary injunction. In a thorough opinion applying the likelihood-of-success standard, the court concluded "[t]his case presents a straightforward First Amendment violation." *Id.* at *1.

The FTC appealed, Dkt. No. 36, and simultaneously moved the district court to stay the order pending appeal, Dkt. No. 37. Observing that the government offered nothing but a rehash of prior failed arguments, the district court denied a stay. Dkt. No. 41.

The FTC now asks this Court to stay the preliminary injunction pending appeal so it can continue its "investigation" and pursuit of Media Matters—actions shown to be impermissible First Amendment retaliation—for the many months it will take this Court to hear and decide the appeal. Emergency Mot. for Admin. Stay and Stay Pending Appeal, Dkt. No. 2132106 ("FTC Emergency Mot."). Because the process of an unlawful retaliatory investigation is irreparable First Amendment harm in and of itself, *amicus* FIRE supports Media Matters's opposition to the stay motion, writes to emphasize the importance of protecting freedom of speech in this case and at this juncture, and urges that the Court deny the FTC's motion.

6

## ARGUMENT

### I.    The First Amendment Bars Government Retaliation for Disfavored Speech.

The Court should deny the stay because the "law is settled that … the First Amendment prohibits government officials from subjecting an individual to retaliatory actions … for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (cleaned up). This is true regardless of the form retaliation takes. Government officials have employed any number of legal devices to restrict or censor speech, but the Supreme Court has made clear officials "cannot do indirectly what [they are] barred from doing directly." *Vullo*, 602 U.S. at 190; *see Bantam Books*, 372 U.S. at 67–69.

Retaliatory government actions—whether direct or indirect, formal or informal—chill speech and cause self-censorship. *See, e.g.*, *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988); *Smith v. California*, 361 U.S. 147, 150–51 (1959) (inhibiting expressive freedom occurs "by making the individual more reluctant to exercise it"); *Sweezy v. New Hampshire*, 354 U.S. 234, 245 (1957) ("It is particularly important that … compulsory process be carefully circumscribed" when it "tends to impinge upon such highly sensitive areas as freedom of speech or press").

As the Supreme Court has affirmed, investigatory subpoenas can alone infringe First Amendment rights. *Roberts v. Pollard*, 393 U.S. 14 (1968), *summarily aff'g* 283 F. Supp. 248, 258 (E.D. Ark.) (enjoining on First Amendment grounds subpoenas seeking donor identities). Subpoenas and other investigative techniques that may be "otherwise legitimate" transgress First Amendment rights if governments use them "to harass [media organizations] in their journalistic information-gathering activities." *Reps. Comm. for Freedom of Press v. Am. Tel. & Tel. Co.*, 593 F.2d 1030, 1064, 1067 (D.C. Cir. 1978).

## II.   The District Court Correctly Found First Amendment Retaliation on Undisputed Record Evidence.

The district court correctly held under preliminary injunction standards and on an extensive record that the FTC targeting Media Matters with oppressive investigative demands plainly constitutes First Amendment retaliation. The court recounted numerous statements by officials about the avowed purpose to target Media Matters and other "progressives" and "leftists" by investigating "advertiser boycotts" of X and other platforms. *See* PI Order *4–5, *19–20. The FTC did not dispute these facts, arguing instead about "official decisionmakers." *See* FTC Emergency Mot. 15–17.

8

First Amendment retaliation exists when the government's action suffices to "deter a person of ordinary firmness" from exercising expressive rights in future, and a causal link to the speech exists. *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016); *see also White v. Lee*, 227 F.3d 1214, 1228–29 (9th Cir. 2000). As the district court held, this is especially concerning when investigatory powers target newsgathering, reporting, and editorial decisions. PI Order *1, *16.

These sweeping FTC investigatory demands are not only enough to deter an organization of "ordinary firmness," they have in fact caused significant damage to Media Matters's First Amendment rights. It has backed off researching and reporting about government entities, X Corp., Mr. Musk, and conservative media—not to mention the FTC's investigation. *Id.* at *16.

Media Matters also saw donors cease giving, incurred millions in legal fees, laid off staff, and considered shutting down.[4] Whether or not the FTC ever succeeds in court—and even if its investigation never

---

[4] Kenneth P. Vogel et al., *Under Siege From Trump and Musk, a Top Liberal Group Falls Into Crisis*, N.Y. Times (July 25, 2025), https://www.nytimes.com/2025/07/25/us/politics/media-matters-musk-crisis.html; *see also* PI Order *6, *16 (summarizing harm).

culminates in action—forcing the organization to contend with the investigations is achieving the FTC's censorial aim. *Backpage.com, LLC v. Dart*, 807 F.3d 229, 231 (7th Cir. 2015) (threat of abuse of power "is actionable and thus can be enjoined even if it turns out to be empty").

The process is thus the punishment—for as long as the FTC can draw it out. That's why the FTC, having failed in casting about for a reason, *any* reason, to delay reaching the merits of Media Matters' First Amendment claim,[5] now seeks to further prolong the process by having the preliminary injunction stayed. This Court must not allow that.

## III. The FTC's Tactics of Intimidating Media Matters and Its Journalism with a Coercive "Investigation" Reflects an Increasing Nationwide Trend.

Government officials are increasingly mirroring the FTC to suppress speech they cannot target directly—and on a bipartisan basis. New Jersey's AG used investigative demands to target crisis pregnancy centers,[6] while Florida's AG used a similar approach against restaurants

---

[5] *See* PI Order *1–2, *7–14 (rejecting FTC's arguments, among others, that the FTC Act and Administrative Procedure Act preclude Media Matters' constitutional challenge).

[6] *First Choice Women's Res. Ctrs., Inc. v. Platkin*, No. 24-781, 2025 WL 1678987 (U.S. June 16, 2025) (granting petition for writ of *certiorari*).

for hosting drag shows.[7] New York's AG sees offensive social media posts and demands that platforms tell her how they're addressing it.[8] And the Missouri AG issued his own demands to large-language-model chatbots to ask why they produce outputs disfavoring President Trump.[9]

Regardless of partisan affiliation, the First Amendment prohibits government officials using investigative powers to target disfavored speech. Dissent is vital to American's political traditions, and the First Amendment "presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of

---

[7] Press Release, Off. of Att'y Gen., *Attorney General James Uthmeier Launches Investigation into Sexualized Performance Advertised to Children; Issues Subpoena to Linda Moore, Vice Mayor of Vero Beach and Owner of Kilted Mermaid* (July 22, 2025), https://www.myfloridalegal.com/newsrelease/attorney-general-james-uthmeier-launches-investigation-sexualized-performance.

[8] Press Release, Off. of N.Y. State Att'y Gen., *Attorney General James Calls on Social Media Platforms to Provide Answers After Terrorist Attacks in Israel Spark Violent Threats Online* (Oct. 13, 2023), https://ag.ny.gov/press-release/2023/attorney-general-james-calls-social-media-platforms-provide-answers-after.

[9] Press Release, Off. of Att'y Gen. of Mo., *Attorney General Bailey Fights To Expose Big Tech Censorship of President Trump as AI Chatbots Produce Fake News* (July 9, 2025), https://ago.mo.gov/attorney-general-bailey-fights-to-expose-big-tech-censorship-of-president-trump-as-ai-chatbots-produce-fake-news/.

authoritative selection." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Whether by direct censorship or, as here, by retaliatory deployment of the federal administrative state, the First Amendment was ratified to guard against the government's efforts to punish its critics.

## IV. The Founders Intended the First Amendment To Prohibit Government Retaliation Against Dissent.

Criticizing the government is an American tradition.[10] Colonial Americans, the Revolution's patriots, and the Founders relied on expression as a political tool and a vehicle for dissent.[11] The generation that ratified the First Amendment knew from experience that permitting the government to ruin its critics would be fatal to the freedoms they fought to secure—and the Founders would recognize in the FTC's attack on Media Matters an echo of the Crown's prosecution of dissent.

In 1734, for example, British officials arrested printer John Peter Zenger for seditious libel for publishing *The New-York Weekly Journal*,

---

[10] *See, e.g.*, *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 361–62 (1995) (Thomas, J., concurring) (describing pamphleteering during the Revolutionary and Ratification periods).

[11] Collins et al., *First Things First: A Modern Coursebook on Free Speech Fundamentals* 2–3 (Jackie Farmer ed., 2019).

which criticized William Cosby, New York's loyalist governor.[12] Cosby sought to silence Zenger through failed indictments and other means, including ordering the paper burned and offering rewards for information about its writers.[13] He finally secured Zenger's arrest by proceeding without an indictment from a grand jury.[14]

Zenger's ultimate acquittal ended successful seditious libel prosecutions during the colonial period—the people rejected censorship through such charges and refused to convict.[15] And it influenced the Founders; Gouverneur Morris called Zenger's victory "the germ of American freedom, the morning star of that liberty which subsequently

---

[12] Michael Kent Curtis, *Free Speech, "The People's Darling Privilege": Struggles for Freedom of Expression in American History* 41 (2000).

[13] *New York Weekly Journal*, Lower Manhattan Historical Association, https://www.historiclowermanhattan.org/printinghouserow/new-york-weekly-journal.

[14] *Crown v. John Peter Zenger, 1735*, Hist. Soc'y of the N.Y. Cts., https://history.nycourts.gov/case/crown-v-zenger.

[15] Curtis, *supra* note 12, at 46.

revolutionized America."[16] But before acquittal, Zenger spent nearly a year in jail, and his wife and attorneys kept his newspaper afloat.[17]

The Founders knew, therefore, that official punishment of disfavored speech imposes a serious, immediate cost, even with eventual vindication in court. So the First Amendment's authors rejected governmental retaliation against dissent just as their predecessors rejected the Crown's prosecution of Zenger. As Madison put it: Without free speech, "'the censorial power' would be in the Government over the people and not 'in the people over the Government.'"[18]

## CONCLUSION

The FTC's retaliation against Media Matters violates the First Amendment. If left unchecked, others will emulate the agency's tactics, leaving expressive rights contingent upon the vagaries of political power.

---

[16] Scott Bomboy, *On This Day, an Early Victory for the Free Press*, Nat'l Const. Ctr. (Aug. 4, 2024), https://constitutioncenter.org/blog/a-huge-free-press-victory-by-the-original-philadelphia-lawyer.

[17] *John Peter Zenger*, Free Speech Ctr. at Middle Tenn. State Univ. (July 2, 2024), https://firstamendment.mtsu.edu/article/john-peter-zenger.

[18] Harry Kalven Jr., *The New York Times Case: A Note on "The Central Meaning of the First Amendment"*, 1964 Sup. Ct. Rev. 191, 208.

This Court should therefore reject the FTC's motion for a stay pending appeal.

Dated: September 2, 2025

/s/ *Robert Corn-Revere*

Robert Corn-Revere
FOUNDATION FOR INDIVIDUAL
    RIGHTS AND EXPRESSION
700 Pennsylvania Avenue, SE
Suite 340
Washington, DC 20003
(215) 717-3473
bob.corn-revere@thefire.org

*Counsel for* Amicus Curiae

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

This document complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 2,579 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

Dated: September 2, 2025

/s/ *Robert Corn-Revere*

Robert Corn-Revere
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION
700 Pennsylvania Avenue, SE
Suite 340
Washington, DC 20003
(215) 717-3473
bob.corn-revere@thefire.org

*Counsel for* Amicus Curiae

## CERTIFICATE OF SERVICE

The undersigned certifies that on September 2, 2025, an electronic copy of the foregoing was filed with the Clerk of this Court using the CM/ECF system, and that all parties will be served through that system.

/s/ *Robert Corn-Revere*

Robert Corn-Revere
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Avenue, SE
Suite 340
Washington, DC 20003
(215) 717-3473
bob.corn-revere@thefire.org

*Counsel for* Amicus Curiae