# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

No. 25-5302                                 September Term, 2025

1:25-cv-01959-SLS

**Filed On:** October 23, 2025

Media Matters for America,

        Appellee

    v.

Federal Trade Commission, et al.,

        Appellants

**BEFORE:**    Millett, Wilkins, and Walker\*, Circuit Judges

## O R D E R

Upon consideration of the emergency motion for stay pending appeal, the response thereto, and the reply; and the amicus curiae brief filed by the Foundation for Individual Rights and Expression, which the court construes as containing a consent motion for leave to participate as amicus curiae, it is

**ORDERED** that the motion for leave to participate as amicus curiae be granted. It is

**FURTHER ORDERED** that the motion for stay be denied.

On November 16, 2023, Media Matters, a "non-profit media watchdog[,]" reported that "corporate advertisements on X appeared adjacent to antisemitic posts, and that [Elon] Musk had endorsed an antisemitic conspiracy theory." _Media Matters for America v. Paxton_, 138 F.4th 563, 569 (D.C. Cir. 2025); _see also Media Matters for America v. Federal Trade Comm'n_, No. 25-cv-1959, 2025 WL 2378009, at \*3 (D.D.C. Aug. 15, 2025) ("_Opinion_"). Soon thereafter, Elon Musk "promise[d] to file 'a

---

\* A statement by Circuit Judge Walker dissenting from the denial of a stay is attached.

thermonuclear lawsuit against Media Matters[.]'" *Paxton*, 138 F.4th at 569; Compl. ¶¶ 38, 46, *Media Matters*, No. 25-cv-1959, Dkt. No. 1; *Opinion*, at *3.

The next day, Stephen Miller, who was then a private citizen, and at all times relevant to this motion is the White House Deputy Chief of Staff, responded to a post on X about the Media Matters article, stating that fraud was unlawful and "[t]here are 2 dozen+ conservative state Attorney Generals[.]" Compl. ¶¶ 10, 40; *Opinion*, at *3. Within a few hours, the Missouri Attorney General responded to that post saying, "My team is looking into this matter." Compl. ¶ 41; *Opinion*, at *3; *see Paxton*, 138 F.4th at 571. And the next day, the Texas Attorney General announced an investigation into Media Matters under Texas's Deceptive Trade Practices Act. *Paxton*, 138 F.4th at 569; Compl. ¶ 42; *Opinion*, at *3.

That same day, X Corp. filed suit in federal district court against Media Matters and the reporter who wrote the article about the X posts and Elon Musk's endorsement. *Paxton*, 138 F.4th at 569; Compl. ¶ 45; *Opinion*, at *3. Within 24 hours, the Texas Attorney General issued a civil investigative demand to Media Matters for a large number of records, including "communications with possible sources at X and its advertisers," and documents on Media Matters' "internal operations, structure, expenditures, and reporting process." *Paxton*, 138 F.4th at 569; Compl. ¶¶ 43, 45; *Opinion*, at *3; Decl. of Benjamin Dimiero at 6 ¶ 15, *Media Matters*, No. 25-cv-1959, Dkt. No. 22-6.

In the following "weeks and months," Media Matters was sued by X's subsidiaries across the world and received an additional civil investigative demand, this time from the Missouri Attorney General. Compl. ¶¶ 44–46; *Opinion*, at *1, *3, *20; Dimiero Decl. at 6 ¶¶ 16–17.

By late 2024, federal courts had preliminarily enjoined both Missouri's and Texas's investigative demands on the ground that they were likely issued in retaliation for Media Matters' speech, in violation of the First Amendment. *Paxton*, 138 F.4th at 572–573; Compl. ¶¶ 50–52; *Opinion*, at *3. Then, in November 2024, Andrew N. Ferguson, a Commissioner of the Federal Trade Commission, committed to "stand[] up to * * * the radical left" and "[i]nvestigate * * * advertiser boycotts[.]" Compl. ¶ 59; *Opinion*, at *4. He emphasized that "it's really important that the FTC take investigative steps in the new administration" because "progressives" who are "fighting disinformation" are "not going to give up just because of the election[.]" *Opinion*, at *1, *4, *19; Compl. ¶¶ 61, 65.

Commissioner Ferguson was named Chair of the Federal Trade Commission ten days later. *Opinion*, at *20; *see also* Compl. ¶ 70. Over the next few months, he brought in several senior staffers who had previously commented that Media Matters "employed a number of stupid and resentful Democrats" and was "scum of the earth." Compl. ¶ 70; *Opinion*, at *5. And, in April 2025, he reportedly met to discuss antitrust matters with an "outside adviser" to the administration, who (1) had publicly stated that Media Matters' X accounts should be "nuke[d]" because "[t]hey're a cancer to free speech"; (2) had solicited money to "build our (growing) list of leftists to throw in the DC gulag," including the Media Matters journalist who wrote the article about X advertisements and Elon Musk, as well as another Media Matters journalist; and (3) had posted the following: "Advertiser boycotts are highly effective tactics leftists use to cow media executives to destroy free speech—and control the political narrative. [Media Matters] is the driving force behind conservative media getting crushed—and conservative voices silenced." Compl. ¶¶ 64, 71; *Opinion*, at *4.

Less than a month after that meeting, on May 20, 2025, the Commission issued a sweeping sixteen-page civil investigative demand to Media Matters. Civil Investigative Demand, *Media Matters*, No. 25-cv-1959, Dkt. Nos. 1-4, 22-3; *see* Compl. ¶ 73; *Opinion*, at *5; Dimiero Decl. at 6–7 ¶ 18. The Demand omitted the statutorily required explanation of the alleged violation it was investigating and citation to the corresponding provision(s) of law. Compl. ¶ 77; *Opinion*, at *5, *21; 15 U.S.C. § 57b-1(c)(2).

To list just a few of the twenty categories of information ordered to be disclosed to the agency, the Demand seeks all Media Matters' documents "produced or received in discovery in any litigation between Media Matters and X Corp. related to advertiser boycotts since 2023"; details on Media Matters' editorial process, such as "the methodology by which Media Matters evaluates * * * any news [or] sources"; all documents related to thirteen other entities that track or rate websites for misinformation, hate speech, or similar categories, where most of these entities "had previously been the subject of Musk's public attention[,]" Compl. ¶ 74; all communications with "any person connected to these entities"; "all communications" with "any other person" regarding a request to label content as hate speech or misinformation; "all analyses or studies" that Media Matters has conducted, sponsored, or commissioned relating to social-media advertising or digital advertising platforms, and "all data sets and code" necessary to replicate these analyses; and all Media Matters' regularly prepared financial statements and budgets. Civil Investigative Demand at 1–3; *see Opinion*, at *5; Dimiero Decl. at 6–7 ¶ 18.

Media Matters filed suit to quash the Demand. As relevant here, Media Matters alleges that the Commission's issuance of the Demand violated the First Amendment because it was taken in retaliation for the content of Media Matters' past reporting, including in particular its article reporting that corporate advertisements on X.com had appeared next to antisemitic and other hateful posts, and that X's owner, Elon Musk, had endorsed an antisemitic conspiracy theory. Compl. ¶¶ 95–104; *Opinion*, at *1, *3.

The district court issued a preliminary injunction enjoining the Demand on the ground that Media Matters is likely to demonstrate that the Demand was issued in retaliation for the content of Media Matters' speech. *Opinion*, at *1–2.

The Commission appealed and now seeks a stay of the preliminary injunction. At this early stage, the Commission has not shown a strong likelihood of success given the unique and (thus far) undisputed facts of this case. Nor do the other stay factors weigh in favor of the Commission's request. While we deny a stay, we emphasize that our decision cannot be divorced from the preliminary posture of this appeal, the deferential standard of review of the district court's factfinding, and the presumably unique fact pattern of this case.

**I**

The stay of a preliminary injunction pending appeal is an "extraordinary" form of relief. *Citizens for Resp. & Ethics in Washington v. Federal Election Comm'n*, 904 F.3d 1014, 1017 (D.C. Cir. 2018) (per curiam). To obtain such relief, an applicant must (1) make a "strong showing that [it] is likely to succeed on the merits" of the appeal; (2) demonstrate that it will be "irreparably injured" in the absence of preliminary relief; (3) show that the issuance of a stay will not "substantially injure the other parties interested in the proceeding"; and (4) establish that "the public interest" favors a stay. *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

The first two factors—the likelihood of success on the merits and the existence of irreparable injury absent a stay—"are the most critical." *Nken*, 556 U.S. at 434. The likelihood of success carries great weight in any stay analysis, as federal courts generally cannot dispense remedies in the absence of a favorable judgment for a party. *See Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926) ("A stay is not a matter of right, even if irreparable injury might otherwise result to the appellant."); *Curry v. Baker*, 479 U.S. 1301, 1302 (1986) (Powell, J., in chambers) ("It is no doubt true that,

absent [a stay], the applicant here will suffer irreparable injury.  This fact alone is not sufficient to justify a stay."); *Citizens for Resp. & Ethics in Washington*, 904 F.3d at 1019 ("Crossroads' appeal shows little prospect of success—an arguably fatal flaw for a stay application.").  In cases involving the First Amendment, the likelihood of success plays a particularly pronounced role.  *Cf. Green v. United States Dep't of Justice*, 54 F.4th 738, 745 (D.C. Cir. 2022) ("In First Amendment cases, the likelihood of success will often be the determinative factor in the preliminary injunction analysis.") (citation omitted).

## II

The Commission argues that it is likely to prevail on the merits of its appeal because (1) the district court lacked jurisdiction, and (2) the record does not support the district court's preliminary determination of a "causal link" between Media Matters' protected speech and the issuance of the Demand, which is the only element of a First Amendment retaliation claim disputed by the government at this stage.  Stay Motion at 12–20; *see Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016).

The Commission has not carried its burden on either point.

## A

The Commission has not made a strong showing that it is likely to succeed on the merits of its jurisdictional argument.

As a general rule, parties seeking to challenge the validity of a civil investigative demand issued by the Commission must wait for the agency to initiate an enforcement action in district court.  *See Federal Trade Comm'n v. Claire Furnace Co.*, 274 U.S. 160, 174 (1927) ("Until the [Commission] acts, the [demand recipients] cannot suffer, and, when [it] does act, they can promptly answer and have full opportunity to contest the legality of any prejudicial proceeding against them."); *see also* 15 U.S.C. § 57b-1(e).

But this court has held in an analogous case that when a company challenges a "sweeping" demand on First Amendment grounds and demonstrates actual and ongoing harm to its constitutional rights, the case is no longer "simply about a pre-enforcement challenge to a non-self-executing [demand.]"  *Paxton*, 138 F.4th at 569, 579.  Instead, if a plaintiff submits evidence credited by the district court that it is suffering "present, concrete, and objective harms [to its] newsgathering activities and media business operations[,]" and that harm will persist without the Commission also taking enforcement

action, then the demand's lawfulness can be challenged and remedied in district court. *Id.* at 579. Those differences set this case apart from *Claire Furnace*, which did not involve a First Amendment claim or any already-accruing harm. *Claire Furnace*, 274 U.S. at 168, 174.

In *Paxton*, Media Matters faced a demand seeking a "slew of records": "all Media Matters' documents and communications dating back to January 1, 2022, regarding X CEO Linda Yaccarino or Musk's purchase of X; all Media Matters' communications with employees and representatives of X and ten other entities in November 2023; documents concerning Media Matters' internal operations, structure, expenditures, and reporting process; and sources of funding for reporting on X." 138 F.4th at 569. Media Matters submitted affidavits showing that, among other things, the pendency of that broad demand stifled its speech through "self-censorship of reporters on political extremism topics, disruptions to their normal editorial practices, and reduced collaboration with other journalists and associations[.]" *Id.* at 572; *see also id.* at 581; *id.* at 586, 588 (Henderson, J., concurring in the judgment) (Media Matters' "associations with other groups" have "been impaired[.]").

Here, Media Matters has submitted declarations showing that it is suffering those same types of harms specifically as a result of the pending Commission Demand. *See* Decl. of Julie Millican at 4 ¶¶ 13–15, *Media Matters*, No. 25-cv-1959, Dkt. No. 22-7 (decrease in or "entirely ceased" communications from other previous collaborators; "noticeable decrease" in number of groups inviting Media Matters to participate in campaigns); Dimiero Decl. at 8–9 ¶¶ 20–22 (additional "burden[]" on editing process for any article with "any reference to the [Commission] or commissioners"; refraining from reporting on how the Commission's merger requirements for two entities, Omnicom and IPG, "placed unprecedented limitations on [those entities'] speech"); Decl. of Cynthia Padera at 5–6 ¶ 22, *Media Matters*, No. 25-cv-1959, Dkt. No. 22-8 ("retention challenges" and "reduc[tion in] the amount of research and reporting that [it] is able to do"); *Opinion*, at *6, *16 (citing declarations).

The district court credited those declarations and found that Media Matters was suffering ongoing and concrete harm to its speech activities. *Opinion*, at *6, *16. The Commission does not, at this stage, dispute the existence of those particular harms or their material impact on Media Matters' ability to engage in speech and reporting, other than asserting that the harms are self-inflicted. As for the latter, we already rejected a similar argument on the ground that Media Matters "reasonably altered its behavior to avoid creating evidence or materials that it would be forced to turn over if the [demand]

were enforced." *Paxton*, 138 F.4th at 581. And the *Paxton* decision was unanimous that the harms to Media Matters' freedom of association were *not* self-inflicted. *See id.* at 588 (Henderson, J., concurring in the judgment) (agreeing that impairment of Media Matters associations with other groups is, "[o]n its face," an "ongoing" and "not self-inflicted" injury).

Given those existing and continuing First Amendment harms, the Commission is unlikely to succeed in showing that Media Matters must suffer through them unless and until—if ever—the Commission chooses to file suit to enforce the Demand. To hold otherwise would empower agencies to issue sweeping demands that inflict concrete and "ongoing injuries" that suppress speech and journalism—for example, a demand for all sources used either by certain reporters or for specific stories—while simultaneously closing the courthouse doors to relief as long as the agency chooses not to take additional enforcement steps. *Paxton*, 138 F.4th at 583, 585.

The Commission argues that, under *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), the enforcement provision in 15 U.S.C. § 57b-1(e) deprives the district court of jurisdiction. That case adopted a claim-channeling doctrine under which district courts lack jurisdiction if "Congress intended that a litigant proceed exclusively through a statutory scheme of administrative and judicial review[,]" as determined by whether "(i) such intent is fairly discernible in the statutory scheme, and (ii) the litigant's claims are of the type Congress intended to be reviewed within [the] statutory scheme." *Arch Coal, Inc. v. Acosta*, 888 F.3d 493, 498 (D.C. Cir. 2018) (citation omitted) (second alteration in original); *see Thunder Basin*, 510 U.S. at 207, 212.

Whether a legal claim is exclusively channeled to an administrative review scheme depends on whether (1) precluding district court jurisdiction would foreclose all meaningful judicial review of the claim, (2) the claim is wholly collateral to the statute's review provisions, and (3) the claim is outside the agency's expertise. *Axon Enter., Inc. v. Federal Trade Comm'n*, 598 U.S. 175, 186, 143 S. Ct. 890, 900 (2023) (citing *Thunder Basin*, 510 U.S. at 212–213).

*Thunder Basin* is unlikely to foreclose district court jurisdiction here. Media Matters does not seek to circumvent an administrative proceeding followed by judicial review in a court of appeals, which was the issue in *Thunder Basin*. There is no dispute, in fact, that Media Matters exhausted what little Commission procedure was available by engaging with agency officials, who then rejected its requests to withdraw or significantly modify the Demand to avoid First Amendment harms. *See* Order

Denying Pet. to Quash Civil Investigative Demand, *In the Matter of Civil Investigative Demand to Media Matters for America Dated May 20, 2025*, FTC Dkt. No. 251-0061 (July 25, 2025).

Even more to the point, unlike in *Thunder Basin*, there is no dispute that the next step for review of Media Matters' constitutional claims is in district court, not a court of appeals. 15 U.S.C. § 57b-1(e). So the only question is whether Media Matters can seek relief at this time for the "here-and-now" First Amendment harms found by the district court, or instead must wait until the Commission initiates an enforcement proceeding—a step that might never happen. *Axon*, 598 U.S. at 191–192, 195, 143 S. Ct. at 903–904, 906. Allowing the party that has issued a demand that is causing concrete and ongoing First Amendment injury to dictate when, if ever, judicial review can commence could deprive parties of all meaningful judicial review of constitutional claims. *Axon*, 598 U.S. at 190–191, 143 S. Ct. at 903–904. And where the agency was already afforded an opportunity to consider the constitutional harms caused by its demand—so that the only question is timing, not forum—there is no agency-expertise benefit to waiting. Nor is foreclosing timely judicial consideration of such purely constitutional claims likely contemplated by the statutory review scheme Congress designed. "What makes the difference here is the nature of the claims and accompanying harms that the parties are asserting." *Axon*, 598 U.S. at 192, 143 S. Ct. at 904 (finding no foreclosure of pre-enforcement district court review where petitioners protested an ongoing constitutional injury and where "rights [were] 'effectively lost' if review is deferred").

For those reasons, the Commission has not shown at this point that it is likely to succeed in establishing that Media Matters' claims must await an enforcement proceeding (if any) under 15 U.S.C. § 57b-1(e).

**B**

**1**

The parties agree that, to prevail on a First Amendment retaliation claim, a plaintiff must show that "(1) [it] engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) [there is] a causal link between the exercise of a constitutional right and the adverse action taken against [it]." *Aref*, 833 F.3d at 258 (formatting modified).

# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 25-5302**                                    **September Term, 2025**

The Commission does not dispute that Media Matters engaged in First Amendment protected speech when it published its November 2023 article about the inclusion of antisemitic and hateful material on X. Nor does the Commission dispute the factual validity of the article's content. The Commission also does not argue that Media Matters' editorial and journalistic reporting processes underlying the November article fall outside the First Amendment's protective realm. Neither does the Commission contest the district court's preliminary factual findings that the Commission's sweeping Demand has deterred third parties from talking or associating with Media Matters in a manner that materially impedes its communicative work and would deter a person of ordinary firmness from undertaking similarly critical speech again.

As a result, to obtain a stay, the burden is on the Commission to show a likelihood that no causal link will be found between its Demand and Media Matters' critical reporting about posted content on X and Elon Musk's asserted endorsement of an antisemitic statement.

**2**

Given our deference to the district court's preliminary factual determinations and the unusual factual pattern in this case, the Commission has not shown at this stage that it is likely to overturn the district court's tentative factual finding of a "causal link" between Media Matters' protected speech and the Commission's issuance of its sweeping and unexplained Demand. We understand the district court's determination as relying on uncontested facts in the record that, when taken together, offer adequate support for finding a likelihood of retaliation at this preliminary stage. But we underscore that the district court's decision is only a tentative determination governing the litigation interim, since Media Matters ultimately will have to clear a number of daunting legal hurdles to prevail.

While the starting presumption is that agency actions are taken in good faith, _Hartman v. Moore_, 547 U.S. 250, 263 (2006), the Commission has not shown that the unique—and seemingly quite unprecedented—constellation of undisputed facts and circumstances compiled in this still-preliminary record would render erroneous the district court's tentative finding that Media Matters' protected speech likely caused issuance of the Demand.

_First_, the Demand issued at a time when a pattern of litigation and information demands targeted at Media Matters had spanned virtually every day of the two years

since it reported both that X had placed advertisements for technology companies next to antisemitic and hateful content and that Elon Musk had endorsed an antisemitic conspiracy theory. *See Eckerman v. Tennessee Dep't of Safety*, 636 F.3d 202, 209–210 (6th Cir. 2010) (finding an inference of retaliatory motive even after a three-year lapse in time because there was subsequent circumstantial evidence of a sufficient nature); *Paterek v. Village of Armada*, 801 F.3d 630, 647 (6th Cir. 2015); *see also Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982) (finding in a First Amendment public employment retaliation case that "an entire campaign of harassment which though trivial in detail may have been substantial in gross" was sufficient to state a claim under Section 1983).

As noted earlier, Elon Musk promised in response to that reporting to launch "a thermonuclear lawsuit against Media Matters." *Opinion*, at *1, *3; Compl. ¶¶ 38, 46. The very next day, the now-Deputy Chief of Staff to the President replied to a post on X about the Media Matters article, stating that "[f]raud is both a civil and criminal violation" and that "[t]here are 2 dozen+ conservative state Attorneys General." *Opinion*, at *3; Compl. ¶ 40. Within a few hours, at least one state probe commenced in Missouri and, within two days, the Texas Attorney General announced that he would investigate Media Matters and issued a civil investigative demand. At the same time, X Corporation (owned by Elon Musk) sued Media Matters and one of its reporters in federal district court in Texas. *Opinion*, at *3; Compl. ¶¶ 41–42, 45.

Courts subsequently ruled that those state civil investigative demands likely violated the First Amendment. *See Paxton*, 138 F.4th at 581 (in case involving Texas demand, court explained that "Media Matters is the target of a government campaign of retaliation, including an investigation, a press release, and a sweeping [demand]"); *Media Matters for America v. Bailey*, No. 24-cv-147, 2024 WL 3924573, at *11–18 (D.D.C. Aug. 23, 2024) (in case involving Missouri demand, court found that "[a] reasonable factfinder is likely to interpret Defendants' words as targeting Media Matters not for legitimate law enforcement purposes but instead for its protected First Amendment activities"), *appeal dismissed sub nom. Media Matters for America v. Paxton*, No. 24-cv-7141, 2025 WL 492257 (D.C. Cir. Feb. 13, 2025); *X Corp. v. Media Matters for America*, No. 4:23-cv-1175 (N.D. Tex Nov. 20, 2023); *Media Matters for America v. X Corp.*, No. 25-cv-2397, 2025 WL 1084715, at *1 (N.D. Cal. Apr. 10, 2025) ("[I]t seems almost certain that the X entities' decision to file multiple suits in multiple jurisdictions is designed more to bully Media Matters and inflict financial hardship upon it than to actually vindicate those entities' rights[.]").

Most of those lawsuits and demands were enjoined by the time the Commission's Demand issued, with one of those injunctions issuing just the previous month.  *See Media Matters for America v. Paxton*, 732 F. Supp. 3d 1, 8 (D.D.C. 2024), *aff'd*, 138 F.4th 563 (D.C. Cir. 2025) (enjoining Texas demand); *Bailey*, 2024 WL 3924573, at *11–18 (enjoining Missouri demand); *X Corp.*, 2025 WL 1084715, at *1.

*Second*, the district court did not err in considering the broad scope of the Demand—including its effort to probe into editorial decisionmaking and journalistic actions surrounding the publication of the disfavored article—as relevant evidence of pretext.  *See Opinion*, at *16 (discussing how the Demand seeks Media Matters' reporting resource materials); *Paxton*, 138 F.4th at 569, 571 (characterizing a similar demand on Media Matters as "sweeping" and "wide-ranging"); *cf. Hartman*, 547 U.S. at 256 ("[W]hen nonretaliatory grounds are in fact insufficient to provoke the adverse consequences, we have held that retaliation is subject to recovery as the but-for cause of official action offending the Constitution."); *Nieves v. Bartlett*, 587 U.S. 391, 400, 139 S. Ct. 1715, 1723 (2019).

In addition, the district court permissibly weighed the fact that the Commission's sweeping demand was issued without the statutorily required explanation of the permissible grounds for its issuance.  The Federal Trade Commission Act requires the agency to "state the nature of the conduct constituting the alleged violation which is under investigation and the provision of law applicable to such violation" when each civil investigative demand issues.  15 U.S.C. § 57b-1(c)(2).  That did not happen here.  *See ANR Storage Co. v. FERC*, 904 F.3d 1020, 1024 (D.C. Cir. 2018) (Whether agency decisions are made in accordance with applicable law under the APA depends "on the reasons stated in the orders under review[,]" not our own, and not "the agency's post-hoc rationalizations[.]") (citations omitted).[1]

_____

[1]  The dissenting opinion is of the view that the demand is probing antitrust matters.  *Dissenting Op.* at 2–7.  The Demand, however, attached only a (i) boilerplate, generic resolution with (ii) a ten-year timespan (iii) that was issued 16 months before Media Matters even published its article, and (iv) that authorized the investigation of any violation of any and all "statutes or rules enforced by the Commission[.]"  *See* Compl. Ex. D at 20, *Media Matters*, No. 25-cv-1959, Dkt. No. 1-4.  The Commission has made no argument here—and it seems unlikely that it could—that attachment of the resolution satisfies 15 U.S.C. § 57b-1(c)(2).  *See Consumer Fin. Prot. Bureau v. Accrediting Council for Indep. Colleges & Schools*, 854 F.3d 683, 690–692 (D.C. Cir. 2017);

On top of that, portions of the Demand's content linked it directly to Media Matters' speech about X's inclusion of antisemitic and hateful advertisements and Elon Musk's actions. The Demand seek, among many other things, all documents "produced or received in discovery in any litigation between Media Matters and X Corp. related to advertiser boycotts since 2023"; all documents relating to other entities that track or evaluate websites and platforms for misinformation, hate speech, or deceptive content; details on Media Matters' editorial process, such as "the methodology by which Media Matters evaluates * * * any news [or] sources"; "all analyses or studies" by Media Matters that are related to social media advertising or digital advertising platforms, along with the data sets and code for replicating the study; and all regularly prepared financial statements and budgets. Civil Investigative Demand at 1–3; *Opinion*, at *5, *16; Compl. ¶ 76.

*Third*, a key Commission decisionmaker, Chairman Andrew N. Ferguson, spoke publicly while seeking the position of Commission Chair of his intent to target media groups and other actors in language that focuses on their viewpoints and the content of their speech. *Opinion*, at *19. In a "leaked memo" supporting his candidacy for Chair, then-Commissioner Ferguson stated that he would "stand[] up to * * * the radical left" and "[i]nvestigate * * * advertiser boycotts[.]" *Opinion*, at *4, *19 (emphasis added); Compl. ¶ 59. Then, just ten days before he was appointed to be the incoming Chair, Mr. Ferguson stated directly that "it's really important that the FTC take investigative steps in the new administration" because "progressives" who are "fighting disinformation" are "not going to give up just because of the election[.]" *Opinion*, at *1, *4, *19–20; Compl. ¶ 61. The Demand issued in the early months of Chairman Ferguson's tenure.

*Fourth*, three individuals who had publicly criticized Media Matters' reporting by name were involved with Chairman Ferguson or the Commission at the time the Demand issued. *See*, *e.g.*, *Opinion*, at *5, *20 (Joe Simonson stating "Media Matters employed a number of stupid and resentful Democrats * * *"; Jon Schweppe stating Media Matters was "scum of the earth"; Jake Denton accusing "Media Matters" of being "an organization devoted to pressuring companies into silencing conservative voices"); Compl. ¶ 70. In the months leading up to the issuance of the Demand, Chairman Ferguson "brought in" those same three individuals as senior Commission staffers.

_____

*Consumer Fin. Prot. Bureau v. Source for Public Data, L.P.*, 903 F.3d 456, 458–460 (5th Cir. 2018).

*Opinion*, at \*5, \*20; Compl. ¶ 70.  Another individual, Mike Davis, became an "outside adviser" to the current administration, *Opinion*, at \*4, \*19; Compl. ¶ 71, and stated two months before the Demand was issued that he was "working with people like Andrew Ferguson, the FTC Chair[,]" Compl. ¶ 71.  That same adviser previously (1) had said that Media Matters' X accounts should be "nuke[d]" because "[t]hey're a cancer to free speech"; (2) had solicited money to "build our (growing) list of leftists to throw in the DC gulag with" the Media Matters journalist who authored the X article and another Media Matters reporter; and (3) had posted that:  "Advertiser boycotts are highly effective tactics leftists use to cow media executives to destroy free speech—and control the political narrative. [Media Matters] is the driving force behind conservative media getting crushed—and conservative voices silenced."  Compl. ¶¶ 64, 71.  The month before the Demand issued, that person allegedly met with Chairman Ferguson on two occasions. Compl. ¶ 71.

Courts have recognized that such circumstantial evidence, including proximity in time between the protected speech and government's adverse actions, the defendant's expression of hostility to the protected speech, and the absence of a proffered legitimate alternative explanation for the action can support a finding that protected speech caused the agency's response.  *See Boquist v. Courtney*, 32 F.4th 764, 777 (9th Cir. 2022); *see also*, *e.g.*, *Bailey v. Ramos*, 125 F.4th 667, 685 (5th Cir. 2025) ("Circumstantial evidence is equally as probative as direct evidence in proving illegitimate intent.  Also, direct evidence of an improper motive is usually difficult, if not impossible, to obtain.") (formatting modified); *Richards v. Perttu*, 96 F.4th 911, 919 (6th Cir. 2024), *aff'd*, 605 U.S. 460, 145 S. Ct. 1793 (2025); *Paterek*, 801 F.3d at 647; *Rosaura Bldg. Corp. v. Municipality of Mayaguez*, 778 F.3d 55, 67 (1st Cir. 2015); *Kidwell v. Eisenhauer*, 679 F.3d 957, 965–966 (7th Cir. 2012); *Eckerman*, 636 F.3d at 209–210 (finding an inference of retaliatory motive even after a three year lapse in time because there was subsequent circumstantial evidence of a sufficient nature); *Mandell v. County of Suffolk*, 316 F.3d 368, 383 (2d Cir. 2003).

Given the seemingly unusual and unprecedented array of facts in the record at this stage, the Commission has not shown it is likely to succeed in showing that the district court erred in finding preliminarily a likelihood of retaliation.  *Cf. Department of Commerce v. New York*, 588 U.S. 752, 780–785, 139 S. Ct. 2551, 2573–2576 (2019) (recognizing that "unusual circumstances" and "significant mismatch" between an

agency's actions and *post hoc* explanations in reviewing agency action can, in some cases, be informative as to motive).[2]

That is not to say that the preliminary finding on motive will necessarily bear out at the merits stage. The burden will remain on Media Matters to establish, with the aid of additional proceedings and record development, that the Commission indeed acted with retaliatory motive. Hurdles include a presumption of agency regularity that "we do not lightly discard[.]" *Hartman*, 547 U.S. at 263. Furthermore, even if there was retaliatory motive, the Commission may be able to show that it would have issued the Demand on nonretaliatory grounds anyway—something the Commission does not argue here. *Id.* at 256; *see Doe v. District of Columbia*, 796 F.3d 96, 107 (D.C. Cir. 2015) ("To satisfy the causation link, a plaintiff must allege that his or her constitutional speech was the 'but for' cause of the defendants' retaliatory action"—a "subjective" inquiry.); *Scahill v. District of Columbia*, 909 F.3d 1177, 1185 (D.C. Cir. 2018). For example, the Commission's attorneys have argued here that civil investigative demands were also issued to sixteen other entities to probe antitrust concerns involving advertiser boycotts, and that the Media Matters Demand was for that same purpose. The Commission, though, has not said or shown that the scope and sweep of those

_____

[2] As the dissenting opinion observes, some of the "laundry list" of statements supporting the district court's preliminary conclusion that the Commission acted with retaliatory motive come from voices other than those of the Commissioners. *Dissenting Op.* at 24. That does not make them "irrelevant to this case," *id.* at 24–25, precisely because courts often have to rely on circumstantial evidence when assessing the subjective motives of government actors. *See Steele v. Mattis*, 899 F.3d 943, 951–952 (D.C. Cir. 2018) (recognizing in the age-discrimination context that "[t]he actions of a discriminatory supervisor that feed into and causally influence the decisionmaker's ultimate determination may also be the proximate cause of an adverse employment action") (citing *Staub v. Proctor Hospital*, 562 U.S. 411, 419–423 (2011)). The dissenting opinion adds that Media Matters has not alleged that these individuals were involved in the issuance of the Demand. *Dissenting Op.* at 25. But Media Matters has alleged that Mr. Schweppe, Mr. Simonson, Mr. Denton, and Mr. Davis were hired by or had discussed antitrust matters with Chairman Ferguson shortly before the Demand was issued. Compl. ¶¶ 70–71; *Opinion*, at *19–20. At this preliminary stage, we cannot say that the district court erred in finding those allegations likely to be relevant. Media Matters will need to provide specific support of its allegations to prove retaliatory motive at the merits stage, but that question is not before us now.

demands matches the one given to Media Matters, or explained any difference in scope. *See* Stay Motion at 14.

At this preliminary stage, all that we decide is that the Commission has not shown that the district court's findings of fact were clearly erroneous or that, if credited, they could not legally support a preliminary and tentative judgment of a First Amendment violation. *See Glossip v. Gross*, 576 U.S. 863, 881 (2015) ("emphasiz[ing]" in reviewing a denial of a preliminary injunction that courts "review the District Court's factual findings under the deferential 'clear error' standard[, which] does not entitle [an appellate court] to overturn a finding 'simply because [it is] convinced that [it] would have decided the case differently.") (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985)); *Gordon v. Holder*, 721 F.3d 638, 651 (D.C. Cir. 2013) ("[T]he [legal] question is a close one, deserving of further development at a trial on the merits, so we affirm [the grant of preliminary injunction] and remand.").

III

As for the relevant equitable considerations, *Paxton* directs our weighing of the competing interests.

On Media Matters' side of the scale, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Paxton*, 138 F.4th at 585 (quoting *Pursuing America's Greatness v. Federal Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016)); *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (same). And Media Matters has documented the concrete harms to its speech activities it is currently suffering with the Commission's Demand hanging over its head. *See*, *e.g.*, Millican Decl. at 4 ¶¶ 13, 15 (decrease in or "entirely ceased" communications from other previous collaborators "shortly after" investigations began; "noticeable decrease" in number of groups willing to work with Media Matters).

Furthermore, the language of the Demand, on its face, appears to require Media Matters to disclose information that may implicate the First Amendment reporter's privilege. *Compare* Civil Investigative Demand at 2–3, *with Zerilli v. Smith*, 656 F.2d 705, 711–712 (D.C. Cir. 1981) (recognizing a qualified reporter's privilege of protecting confidential sources that "should be readily available" in civil cases); *see Chen v. Federal Bureau of Investigation*, No. 24-5050, --- F.4th ----, 2025 WL 2779312, at *1, *3 (D.C. Cir. Sept. 30, 2025) (applying *Zerilli*); *Securities & Exch. Comm'n v. McGoff*, 647 F.2d 185, 191 (D.C. Cir. 1991) (permitting withholding of "documentation relating solely

to 'editorial policy' or news gathering" from SEC subpoena); *Chevron Corp. v. Berlinger*, 629 F.3d 297, 306 (2d Cir. 2011) ("This circuit has long recognized a qualified evidentiary privilege for information gathered in a journalistic investigation. [This privilege] is intended to protect the public's interest in being informed by 'a vigorous, aggressive and independent press[.]'") (citations omitted); *Shoen v. Shoen*, 48 F.3d 412, 415–416 (9th Cir. 1995) (recognizing that the compelled "disclosure of research materials poses a serious threat to the vitality of the newsgathering process") (citation omitted); *United States v. Cuthbertson*, 630 F.2d 139, 147 (3d Cir. 1980) ("The compelled production of a reporter's resource materials can constitute a significant intrusion into the newsgathering and editorial processes * * * [that] may substantially undercut the public policy favoring the free flow of information to the public[.]") (citation omitted).

As for the Commission, it certainly has an interest in enforcing consumer protection laws. But nothing in the Demand the Commission issued said what, if any, law Media Matters was being investigated for possibly violating, or what conduct of Media Matters is under investigation.

To be sure, the dissenting opinion offers its own theory about the Commission's purpose in issuing the Demand. *Dissenting Op.* at 2–7. But Congress required the Commission to explain itself when it issued the Demand.

We note that, *after* Media Matters filed its lawsuit and seven weeks *after* the Demand was issued, the Commission retroactively amended its Demand to include some explanation of the basis for its issuance, presumably in a belated effort to comply with 15 U.S.C. § 57b-1(c)(2). *See* Mot. for Prelim. Inj. Ex. B at 2, *Media Matters*, No. 25-cv-1959, Dkt. No. 22-4. Even assuming that revision brings the Demand in compliance with the statute—something the government does not argue here—that post-litigation addition does not demonstrate how enjoining the Demand pending further litigation will impair the Commission's work. The Commission, after all, has not sought to enforce the Demand or said that it has any short- or medium-term plans to do so.

In addition, nothing in this decision or the district court's injunction impairs the Commission's ability to proceed on any other demands it has issued. The Commission offers just one sentence in its motion papers asserting that it would suffer the "administrative difficulty of separating out and halting a single component of a broad multi-party investigation"—a difficulty that it asserts "would only grow more severe if other [demand] recipients followed Media Matters' example." Stay Motion at 21. But

the Commission's sentence is not supported by any declaration or otherwise elaborated on with any explanatory information. It does not, for example, explain what difficulties it would encounter, how the investigations are so closely interconnected that the Media Matters Demand would be inseparable from the others, or how this short delay would impair its work given that it has not expressed to this court any current interest in enforcing the Media Matters Demand. Nor has it explained how any of its demands to other entities involve anything like the type of unique factual circumstances surrounding the Media Matters Demand and so could plausibly allow those entities to seek similar relief. *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (Injury "must be both certain and great"; "actual and not theoretical"; and "of such imminence that there is a 'clear and present' need for equitable relief.") (citation omitted); *Committee in Solidarity with People of El Salvador v. Sessions*, 929 F.2d 742, 745–46 (D.C. Cir. 1991) ("Injunctions * * * will not issue to prevent injuries neither extant nor presently threatened, but only merely feared.") (formatting modified) (citation omitted).

All this lack of clarity by the Commission gives us no sufficient basis for finding that the district court abused its discretion in finding no irreparable injury or in weighing the competing interests in this case. Especially because whatever the Commission's prospective plans regarding this demand, it "may not 'act unlawfully even in pursuit of desirable ends.'" *Paxton*, 138 F.4th at 585 (quoting *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 734 (D.C. Cir. 2022)); *see also Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) ("The Constitution, however, does not permit [the government] to prioritize any policy goal over the Due Process Clause, and enforcement of an unconstitutional law is always contrary to the public interest.") (formatting modified).

\* \* \* \* \*

For the foregoing reasons, the Commission's motion for a stay pending appeal is denied. If the Commission wishes to have the appeal expedited—something it has not mentioned—the parties should consult and propose a schedule to the court.

### Per Curiam

FOR THE COURT:
Clifton B. Cislak, Clerk

BY:      /s/
         Selena R. Gancasz
         Deputy Clerk

WALKER, *Circuit Judge*, dissenting:

In the weeks leading up to President Trump's inauguration, before Andrew Ferguson became Chairman of the Federal Trade Commission, Ferguson identified what he saw as a recent problem, the potential for a future problem, and a solution:

- The recent problem — censorship of social-media users by officials in the administration of President Joe Biden.

- The potential future problem — those officials' imminent entry into the private sector, where they might pursue old goals through new means, including collusive boycotts by advertisers of disfavored social-media platforms.

- The solution — enforcement actions against them if they illegally coordinate advertiser boycotts in violation of antitrust laws.

Then, after Ferguson became Chairman, the Federal Trade Commission launched an investigation into anticompetitive collusion by advertisers that boycott media outlets. In that investigation, the FTC issued "seventeen still-pending" civil investigative demands.[1] One of the seventeen demands went to Media Matters, an advocacy organization that helps "activists" to "take direct action against offending media institutions."[2]

---

[1] Order Denying Petition to Quash Civil Investigative Demand, *In re Civil Investigative Demand to Media Matters for America Dated May 20, 2025*, FTC File No. 251-0061, at 2 (July 25, 2025).

[2] *About Us*, Media Matters for America, https://perma.cc/3MBD-Y5C4.

Media Matters alleges that the FTC's investigation is in retaliation for a 2023 Media Matters article critical of X, formerly known as Twitter. Never mind that the article didn't mention the FTC or anyone who runs it. Never mind that the article was published a year and a half before the investigation. And never mind that the record does not include a single statement about Media Matters by any decisionmaker at the FTC before the FTC's investigation.

Media Matters sued to enjoin the FTC. The district court issued a preliminary injunction.[3] Because the FTC is (very) likely to prevail on the merits and because the other stay factors favor the FTC, I would stay the injunction pending appeal.

\* \* \*

"During the 2020 election season and the COVID–19 pandemic, social-media platforms frequently removed, demoted, or fact checked posts containing allegedly false or misleading information. At the same time, federal officials, concerned about the spread of 'misinformation' on social media, communicated extensively with the platforms about their content-moderation efforts."[4] That "misinformation" included "posts supporting the theory that the virus leaked from a laboratory," a theory that the FBI and Department of Energy now consider "probably correct."[5]

---

[3] *Media Matters for America v. FTC*, Civ. A. No. 25-1959, 2025 WL 2378009, at \*2 (D.D.C. Aug. 15, 2025) (hereinafter District Court Opinion).

[4] *Murthy v. Missouri*, 144 S. Ct. 1972, 1981 (2024).

[5] *Id.* at 1998, 1998 n.2 (Alito, J., dissenting) (joined by Thomas and Gorsuch, JJ.).

"Some of these [government] communications [to social-media platforms] were more aggressive than others."[6]   At times, high-ranking officials in the Executive Branch "harried and implicitly threatened Facebook with potentially crippling consequences if it did not comply with their wishes about the suppression of certain COVID–19-related speech."[7]

When President Biden's officials were sued for violating social-media users' free-speech rights, all seven federal judges and justices who reached the suit's merits agreed that the Biden administration had brazenly violated the First Amendment. The district court found "a far-reaching and widespread censorship campaign."[8]   Then a unanimous circuit panel held that the White House likely "coerced the platforms" and "commandeer[ed] their decision-making processes, both in violation of the First Amendment."[9]   And finally, though six justices concluded that the plaintiffs lacked standing, the only three justices to reach the merits called the White House's conduct "dangerous" and "blatantly unconstitutional."[10]

---

[6] *Id.* at 1983 (majority op.).

[7] *Id.* at 1998 (Alito, J., dissenting) (joined by Thomas and Gorsuch, JJ.).   For example, White House officials told Facebook that the administration was "'considering our options on what to do about it,'" *id.* at 2012 (quoting Andy Slavitt), later "paired a request for platforms to 'stop amplifying untrustworthy content' with a reminder that President Biden 'supports . . . a robust anti-trust program,'" *id.* (quoting Jen Psaki), and still later "asserted that the platforms 'should be held accountable' for publishing misinformation," *id.* (quoting Kate Bedingfield).

[8] *Missouri v. Biden*, 680 F. Supp. 3d 630, 729 (W.D. La. 2023).

[9] *State v. Biden*, 80 F.4th 641, 672 (5th Cir. 2023).

[10] *Murthy v. Missouri*, 144 S. Ct. at 1999 (Alito, J., dissenting) (joined by Thomas and Gorsuch, JJ.).

In the time between President Trump's election and inauguration, Federal Trade Commissioner Andrew Ferguson sat for an interview on a podcast to discuss the Biden Administration's record of censoring "disinformation."[11] He said, "The word we always hear is disinformation. That's the classic way that this is said. That's just Orwellian newspeak for ideas that Silicon Valley and progressives don't like."[12]

Not once in the interview did Ferguson say that "progressives" should be punished for what they believe.[13] Rather, he chided "progressives" in the Biden Administration for punishing *others* for what *others* believe.[14] And he proposed two government actions to combat censorship.

First, "the government can forbid its own officials from doing that. You know, President Trump and his new Cabinet that he's been rolling out over the last several days, they can just order their subordinates, stop doing this. Get off the phone with these platforms, stop suppressing the free speech of Americans, quit doing this."[15]

Second, the FTC can "make sure that that sort of cooperation and collusion doesn't move into the private sector. No advertiser cartels, no cooperation among the platforms to

---

[11] Transcript of Andrew Ferguson on The War Room:11-30-24 at 2, *Media Matters for America v. FTC*, Civ. Case No. 25-1959, Docket No. 32-1 (D.D.C. Aug. 15, 2025).

[12] *Id.* at 2; *see also id.* at 3 ("you had the government cooperating, coordinating, whatever you want to call it, with the platforms to take down misinformation and disinformation, all the stuff that Silicon Valley and the progressives don't like").

[13] *See id.* at 2-5.

[14] *See id.* at 2-3.

[15] *Id.* at 3.

say, hey, let's all just agree we're not going to allow this type of speech. And I think that that's where the FTC and the FCC, the way that future Chairman Carr has talked about it, can do really, really important work."[16]

In other words, Ferguson first proposed that government officials stop violating the First Amendment. And then he proposed that the FTC stop private parties from violating antitrust laws. He worried about the threat of antitrust violations because he expected the allegedly illegal conduct he identified (censorship by progressives in the Biden Administration) to shift from a method previously available to progressives within government to a method available to progressives outside of government. As he put it, "progressives, Silicon Valley, everyone who is fighting disinformation, they're not gonna give up just because of the election."[17]

Of course, as Ferguson noted, "private companies can sort of decide what they'd like to do with their own resources."[18] If a tech company wants to platform only progressive speech, it can do so. And if an advertiser wants to advertise on only progressive platforms, it can do so too. But "one of the most important things the antitrust laws forbid is people getting in a room and agreeing, we're not going to compete. And, you know, if there are a bunch of powerful advertisers getting in a room together and saying, hey, let's all agree not to advertise on this platform because we don't like that they have free speech on that platform, or let's agree not to advertise about this podcast or this online show, that can potentially violate the antitrust laws because the antitrust laws are designed to make

---

[16] *Id.*

[17] *Id.*

[18] *Id.* at 2.

sure that all of us get to participate in markets freely and fairly and that there isn't a bunch of backdoor dealing among competitors to suppress people or ideas."[19]

Around the same time, Ferguson wrote in a memo that he would "[i]nvestigate and prosecute collusion on . . . advertiser boycotts" if President Trump appointed him Chairman of the FTC.[20] And he said he could be counted on to do so because he had "a track record of standing up to" the "anti-business, anti-innovation agenda of the radical left."[21] In other words, Ferguson did what he had done in the podcast interview — he identified allegedly illegal conduct (collusive "advertiser boycotts"), proposed a solution (FTC investigations and prosecutions of "collusion on . . . advertiser boycotts"), and bolstered (with his "track record of standing up to" the people who had engaged in the illegal conduct) the credibility of his promise to apply that solution to the problem.

Finally, after President Trump appointed him, Ferguson did what he had promised to do — he investigated whether

---

[19] *Id.*; *see also id.* ("And so, you know, at the FTC, that's one of the concerns that I really hope that the new Trump FTC is going to look into and that I've been calling for it to look into, which is if we've got agreements among the platforms to suppress ideas or speech, we have to investigate those for potential antitrust violations. And if we have advertiser cartels where advertisers are agreeing we're not going to advertise on this show, on this platform, those also potentially violate the antitrust laws. Group boycotts are illegal under the antitrust laws and I think they cry out for antitrust scrutiny. And then I think we have a second censorship problem and it's super important that President Trump won this election, because it's the kind of thing that he and his new government can address directly.").

[20] *FTC Commissioner Andrew N. Ferguson for FTC Chairman*, at 1 Punchbowl News, https://perma.cc/A56K-Q4YM.

[21] *Id.*

collusive advertiser boycotts existed and if so, whether they violated antitrust laws. Under his leadership, the FTC issued seventeen currently outstanding civil investigative demands to advertising trade associations, brand safety/suitability rating organizations, and policy/advocacy groups.[22] The investigation focused on "whether entities have conspired to withhold, degrade, increase the cost of, or otherwise diminish the quantity of advertising placed on news outlets, media platforms, or other publishers in violation of Section 1 of the Sherman Act and Section 5 of the FTC Act, under the guise of promoting 'brand suitability' and 'brand safety' against 'misinformation.'"[23] One of those advocacy groups is Media Matters, which helps "activists" to "take direct action against offending media institutions."[24]

Ferguson's sequence of conduct — saying what he would do in office, and then doing it — is what we expect of public servants tasked with enforcing the law, especially in a republic where elections and appointments by elected Presidents matter. It is also what Attorney General Robert Kennedy did when he kept his promise to investigate organized crime.[25] It's what Consumer Financial Protection Bureau Director Richard Cordray did when he kept his promise to investigate subprime

---

[22] Order Denying Petition to Quash Civil Investigative Demand, *supra* note 1, at 2.

[23] *Id.*

[24] *About Us*, Media Matters for America, https://perma.cc/3MBD-Y5C4.

[25] "If we do not on a national scale attack organized criminals with weapons and techniques as effective as their own, they will destroy us." Robert F. Kennedy, *The Enemy Within*, 265 (1960).

lenders.[26]  And it's what FTC Chairwoman Lina Khan did when she kept her promise to investigate Big Tech companies.[27]

Khan's example is especially illustrative, both because she was Ferguson's immediate predecessor and because her pre-appointment promises were so clear.  Before suing Big Tech companies with great fanfare and with (to put it generously) mixed results, Khan said the FTC should investigate them.[28]

---

[26] Ben Protess, *Wall Street's Newest Regulator a Longtime Foe*, The New York Times (July 18, 2011), https://perma.cc/S5PG-G9HR ("There's a belief here that Wall Street is a fixed casino and it's back in business, and we're left holding the bag. . . .  It's important for us to show we'll go after a company that does wrong.") (quoting Richard Cordray).

[27] After being asked what the biggest challenge is to adequate enforcement against Big Tech, Lina Khan responded that one of the main impediments has been the "deep information asymmetries" between Big Tech and antitrust enforcers. *Nomination to the National Aeronautics and Space Administration, Federal Trade Commission and U.S. Department of Commerce Before the Senate Committee on Commerce, Science, and Transportation*, 117 Cong. 56 (2021) (statement of Lina Khan, nominee for Commissioner of the FTC).  She later followed up on her earlier comments on Big Tech stating that "we really need the Federal Trade Commission to be using its information collection capacities to really try and mitigate some of these information gaps" with social media companies. *Id.* at 60.

[28] Adam J. White, *The Power Broke Her*, Commentary Magazine (March 2024), https://perma.cc/Q5H9-4HXZ (noting that while at Yale Law School, she joined her former boss "for a key meeting with Senator Elizabeth Warren on the need to pursue antitrust action against Big Tech Companies").

News Release, *Antitrust Scholar Lina Khan Joins Faculty*, Columbia Law School (December 2, 2020), https://perma.cc/2P8Q-

She even voiced the very same concerns that Ferguson has expressed about the effect of anticompetitive behavior on journalism.[29] But unlike Ferguson — who never mentioned Media Matters in his podcast interview or his memo — Khan identified the future targets of her investigations by name, over and over and over again:

## Facebook

1. "We . . . request that the Federal Trade Commission conduct a thorough review of **Facebook's** dominance in social networking and online advertising; assess the hazards that this dominance poses to commerce and competition, basic democratic institutions, and national security[.]"[30]

---

LDPQ ("If Khan has her way, Amazon, Apple, Facebook, and Google will not remain omnipotent behemoths."); *Sway: Lina Khan is Bursting Big Tech's Bubble*, The New York Times (October 29, 2020), https://tinyurl.com/4eb98c6c (Khan is "an existential threat to companies like Amazon, Facebook, Google and Apple.").

[29] Like Andrew Ferguson, Lina Khan has expressed concerns about algorithmic discrimination against certain publishers and increased market consolidation in the digital ad market: "Increasingly, news publishers are dependent on a few gatekeepers to disseminate their news . . . . [A] single change in an algorithm can plummet readership . . . . [T]here are also some serious concerns within the digital ad market as well as vertical integration that has potentially created some conflicts of interest." Khan, *Nomination to the Federal Trade Commission*, *supra* note 27, at 49.

[30] *Open Markets Institute Calls on the FTC to Block All Facebook Acquisitions*, Open Markets Institute, (Nov. 1, 2017) https://perma.cc/U6KP-WFLV (emphasis added) (quoting letter signed by Lina Khan, Director of Legal Policy); *cf.* Redacted Amended Complaint, *FTC v. Facebook Inc.*, Case No. 1:20-cv-

2. "[W]e ask that your agency [the FTC] adopt a presumptive ban on all acquisitions by **Facebook**."[31]

3. "**Facebook** appears to be using the dominance that comes from its control over this vital social network to crush or acquire nascent rivals in ways that reduce choice, undermine innovation, and harm the ability of individual American citizens to share information and engage in open . . . commerce with one another."[32]

4. "**Facebook** also delivers certain apps and features directly, placing it in competition with developers. It has both foreclosed competitors from its platform and appropriated their business information and functionality."[33]

5. "**Facebook** . . . has leveraged its dominant position as a communications network to extract sensitive business information from publishers. Collecting this information

---

03590, Doc. No. 75-1 (D.D.C. Aug. 19, 2021), https://perma.cc/FH78-EYRE (antitrust enforcement action against Facebook).

[31] *Open Markets Institute Calls on the FTC to Block All Facebook Acquisitions*, *supra* note 30, (emphasis added) (quoting letter signed by Lina Khan, Director of Legal Policy); *cf.* Redacted Amended Complaint, *supra* note 30 (antitrust enforcement action against Facebook).

[32] *Open Markets Institute Calls on the FTC to Block All Facebook Acquisitions*, *supra* note 30, (emphasis added) (quoting letter signed by Lina Khan, Director of Legal Policy); *cf.* Redacted Amended Complaint, *supra* note 30 (antitrust enforcement action against Facebook).

[33] Lina M. Khan, *The Separation of Platforms and Commerce*, 119 Colum. L. Rev. 973, 1001 (2019) (emphasis added); *cf.* Redacted Amended Complaint, *supra* note 30 (antitrust enforcement action against Facebook).

from publishers has enabled **Facebook** to significantly enhance the value of its advertising business at publishers' expense."[34]

6. "Using information captured by Onavo, **Facebook** has copied the functionality of several apps — including . . . Snapchat — and bought out WhatsApp . . . . Apps whose functionality **Facebook** has copied — like Snapchat — went on to see declines in user growth."[35]

7. "The loss of privacy and control experienced by **Facebook** users therefore does not stem, organically, 'from the structure and nature of the fiduciary relation.' It stems from **Facebook's** deliberate efforts to create such vulnerabilities."[36]

8. "To the extent that users feel beholden to **Facebook**, it is not because the company offers them especially skillful services or judgments so much as because of a lack of

---

[34] Khan, *The Separation of Platforms and Commerce*, *supra* note 33, at 1003 (emphasis added); *cf.* Redacted Amended Complaint, *supra* note 30 (antitrust enforcement action against Facebook).

[35] Khan, *The Separation of Platforms and Commerce*, *supra* note 33, at 1002-03 (emphasis added); *cf.* Redacted Amended Complaint, *supra* note 30 (antitrust enforcement action against Facebook).

[36] Lina M. Khan & David E. Pozen, *A Skeptical View of Information Fiduciaries*, 133 Harv. L. Rev. 497, 517-18 (2019) (emphasis added) (internal citations omitted); *cf. Statement of Chair Lina M. Khan Regarding the Social Media and Video Streaming Service Providers Privacy Report Commission File No. P205402*, Federal Trade Commission, at 3 (Sept. 19, 2024), https://perma.cc/5F4U-9969 ("In the context of platforms that mediate speech and expressive content, market dominance can pose a unique danger — allowing a small number of executives to determine whose views are amplified or silenced.").

viable alternatives. By virtue of owning four of the top five social media applications, **Facebook** makes it difficult to escape the company's ecosystem."[37]

9. "To appreciate just how odd it is to think that a behavioral-advertising company could be a fiduciary for its users, imagine visiting a doctor — let's call her Marta **Zuckerberg** — whose main source of income is enabling third parties to market you goods and services. . . . [T]o be sure she does not miss anything, she has planted surveillance devices all around your neighborhood as well as her office."[38]

10. Government officials need "to make sure **Facebook** is not acquiring further power. So if **Facebook** tomorrow announces that it's acquiring another company, I would hope that the FTC would look at that very closely and block it."[39]

---

[37] Khan & Pozen, *supra* note 36, at 518 (emphasis added) (internal citations omitted); *cf.* Redacted Amended Complaint, *supra* note 30 (antitrust enforcement action against Facebook).

[38] Khan & Pozen, *supra* note 36, at 514 (2019) (emphasis added) (internal citations omitted); *cf. Statement of Chair Lina M. Khan Regarding the Social Media and Video Streaming Service Providers Privacy Report Commission File No. P205402, supra* note 36, at 3 ("Unchecked private surveillance by these platforms creates heightened risk of improper surveillance by the state."); Redacted Amended Complaint, *supra* note 30 (antitrust enforcement action against Facebook).

[39] Khan, THE BERNIE SANDERS SHOW: THE GREATEST THREAT TO OUR DEMOCRACY?, *Are Facebook, Amazon & Google Threats to American Democracy?,* at 20:31 (May 15, 2018), https://perma.cc/6YMW-ZQ3L (emphasis added); *cf.* Redacted

11. "[O]ften times it's only **Facebook** that has knowledge about how potentially successful this other company could be and it's able to kind of swoop in there . . . [and] make an acquisition offer before any other . . . acquisitions might be on the table . . . this is definitely something that antitrust [enforcers] should be paying attention to."[40]

12. "In hindsight, I think, looking back, looking at the documents, looking at the evidence that was available, now the agency was able to determine, [**Facebook's** acquisition of Instagram] was an illegal transaction."[41]

13. "[**Facebook**] know[s] how you're feeling, . . . what you're thinking. A few years ago, it was revealed that **Facebook** had basically conducted a psychological experiment on users so I think we're at an unprecedented moment where these companies have a level of insight and information about individuals in a way that we've never experienced in history."[42]

---

Amended Complaint, *supra* note 30 (antitrust enforcement action against Facebook).

[40] Lina Khan, *The Capitol Forum Interview Series: Lina Khan*, at 7:16 (May 9, 2018), https://tinyurl.com/yc2ambvd (emphasis added); *cf.* Redacted Amended Complaint, *supra* note 30 (antitrust enforcement action against Facebook).

[41] Lina Khan, *Sway: Lina Khan is (Still) Bursting Big Tech's Bubble*, The New York Times (October 29, 2020) (transcript); *cf.* Redacted Amended Complaint, *supra* note 30 (antitrust enforcement action against Facebook).

[42] Khan, *Are Facebook, Amazon & Google Threats to American Democracy?*, *supra* note 39 at 2:58 (emphasis added); *cf.* Redacted Amended Complaint, *supra* note 30 (antitrust enforcement action against Facebook).

14. "**Facebook's** business model is privileging sensational content [and] privileging misinformation and that's at odds with kind of the social purpose that it's now playing in society."[43]

15. "[**Facebook**] actually studied the techniques used by the gambling industry to figure out how to addict people to their apps."[44]

16. **Facebook** "is undermining democracy because **Facebook** controls access . . . ."[45]

17. **Facebook** "controls how you communicate to people . . . to show information it likes and not show information it doesn't like . . . . [T]his has huge implications for the

---

[43] Khan, *Are Facebook, Amazon & Google Threats to American Democracy?*, *supra* note 39, at 5:19 (emphasis added); *cf.* Redacted Amended Complaint, *supra* note 30 (antitrust enforcement action against Facebook).

[44] Khan, *Are Facebook, Amazon & Google Threats to American Democracy?*, *supra* note 39, at 6:42 (emphasis added); *cf. Statement of Chair Lina M. Khan Regarding the Social Media and Video Streaming Service Providers Privacy Report Commission File No. P205402*, *supra* note 36, at 2 ("This newfound ability to monetize people's behavior, activity, and characteristics helped drive the creation of a multi-billion dollar industry specializing in tracking and collecting . . . personal data."); Redacted Amended Complaint, *supra* note 30 (antitrust enforcement action against Facebook).

[45] Khan, *Are Facebook, Amazon & Google Threats to American Democracy?*, *supra* note 39, at 10:01 (emphasis added); *cf. Statement of Chair Lina M. Khan Regarding the Social Media and Video Streaming Service Providers Privacy Report Commission File No. P205402*, *supra* note 36, at 3 ("When a single firm controls a market and is unchecked by competition, its policies can effectively function as private regulation."); Redacted Amended Complaint, *supra* note 30 (antitrust enforcement action against Facebook).

journalism industry for what news gets shown and what doesn't get shown. Companies that get to control access to the news ultimately control what that news is."[46]

18. "**Facebook** enjoys the power that it does today in part because it was allowed to buy up Instagram, it was allowed to buy up WhatsApp and that meant that it was able to lock in more and more users on its platform."[47]

19. "So I think you know that the fact that **Facebook** is a monopoly and has a lot of power comes back . . . to the fact that we don't really enforce our antitrust laws in a good way anymore."[48]

---

[46] Khan, *Are Facebook, Amazon & Google Threats to American Democracy?*, *supra* note 39, at 10:09 (emphasis added); *cf. Statement of Chair Lina M. Khan Regarding the Social Media and Video Streaming Service Providers Privacy Report Commission File No. P205402*, *supra* note 36, at 3 ("In the context of platforms that mediate speech and expressive content, market dominance can pose a unique danger — allowing a small number of executives to determine whose views are amplified or silenced."); Redacted Amended Complaint, *supra* note 30 (antitrust enforcement action against Facebook).

[47] Khan, *Are Facebook, Amazon & Google Threats to American Democracy?*, *supra* note 39, at 15:59 (emphasis added); *cf.* Redacted Amended Complaint, *supra* note 30 (antitrust enforcement action against Facebook).

[48] Khan, *Are Facebook, Amazon & Google Threats to American Democracy?*, *supra* note 39, at 16:20 (emphasis added); *cf.* Redacted Amended Complaint, *supra* note 30 (antitrust enforcement action against Facebook).

20. "[P]eople are very worried about [**Facebook's** dominance] but they don't feel like they have [any other] options."[49]

### Amazon

21. "[W]e should examine how **Amazon** could use its dominance to recoup its losses in ways that are more sophisticated than what courts generally consider or are able to assess."[50]

22. "The dominant framework in antitrust today fails to recognize the risk that **Amazon's** dominance poses for discrimination and barriers to new entry."[51]

23. "Given that **Amazon** increasingly serves as essential infrastructure across the internet economy, applying elements of public utility regulations to its business [are] worth considering."[52]

---

[49] Khan, *Are Facebook, Amazon & Google Threats to American Democracy?*, *supra* note 39, at 23:03 (emphasis added); *cf.* Redacted Amended Complaint, *supra* note 30 (antitrust enforcement action against Facebook).

[50] Lina M. Khan, *Amazon's Antitrust Paradox*, 126 Yale L.J. 710, 762 (2017) (emphasis added); *cf.* Redacted Complaint, *FTC v. Amazon.com, Inc.*, Case No. 2:23-cv-01495, Doc. No. 114 (W.D. Wash. Nov. 2, 2023), https://perma.cc/MK8L-DH7V (antitrust enforcement action against Amazon).

[51] Khan, *Amazon's Antitrust Paradox*, *supra* note 50, at 780 (emphasis added); *cf.* Redacted Complaint, *supra* note 50 (antitrust enforcement action against Amazon).

[52] Khan, *Amazon's Antitrust Paradox*, *supra* note 50, at 798 (emphasis added); *cf.* Redacted Complaint, *supra* note 50 (antitrust enforcement action against Amazon).

24. "**Amazon** is a dominant online platform. Over 50% of online shopping searches now begin on its website."[53]

25. "It also has a massive logistics network where if you're an independent retailer and you want [products] to be delivered in two days, you're going to be compelled to use **Amazon** services."[54]

26. "People are . . . economically dependent on **Amazon** and I think **Amazon** can take advantage of that bargaining power."[55]

27. "You have these merchants that are undertaking the initial risk of bringing a product to market but **Amazon** is able to swoop in when it sees something is doing well and kind of reap the reward."[56]

28. "It's also interesting because . . . it also shows this kind of distance between what Wall Street recognizes and what Washington recognizes. . . . Wall Street's pricing **Amazon's** stock at multiples that I would say reflect the market power that **Amazon** has and yet in Washington I think there is still a reluctance to even acknowledge that it

---

[53] Khan, *The Capitol Forum Interview Series: Lina Khan*, *supra* note 40, at 2:34 (emphasis added); *cf.* Redacted Complaint, *supra* note 50 (antitrust enforcement action against Amazon).

[54] Khan, *The Capitol Forum Interview Series: Lina Khan*, *supra* note 40, at 2:43 (emphasis added); *cf.* Redacted Complaint, *supra* note 50 (antitrust enforcement action against Amazon).

[55] Khan, *The Capitol Forum Interview Series: Lina Khan*, *supra* note 40, at 3:40 (emphasis added); *cf.* Redacted Complaint, *supra* note 50 (antitrust enforcement action against Amazon).

[56] Khan, *The Capitol Forum Interview Series: Lina Khan*, *supra* note 40, at 5:44 (emphasis added); *cf.* Redacted Complaint, *supra* note 50 (antitrust enforcement action against Amazon).

has dominance in any line of business. . . . The investors get it in ways that . . . enforcers are not really getting it yet."[57]

29. "I think [the antitrust remedy] would basically . . . prohibit **Amazon** from selling its own **Amazon**-labeled goods on its platform. . . . There were a host of other reasons that we're focused on [this remedy]. You know, wanting to promote diversity in the press."[58]

30. "I think there is good reason to think that this is actually causing economic harm. A lot of the small businesses that are dependent on **Amazon** are terrified."[59]

31. On **Amazon**: "There are certain forms of conflicts of interest that should just not exist, the main one being that if you are a platform, you should not be able to compete with the businesses that are relying on you."[60]

---

[57] Khan, *The Capitol Forum Interview Series: Lina Khan*, *supra* note 40, at 14:51 (emphasis added); *cf.* Redacted Complaint, *supra* note 50 (antitrust enforcement action against Amazon).

[58] Lina Khan, *Aspen Ideas Festival: When is 'Big' Just Too Big?*, The Aspen Institute, at 9:34 (June 29, 2019), https://tinyurl.com/4np92b2 (emphasis added); *cf.* Redacted Complaint, *supra* note 50 (antitrust enforcement action against Amazon).

[59] Lina Khan, *Next Generation Leaders: Lina Khan on Challenging Monopoly Companies Such as Amazon*, Time Magazine, at 0:49 (Oct. 17, 2019), https://tinyurl.com/5n7we2pu (emphasis added); *cf.* Redacted Complaint, *supra* note 50 (antitrust enforcement action against Amazon).

[60] Lina Khan, *New America: Amazon and the Law*, at 33:45 (Feb. 4, 2016), https://tinyurl.com/sjt4svt2; *cf.* Redacted Complaint, *supra* note 50 (antitrust enforcement action against Amazon).

32. "[**Amazon**] has established its level of dominance because of the failings of our current antitrust laws."[61]

33. "And like the railroads of yore, **Amazon** dictates terms and prices to those dependent on its rails."[62]

### Uber

34. "The idea that investors are willing to fund predatory growth in winner-take-all markets also holds in the case of **Uber**."[63]

35. "While **Uber** claims that its algorithms set prices to reflect real-time supply and demand, initial research has found that the company manipulates the availability of both."[64]

### "Big Tech"

36. **Amazon**, **Alphabet**, **Facebook**, and **Apple** all are "dominant digital platforms" that "use their integrated

---

[61] Lina Khan, *Amazon Bites Off Even More Monopoly Power*, The New York Times (June 21, 2017), https://tinyurl.com/27mbbjcy (emphasis added); *cf.* Redacted Complaint, *supra* note 50 (antitrust enforcement action against Amazon).

[62] Khan, *Amazon Bites Off Even More Monopoly Power*, *supra* note 61 (emphasis added); *cf.* Redacted Complaint, *supra* note 50 (antitrust enforcement action against Amazon).

[63] Khan, *Amazon's Antitrust Paradox*, *supra* note 50, at 786 (emphasis added); *cf.* João da Silva, *Uber Probed by US Regulator Over Subscription Plan*, BBC (Nov. 28, 2024), https://perma.cc/47L2-9N8H (announcing FTC investigation into Uber's subscription service).

[64] Khan, *Amazon's Antitrust Paradox*, *supra* note 50, at 789 (emphasis added); *cf.* Silva, *supra* note 63 (announcing FTC investigation into Uber's subscription service).

structure to engage in both discrimination and information appropriation."[65]

37. "This is a moment in time that invites a movement . . . . It's bigger than antitrust, bigger than **Big Tech**. It's about whether the laws serve democratic ends."[66]

38. "Big tech platforms — **Amazon**, **Facebook**, **Google** — control a large and growing share of our commerce and communications, and the scope and degree of their dominance poses real hazards."[67]

---

[65] Khan, *The Separation of Platforms and Commerce*, *supra* note 33, at 983; *cf.* Redacted Complaint, *supra* note 50 (antitrust enforcement action against Amazon); FTC Amicus Curiae Brief at 8-12, *In re Google Play Store Antitrust Litigation*, Case No. 3:21-md-02981, Doc. No. 686-1 (N.D. Cal. Aug. 12, 2024), https://perma.cc/7X4H-PE3R (mirroring similar arguments to Lina Khan's academic work, including advocating for antitrust remedies to combat Google's "network effects" and "data feedback loops"); Redacted Amended Complaint, *supra* note 30 (antitrust enforcement action against Facebook).

[66] David Streitfeld, *Amazon's Antitrust Antagonist Has a Breakthrough Idea*, The New York Times (Sept. 7, 2018), https://tinyurl.com/muvr3he2 (emphasis added) (quoting Lina Khan); *cf.*, Amended Complaint, *FTC v. Meta Platforms, Inc.*, Case No. 5:22-cv-04325, Doc. No. 101-1 (N.D. Cal. filed Oct. 7, 2022), https://perma.cc/8U6H-H6PL; Redacted Complaint, *supra* note 50 (antitrust enforcement action against Amazon); FTC Amicus Curiae Brief at 8-12, *supra* note 65 (advocating for antitrust remedies to combat Google's "network effects" and "data feedback loops").

[67] Lina Khan, *The Supreme Court Case That Could Give Tech Giants More Power*, The New York Times (Mar. 2, 2018), https://tinyurl.com/2avfbc2d (emphasis added); *cf.* Redacted Complaint, *supra* note 50 (antitrust enforcement action against

39. "These dominant platforms — **Google**, **Amazon** — are now effectively serving as infrastructure for other businesses and that creates a relationship of dependence. But in addition to serving as infrastructure for other businesses, **Amazon** and **Google** are integrated in all these other lines and that puts them in direct competition with the companies reliant on their infrastructure. And I think that creates a core conflict of interest is raising a bunch of anti-competitive concerns."[68]

40. "I think another key issue is monopoly leveraging. So the way that **Google**, **Amazon** are able to use their dominance to expand into other lines of business and give themselves an advantage."[69]

41. "The last issue I'd point to is that we see huge information asymmetries. So, the fact that these platforms are hosting all of this economic activity by other companies means that they collect a lot of information that they're then able to use often times against those businesses in their vertical

---

Amazon); FTC Amicus Curiae Brief at 8-12, *supra* note 65 (advocating for antitrust remedies to combat Google's "network effects" and "data feedback loops"); Redacted Amended Complaint, *supra* note 30 (antitrust enforcement action against Facebook).

[68] Khan, *The Capitol Forum Interview Series: Lina Khan*, *supra* note 40, at 0:34 (emphasis added); *cf.* FTC Amicus Curiae Brief at 8-12, *supra* note 65 (advocating for antitrust remedies to combat Google's "network effects" and "data feedback loops"); Redacted Complaint, *supra* note 50 (antitrust enforcement action against Amazon).

[69] Khan, *The Capitol Forum Interview Series: Lina Khan*, *supra* note 40, at 1:01 (emphasis added); *cf.* FTC Amicus Curiae Brief at 8-12, *supra* note 65 (advocating for antitrust remedies to combat Google's "network effects" and "data feedback loops"); Redacted Complaint, *supra* note 50 (antitrust enforcement action against Amazon).

integration.  So, we see this with **Facebook**, with **Amazon**, with **Google**." [70]

42. "Famously, **Facebook** purchased Onavo, which is a VPN server that gave **Facebook** . . . detailed insight into which rival applications were diverting . . . attention from **Facebook** and was then able to go out and buy competing products. . . .  You see a similar dynamic with **Google** and **Amazon**."[71]

*   *   *

The facts as they currently appear do not come close to showing that the FTC issued a 2025 civil investigative demand to Media Matters in retaliation for Media Matters' 2023 article — an article that mentioned neither the FTC nor Chairman Ferguson, written by an organization that neither Ferguson nor any decisionmaker at the FTC is accused of ever mentioning before this investigation.  **[[ECF 1, Ex. A; ECF 1, Ex. D]].**  So the FTC is likely to succeed on the merits of this

---

[70] Khan, *The Capitol Forum Interview Series: Lina Khan*, *supra* note 40, at 1:34 (emphasis added); *cf.* Redacted Amended Complaint, *supra* note 30 (antitrust enforcement action against Facebook); Redacted Complaint, *supra* note 50; FTC Amicus Curiae Brief at 8-12, *supra* note 65 (advocating for antitrust remedies to combat Google's "network effects" and "data feedback loops").

[71] Khan, *Aspen Ideas Festival: When is 'Big' Just Too Big?*, *supra* note 58, at 12:34 (emphasis added); *cf.* Redacted Amended Complaint, *supra* note 30 (antitrust enforcement action against Facebook); FTC Amicus Curiae Brief at 8-12, *supra* note 65 (advocating for antitrust remedies to combat Google's "network effects" and "data feedback loops"); Redacted Complaint, *supra* note 50 (antitrust enforcement action against Amazon).

appeal — the first factor we consider when deciding whether to grant a stay of the district court's preliminary injunction.[72]

To support its theory of retaliation, Media Matters' evidence is sparse. Its only evidence about *any* FTC decisionmaker is the podcast interview and memo by Ferguson that I described above.[73] But Ferguson didn't criticize Media Matters in his interview or in his memo. Indeed, he didn't even *mention* Media Matters.

Instead, Ferguson criticized "progressives" in the Biden Administration for censoring the speech of their political opponents, noted that he believed their censorship violated the First Amendment, worried that they might continue their efforts once out of power through collusive advertiser boycotts, and said he would try to stop that kind of alleged antitrust violation if he led the FTC. Not a single one of those statements evinced an "intent to target media groups and other actors in language that focuses on their viewpoints and the content of their speech"[74] — rather, they evinced an awareness of what members of the Biden Administration had done and an intent to investigate collusive advertiser boycotts against platforms that allow the kind of speech that the Biden Administration had censored.

True, in Ferguson's interview and memo, he didn't discuss investigating conservatives for colluding to suppress speech.

---

[72] *See Nken v. Holder*, 556 U.S. 418, 426 (2009).

[73] In paragraph 60 of its complaint, Media Matters mentions an additional interview of Ferguson, but there is no reference to that interview in the district court's Order, in the opposition by Media Matters to the FTC's Motion for a Stay, or in the panel's Order today.

[74] Order Denying the FTC's Motion for Stay Pending Appeal at 16 (hereinafter Order).

24

But that's because there had been no conservatives in the Biden White House. And as Ferguson saw it — and as seven out of seven federal judges had seen it — the record of the past four years was replete with "progressives" in the White House and their ideological allies censoring "ideas that Silicon Valley and progressives don't like."[75]

In an ironic twist on Ferguson's campaign *against* censorship, my colleagues argue that his statements help prove that the FTC violated the Free Speech Clause when it issued a civil investigative demand to Media Matters. For the reasons I've explained above, they are mistaken. That Ferguson's (far-from-incriminating) comments are discussed in just one paragraph of the (twenty-three-page) order says more about this case than do any of the quotations picked out of context by Media Matters and included in the order's solitary paragraph.

To be clear, I take no position on whether the Biden Administration violated the First Amendment or whether advertiser boycotts violate antitrust laws. Neither, at least in this litigation, does Media Matters. Both are important legal questions. And the legality of advertiser boycotts may one day be litigated in court. At that point, this case will look more like a sideshow than a lawsuit — a forgettable political spat between political activists and a political branch of government.

As for Media Matters' laundry list of statements made by those without any authority to make decisions at the FTC, that evidence is "a sideshow of a sideshow."[76] Elon Musk lacks that authority, and so his commentary on Media Matters is

---

[75] Transcript of Andrew Ferguson on The War Room:11-30-24, *supra* note 11, at 2.

[76] *Lawrence of Arabia* (Columbia Pictures, 1962).

irrelevant to this case.[77]  The same goes for Stephen Miller.[78]
And Mike Davis.[79]  And the Attorney General of Missouri.[80]
And the Attorney General of Texas.[81]   And X Corporation.[82]
And Joe Simonson, Jon Schweppe, and Jake Denton.[83]  Those
last three people are the only three on this list who even work
at the FTC, and "Media Matters has not even *alleged* (let alone
demonstrated) that any of these officials were in any way
involved in the issuance of" Media Matters' civil investigative
demand.[84]

                               *    *    *

     Finally, the other stay factors[85] are intertwined with the
merits and favor a stay of the "improper intrusion by a federal
court into the workings of a coordinate branch of the
Government."[86]   The FTC has an interest in lawfully
"enforcing consumer protection laws,"[87] and it was irreparably
harmed when the district court enjoined its lawful activity.
And Media Matters does not need an injunction to protect it

---

[77] *Cf.* Order at 1, 13; *see also* District Court Opinion at *1, *3.

[78] *Cf.* Order at 1; *see also* District Court Opinion at *1, *3.

[79] *Cf.* Order at 17; *see also* District Court Opinion at *1, *4, *19.

[80] *Cf.* Order at 1, 13; *see also* District Court Opinion at *1, *3, *20.

[81] *Cf.* Order at 1, 13; *see also* District Court Opinion at *1, *3, *20.

[82] *Cf.* Order at 1-2, 13; *see also* District Court Opinion at *1-*5, *21.

[83] *Cf.* Order at 16-17; *see also* District Court Opinion at *5, *20.

[84] Stay Motion at 16.

[85] *See Nken*, 556 U.S. at 426.

[86] *Immigration & Naturalization Service v. Legalization Assistance Project of Los Angeles County Federation of Labor*, 510 U.S. 1301, 1306 (1993) (O'Connor, J., in chambers).

[87] Order at 21.

from irreparable harm because the FTC inflicted no harm, irreparable or otherwise.

I respectfully dissent.