**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————

MEDIA MATTERS FOR AMERICA,
*Plaintiff-Appellee*,
v.
FEDERAL TRADE COMMISSION, *et al.*,
*Defendants-Appellants*.

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

**[CORRECTED]
BRIEF FOR APPELLANTS FEDERAL TRADE COMMISSION, ET AL.**

———————————

DANIEL GUARNERA
*Director*

KELSE MOEN
*Deputy Director*

GEOFFREY GREEN
*Assistant Director*

BUREAU OF COMPETITION

LUCAS CROSLOW
  *General Counsel*

ALEX POTAPOV
  *Deputy General Counsel*

H. THOMAS BYRON III
  *Deputy General Counsel*

STEPHEN T. FAIRCHILD
ETHAN D. BECK
  *Attorneys*

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue NW
Washington, D.C. 20580
(202) 326-2527
*hbyron@ftc.gov*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), undersigned counsel certifies as follows:

## A.    Parties and Amici

Plaintiff-appellee is Media Matters for America.  Defendants-appellants are: the Federal Trade Commission; Andrew N. Ferguson, in his official capacity as Chairman of the Federal Trade Commission; Mark R. Meador, in his official capacity as Commissioner of the Federal Trade Commission; John Doe 1, in their official capacity as Commissioner of the Federal Trade Commission; and John Doe 2, in their official capacity as Commissioner of the Federal Trade Commission.[*]

There were no amici in district court.  In this Court, the Foundation for Individual Rights and Expression appeared as amicus curiae to support plaintiff in opposition to the defendants' motion for stay pending appeal.  The New Civil Liberties Alliance intends to file an amicus brief in support of neither party.

---

[*] Former Commissioner Melissa Ann Holyoak was named as a defendant in her official capacity as Commissioner of the Federal Trade Commission.  She resigned from her position on November 17, 2025, and her seat has not been filled by a successor.  Pursuant to Rule 43(c)(2), she is no longer a defendant, and any successor will be automatically substituted for her.

**B.    Rulings Under Review**

The district court decision on appeal is the preliminary injunction order (App.256) and opinion (App.208), entered on August 15, 2025, by the Honorable Sparkle L. Sooknanan in *Media Matters for America v. Federal Trade Commission*, No. 25-cv-1959 (D.D.C.).  The district court's opinion has not yet been published but is available at 2025 WL 2378009.

**C.    Related Cases**

This case has not previously been before this Court.  The case remains pending in the court below.  Counsel are aware of no related cases within the meaning of the rule.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..............................................................................v

GLOSSARY............................................................................................ xii

INTRODUCTION ....................................................................................1

JURISDICTION.......................................................................................3

ISSUE PRESENTED FOR REVIEW ........................................................3

STATUTES AND REGULATIONS..........................................................3

STATEMENT OF THE CASE..................................................................4

    A.    Statutory and Regulatory Framework ....................................4

    B.    The Commission's Investigation Into Anticompetitive Advertising Boycotts............................................................................9

    C.    Procedural History.............................................................12

SUMMARY OF ARGUMENT .................................................................14

STANDARD OF REVIEW ......................................................................19

ARGUMENT ..........................................................................................19

I.    Media Matters Cannot Prevail on the Merits. ..............................19

    A.    The District Court Lacked Authority to Hear Media Matters' Pre-Enforcement Challenge. ....................................................19

        1.    *Thunder Basin*'s claim-channeling doctrine precludes jurisdiction over Media Matters' collateral action...................21

            a.    Congress's preclusive intent is "fairly discernible" in the FTC Act.. ............................................................22

            b.    Media Matters' claims are squarely "of the type" Congress intended to be reviewed through the exclusive statutory mechanism.....................................25

2.    Media Matters lacks an implied equitable cause of action. ......30

3.    Media Matters failed to exhaust its retaliation claim................32

B.   Media Matters Is Not Likely to Prevail on Its First Amendment
Retaliation Claim...............................................................................36

1.    Media Matters cannot demonstrate a causal connection
between its speech and the CID. ...............................................37

a.   The undisputed evidence demonstrates that the
Commission acted for nonretaliatory reasons. ...............38

b.   Media Matters' purported evidence of retaliation
fails as a matter of law....................................................41

2.    Media Matters also cannot demonstrate that the CID had
the requisite chilling effect.......................................................51

II.   The Equitable Factors Weigh Against a Preliminary Injunction. .................54

CONCLUSION ......................................................................................................56

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

## CASES

*Alexander v. Sandoval*,
  532 U.S. 275 (2001) ........................................................................31

*Allen v. Napolitano*,
  774 F. Supp. 2d 186 (D.D.C. 2011) ...............................................42

*Am. Fed'n Gov't Emps., AFL-CIO v. Loy*,
  367 F.3d 932 (D.C. Cir. 2004) ........................................................30

*Am. Fed'n Gov't Emps., AFL-CIO v. Trump*,
  929 F.3d 748 (D.C. Cir. 2019) ........................................................30

*Am. Motors Corp. v. FTC*,
  601 F.2d 1329 (6th Cir. 1979) ........................................................20

*Anheuser-Busch, Inc. v. FTC*,
  359 F.2d 487 (8th Cir. 1966) ..........................................................20

*Archer v. Chisholm*,
  870 F.3d 603 (7th Cir. 2017) ..........................................................51

*Aref v. Lynch*,
  833 F.3d 242 (D.C. Cir. 2016) ................................................. 37, 51

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015) ........................................................................31

*Atl. Richfield Co. v. FTC*,
  546 F.2d 646 (5th Cir. 1977) ..........................................................20

*Axon Enterprise, Inc. v. FTC*,
  598 U.S. 175 (2023) .......................................... 16, 24, 25, 26, 28, 29

*Belle Fourche Pipeline Co. v. United States*,
  751 F.2d 332 (10th Cir. 1984) ........................................................20

*Blue Ribbon Quality Meats, Inc. v. FTC*,
  560 F.2d 874 (8th Cir. 1977) ................................................. 8, 20, 49

*Branch Ministries v. Rossotti*,
  211 F.3d 137 (D.C. Cir. 2000) ........................................................46

*Breaux v. City of Garland*,
  205 F.3d 150 (5th Cir. 2000) ..........................................................51

*Carr v. Saul*,
    593 U.S. 83 (2021) ................................................................ 32, 33, 34

*Cones v. Shalala*,
    199 F.3d 512 (D.C. Cir. 2000) ...........................................................47

*Constantine v. Rectors & Visitors of George Mason Univ.*,
    411 F.3d 474 (4th Cir. 2005).......................................................... 41, 53

*Doe v. FAA*,
    432 F.3d 1259 (11th Cir. 2005) .........................................................29

*FEC v. Lance*,
    635 F.2d 1132 (5th Cir. 1981) ...........................................................7

*Forest Guardians v. U.S. Forest Serv.*,
    641 F.3d 423 (10th Cir. 2011) ...........................................................33

*FTC v. Boehringer Ingelheim Pharms., Inc.*,
    778 F.3d 142 (D.C. Cir. 2015) ...........................................................6

*FTC v. Church & Dwight Co.*,
    665 F.3d 1312 (D.C. Cir. 2011) ..........................................................7

*FTC v. Claire Furnace Co.*,
    274 U.S. 160 (1927)............................................. 1, 7, 19, 31, 32, 54

*FTC v. Invention Submission Corp.*,
    965 F.2d 1086 (D.C. Cir. 1992) ..................................................... 4, 6, 48

*FTC v. Ken Roberts Co.*,
    276 F.3d 583 (D.C. Cir. 2001) .........................................................7, 8

*FTC v. Match Grp., Inc.*,
    No. 1:22-mc-54, 2023 WL 3181351 (D.D.C. May 1, 2023) .................6

*FTC v. Mt. Olympus Fin., LLC*,
    211 F.3d 1278 (Table), 2000 WL 419825(10th Cir. 2000) ...................7

*FTC v. O'Connell Assocs.*,
    828 F. Supp. 165 (E.D.N.Y. 1993) ......................................................35

*FTC v. Owens-Corning Fiberglas Corp.*,
    626 F.2d 966 (D.C. Cir. 1980) ...........................................................7

*FTC v. Standard Oil Co. of Cal.*,
    449 U.S. 232 (1980)...................................................................54

*FTC v. Texaco, Inc.*,
    555 F.2d 862 (D.C. Cir. 1977) (en banc)................................. 9, 38, 50

*FTC v. XCast Labs, Inc.*,
No. 21-1026, 2021 WL 6297885 (C.D. Cal. Dec. 9, 2021)................................34

*Gen. Fin. Corp. v. FTC*, 700 F.2d 366 (7th Cir. 1983)............................ 1, 7, 20, 22

*Glob. Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025) ...............................................................19

*Gonzalez v. Trevino*,
602 U.S. 653 (2024)..........................................................................37

*Gonzalez v. Walgreen Co.*,
140 F.4th 663 (5th Cir. 2025) ............................................................43

*Green v. U.S. Dep't of Justice*,
54 F.4th 738 (D.C. Cir. 2022).............................................................19

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*,
527 U.S. 308 (1999).........................................................................31

*Gustave-Schmidt v. Chao*,
360 F. Supp. 2d 105 (D.D.C. 2004)......................................................43

*Hamilton v. Geithner*,
666 F.3d 1344 (D.C. Cir. 2012) ..........................................................41

*Harris v. Wackenhut Servs., Inc.*,
648 F. Supp. 2d 53 (D.D.C. 2009) .......................................................47

*Hartman v. Moore*,
547 U.S. 250 (2006) ............................................................. 37, 51, 52

*In re Architect of Capitol Emp. Disp.*,
No. 23-2334, 2024 WL 3359515 (D.D.C. July 10, 2024) ...................................47

*Iyoha v. Architect of the Capitol*,
927 F.3d 561 (D.C. Cir. 2019).......................................................... 43, 44

*J.T.H. v. Mo. Dep't of Soc. Servs. Child.'s Div.*,
39 F.4th 489 (8th Cir. 2022) .............................................................52

*John Doe Co. v. CFPB*,
849 F.3d 1129 (D.C. Cir. 2017)..........................................................24

*Johnson v. Interstate Mgmt. Co.*,
849 F.3d 1093 (D.C. Cir. 2017)..........................................................31

*L.W. ex rel. Williams v. Skrmetti*,
83 F.4th 460 6th Cir. 2023)...............................................................52

*LabMD, Inc. v. FTC*,
  776 F.3d 1275 (11th Cir. 2015) .........................................................30

*Maryland v. King*,
  567 U.S. 1301 (2012)........................................................................54

*Media Matters for Am. v. Bailey*,
  No. 24-cv-147, 2024 WL 3924573 (D.D.C. Aug. 23, 2024)....................... 37, 42

*Media Matters for Am. v. FTC*,
  No. 25-5302, 2025 WL 2988966 (D.C. Cir. Oct. 23, 2025)
  (per curiam)....................................... 14, 19, 35, 36, 39, 40, 41, 44, 45, 46, 47, 54

*Media Matters for Am. v. Paxton*,
  138 F.4th 563 (D.C. Cir. 2025).................................................... 29, 51

*Minter v. District of Columbia*,
  809 F.3d 66 (D.C. Cir. 2015) ....................................................... 43-44

*Moore v. Garnand*,
  83 F.4th 743 (9th Cir. 2023) ...........................................................52

*Nat'l Ass'n Immigr. Judges v. Owen*,
  139 F.4th 293 (4th Cir. 2025) ..........................................................28

*Nat'l Taxpayers Union v. SSA*,
  376 F.3d 239 (4th Cir. 2004)...........................................................30

*Nieves v. Bartlett*,
  587 U.S. 391 (2019) ................................................................. 37, 44

*NTEU v. Vought*,
  149 F.4th 762 (D.C. Cir. 2025) ..................................................... 21, 28

*Rehberg v. Paulk*,
  611 F.3d 828(11th Cir. 2010)..........................................................52

*Reisman v. Caplin*,
  375 U.S. 440 (1964) ................................................................. 20, 32

*Reporters Comm. for Freedom of Press v. AT&T Co.*,
  593 F.2d 1030 (D.C. Cir. 1978) ........................................................51

*Roosevelt v. E.I. Du Pont de Nemours & Co.*,
  958 F.2d 416 (D.C. Cir. 1992) .........................................................36

*Sanjour v. EPA*,
  56 F.3d 85 (D.C. Cir. 1995) ...........................................................46

*Seila Law LLC v. CFPB*,
 591 U.S. 197 (2020) ...............................................................................7

*Sivella v. Twp. of Lyndhurst*,
 No. 20-2342, 2021 WL 335693 (3d Cir. Aug. 3, 2011) ......................51

*Smith v. McMahon*,
 239 F. Supp. 3d 57 (D.D.C. 2017) ......................................................42

*Taylor v. Solis*,
 571 F.3d 1313 (D.C. Cir. 2009) ..........................................................42

*Thompson v. Hall*,
 426 F. App'x 855 (11th Cir. 2011) (per curiam) ................................52

*Thunder Basin Coal Co. v. Reich*,
 510 U.S. 200 (1994) ........................................................... 21, 22, 28, 30

*Traffic Jam Events, LLC v. FTC*,
 No. 21-60947, 2025 WL 1904566 (5th Cir. July 10, 2025) ...............33

*Trump v. CASA, Inc.*,
 606 U.S. 831 (2025) .............................................................................54

*Trump v. Hawaii*,
 585 U.S. 667 (2018) .............................................................................38

*United States v. Biden*,
 729 F. Supp. 3d 410 (D. Del. 2024) ....................................................47

*United States v. Fokker Servs. B.V.*,
 818 F.3d 733 (D.C. Cir. 2016) ............................................................38

*United States v. Morton Salt Co.*,
 338 U.S. 632 (1950) ............................................................ 4, 9, 34, 50

*United States v. Penagaricano-Soler*,
 911 F.2d 833 (1st Cir. 1990) ...............................................................45

*United States v. Rundo*,
 108 F.4th 792 (9th Cir. 2024) .............................................. 39, 43, 45, 46

*United States v. Wilson*,
 123 F.4th 1021 (9th Cir. 2024) ...........................................................45

*Waggel v. George Wash. Univ.*,
 957 F.3d 1364 (D.C. Cir. 2020) ..........................................................46

*Wearly v. FTC*,
 616 F.2d 662 (3d Cir. 1980) ................................................. 7, 20, 31

*Yee v. City of Escondido*,
   503 U.S. 519 (1992) .................................................................35

*Youssef v. Lynch*,
   144 F. Supp. 3d 70 (D.D.C. 2015) ......................................46

*Ziglar v. Abbasi*,
   582 U.S. 120 (2017) .............................................................30

*Zorn v. City of Marion*,
   774 F. Supp. 3d 1279 (D. Kan. 2025) ................................42

## STATUTES

15 U.S.C. § 45 ...........................................................................4

15 U.S.C. § 46 ...........................................................................4

15 U.S.C. § 57b-1 ...........................4, 5, 6, 7, 8, 22, 24, 26, 32, 44, 48

28 U.S.C. § 1292 .......................................................................3

## REGULATIONS

16 C.F.R. § 2.1 ..........................................................................4

16 C.F.R. § 2.4 .................................................................4, 5, 22

16 C.F.R. § 2.7 .............................................................5, 6, 22, 23

16 C.F.R. § 2.10 .............................................5, 6, 22, 32, 33, 34

## OTHER AUTHORITIES

Attachment to Global Disinformation Index's Petition to
   Quash Civil Investigative Demand, FTC File No. 251-
   0061 (Sept. 17, 2025) ..........................................................40

Complaint, *In the Matter of Omnicom Group / The
   Interpublic Group of Cos.* ...................................................10

*Feb. 11, 2014 CID Issued to Ziegler Supersys., Inc.*, 157
   F.T.C. 1880 (2014) ...............................................................34

FTC Press Release, Federal Trade Commission Launches
   Inquiry on Tech Censorship (Feb. 20, 2025) ......................10

FTC Press Release, FTC Prevents Anticompetitive
   Coordination in Global Advertising Merger (June 23,
   2025) .....................................................................................10

*FTC v. Cigna Group*, No. 1:25-mc-00004, Dkt.1-2
(D.D.C Jan. 15, 2025) ........................................................... 40

*FTC v. Retail Services & Systems, Inc. d/b/a Total Wine
& More*, No. 1:23-mc-00028, Dkt.1-2 (E.D. Va. Oct.
20, 2023) .............................................................................40

Order Denying Petition to Quash Civil Investigative
Demand, *In the Matter of Civil Investigative Demand
to Media Matters for America Dated May 20, 2025*,
FTC Dkt. No. 251-0061 (July 25, 2025).............................. 11, 12, 34, 38, 44, 49

Statement of Chairman Andrew N. Ferguson, *In the
Matter of Omnicom Group / The Interpublic Group of
Cos.*, Matter No. 2510049 (June 23, 2025)........................................11

# GLOSSARY

App.                Appendix

CID                Civil Investigative Demand

Dkt.                District Court Docket Entry

FTC                Federal Trade Commission

PTQ                Petition to Quash

Stay Opp'n                Appellee's Opposition to a Stay Pending Appeal (Sept. 2, 2025)

# INTRODUCTION

The FTC has launched a broad investigation into an area of significant concern for the agency and the public: potentially unlawful advertiser boycotts. As part of this investigation, the FTC issued a number of civil investigative demands (CIDs), including one directed to plaintiff Media Matters for America. Plaintiff sued, alleging that the CID constituted unconstitutional retaliation for its speech. The district court then entered an unprecedented preliminary injunction which prevents the FTC from enforcing or implementing the CID. The district court's decision rested on two fundamental errors.

First, the court erred in entertaining Media Matters' retaliation claim at all. It has long been established that FTC CIDs can be reviewed only in an enforcement action brought by the Commission. Indeed, there is an unbroken, nearly century-long line of cases denying pre-enforcement review of FTC subpoenas and CIDs. *See, e.g.*, *FTC v. Claire Furnace Co.*, 274 U.S. 160, 174 (1927); *Gen. Fin. Corp. v. FTC*, 700 F.2d 366, 368 (7th Cir. 1983). Notably, Media Matters has not identified a single example of a successful pre-enforcement challenge to *any* federal subpoena or CID.

Media Matters' pre-enforcement challenge should similarly be rejected. For one thing, the district court lacked jurisdiction. That result is dictated by the applicable statutory scheme, which channels this type of claim to enforcement

proceedings initiated by the FTC. It was improper for the district court to disregard this congressional design. In addition, Media Matters lacks an implied cause of action to bring this claim. Finally, Media Matters failed to exhaust the claim by raising it in an administrative proceeding before the FTC, as it was required to do.

Second, the district court erred in crediting Media Matters' retaliation claim. Media Matters' purported evidence of retaliation fails as a matter of law, particularly in light of the presumption of regularity that attaches to government action. Media Matters seeks to brush aside undisputed evidence of the CID's proper purpose in favor of a mishmash of impermissible inferences (such as imputing to the FTC Chairman the views of an individual who is not even in government and who is not alleged to have played any role in the issuance of the CID). All of this flies in the face of established principles of First Amendment retaliation law.

The combination of these two errors—allowing pre-enforcement challenges to CIDs while radically diluting the legal standard governing retaliation claims—creates a roadmap for derailing virtually any federal investigation based on unsupported assertions of retaliatory intent. As a result, this case is not about just one agency or just one investigation. Instead, it presents a far broader and more fundamental question: whether recipients of federal subpoenas and CIDs should be allowed to bring pre-enforcement challenges and halt federal investigations based on minimal

and speculative evidence of purported retaliation.  The answer is, and must be, no.
The district court's decision should be reversed.

## JURISDICTION

Plaintiff Media Matters for America invoked the district court's jurisdiction under 28 U.S.C. § 1331.  App.016.  The district court entered a preliminary injunction on August 15, 2025, and defendants filed a timely notice of appeal on August 18, 2025.  App.256-257.  This Court has jurisdiction to hear the appeal under 28 U.S.C. § 1292(a)(1).

## ISSUE PRESENTED FOR REVIEW

The district court entered an unprecedented preliminary injunction prohibiting the Federal Trade Commission from enforcing or implementing its civil investigative demand (CID) directed to plaintiff Media Matters for America.  The question presented is whether the district court erred in doing so because (1) the district court lacked authority to consider this pre-enforcement challenge and (2) Media Matters failed as a matter of law to show that the CID was motivated by improper retaliatory purposes.

## STATUTES AND REGULATIONS

Relevant statutes and regulations are set forth in an addendum.

# STATEMENT OF THE CASE

## A. Statutory and Regulatory Framework

Section 5 of the FTC Act prohibits "persons, partnerships, or corporations" from engaging in "unfair methods of competition in or affecting commerce." 15 U.S.C. § 45(a). Congress "empowered and directed" the Commission "to prevent" these anticompetitive practices, *id.* § 45(a)(2), and thus authorized the agency "to investigate … any person, partnership, or corporation engaged in or whose business affects commerce," *id.* § 46(a). *See* 16 C.F.R. § 2.1 (describing how Commission investigations are initiated); *id.* § 2.4 (the Commission "encourages the just and speedy resolution of investigations," and "will … employ compulsory process when in the public interest"). To fulfill this "continuing duty," the Commission "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Morton Salt Co.*, 338 U.S. 632, 639, 642-43 (1950).

To aid the agency in conducting its investigations, the FTC Act authorizes the Commission to issue civil investigative demands (CIDs)—a type of agency subpoena—to "any person" who may have "any information" relevant to potential violations of the laws enforced by the Commission. 15 U.S.C. § 57b-1. The issuance of a CID is not final agency action. *See, e.g.*, *FTC v. Invention Submission Corp.*, 965 F.2d 1086, 1089 (D.C. Cir. 1992) ("The agency, in issuing a subpoena, has

4

undertaken no final administrative action; a subpoena becomes an appealable final order only after the subpoenaed party refuses to comply and the agency requests and receives judicial enforcement."). Instead, it is simply one step in an ongoing investigation, which initiates a process of discussion and negotiation. This process is "cooperative[]": the Commission expects CID recipients "to engage in meaningful discussions with staff to prevent confusion or misunderstandings regarding the nature and scope of the information and material being sought." 16 C.F.R. § 2.4.

That cooperative process includes negotiations between a CID recipient and FTC staff "to discuss compliance and to address and attempt to resolve all issues," including legal objections to a CID. *Id.* § 2.7(k). The Commission's regulations authorize FTC staff, through the management of the Bureaus of Competition and Consumer Protection, to modify and approve the terms of compliance of a CID following those meet-and-confer negotiations. *Id.* § 2.7(*l*). CID recipients are required to participate in the meet-and-confer process before filing a petition to quash the CID. *Id.* § 2.7(k).

The petition-to-quash process offers the Commission an opportunity to address any objections to a CID. *Id.* § 2.10; *see* 15 U.S.C. § 57b-1(f)(1). The petition process builds on the meet-and-confer negotiations. 16 C.F.R. § 2.7(k) ("absent extraordinary circumstances," the Commission "will consider only issues raised during the meet and confer process"); *id.* § 2.10(a)(2) (requiring "a signed separate

5

statement representing that counsel for the petitioner has conferred with Commission staff pursuant to § 2.7(k) of this part in an effort in good faith to resolve by agreement the issues raised by the petition and has been unable to reach such an agreement"). FTC staff may reply to the petition to quash, and the Commission generally has 40 days to rule on a petition; the CID compliance deadline is suspended during the pendency of a petition to quash. *Id.* § 2.10(a)(4), (b), (c); *see* 15 U.S.C. § 57b-1(f)(2). Together, these administrative procedures allow the parties to identify and narrow or resolve disputed issues before judicial review of any remaining objections in an enforcement action.

If that administrative process fails to resolve any differences between the CID recipient and Commission staff, the Commission may file a petition for enforcement in a federal district court pursuant to 15 U.S.C. § 57b-1(e). *See, e.g.*, *Invention Submission Corp.*, 965 F.2d at 1088 (describing FTC CID administrative process and enforcement action); *id.* at 1089-91 (describing standard of review). The court hearing a CID enforcement action (and an appellate court following the district court's decision) can address and resolve a wide range of issues, from routine discovery disputes, *see, e.g.*, *FTC v. Match Grp., Inc.*, No. 1:22-mc-54, 2023 WL 3181351 (D.D.C. May 1, 2023) (motions to seal and for discovery), to claims of trade secrets and attorney-client privilege or work-product protection, *see, e.g.*, *FTC v. Boehringer Ingelheim Pharms., Inc.*, 778 F.3d 142 (D.C. Cir. 2015); *FTC v.*

*Owens-Corning Fiberglas Corp.*, 626 F.2d 966 (D.C. Cir. 1980), to issues of statutory construction, *see, e.g.*, *FTC v. Ken Roberts Co.*, 276 F.3d 583 (D.C. Cir. 2001), and assertions that the scope of the investigation prompting the CID was not properly authorized by a Commission resolution, *see, e.g.*, *FTC v. Church & Dwight Co.*, 665 F.3d 1312 (D.C. Cir. 2011). Similarly, constitutional challenges and objections to an agency CID may be (and often are) adjudicated in an enforcement action. *See, e.g.*, *Seila Law LLC v. CFPB*, 591 U.S. 197, 208-09 (2020); *FTC v. Mt. Olympus Fin., LLC*, 211 F.3d 1278 (Table), 2000 WL 419825, at *1-2 (10th Cir. 2000); *FEC v. Lance*, 635 F.2d 1132, 1140-42 (5th Cir. 1981) (en banc).

A CID is not self-executing, and a recipient incurs no penalty or other legal detriment for failing to comply with a CID before a court orders enforcement. "[T]here are no sanctions for failing to comply with a subpoena of this type unless and until a district court enters an order under section 20(e) of the Act, 15 U.S.C. § 57b-1(e), directing compliance." *Gen. Fin. Corp. v. FTC*, 700 F.2d 366, 368 (7th Cir. 1983); *id.* at 367 (explaining that a CID is "a type of subpoena"); *see also, e.g.*, *FTC v. Claire Furnace Co.*, 274 U.S. 160, 174 (1927) ("the defendants cannot suffer" until the government brings an enforcement action); *Wearly v. FTC*, 616 F.2d 662, 665 (3d Cir. 1980) ("a subpoena from the FTC is not self-enforcing").

The scope of the Commission's authority to investigate and to issue CIDs is broader than its enforcement authority under Section 5 of the FTC Act. The FTC

Act gives the Commission broad authority to seek information from "any person" by issuing a CID if the Commission "has reason to believe" that the recipient "may be in possession, custody, or control of any documentary material or tangible things, or may have any information, relevant to unfair or deceptive acts or practices in or affecting commerce … or to antitrust violations." 15 U.S.C. § 57b-1(c). Thus, the Commission is entitled to seek information from entities that are not themselves suspected of any wrongdoing (and indeed might not even be subject to the laws at issue). More generally, this Court has consistently held that administrative agencies are accorded "wide latitude in asserting their power to investigate by subpoena," and that "an individual may not normally resist an administrative subpoena on the ground that an agency lacks regulatory jurisdiction if the subpoena is issued at the investigative stage." *Ken Roberts Co.*, 276 F.3d at 586; *see also, e.g.*, *Blue Ribbon Quality Meats, Inc. v. FTC*, 560 F.2d 874, 876 (8th Cir. 1977) (it "should not be surprising" that "the investigatory power granted the FTC … reaches further than [its] regulatory power").

Moreover, the Commission need not be certain that a CID recipient possesses relevant information: the statutory standard requires only a "reason to believe" that the recipient "may have" relevant information. 15 U.S.C. § 57b-1(c). That undemanding standard accords with the FTC's broad investigative power. The Supreme Court has emphasized the Commission's "power to get information from

8

those who best can give it," analogizing the FTC's authority to that of a grand jury in a criminal investigation. *Morton Salt*, 338 U.S. at 642. And this Court has noted "the important governmental interest in the expeditious investigation of possible unlawful activity." *FTC v. Texaco, Inc.*, 555 F.2d 862, 872 (D.C. Cir. 1977) (en banc) ("the 'very backbone of an administrative agency's effectiveness in carrying out the congressionally mandated duties of industry regulation is the rapid exercise of the power to investigate'").

## B. The Commission's Investigation Into Anticompetitive Advertising Boycotts

Chairman Ferguson and the FTC have expressed concern about, and taken action to prevent, potential anticompetitive collusion in the digital advertising industry to withhold advertising from certain disfavored media. This issue is a high priority for the Commission because such concerted action would likely violate the federal antitrust laws and harm the public. Unlawful collusion could reduce competition in markets for advertising purchasing and other advertising-related products or services, which could in turn reduce consumer choice in content, degrade the quality of advertisements, and ultimately stifle debate on matters of public importance.

The Commission has taken several significant steps to address this concern. For example, it has launched a public inquiry into censorship on technology platforms, which "may have resulted from a lack of competition, or may have been

the product of anti-competitive conduct." FTC Press Release, Federal Trade Commission Launches Inquiry on Tech Censorship (Feb. 20, 2025).[1] Along similar lines, in June 2025 the Commission approved the acquisition of one large advertising agency (IPG) by another (Omnicom), but only subject to a consent order that will prevent potential anticompetitive coordination by advertising agencies. FTC Press Release, FTC Prevents Anticompetitive Coordination in Global Advertising Merger (June 23, 2025).[2] The Commission had issued an administrative complaint alleging that "advertising agencies have coordinated—including through industry associations—on decisions not to advertise on certain websites and applications" and that such coordination may "reduce ad revenues for particular media publishers, forcing those publishers to reduce the quality and quantity of products they can feasibly offer to their own downstream consumers." Complaint, *In the Matter of Omnicom Group / The Interpublic Group of Cos.*[3] In a statement regarding the filing of the administrative complaint and proposed decision and order, Chairman Ferguson noted that "[i]n recent years, the advertising industry has been plagued by deliberate, coordinated efforts to steer ad revenue away from certain news organizations, media outlets, and social media networks." Statement of Chairman

---

[1] https://tinyurl.com/373z74he.

[2] https://tinyurl.com/3vrzxt3e. The Commission gave final approval in September 2025. https://tinyurl.com/mu8ekdd5.

[3] https://tinyurl.com/yr9m8er4.

Andrew N. Ferguson, *In the Matter of Omnicom Group / The Interpublic Group of Cos.*, Matter No. 2510049 (June 23, 2025).[4]

To further address this concern, the Commission opened a broad investigation into potential digital advertising boycotts against certain media (that is, concerted refusals to deal with those media) on the basis of agreed-upon definitions of subjective terms such as "misinformation" or "brand safety." In furtherance of this investigation, the Commission issued CIDs to a variety of entities including ad agencies, advertising trade associations, brand safety and suitability rating organizations, and policy and advocacy groups focused on digital advertising.[5] Seventeen of those CIDs are currently outstanding.

One of the CID recipients was plaintiff Media Matters for America. The CID to Media Matters, which was issued on May 20, 2025, seeks several categories of documents and information, including: information pertaining to Media Matters' organizational structure; documents it has produced or received in litigation relating to advertising boycotts; documents pertaining to the relationship between online platforms and advertisers, including documents discussing rating systems, harmful

---

[4] https://tinyurl.com/8y7h44ke.

[5] The underlying investigation is described in the Commission's Order Denying Petition to Quash Civil Investigative Demand, *In the Matter of Civil Investigative Demand to Media Matters for America Dated May 20, 2025*, FTC Dkt. No. 251-0061 (July 25, 2025) (PTQ Order), https://tinyurl.com/48pc74bz.

or undesirable content, and brand safety tools for online advertising; the methodology by which Media Matters evaluates or categorizes publishers; complaints that Media Matters has received pertaining to its programs; and Media Matters' financial information. App.095-111.[6]

After engaging in meet-and-confer negotiations with FTC staff, Media Matters filed a petition with the Commission seeking to quash the CID. App.136-183. The petition objected to the CID on a variety of grounds—such as lack of notice and overbreadth—but did not include a First Amendment retaliation argument. App.138-150. Nor did Media Matters purport to have raised any retaliation objection in its discussions with FTC staff. App.174-177. The Commission rejected plaintiff's arguments and denied the petition. *See* PTQ Order.

## C.    Procedural History

Plaintiff also brought this suit and request for a preliminary injunction, alleging primarily that the Commission's investigation into Media Matters violates the First Amendment by retaliating against Media Matters for its protected expression. *See* App.008, 046. The complaint alleges that Media Matters is a nonprofit organization dedicated to monitoring, analyzing, and correcting "misinformation" in the U.S. media. App.010. One of Media Matters' articles, dated

---

[6] The requests for documents and other information are set forth in the "Specifications" of the CID (App.096-098).

November 16, 2023, "reported that X [formerly Twitter] was permitting advertisements to be placed next to pro-Nazi or other extremist content." App.011. Media Matters sought a preliminary injunction, asserting that the FTC is investigating Media Matters in order to retaliate for Media Matters' journalism, pointing to the November 16, 2023 article. Dkt.22-1 at 32.

The district court preliminarily enjoined the FTC from "implementing" or "enforcing" the CID. App.256. In doing so, the court rejected the FTC's arguments that it lacked jurisdiction over this pre-enforcement challenge because Congress channeled judicial review of such claims to FTC enforcement actions and that plaintiff lacks a cause of action. App.221-238. The court accepted plaintiff's claim of retaliation, pointing to what the court viewed as "a sweeping and burdensome CID calling for sensitive materials," App.239, and relying principally on statements and actions by several non-decisionmakers, including States and persons not affiliated with the FTC. App.247-249. The district court also relied on policy statements by the FTC Chairman that the district court construed as "characteriz[ing] Media Matters and this investigative push 'in ideological terms,'" App.247; App.247-249. The court further concluded that "the timing" of the CID suggested "retaliatory animus." App.249. Although there were a full 18 months between the article (published on November 16, 2023) and the CID (issued on May 20, 2025), the court suggested that actions during that period by others, such as the Attorneys

13

General of Texas and Missouri, could be linked together with the CID to create a chain of causation. App.249-250. The court also reasoned that the mere issuance of the non-self-executing CID would deter a person of ordinary firmness from speaking. App.239-242. Based solely on its assessment of the merits, the court also concluded that equitable factors supported an injunction. App.254-255.

The district court denied a stay pending appeal. App.258-264. On appeal, a divided motions panel of this court also denied a stay. *Media Matters for Am. v. FTC*, No. 25-5302, 2025 WL 2988966 (D.C. Cir. Oct. 23, 2025) (per curiam) (Stay Op.). The panel majority concluded that the FTC had not carried its burden to justify a stay in light of the "preliminary posture," reasoning that the district court likely had jurisdiction over this pre-enforcement suit and deferring to the district court's causation ruling with respect to the retaliation claim. *Id.*, 2025 WL 2988966, at *2, *3-5, *5-9. Judge Walker dissented. He would have granted a stay pending appeal because "the FTC is (very) likely to prevail on the merits and because the other stay factors favor the FTC." *Id.* at *11, *12 (Walker, J., dissenting) (Walker Dissent).

## SUMMARY OF ARGUMENT

This appeal presents a question of exceptional importance: whether recipients of federal subpoenas and CIDs can derail agency investigations by asserting speculative retaliation claims. It was error for the district court even to entertain Media Matters' pre-enforcement challenge to the CID, which is barred three times

over: (1) because Congress channeled such claims into the FTC's administrative review process, to be followed by judicial review only in an agency enforcement action; (2) because Media Matters lacks a cause of action to bring its novel pre-enforcement claim; and (3) because Media Matters failed to exhaust this issue before the FTC. It was also error for the district court to credit Media Matters' speculative and baseless retaliation theory, which fails as a matter of law. Finally, the equities, including the public interest in expeditious law-enforcement investigations, also require reversal of the district court's injunction.

**1.** The injunction below is flatly contrary to nearly a century of unbroken precedent from the Supreme Court and lower courts, which have consistently rejected pre-enforcement challenges to federal agency CIDs and subpoenas. When the Commission brings an action in district court to enforce the CID, that court has exclusive jurisdiction to resolve all disputes about the CID, including constitutional issues.

The FTC Act's channeling mechanism precludes jurisdiction over collateral challenges like this one. Congress in the FTC Act demonstrated a clear intent to require all disputes about a CID to be adjudicated by the district court in an enforcement action, after exhausting disputes administratively. The statute and the FTC's regulations provide administrative procedures before an enforcement action, including negotiations with FTC staff to narrow any disagreements, and

Commission review of a petition to quash. Together, the administrative process and the opportunity for judicial review in an enforcement proceeding establish a streamlined and efficient mechanism that facilitates the broad investigative authority that Congress conferred on the Commission while protecting the interests of CID recipients (who face no legal penalty for failure to comply until their challenges to the CID are heard by a federal court in an enforcement action).

The claim here is squarely of the type that Congress intended to be reviewed in the exclusive channeling mechanism established by statute. The constitutional argument—claiming retaliation against a 2023 article—is nothing like the structural objections to the FTC's very existence at issue in *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175, 189 (2023). The fact-specific arguments here are not meaningfully different than the statutory and constitutional issues that district courts routinely adjudicate in enforcement actions.

Media Matters also lacks an equitable cause of action because an injunction against enforcement of an administrative CID or subpoena was not historically available. The availability of an adequate remedy at law—in an enforcement proceeding—precludes an equitable claim.

Finally, Media Matters declined to raise its retaliation claim during the administrative process. Although it filed a petition to quash with the Commission, and that petition raised numerous objections to the CID, it pointedly did *not* include

a retaliation argument.  This failure to exhaust the issue in the administrative process provides yet another basis for rejecting Media Matters' claim here.

**2.**  The retaliation claim fails on the merits as well.  Media Matters cannot show that the CID at issue here was causally linked to an unrelated article published 18 months earlier.  The FTC's investigation into advertiser boycotts is not limited to or focused solely on Media Matters; it is part of a broad effort to enforce the antitrust laws by ensuring that digital advertising industry participants do not illegally coordinate their efforts, reducing competition in advertising and related markets.  Such potentially unlawful advertising boycotts are a priority for the Commission because they could reduce available content and limit the range of voices participating in debates about matters of public importance, seriously harming free speech.

None of the evidence relied on by Media Matters demonstrates that the CID here is unconstitutional retaliation, and the district court's contrary conclusion ignored the presumption of regularity that attaches to government action.  First, the passage of time—18 months—from the 2023 article demonstrates the absence of a link.  And the intervening events, such as unrelated investigations by States, do not establish a causal chain from the article to the FTC's investigation.  Second, statements by individuals unrelated to this investigation are irrelevant.  And the only identified statements by Chairman Ferguson say nothing at all about Media Matters

or its 2023 article. Indeed, Chairman Ferguson's consistent focus on advertiser boycotts that violate the antitrust laws reinforces the valid law-enforcement purpose of the CID here. Finally, the scope of the CID at issue here is no broader than other CIDs in this or earlier investigations.

Media Matters also cannot show that the CID here had the required chilling effect. If a CID could ever have such an effect, it would only be in extraordinary circumstances, which are entirely absent here. The asserted harms Media Matters relies on are themselves generic and unexceptional, and any recipient of an FTC CID could make the same claims. Moreover, Media Matters has pointed to other causes for the same injuries.

**3.** Finally, the equities cannot support an injunction here. Most important, Media Matters' claimed harms are inextricably linked to the merits of its First Amendment retaliation theory. But that claim is unsustainable, and the injuries are likewise insupportable. Moreover, the injunction demonstrably harms the government and the public interest by impeding a lawful investigation into violations of the antitrust laws, as well as by inviting a flood of copycat challenges to other investigations. Especially in light of the unprecedented nature of the injunction here, at odds with nearly a century of case law, the district court's preliminary injunction should be reversed.

## STANDARD OF REVIEW

This Court "review[s] the district court's decision whether to grant a preliminary injunction for abuse of discretion, its legal conclusions de novo and its findings of fact for clear error." *Glob. Health Council v. Trump*, 153 F.4th 1, 12 (D.C. Cir. 2025).

## ARGUMENT

## I.    MEDIA MATTERS CANNOT PREVAIL ON THE MERITS.

This Court has recognized that "the likelihood of success will often be the determinative factor in the preliminary injunction analysis," particularly in "First Amendment cases." *Green v. U.S. Dep't of Justice*, 54 F.4th 738, 745 (D.C. Cir. 2022) (cleaned up).  Media Matters cannot show that it is likely to prevail on the merits, for two reasons.  First, the district court has no authority to hear this pre-enforcement challenge.  And second, Media Matters has failed as a matter of law to adduce anything approaching sufficient evidence of retaliation for its 2023 article.  Judge Walker was quite right to observe that "the FTC is (very) likely to prevail on the merits."  Walker Dissent, 2025 WL 2988966, at *12.

### A.    The District Court Lacked Authority to Hear Media Matters' Pre-Enforcement Challenge.

For nearly a century, the Supreme Court and lower courts have consistently held that disputes about federal CIDs or subpoenas should be resolved in an enforcement action.  *See FTC v. Claire Furnace Co.*, 274 U.S. 160, 174 (1927); *see*

19

*also Reisman v. Caplin*, 375 U.S. 440, 443 (1964) (upholding dismissal of pre-enforcement challenge to IRS summons). Relying on *Claire Furnace* and *Reisman*, courts of appeals have unanimously rejected pre-enforcement challenges to FTC and other federal agency CIDs and subpoenas. *See Gen. Fin. Corp. v. FTC*, 700 F.2d 366, 368 (7th Cir. 1983) (a plaintiff "must wait till the government sues … since that is the method of judicial review of FTC investigations that Congress has prescribed"); *see also, e.g.*, *Belle Fourche Pipeline Co. v. United States*, 751 F.2d 332, 334-35 (10th Cir. 1984); *Wearly v. FTC*, 616 F.2d 662, 668 (3d Cir. 1980); *Am. Motors Corp. v. FTC*, 601 F.2d 1329, 1335-37 (6th Cir. 1979); *Blue Ribbon Quality Meats, Inc. v. FTC*, 560 F.2d 874, 876-77 (8th Cir. 1977); *Atl. Richfield Co. v. FTC*, 546 F.2d 646, 651 (5th Cir. 1977); *Anheuser-Busch, Inc. v. FTC*, 359 F.2d 487, 490-91 (8th Cir. 1966) (Blackmun, J.).

These cases have a common thread: recipients of agency CIDs or subpoenas are not entitled to equitable relief in a pre-enforcement posture because they have an adequate remedy at law: challenging the CID or subpoena in an enforcement action. *E.g.*, *Atl. Richfield*, 546 F.2d at 649. And this doctrine serves important purposes. On the one hand, it protects CID and subpoena recipients by ensuring that they face no legal penalty until they have had an opportunity to raise their objections in an enforcement action in federal court. On the other, it ensures that agencies are able to conduct investigations as directed by Congress, allows the parties to narrow and

potentially resolve any disputes prior to litigation, and prevents litigants from dragging courts into abstract legal disagreements without the specific factual context presented in an enforcement action.

In entering its unprecedented preliminary injunction in this case, the district court departed from this unbroken line of precedent. As discussed below, it was wrong to do so for three reasons. First, Congress has precluded pre-enforcement review of CIDs under the claim-channeling doctrine of *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994). Second, Media Matters lacks a cause of action. And third, Media Matters failed to exhaust its claim because it did not raise a retaliation argument in its petition to quash.

### 1. *Thunder Basin*'s claim-channeling doctrine precludes jurisdiction over Media Matters' collateral action.

*Claire Furnace*, *Reisman*, and their progeny confirm that district courts should not entertain pre-enforcement challenges to FTC CIDs. It is unsurprising, then, that this is precisely the outcome Congress directed in the FTC Act.

The Supreme Court in *Thunder Basin* explained that Congress may establish a statutory scheme that channels judicial review into an exclusive jurisdictional mechanism, divesting district courts of their ordinary federal-question jurisdiction. 510 U.S. at 218. A statute channels review when "a preclusive intent is 'fairly discernible in the statutory scheme,'" and "the claims at issue 'are of the type Congress intended to be reviewed within' the special scheme." *NTEU v. Vought*,

149 F.4th 762, 774 (D.C. Cir. 2025) (quoting *Thunder Basin*, 510 U.S. at 207, 212).

This framework effectuates Congress's objective of directing certain challenges to agency actions "to a single review process," streamlining investigations and enforcement proceedings. *Thunder Basin*, 510 U.S. at 211. Here, both prongs of the *Thunder Basin* claim-channeling framework are straightforwardly satisfied.

### a. Congress's preclusive intent is "fairly discernible" in the FTC Act.

The FTC Act and its implementing regulations create an interdependent scheme to protect CID recipients. The scheme allows recipients to petition the Commission to quash the CID, 15 U.S.C. § 57b-1(f); discuss and negotiate the CID with FTC staff to resolve or narrow disputes, 16 C.F.R. §§ 2.4, 2.7(k); and obtain judicial review of the CID, including any objections, when the FTC seeks to enforce it, 15 U.S.C. § 57b-1(h). CIDs are not self-executing, and recipients face no penalties for noncompliance until the court rules in an enforcement action. *See Gen. Fin. Corp.*, 700 F.2d at 368-69.

The scheme also protects the integrity of FTC investigations. Before the FTC brings an enforcement action, the FTC's Rules of Practice contemplate that CID recipients will "engage in meaningful discussions with staff," meet and confer "to address and attempt to resolve all issues," and only then file a petition to quash. 16 C.F.R. §§ 2.4, 2.7(k), 2.10. This administrative process allows the parties to narrow

disputed issues without unnecessarily embroiling district courts in broad legal disputes that lack a well-developed factual record.

This case is a prime example. In addition to its retaliation claim, Media Matters claims the CID violates the First and Fourth Amendments because it is overbroad and requires the production of "sensitive and privileged materials." App.045-047. But it is premature to evaluate that claim now, before any dispute has crystallized regarding *any* particular document (let alone a potentially privileged document). The district court effectively acknowledged as much by addressing only the retaliation claim in its preliminary injunction ruling. App.210. And if *one* of Media Matters' constitutional objections to the CID should be considered in an enforcement proceeding, surely the other one should be as well. Allowing piecemeal, claim-splitting challenges would vitiate Congress's statutory scheme and subvert judicial economy. Indeed, even Media Matters recognizes that this Court should not enable two simultaneous proceedings concerning the same CID. *See* Stay Opp'n 22.

In short, Congress's preclusive intent is straightforwardly evident—and certainly "fairly discernible." The district court attempted to escape this conclusion by calling it "highly unusual" that the FTC Act channels claims to an enforcement action in district court, rather than first to an administrative proceeding. App.222. That response misses the mark for several reasons.

First, nothing in the Constitution or the Supreme Court's reasoning in *Thunder Basin* precludes Congress from channeling review to district courts, and the Supreme Court has never suggested that preclusion is appropriate only when judicial review in an appellate court follows an agency's administrative decision. *Axon* explained that a "special statutory review scheme" may channel certain claims and preclude collateral challenges. 598 U.S. at 185. The Court there referred to an "alternative scheme of review" or "a different method to resolve claims about agency action." *Id.* Nothing in that flexible approach supports the conclusion that the FTC Act's channeling mechanism is somehow improper. While Congress "typically chooses" agency administrative proceedings followed by review in a court of appeals, *id.*, Congress is free to choose other methods as well, and sometimes does so. *See John Doe Co. v. CFPB*, 849 F.3d 1129, 1134 (D.C. Cir. 2017) (per curiam) (denying injunction pending appeal in pre-enforcement challenge to CID, relying on *Thunder Basin* to conclude that district court lacked jurisdiction because CFPB statute channeled constitutional CID challenges to an enforcement action).

Second, Media Matters *did* have the chance to raise its retaliation claim administratively. It had numerous meet-and-confer opportunities, where it never raised the retaliation issue. It then filed a petition to quash, where it could have made a retaliation argument but declined to do so. *See* 15 U.S.C. § 57b-1(f)(2) (explaining that petitions "may be based upon … any *constitutional* or other legal right or

privilege" (emphasis added)).  In other words, an administrative proceeding *was* available here; Media Matters simply declined to use it to raise its retaliation claim.[7]  Therefore, the very premise of the district court's argument—that the channeling scheme at issue here omits administrative proceedings—is mistaken.

Finally, any suggestion that the channeling scheme of the FTC Act is somehow unusual is particularly inapt because, as described above, pre-enforcement challenges to federal CIDs and subpoenas have *never* been available.  It is hardly anomalous for Congress to endorse and adopt the very approach that has always been used.

### b. Media Matters' claims are squarely "of the type" Congress intended to be reviewed through the exclusive statutory mechanism.

*Thunder Basin* identified three factors that must be considered in evaluating this prong: (1) whether precluding district court jurisdiction would "foreclose all meaningful judicial review" of the claim; (2) whether the claim is "wholly collateral to the statute's review provisions"; and (3) whether the claim is "outside the agency's expertise."  *Axon*, 598 U.S. at 186 (quoting *Thunder Basin*, 510 U.S. at 212-13) (cleaned up).  Here, the answer to all three questions is no.  Unlike *Axon*'s "structural constitutional claims" that contest an agency's "power to proceed at all," 598 U.S.

_____

[7] As discussed below, this failure to exhaust is an independent reason to reject Media Matters' claim.

25

at 191-92, Media Matters' retaliation claim challenges a discrete agency action and implicates issues on which the FTC has considerable expertise.

*First*, precluding this pre-enforcement challenge would not foreclose meaningful judicial review because all objections, including First Amendment claims, can be raised and resolved in a CID enforcement action in federal court. *See* 15 U.S.C. § 57b-1(h). Indeed, as discussed above, this is how federal agency CIDs and subpoenas have always been reviewed, and it is not credible to suggest that this traditional mechanism—endorsed by numerous courts, including the Supreme Court—somehow does not amount to meaningful judicial review. *Second*, there is nothing "wholly collateral" about Media Matters' retaliation claim. Unlike in *Axon*, Media Matters challenges something "particular about how [the FTC's] power was wielded"—namely, the issuance of the CID—not the Commission's "power generally." *Axon*, 598 U.S. at 193. As illustrated by the district court's opinion, its challenge also implicates "procedural or evidentiary matters," *id.*, such as the adequacy of the agency's explanation for the CID, the breadth of the CID, and the relevance of the various specifications to the goals of the investigation. App.251-253. Media Matters' challenge, therefore, directly "relate[s] to the subject of [an] enforcement action[]." *Axon*, 598 U.S. at 193. *Third*, questions about the propriety of CIDs fall directly within the FTC's expertise; thus, the agency should be permitted to decide whether to narrow its CID before commencing an enforcement action.

Disputes about whether CIDs have been properly issued, or whether they are overbroad or seek privileged information, raise "considerations of agency policy" in which the FTC has "competence and expertise." *Id.* at 194 (cleaned up). The FTC routinely issues CIDs and has considerable experience negotiating with recipients over CIDs' scope and breadth, alongside expertise in its own administrative process, i.e., conducting meet-and-confer negotiations and evaluating petitions to quash. Media Matters' constitutional claims are "intertwined with or embedded in" the FTC's expertise, *id.* at 195, since, as detailed above, the Commission has authority to consider any objections, including constitutional arguments, in a petition to quash, and undeniably has the authority to limit or modify (or quash altogether) a CID on any ground.

The district court's contrary conclusion was mistaken. The court suggested that precluding Media Matters' pre-enforcement retaliation claim would "foreclose all meaningful judicial review." App.230. As explained above, that is incorrect. Judicial review is available through an FTC-initiated enforcement proceeding, as confirmed by the numerous cases cited above that denied pre-enforcement challenges to CIDs and subpoenas. The district court also expressed concern that applying *Thunder Basin* to the FTC Act would allow the FTC to decide whether the retaliation claim will ever be heard. App.231. But that is true only because the Commission can choose *not to enforce* the CID, and the recipient then suffers no

legal penalty. Indeed, that choice is part of the statutory design and further underscores why Congress did not permit pre-enforcement litigation before the controversy is concrete and the agency has decided to enforce the CID. Notably, *Thunder Basin* itself rejected a pre-enforcement challenge, forcing the plaintiff to await enforcement by the agency. *See* 510 U.S. at 207-09.

The district court further justified its holding by emphasizing the "ongoing concrete injuries" Media Matters alleged it was suffering. App.231. But nothing in *Thunder Basin*'s framework turns on whether the plaintiff is suffering ongoing harm. *See, e.g.*, *Nat'l Ass'n Immigr. Judges v. Owen*, 139 F.4th 293, 312 (4th Cir. 2025) ("Plaintiffs cannot avoid" claim channeling under *Thunder Basin* "by merely alleging an irreparable injury."). To the contrary, channeling schemes often *presume* that such harm will exist. As the Supreme Court observed in *Axon*, exclusive review schemes often "require parties to wait before appealing, even when doing so subjects them to 'significant burdens.'" 598 U.S. at 191-92. *Thunder Basin* similarly presupposes the possibility of harms from "delayed judicial review," 510 U.S. at 207, even when such harms are irreparable and "onerous," *id.* at 205, 218; *see Vought*, 149 F.4th at 786 (postponing review is "not a hardship" but "par for the course").

The district court justified its focus on ongoing injuries by pointing to *Media Matters for America v. Paxton*, 138 F.4th 563 (D.C. Cir. 2025). App.231. But

*Paxton* is inapposite to the claim-channeling question, for the straightforward reason that it involved a CID issued by a *state* official and did not implicate any federal statutory scheme. As a result, the *Thunder Basin* framework—which addresses "challenges to *federal* agency action," *Axon*, 598 U.S. at 185 (emphasis added)— simply did not apply.

In short, while Media Matters (like any number of other CID or subpoena recipients) would prefer immediate review, Congress was free to weigh the policy considerations and channel all such disputes to the enforcement action. And as discussed above, the scheme Congress adopted takes the interests of CID recipients into account. While Media Matters awaits review, it faces no penalties and is not required to "engage in, or to refrain from, any conduct." *Vought*, 149 F.4th at 786 (cleaned up). By contrast, the district court's approach would have drastic and unwelcome consequences. Particularly when combined with the district court's lax standard for demonstrating retaliation, it could potentially allow any recipient of process to bring law enforcement investigations to a halt simply by claiming retaliation. That is not the law. *See Doe v. FAA*, 432 F.3d 1259, 1263 (11th Cir. 2005) (refusing to enjoin ongoing agency proceedings where statute provided exclusive judicial review framework).

Finally, it makes no difference that Media Matters asserts a First Amendment harm. App.230-231. There is no First Amendment exception to the *Thunder Basin*

framework, and several courts have applied *Thunder Basin* to preclude First Amendment claims, even where the plaintiffs allege ongoing harms. *See Am. Fed'n Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 755-56 (D.C. Cir. 2019); *Am. Fed'n Gov't Emps., AFL-CIO v. Loy*, 367 F.3d 932, 936-37 (D.C. Cir. 2004); *see also LabMD, Inc. v. FTC*, 776 F.3d 1275, 1280 (11th Cir. 2015) ("[N]one of our cases suggest that First Amendment retaliation claims must be treated differently than other constitutional claims under *Thunder Basin*[.]"); *Nat'l Taxpayers Union v. SSA*, 376 F.3d 239, 244 (4th Cir. 2004) (holding prior restraint claims must first be adjudicated under statutory scheme). More generally, the Supreme Court has repeatedly applied claim-channeling to constitutional claims, including in *Thunder Basin* itself. *See* 510 U.S. at 205.

## 2. Media Matters lacks an implied equitable cause of action.

Compounding the lack of jurisdiction to hear its claim, Media Matters also has no cause of action. Media Matters does not dispute that there is no cause of action under the Administrative Procedure Act. *See* Dkt.28 at 15. Therefore, it must rely on an implied equitable cause of action under either the First Amendment or the FTC Act. But the Supreme Court has warned federal courts to hesitate before finding implied constitutional causes of action. *E.g.*, *Ziglar v. Abbasi*, 582 U.S. 120, 134-35 (2017) ("separation-of-powers principles are or should be central to the analysis"). Likewise, "since *Cort v. Ash*, [422 U.S. 66 (1975),] the Supreme Court

has been very hostile to implied [statutory] causes of action." *Johnson v. Interstate Mgmt. Co.*, 849 F.3d 1093, 1097 (D.C. Cir. 2017).

That hostility to implied causes of action is related to the scope of the "traditional equitable powers" of the federal courts. *Ziglar*, 582 U.S. at 133. Those powers are limited to relief that was "traditionally accorded by courts of equity," *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999), and pre-enforcement injunctions against agency CIDs and subpoenas were not available at equity, *e.g.*, *Claire Furnace*, 274 U.S. at 174.

In addition, the equitable power to "enjoin unlawful executive action is subject to express and implied statutory limitations." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). In *Exceptional Child Center*, the Court relied on the Medicaid Act's implicit preclusion of private enforcement in declining to employ federal courts' equitable powers. *Id.* at 327-29. Likewise here, the FTC Act provides no express cause of action, and Congress's choice of an enforcement action as the sole remedy for CID recipients impliedly restricts equitable collateral attacks. *See Alexander v. Sandoval*, 532 U.S. 275, 290 (2001). Unsurprisingly, the Supreme Court and lower courts have frequently grounded their dismissals of pre-enforcement CID challenges in the want of equity and the availability of an adequate remedy at law. *See, e.g.*, *Reisman*, 375 U.S. at 443; *Claire Furnace*, 274 U.S. at 174; *Wearly*, 616 F.2d at 665.

### 3. Media Matters failed to exhaust its retaliation claim.

The district court also erred in granting a preliminary injunction because Media Matters failed to exhaust the retaliation issue. Its 16-page petition to quash said nothing about retaliation. Its only First Amendment claim was a two-paragraph assertion that a newsgathering privilege shields it from answering the CID. App.141-142. Media Matters also does not claim to have raised retaliation in its meet-and-confer discussions with FTC staff. App.174-177 (statement of counsel required by 16 C.F.R. § 2.10(a)(2)). Instead, Media Matters raised the retaliation theory for the first time in this collateral lawsuit. That is precisely the type of gamesmanship precluded by the administrative exhaustion requirement— particularly where FTC staff and the Commission could have applied their considerable experience with CIDs in attempting to address Media Matters' retaliation concerns.

"Administrative review schemes commonly require parties to give the agency an opportunity to address an issue before seeking judicial review of that question." *Carr v. Saul*, 593 U.S. 83, 88 (2021). Consistent with this general practice, the FTC Act's review scheme demands that CID recipients present all their objections in a petition to quash. *See* 15 U.S.C. § 57b-1(f)(2) ("Such petition shall specify *each ground* upon which the petitioner relies ...." (emphasis added)); 16 C.F.R. § 2.10(a)(1) (petitions "shall set forth *all assertions* of protected status *or other*

*factual and legal objections* to the [CID], including *all* appropriate arguments …." (emphasis added)). This administrative exhaustion requirement prevents gamesmanship, protects agency authority, and promotes judicial efficiency. *See Forest Guardians v. U.S. Forest Serv.*, 641 F.3d 423, 431 n.6 (10th Cir. 2011) (per curiam).

Even when a statute or regulation does not expressly require exhaustion, courts may impose an exhaustion requirement "based on an analogy to the rule that appellate courts will not consider arguments not raised before trial courts." *Carr*, 593 U.S. at 88 (cleaned up). In determining whether to require exhaustion, courts consider:

> (1) whether the agency proceedings were adversarial or inquisitorial, in particular "whether claimants bear the responsibility to develop issues for adjudicators' consideration"; (2) "that agency adjudications are generally ill suited to address structural constitutional challenges, which usually fall outside the adjudicators' areas of technical expertise"; and (3) that "this Court has consistently recognized a futility exception to exhaustion requirements."

*Traffic Jam Events, LLC v. FTC*, No. 21-60947, 2025 WL 1904566, at *2 (5th Cir. July 10, 2025) (quoting *Carr*, 593 U.S. at 88-89, 92-93).

Here, even setting aside the express exhaustion requirements discussed above, the statutory and regulatory scheme governing petitions to quash comfortably satisfies *Carr*'s factors for requiring administrative exhaustion. First, petitions to quash are clearly adversarial. The petition must include "all appropriate arguments,

affidavits, and other supporting documentation," 16 C.F.R. § 2.10(a)(1); FTC staff may submit a "factual and legal response" to the petition, *id.* § 2.10(a)(4); and the Commission issues an order ruling on the petition, *id.* § 2.10(c). Second, this is not an *Axon*-like structural constitutional challenge where the agency has no special expertise. *Cf. Carr*, 593 U.S. at 93. The retaliation claim here is limited to a single CID, and the Commission routinely addresses constitutional objections (as it did with Media Matters' First Amendment privilege argument) in ruling on petitions to quash.[8] Third, raising the retaliation issue in Media Matters' petition would not have been futile, as the Commission was empowered to quash or modify the CID based on any proper objection. 16 C.F.R. § 2.10(c).

Unsurprisingly, courts have repeatedly confirmed that challenges to FTC investigations are subject to an exhaustion requirement. *See, e.g.*, *Morton Salt*, 338 U.S. at 653-54 (requiring exhaustion of objections to FTC compliance reports); *FTC v. XCast Labs, Inc.*, No. 21-1026, 2021 WL 6297885, at *3 (C.D. Cal. Dec. 9, 2021) (given the "statutorily-established administrative petition remedy," it "makes little sense to conclude that Congress set up an entirely optional route for challenging an investigative demand that a party could voluntarily choose to avoid"); *FTC v.*

---

[8] PTQ Order at 6-8 (addressing First Amendment privilege claim); *see also, e.g.*, *Feb. 11, 2014 CID Issued to Ziegler Supersys., Inc.*, 157 F.T.C. 1880, 1887-88 (2014) (same).

*O'Connell Assocs.*, 828 F. Supp. 165, 168 (E.D.N.Y. 1993) ("It is also well settled that this exhaustion requirement applies to FTC investigatory proceedings.").

These holdings are eminently sensible. It would indeed be illogical for Congress to set up an adversarial process where parties could raise all legal challenges to a CID in front of the Commission, only to leave the parties entirely free to boycott that process and raise those arguments in separate litigation. Notably, the stay panel majority seemed to presume, without briefing on this issue, that the FTC Act contained an exhaustion requirement. *See* Stay Op., 2025 WL 2988966, at *5.[9]

Lastly, while the FTC did not expressly raise lack of exhaustion in its earlier briefing, there is ample reason for the Court to consider it now. First, as the Supreme Court has explained, "parties are not limited to the precise arguments they made below" because "[o]nce a federal claim is properly presented, a party can make any argument in support of that claim." *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992). Here, exhaustion is inextricably intertwined with the FTC's other

---

[9] The stay panel majority incorrectly believed that Media Matters satisfied that requirement by raising the retaliation argument in its PTQ—which in fact it did not do, as discussed above. Accordingly, the panel majority thought, there would be no "agency-expertise benefit to waiting" for an enforcement action, since "the agency was already afforded an opportunity to consider the constitutional harms caused by its demand." Stay Op., 2025 WL 2988966, at *5. This suggests that, if the panel majority had correctly evaluated the PTQ's contents, it might have granted a stay.

arguments, particularly as to *Thunder Basin*'s channeling analysis. Indeed, as noted above, the two are so closely related that the stay panel raised and (erroneously) addressed exhaustion *sua sponte*. *See* Stay Op., 2025 WL 2988966, at *5. There is therefore no reason for this Court to shy away from the issue. Second, in any event, courts of appeals "have a fair measure of discretion to determine what questions to consider and resolve for the first time on appeal," and this Court has exercised its discretion to consider new arguments in a variety of circumstances, including where "the issue is purely one of law important in the administration of federal justice, and resolution of the issue does not depend on any additional facts not considered by the district court." *Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d 416, 419 n.5 (D.C. Cir. 1992). That principle applies here. The exhaustion issue is purely legal and requires no factfinding. Moreover, the case is currently in a preliminary injunction posture, with the merits proceeding in the district court still to come. Accordingly, addressing the issue now would promote judicial economy and may substantially accelerate the ultimate resolution of this litigation.

### B.    Media Matters Is Not Likely to Prevail on Its First Amendment Retaliation Claim.

To prevail on its retaliation claim, Media Matters must show (1) that it "engaged in conduct protected under the First Amendment," (2) that the FTC "took some retaliatory action sufficient to deter a person of ordinary firmness in [Media Matters'] position from speaking again," and (3) that there is "a causal link between

36

the exercise of a constitutional right and the adverse action." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (cleaned up).

While the Commission does not dispute that Media Matters engages in some protected First Amendment conduct, Media Matters fails at each of the other two prongs: it cannot show the necessary causal link between its 2023 article and the FTC CID, and it cannot show that the CID caused a sufficient chilling effect.

### 1. Media Matters cannot demonstrate a causal connection between its speech and the CID.

To show causation, Media Matters must demonstrate at a *minimum* that the CID "would not have been [issued] absent the retaliatory motive." *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019).[10] In making that but-for showing, Media Matters must overcome the "longstanding presumption of regularity" that attaches to government action. *Hartman v. Moore*, 547 U.S. 250, 263 (2006). That presumption is at its apex in the context of law-enforcement investigations, an area of "executive discretion of such high order" that "judicial intrusion … should be minimal." *Id.*

---

[10] In fact, the requisite showing is more robust: Media Matters actually must demonstrate that there was no reasonable basis for the CID. For example, in the similar context of retaliatory arrests, the Supreme Court has held that plaintiffs must show that the government lacked probable cause. *Nieves*, 587 U.S. at 399-400. The same logic applies here too. *See Gonzalez v. Trevino*, 602 U.S. 653, 663 (2024) (Alito, J., concurring); *cf. Media Matters for Am. v. Bailey*, No. 24-cv-147, 2024 WL 3924573, at *12-13 (D.D.C. Aug. 23, 2024) (considering the issue and ultimately declining to impose an objective basis standard, at least in part for case-specific reasons). However, the Court need not reach that issue because Media Matters cannot satisfy even the basic but-for standard.

Excessive judicial interference "could 'chill law enforcement,' cause delay, and 'impair the performance of a core executive constitutional function.'" *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016) (quoting *United States v. Armstrong*, 517 U.S. 456, 465 (1996)); *see Trump v. Hawaii*, 585 U.S. 667, 702 (2018); *FTC v. Texaco, Inc.*, 555 F.2d 862, 872-73 (D.C. Cir. 1977) (en banc).

To show a likelihood of success on the merits, then, Media Matters must put forward enough evidence to displace the presumption and demonstrate that the but-for cause of the CID was Media Matters' 2023 article about X.com—which is undisputedly the sole piece of First Amendment expression at issue. App.210, 238. Media Matters has not come close to carrying that burden and its position must be rejected as a matter of law.

### a. The undisputed evidence demonstrates that the Commission acted for nonretaliatory reasons.

The CID is part of a broad investigation into a high priority issue—advertising boycotts that violate the antitrust laws. In particular, the Commission is investigating whether various entities unlawfully agreed to withhold the placement of ads using lists that categorize content publishers as not "brand suitable" or "brand safe." PTQ Order at 2. The investigation includes seventeen outstanding CIDs that were issued to a variety of entities, such as advertising trade associations, brand safety/suitability rating organizations, and policy/advocacy groups like Media Matters. *Id.*

The investigation's breadth refutes Media Matters' theory that its CID was issued in retaliation for a specific Media Matters article. Needless to say, the other entities that received a CID did not write that article and, as the stay panel majority acknowledged, could not "plausibly … seek similar relief." Stay Op., 2025 WL 2988966, at *11. The fact that they received CIDs anyway demonstrates that the Media Matters CID would have been issued regardless of any purported retaliatory motive.

In response, Media Matters offers only wild speculation. It has hypothesized, for example, that the sixteen other CID recipients were added to "lard[]" the investigation "with seemingly innocent targets." Stay Opp'n 18. It has also hypothesized that the other entities might have been added because the Commission is retaliating against them as well (for unspecified other speech). *Id.* But none of this was even alleged, let alone demonstrated. And "guess[es] [are] insufficient to rebut the presumption of regularity." *United States v. Rundo*, 108 F.4th 792, 808 (9th Cir. 2024).

The district court ignored this issue altogether. For its part, the stay panel rightly declined to engage in the rank speculation offered by Media Matters. Instead, however, the stay panel majority adopted an unsustainable position that even Media Matters had not advocated. Specifically, it theorized that the Media Matters CID

may have been broader than the CIDs issued to other entities, and it faulted the FTC for failing to disprove this possibility. Stay Op., 2025 WL 2988966, at *9.

In doing so, the stay panel majority put the burden on the wrong party and inverted the presumption of regularity. The burden is on Media Matters to demonstrate retaliation, not on the FTC to disprove plaintiff's far-fetched theory that the agency's broad investigation is pretextual (particularly when doing so would force the Commission to disclose confidential information regarding investigations of other parties). At any rate, the Media Matters CID is *not* unusually broad. In fact, another CID from the same investigation (which became public after the recipient filed a petition to quash) is, if anything, *broader*. That CID, which was issued to a brand safety/suitability ratings organization, extends for a longer period and includes more specifications than the CID issued to Media Matters.[11] More generally, Media Matters' CID is no broader than the typical CID issued in FTC investigations.[12] In sum, far from demonstrating causation, the undisputed evidence disproves it.

---

[11] Attachment to Global Disinformation Index's Petition to Quash Civil Investigative Demand, FTC File No. 251-0061 (Sept. 17, 2025), https://tinyurl.com/v9mhhm8c (listing 29 specifications, including several not directed to Media Matters, such as descriptions of "each product and service" GDI has offered, a list of every rating GDI has assigned, and all documents related to the effect of any rating on a news source).

[12] *E.g.*, *FTC v. Cigna Group*, No. 1:25-mc-00004, Dkt.1-2 (D.D.C. Jan. 15, 2025); *FTC v. Retail Services & Systems, Inc. d/b/a Total Wine & More*, No. 1:23-mc-00028, Dkt.1-2 (E.D. Va. Oct. 20, 2023).

### b. Media Matters' purported evidence of retaliation fails as a matter of law.

Media Matters points to three categories of evidence to show retaliation: (1) the timing of the CID, (2) statements by various individuals, and (3) the scope of the CID. All of this purported evidence is categorically inadequate as a matter of law.

**1.** As to timing: the Media Matters CID was issued in May 2025, a year and a half after the November 2023 article that supposedly triggered it. As a matter of law, such a "lengthy time lapse … negates any inference" of a causal connection. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005) (cleaned up); *Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012) (temporal proximity can support causation "only where the two events are very close in time" and even "a three-month period" may "be too lengthy") (cleaned up).

Media Matters offers two basic responses to this timing problem, both of which were adopted by the district court and the stay panel. *See* App.249-251; Stay Op., 2025 WL 2988966, at *6-7. These responses fail.

*First*, Media Matters asserts that the Texas and Missouri investigations into Media Matters fill the "temporal gap" between the November 2023 article and the May 2025 CID. Dkt.28 at 17. This is wrong both legally and factually. While Media Matters has pointed to a district court case suggesting that a series of retaliatory acts by *one* organization could reset the timing, *see* Dkt.22-1 at 30 (citing

*Lewis v. Gov't of D.C.*, 161 F. Supp. 3d 15, 29 (D.D.C. 2015)), it has identified no authority applying that timing principle across distinct organizations, let alone distinct sovereigns, especially (as here) in the absence of any evidence or even allegations of coordination among those agencies.  *See Zorn v. City of Marion*, 774 F. Supp. 3d 1279, 1326-27 (D. Kan. 2025) (defendants allegedly "collud[ed]" and "agree[d]" to take retaliatory action).

At any rate, even combining these distinct investigations does not help Media Matters.  The state investigations had been enjoined by August 2024, *Media Matters for Am. v. Bailey*, No. 24-cv-147, 2024 WL 3924573, at *19 (D.D.C. Aug. 23, 2024), and the CID was not issued until May 2025.  That leaves a nine-month gap, and courts have repeatedly found that far shorter gaps are too long to support causation.  *E.g.*, *Taylor v. Solis*, 571 F.3d 1313, 1322 (D.C. Cir. 2009) (no causation for two-and-a-half-month gap); *Smith v. McMahon*, 239 F. Supp. 3d 57, 76 (D.D.C. 2017) (same for 6-month gap); *Allen v. Napolitano*, 774 F. Supp. 2d 186, 201 n.2 (D.D.C. 2011) ("[A]lleged retaliatory acts must occur within three to four months of the protected activity to establish causation ….")

Ultimately, the stay majority could conclude only that the CID was issued after a period of "litigation and information demands targeted at Media Matters" by entities other than the FTC.  Stay Op., 2025 WL 2988966, at *6.  This is transparently insufficient; it would weigh against *any* CID or subpoena issued to Media Matters,

regardless of how disconnected from the 2023 article, "effectively grant[ing Media Matters] a period of immunity." *Iyoha v. Architect of the Capitol*, 927 F.3d 561, 574 (D.C. Cir. 2019).

*Second*, Media Matters asserts that the timing lapse should be overlooked because the CIDs were issued within four months of Ferguson becoming Chairman. To begin, that delay would still be beyond the typical "outer limit" for establishing causation. *Gustave-Schmidt v. Chao*, 360 F. Supp. 2d 105, 118-19 (D.D.C. 2004). Regardless, the assertion that the investigation was launched promptly does not support Media Matters' version of events because it is equally consistent with what actually occurred: namely, a robust effort by the Commission to pursue a high priority investigation into advertising boycotts. Obviously, a fact that is equally consistent with both sides' positions does not constitute evidence in favor of either. *See, e.g.*, *Gonzalez v. Walgreen Co.*, 140 F.4th 663, 674 (5th Cir. 2025). More generally, the issuance of a CID *in 2025* simply does nothing to tie that CID to an article published *in 2023*.

Finally, "temporal proximity" alone is insufficient in any event. *Minter v. District of Columbia*, 809 F.3d 66, 71 (D.C. Cir. 2015); *see Rundo*, 108 F.4th at 805 ("[T]iming" does not show "improper motive" because it "can merely be the sign of the government's change in enforcement priorities."). A plaintiff must identify "positive evidence [of retaliation] beyond mere proximity." *Minter*, 809 F.3d at 71-

72 (cleaned up); *see Iyoha*, 927 F.3d at 574 (same). Accordingly, even if the timing of the CID supported causation, Media Matters also must provide *additional* probative evidence, which—as discussed below—it has not done.

**2.** Next, Media Matters relies on the statements of various individuals regarding censorship, advertising boycotts, or (in some cases) Media Matters. But to demonstrate a likelihood of success on the merits, it must establish a retaliatory motive on the part of *the relevant decisionmaker*. Here, Media Matters identifies only one decisionmaker: Chairman Ferguson. And Media Matters has not pointed to a single statement from Chairman Ferguson that so much as mentions Media Matters (let alone any particular article by Media Matters). Walker Dissent, 2025 WL 2988966, at *18 ("Ferguson … didn't even *mention* Media Matters.").

Notably, Media Matters offers no allegations or evidence about the motives of the other Commissioners. While Chairman Ferguson signed the CID, he could do so only "pursuant to a Commission resolution." 15 U.S.C. § 57b-1(i). And the entire Commission effectively ratified the CID by denying Media Matters' petition to quash (on a 2-0 vote, with Commissioner Meador recused). PTQ Order at 13. The key role played by the rest of the Commission further demonstrates the inadequacy of Media Matters' retaliation allegations. *See Nieves*, 587 U.S. at 400.

Media Matters points to general statements from Chairman Ferguson about his enforcement priorities with respect to advertising boycotts. But as Judge Walker

explained, such statements are common for enforcement officials; indeed, it "is what we expect of public servants tasked with enforcing the law." Walker Dissent, 2025 WL 2988966, at *14; *see also id.* at *18 (explaining that "Ferguson's (far-from-incriminating) comments" reveal a "campaign *against* censorship"); *see Rundo*, 108 F.4th at 807 (statement that prosecution "was initiated to address violent attempts to 'squelch free speech'" was "not suspect" and instead "put[] the *non*-discriminatory motive of the prosecutors' office on display"); *United States v. Wilson*, 123 F.4th 1021, 1032 (9th Cir. 2024) (Bumatay, J., concurring) ("mere fact that government officials" used labels such as "'radical left' … to identify violent wrongdoers" "doesn't suggest that they targeted the violent rioters because of their political beliefs" instead of "based on their violence alone"); *see also United States v. Penagaricano-Soler*, 911 F.2d 833, 838 (1st Cir. 1990) (rejecting selective prosecution claim based on public statements by high ranking officials where "the government presented sufficient countervailing reasons of a non-discriminatory nature"). At any rate, the statements certainly do not connect the CID to "Media Matters' 2023 article—an article that mentioned neither the FTC nor Chairman Ferguson, written by an organization that neither Ferguson nor any decisionmaker

at the FTC is accused of ever mentioning before this investigation." Walker Dissent, 2025 WL 2988966, at *18.[13]

Media Matters also points to statements by *non-decisionmakers*: three FTC staffers (who made the comments prior to joining the FTC) and one individual who is not even in the government. Remarks from "non-decisionmakers are not generally direct evidence of retaliation." *Waggel v. George Wash. Univ.*, 957 F.3d 1364, 1374 (D.C. Cir. 2020); *accord Youssef v. Lynch*, 144 F. Supp. 3d 70, 101 (D.D.C. 2015).[14] The only way such statements could even conceivably enter the analysis is if the

---

[13] Nor does it help Media Matters to frame Chairman Ferguson's statements as partisan or ideological. To begin, that characterization does nothing to advance its *retaliation* claim because those general statements do nothing to connect the CID to a particular Media Matters article. At bottom, Media Matters is attempting to transform its First Amendment retaliation claim into a Fifth Amendment selective enforcement claim, which it did not bring. *Sanjour v. EPA*, 56 F.3d 85, 92 n.9 (D.C. Cir. 1995) ("'Selective enforcement' is not, of course, a First Amendment cause of action; rather, … it lies in 'a murky corner of equal protection law.'"). And even that claim would necessarily fail. *See Branch Ministries v. Rossotti*, 211 F.3d 137, 144 (D.C. Cir. 2000) (describing the claim's "demanding" burden). First, Chairman Ferguson's statements simply reflect his factual understanding about the groups that had recently engaged in ideological censorship. *See* Walker Dissent, 2025 WL 2988966, at *18 (explaining that Ferguson's statements merely "evinced an awareness" of the entities responsible for recent censorship efforts); *Rundo*, 108 F.4th at 806-07 (prosecutor mentioning "white supremacists" did not indicate "that [an organization] was 'targeted' *because* they were 'white supremacists'"). Second, Media Matters has not and cannot identify "similarly situated" entities that were not investigated. *Branch Ministries*, 211 F.3d at 144.

[14] In any event, none of these non-decisionmaker comments made any reference to the 2023 Media Matters article.

non-decisionmaker was involved in the decisionmaking process. *E.g.*, *Cones v. Shalala*, 199 F.3d 512, 519 (D.C. Cir. 2000) (considering non-decisionmaker's statements because the record was "replete with evidence of [his] involvement in the [relevant] decision"); *Harris v. Wackenhut Servs., Inc.*, 648 F. Supp. 2d 53, 62 (D.D.C. 2009), *aff'd*, 419 F. App'x 1 (D.C. Cir. 2011) (concluding that "comments made by … non-decisionmakers[] are inadmissible" where "plaintiff [had] failed to proffer evidence … that the speakers had any influence, or even had any input, on the [relevant] decision"). And here, Media Matters has not alleged that *any* of these individuals had *any* involvement in the issuance of the CID.

This is fatal to Media Matters' argument. For example, the stay panel pointed to the allegation that a private individual "allegedly met with Chairman Ferguson on two occasions." Stay Op., 2025 WL 2988966, at *8. But that is not remotely sufficient in the absence of any allegations that those meetings had anything whatsoever to do with Media Matters. *See, e.g.*, *In re Architect of Capitol Emp. Disp.*, No. 23-2334, 2024 WL 3359515, at *3 (D.D.C. July 10, 2024) (disregarding comments by "non-decisionmakers" who "did not work for the [relevant entity]" and who plaintiffs "never link[ed] to [their] termination"); *United States v. Biden*, 729 F. Supp. 3d 410, 422 (D. Del. 2024) (any "pressure campaign from Congressional Republicans" to charge defendant was irrelevant without "credible [allegations] to

suggest that the conduct of those lawmakers (or anyone else) had any impact whatsoever on the Special Counsel").

**3.** Media Matters also points to the CID's asserted breadth as evidence of retaliation.  As noted above, however, the CID's scope is far from unusual.  And all the CID's specifications follow naturally from the Commission's objective of investigating potential advertising boycotts.  The district court acknowledged that several of the specifications are directly relevant to that goal, *see* App.252-253, and the same is true for the other specifications.  Media Matters' financial documents, for example, could shed light on whether Media Matters expended funds on (or received funds for) coordinating activities.  *See FTC v. Invention Submission Corp.*, 965 F.2d 1086, 1089-90 (D.C. Cir. 1992) (recognizing that "financial information can be relevant to a pre-complaint *investigation*").  Similarly, it is typical for the FTC, like ordinary civil litigants, to ask for already existing document productions in "litigation … related to" the subject of its investigation, given that Media Matters had been engaged in litigation about advertising boycotts.  App.253.[15]

---

[15] Media Matters has also suggested that advertiser boycotts are categorically protected speech.  Dkt.28 at 20-21.  But as it acknowledged, Dkt.22-1 at 34, that assertion is at least debatable, and the Commission is entitled to investigate *potential* antitrust violations.  Similarly, Media Matters has suggested that it is immune from enforcement action as a nonprofit.  Dkt.22-1 at 33-34.  But even assuming that's true, it is emphatically *not* immune from CIDs.  The Commission can issue a CID to "any person," including a nonprofit, who "the Commission has reason to believe … may … have any information[] relevant to … antitrust violations."  15 U.S.C. § 57b-

Media Matters also points to the fact that Commission staff amended the CID's original statement of the nature of the investigation. But the statement was amended in response to Media Matters' petition to quash (which argued that the explanation was statutorily inadequate), not in response to this lawsuit. *See* PTQ Order at 3. Providing additional detail in response to a request for clarification hardly smacks of retaliation. In any event, the original explanation was legally sufficient, as the Commission explained in its ruling on the petition to quash. *Id.* at 3-6 (citing several cases that found similar CID descriptions adequate). And any purported shortcomings in the description would be at most a statutory or regulatory concern (which was undisputedly addressed by the amendment). None of this has any bearing on Media Matters' *constitutional* claim.

Moreover, to the extent Media Matters (or the district court) suggested that the Commission should have explained what relevant documents it believes Media Matters possesses, *see* Dkt.28 at 20, that puts the cart before the horse. If the Commission already knew what documents Media Matters possesses, there would be no need for a CID. Similarly, requiring the Commission to reveal "*why*" it

---

1(c)(1); *see id.* § 57b-1(a)(6) (defining "person" to include a "partnership, corporation, association, or other legal entity"). Accordingly, nonprofits may be required to respond to CIDs regardless of whether they are subject to the FTC's enforcement authority. *See Blue Ribbon Quality Meats*, 560 F.2d at 875-76 (noting the difference "between the FTC's investigatory power" and its "regulatory power").

believes Media Matters has relevant information—as the district court did, App.252—would improperly force investigators to prove their cases *before* they begin investigating. *See Morton Salt*, 338 U.S. at 642-43 (The FTC "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not."); *Texaco*, 555 F.2d at 874 ("an investigating agency is under no obligation to propound a narrowly focused theory of a possible future case" when enforcing a subpoena or CID). More broadly, requiring federal law enforcement agencies to disclose their preliminary evidence and theories to receive judicial sign-off to begin their investigations would constitute an improper judicial intrusion into core executive functions and would destroy the very concept of confidential investigations. *See Texaco*, 555 F.2d at 871-72 (describing a court's role in evaluating an FTC subpoena as "strictly limited").

\*　　\*　　\*　　\*

In sum, the Commission has proffered undisputed evidence of a nonretaliatory purpose for issuing the CID, and Media Matters' purported evidence of retaliation fails as a matter of law. If successful, Media Matters' tactics would furnish a blueprint for derailing virtually any federal investigation.

### 2.  Media Matters also cannot demonstrate that the CID had the requisite chilling effect.

Media Matters must also demonstrate that the CID is "sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again." *Aref*, 833 F.3d at 258 (cleaned up).  Media Matters has not made this showing.

As an initial matter, it appears unlikely that a retaliatory investigation claim is even cognizable.  The Supreme Court and this Court have declined to resolve the question. *See Hartman*, 547 U.S. at 262 n.9; *Paxton*, 138 F.4th at 584-85.[16]  Several courts of appeals have suggested that such claims should *not* be recognized.  *See Archer v. Chisholm*, 870 F.3d 603, 620 (7th Cir. 2017); *Breaux v. City of Garland*, 205 F.3d 150, 157-61 (5th Cir. 2000); *see also J.T.H. v. Mo. Dep't of Soc. Servs. Child.'s Div.*, 39 F.4th 489, 493 (8th Cir. 2022) ("[W]e have never recognized a retaliatory-investigation claim of this kind.  Nor have other courts around the country."); *Sivella v. Twp. of Lyndhurst*, No. 20-2342, 2021 WL 3356934, at *3 (3d

---

[16] The district court found support for a retaliatory investigation claim in *Paxton*, App.245-246, but *Paxton* did not address the point because the defendant there forfeited this argument.  *Paxton*, 138 F.4th at 584.  And *Reporters Committee for Freedom of Press v. AT&T Co.*, 593 F.2d 1030 (D.C. Cir. 1978), predates the Supreme Court's decision in *Hartman* and the modern doctrine on this issue.  Even on its own terms, *Reporters Committee* does nothing more than recognize that "subpoenas issued in bad faith" could "*in theory*" "abridge First Amendment rights" "in some cases" where a plaintiff laid "an adequate foundation for such judicial intervention" by "establish[ing] a *clear and imminent* threat of [government] misconduct."  *Id.* at 1070-71.  That demanding standard was not satisfied there and the same is true here.

Cir. Aug. 3, 2011). And the Eleventh Circuit has squarely held that "a retaliatory investigation" "does not implicate a federal constitutional right." *Rehberg v. Paulk*, 611 F.3d 828, 850 & n.24 (11th Cir. 2010), *aff'd*, 566 U.S. 356 (2012); *Thompson v. Hall*, 426 F. App'x 855, 858 (11th Cir. 2011) (per curiam) (same).

This caselaw is sufficient to deny a preliminary injunction. After all, the claim here is either not cognizable or at a minimum is unprecedented. The novelty of the claim itself "suggest[s] that the key premise of a preliminary injunction—a showing of a likelihood of success on the merits—is missing." *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 471 (6th Cir. 2023), *aff'd*, 605 U.S. 495 (2025). At any rate, the uncertainty about whether the "adverse consequences of a retaliatory investigation would *ever* justify recognizing such an investigation as a distinct constitutional violation," *Hartman*, 547 U.S. at 262 n.9 (emphasis added), counsels skepticism that the adverse consequences of any particular investigation are sufficiently grave to chill a person of ordinary firmness.

To put it another way, even if a retaliatory investigation claim is theoretically cognizable, it could arise only in extraordinary circumstances that are absent here. *See, e.g.*, *Moore v. Garnand*, 83 F.4th 743, 752 (9th Cir. 2023) (while no case had "held that a retaliatory investigation by itself was unconstitutional," it was possible that the entire "scope and manner" of a given investigation could violate the First Amendment) (emphasis omitted) (cited in App.244). Likewise, asserting a sufficient

chilling effect would require extraordinary circumstances. But Media Matters has raised a generic retaliatory investigation claim. The scope of the CID is standard for FTC investigations, and Media Matters has not alleged any unusual injury as a result of the CID. For example, Media Matters says third parties have treated it differently due to the CID, App.199-200, but the same could occur in any federal investigation. More broadly, Media Matters attributes many of its alleged injuries to multiple causes, making it impossible to discern what (if any) chilling effect stems from the FTC's CID. *E.g.*, App.190 (attributing chilling effect to the "successive investigations"); App.194 (describing self-censorship "since the Texas CID was issued"); App.194-195 (describing "journalistic harms inflicted upon Media Matters by [the FTC] CID and by the related, retaliatory investigations and litigations initiated by other parties"). And many of Media Matters' other alleged injuries turn on its own voluntary reactions. *See, e.g.*, App.190 (describing changes to its "editorial processes" and suggesting that Media Matters has a "culture of fear"). But subjective responses are of limited usefulness in determining whether the CID is *objectively* likely to chill speech. *Constantine*, 411 F.3d at 500 (rejecting a "subjective standard"). And Media Matters' allegations of a chilling effect are further weakened because, by its own account, Media Matters is not subject to the Commission's enforcement authority, Dkt.22-1 at 25-26, and thus cannot assert that

it faces a risk of enforcement. In short, Media Matters fails this prong of the retaliation test as well.

## II. THE EQUITABLE FACTORS WEIGH AGAINST A PRELIMINARY INJUNCTION.

As Judge Walker correctly observed, the remaining factors are "intertwined with the merits." Walker Dissent, 2025 WL 2988966, at *19.

The FTC is irreparably harmed by the overbroad and unlawful injunction, which undercuts an important investigation. *See Trump v. CASA, Inc*., 606 U.S. 831, 860 (2025) ("[T]he Government is likely to suffer irreparable harm from the District Courts' entry of injunctions that likely exceed the [court's] authority."); *cf. Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.") (cleaned up). It offends the separation of powers for the judiciary to halt ongoing investigations unless the Executive reveals confidential information about those investigations. And the public's interest lies in the vigorous enforcement of the antitrust laws. *See FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 242 (1980).

As for Media Matters, it has suffered no First Amendment harm because there is no First Amendment violation. And the mere issuance of a CID does not in and of itself result in irreparable harm. *Claire Furnace*, 274 U.S. at 174; *see Standard Oil*, 449 U.S. at 244. Media Matters therefore has no injury at all to offset the

grievous harm to the public and to the FTC, which is exacerbated by the likelihood

that the injunction will invite a barrage of copycat pre-enforcement challenges.[17]

---

[17] Indeed, another entity that received a CID as part of the same investigation—Global Disinformation Index (GDI)—has already filed a similar pre-enforcement challenge and sought a preliminary injunction. *Disinformation Index, Inc. v. FTC*, No. 1:25-cv-4137, Dkt.8-1 (D.D.C. Nov. 26, 2025). Parroting Media Matters' legal theories, GDI infers a retaliatory motive from even weaker purported evidence (such as Chairman Ferguson's observation that, based on Congressional investigations, GDI may have violated the antitrust laws by leading collusive ad boycotts). *Id.* at 14. If this Court affirms the district court's order—which GDI's motion cites more than 15 times—it may become commonplace for CID or subpoena recipients to bring pre-enforcement challenges based on similarly dubious allegations of retaliation.

# CONCLUSION

This Court should reverse the district court's preliminary injunction.

Respectfully submitted,

Of Counsel:

DANIEL GUARNERA
*Director*

KELSE MOEN
*Deputy Director*

GEOFFREY GREEN
*Assistant Director*

BUREAU OF COMPETITION

LUCAS CROSLOW
 *General Counsel*

ALEX POTAPOV
 *Deputy General Counsel*

/s/ H. Thomas Byron III
H. THOMAS BYRON III
 *Deputy General Counsel*

STEPHEN T. FAIRCHILD
ETHAN D. BECK
 *Attorneys*

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580
(202) 326-2527
*hbyron@ftc.gov*

January 2026

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and D.C. Cir. R. 32(e)(1), it contains 12,982 words.  The brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman typeface.


January 5, 2026                                 /s/ H. Thomas Byron III
                                                H. Thomas Byron III

# ADDENDUM

# TABLE OF CONTENTS

STATUTES (excerpts)

    15 U.S.C. § 45 ........................................................................ A-1

    15 U.S.C. § 46 ........................................................................ A-2

    15 U.S.C. § 57b-1 .................................................................. A-4

REGULATIONS

    16 C.F.R. § 2.1 ...................................................................A-11

    16 C.F.R. § 2.4 ...................................................................A-12

    16 C.F.R. § 2.7 ...................................................................A-13

    16 C.F.R. § 2.10 (excerpts) ................................................A-18

# 15 U.S.C. § 45
## Unfair methods of competition unlawful; prevention by Commission

**(a) Declaration of unlawfulness; power to prohibit unfair practices; inapplicability to foreign trade.**

**(1)** Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful.

**(2)** The Commission is hereby empowered and directed to prevent persons, partnerships, or corporations, except banks, savings and loan institutions described in section 57a(f)(3) of this title, Federal credit unions described in section 57a(f)(4) of this title, common carriers subject to the Acts to regulate commerce, air carriers and foreign air carriers subject to part A of subtitle VII of Title 49, and persons, partnerships, or corporations insofar as they are subject to the Packers and Stockyards Act, 1921, as amended, except as provided in section 406(b) of said Act, from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce.

\*　　\*　　\*

# 15 U.S.C. § 46
## Additional Powers of Commission

The Commission shall also have power—

**(a) Investigation of persons, partnerships, or corporations.** To gather and compile information concerning, and to investigate from time to time the organization, business, conduct, practices, and management of any person, partnership, or corporation engaged in or whose business affects commerce, excepting banks, savings and loan institutions described in section 57a(f)(3) of this title, Federal credit unions described in section 57a(f)(4) of this title, and common carriers subject to the Act to regulate commerce, and its relation to other persons, partnerships, and corporations.

\*     \*     \*

*Provided*, That the exception of "banks, savings and loan institutions described in section 57a(f)(3) of this title, Federal credit unions described in section 57a(f)(4) of this title, and common carriers subject to the Act to regulate commerce" from the Commission's powers defined in subsections (a), (b), and (j) of this section, shall not be construed to limit the Commission's authority to gather and compile information, to investigate, or to require reports or answers from, any person, partnership, or corporation to the extent that such action is necessary to the investigation of any person, partnership, or corporation, group of persons, partnerships, or corporations, or industry which is not engaged or is engaged only incidentally in banking, in business as a savings and loan institution, in business as a Federal credit union, or in business as a common carrier subject to the Act to regulate commerce.

\*     \*     \*

No officer or employee of the Commission or any Commissioner may publish or disclose information to the public, or to any Federal agency, whereby any line-of-business data furnished by a particular establishment or individual can be identified. No one other than designated sworn officers and employees of the Commission may examine the line-of-business reports from individual firms, and information provided in the line-of-business program administered by the Commission shall be used only for statistical purposes. Information for carrying out specific law enforcement responsibilities of the Commission

shall be obtained under practices and procedures in effect on May 28, 1980, or as changed by law.

Nothing in this section (other than the provisions of clause (c) and clause (d)) shall apply to the business of insurance, except that the Commission shall have authority to conduct studies and prepare reports relating to the business of insurance. The Commission may exercise such authority only upon receiving a request which is agreed to by a majority of the members of the Committee on Commerce, Science, and Transportation of the Senate or the Committee on Energy and Commerce of the House of Representatives. The authority to conduct any such study shall expire at the end of the Congress during which the request for such study was made.

# 15 U.S.C. § 57b-1
# Civil Investigative Demands

**(a) Definitions.** For purposes of this section:

**(1)** The terms "civil investigative demand" and "demand" mean any demand issued by the Commission under subsection (c)(1).

**(2)** The term "Commission investigation" means any inquiry conducted by a Commission investigator for the purpose of ascertaining whether any person is or has been engaged in any unfair or deceptive acts or practices in or affecting commerce (within the meaning of section 45(a)(1) of this title) or in any antitrust violations.

**(3)** The term "Commission investigator" means any attorney or investigator employed by the Commission who is charged with the duty of enforcing or carrying into effect any provisions relating to unfair or deceptive acts or practices in or affecting commerce (within the meaning of section 45(a)(1) of this title) or any provisions relating to antitrust violations.

**(4)** The term "custodian" means the custodian or any deputy custodian designated under section 57b-2(b)(2)(A) of this title.

**(5)** The term "documentary material" includes the original or any copy of any book, record, report, memorandum, paper, communication, tabulation, chart, or other document.

**(6)** The term "person" means any natural person, partnership, corporation, association, or other legal entity, including any person acting under color or authority of State law.

**(7)** The term "violation" means any act or omission constituting an unfair or deceptive act or practice in or affecting commerce (within the meaning of section 45(a)(1) of this title) or any antitrust violation.

**(8)** The term "antitrust violation" means—

    **(A)** any unfair method of competition (within the meaning of section 45(a)(1) of this title);

**(B)** any violation of the Clayton Act or of any other Federal statute that prohibits, or makes available to the Commission a civil remedy with respect to, any restraint upon or monopolization of interstate or foreign trade or commerce;

**(C)** with respect to the International Antitrust Enforcement Assistance Act of 1994, any violation of any of the foreign antitrust laws (as defined in section 12 of such Act) with respect to which a request is made under section 3 of such Act; or

**(D)** any activity in preparation for a merger, acquisition, joint venture, or similar transaction, which if consummated, may result in any such unfair method of competition or in any such violation.

**(b) Actions conducted by Commission respecting unfair or deceptive acts or practices in or affecting commerce.** For the purpose of investigations performed pursuant to this section with respect to unfair or deceptive acts or practices in or affecting commerce (within the meaning of section 45(a)(1) of this title); all actions of the Commission taken under section 46 and section 49 of this title shall be conducted pursuant to subsection (c).

**(c) Issuance of demand; contents; service; verified return; sworn certificate; answers; taking of oral testimony.**

**(1)** Whenever the Commission has reason to believe that any person may be in possession, custody, or control of any documentary material or tangible things, or may have any information, relevant to unfair or deceptive acts or practices in or affecting commerce (within the meaning of section 45(a)(1) of this title), or to antitrust violations, the Commission may, before the institution of any proceedings under this subchapter, issue in writing, and cause to be served upon such person, a civil investigative demand requiring such person to produce such documentary material for inspection and copying or reproduction, to submit such tangible things, to file written reports or answers to questions, to give oral testimony concerning documentary material or other information, or to furnish any combination of such material, answers, or testimony.

**(2)** Each civil investigative demand shall state the nature of the conduct constituting the alleged violation which is under investigation and the provision of law applicable to such violation.

**(3)** Each civil investigative demand for the production of documentary material shall—

**(A)** describe each class of documentary material to be produced under the demand with such definiteness and certainty as to permit such material to be fairly identified;

**(B)** prescribe a return date or dates which will provide a reasonable period of time within which the material so demanded may be assembled and made available for inspection and copying or reproduction; and

**(C)** identify the custodian to whom such material shall be made available.

**(4)** Each civil investigative demand for the submission of tangible things shall—

**(A)** describe each class of tangible things to be submitted under the demand with such definiteness and certainty as to permit such things to be fairly identified;

**(B)** prescribe a return date or dates which will provide a reasonable period of time within which the things so demanded may be assembled and submitted; and

**(C)** identify the custodian to whom such things shall be submitted.

**(5)** Each civil investigative demand for written reports or answers to questions shall—

**(A)** propound with definiteness and certainty the reports to be produced or the questions to be answered;

**(B)** prescribe a date or dates at which time written reports or answers to questions shall be submitted; and

**(C)** identify the custodian to whom such reports or answers shall be submitted.

**(6)** Each civil investigative demand for the giving of oral testimony shall—

**(A)** prescribe a date, time, and place at which oral testimony shall be commenced; and

**(B)** identify a Commission investigator who shall conduct the investigation and the custodian to whom the transcript of such investigation shall be submitted.

**(7)** **(A)** Any civil investigative demand may be served by any Commission investigator at any place within the territorial jurisdiction of any court of the United States.

**(B)** Any such demand or any enforcement petition filed under this section may be served upon any person who is not found within the territorial jurisdiction of any court of the United States, in such manner as the Federal Rules of Civil Procedure prescribe for service in a foreign nation.

**(C)** To the extent that the courts of the United States have authority to assert jurisdiction over such person consistent with due process, the United States District Court for the District of Columbia shall have the same jurisdiction to take any action respecting compliance with this section by such person that such district court would have if such person were personally within the jurisdiction of such district court.

**(8)** Service of any civil investigative demand or any enforcement petition filed under this section may be made upon a partnership, corporation, association, or other legal entity by—

**(A)** delivering a duly executed copy of such demand or petition to any partner, executive officer, managing agent, or general agent of such partnership, corporation, association, or other legal entity, or to any agent of such partnership, corporation, association, or other legal entity authorized by appointment or by law to receive service of process on behalf of such partnership, corporation, association, or other legal entity;

**(B)** delivering a duly executed copy of such demand or petition to the principal office or place of business of the partnership, corporation, association, or other legal entity to be served; or

**(C)** depositing a duly executed copy in the United States mails, by registered or certified mail, return receipt requested, duly addressed to such partnership, corporation, association, or other legal entity at its principal office or place of business.

**(9)** Service of any civil investigative demand or of any enforcement petition filed under this section may be made upon any natural person by—

**(A)** delivering a duly executed copy of such demand or petition to the person to be served; or

**(B)** depositing a duly executed copy in the United States mails by registered or certified mail, return receipt requested, duly addressed to such person at his residence or principal office or place of business.

**(10)** A verified return by the individual serving any civil investigative demand or any enforcement petition filed under this section setting forth the manner of such service shall be proof of such service. In the case of service by registered or certified mail, such return shall be accompanied by the return post office receipt of delivery of such demand or enforcement petition.

**(11)** The production of documentary material in response to a civil investigative demand shall be made under a sworn certificate, in such form as the demand designates, by the person, if a natural person, to whom the demand is directed or, if not a natural person, by any person having knowledge of the facts and circumstances relating to such production, to the effect that all of the documentary material required by the demand and in the possession, custody, or control of the person to whom the demand is directed has been produced and made available to the custodian.

**(12)** The submission of tangible things in response to a civil investigative demand shall be made under a sworn certificate, in such form as the demand designates, by the person to whom the demand is directed or, if not a natural person, by any person having knowledge of the facts and circumstances relating to such production, to the effect that all of the tangible things required

by the demand and in the possession, custody, or control of the person to whom the demand is directed have been submitted to the custodian.

**(13)** Each reporting requirement or question in a civil investigative demand shall be answered separately and fully in writing under oath, unless it is objected to, in which event the reasons for the objection shall be stated in lieu of an answer, and it shall be submitted under a sworn certificate, in such form as the demand designates, by the person, if a natural person, to whom the demand is directed or, if not a natural person, by any person responsible for answering each reporting requirement or question, to the effect that all information required by the demand and in the possession, custody, control, or knowledge of the person to whom the demand is directed has been submitted.

\*      \*      \*

**(d) Procedures for demand material.** Materials received as a result of a civil investigative demand shall be subject to the procedures established in section 57b-2 of this title.

**(e) Petition for enforcement.** Whenever any person fails to comply with any civil investigative demand duly served upon him under this section, or whenever satisfactory copying or reproduction of material requested pursuant to the demand cannot be accomplished and such person refuses to surrender such material, the Commission, through such officers or attorneys as it may designate, may file, in the district court of the United States for any judicial district in which such person resides, is found, or transacts business, and serve upon such person, a petition for an order of such court for the enforcement of this section. All process of any court to which application may be made as provided in this subsection may be served in any judicial district.

**(f) Petition for order modifying or setting aside demand.**

**(1)** Not later than 20 days after the service of any civil investigative demand upon any person under subsection (c), or at any time before the return date specified in the demand, whichever period is shorter, or within such period exceeding 20 days after service or in excess of such return date as may be prescribed in writing, subsequent to service, by any Commission investigator named in the demand, such person may file with the Commission a petition for an order by the Commission modifying or setting aside the demand.

**(2)** The time permitted for compliance with the demand in whole or in part, as deemed proper and ordered by the Commission, shall not run during the pendency of such petition at the Commission, except that such person shall comply with any portions of the demand not sought to be modified or set aside. Such petition shall specify each ground upon which the petitioner relies in seeking such relief, and may be based upon any failure of the demand to comply with the provisions of this section, or upon any constitutional or other legal right or privilege of such person.

\*　　\*　　\*

**(h) Jurisdiction of court.** Whenever any petition is filed in any district court of the United States under this section, such court shall have jurisdiction to hear and determine the matter so presented, and to enter such order or orders as may be required to carry into effect the provisions of this section. Any final order so entered shall be subject to appeal pursuant to section 1291 of Title 28. Any disobedience of any final order entered under this section by any court shall be punished as a contempt of such court.

**(i) Commission authority to issue subpoenas or make demand for information.** Notwithstanding any other provision of law, the Commission shall have no authority to issue a subpoena or make a demand for information, under authority of this subchapter or any other provision of law, unless such subpoena or demand for information is signed by a Commissioner acting pursuant to a Commission resolution. The Commission shall not delegate the power conferred by this section to sign subpoenas or demands for information to any other person.

**(j) Applicability of this section.** The provisions of this section shall not—

**(1)** apply to any proceeding under section 45(b) of this title, any proceeding under section 11(b) of the Clayton Act (15 U.S.C. 21(b)), or any adjudicative proceeding under any other provision of law; or

**(2)** apply to or affect the jurisdiction, duties, or powers of any agency of the Federal Government, other than the Commission, regardless of whether such jurisdiction, duties, or powers are derived in whole or in part, by reference to this subchapter.

## 16 C.F.R. § 2.1
## How Initiated

Commission investigations and inquiries may be originated upon the request of the President, Congress, governmental agencies, or the Attorney General; upon referrals by the courts; upon complaint by members of the public; or by the Commission upon its own initiative. The Commission has delegated to the Director, Deputy Directors, and Assistant Directors of the Bureau of Competition, the Director, Deputy Directors, and Associate Directors of the Bureau of Consumer Protection and, the Regional Directors and Assistant Regional Directors of the Commission's regional offices, without power of redelegation, limited authority to initiate investigations. The Director of the Bureau of Competition has also been delegated, without power of redelegation, authority to open investigations in response to requests pursuant to an agreement under the International Antitrust Enforcement Assistance Act, 15 U.S.C. 6201 *et seq.*, if the requests do not ask the Commission to use process. Before responding to such a request, the Bureau Director shall transmit the proposed response to the Secretary and the Secretary shall notify the Commission of the proposed response. If no Commissioner objects within three days following the Commission's receipt of such notification, the Secretary shall inform the Bureau Director that he or she may proceed.

**16 C.F.R. § 2.4**
**Investigational Policy**

Consistent with obtaining the information it needs for investigations, including documentary material, the Commission encourages the just and speedy resolution of investigations. The Commission will therefore employ compulsory process when in the public interest. The Commission encourages cooperation in its investigations. In all matters, whether involving compulsory process or voluntary requests for documents and information, the Commission expects all parties to engage in meaningful discussions with staff to prevent confusion or misunderstandings regarding the nature and scope of the information and material being sought, in light of the inherent value of genuinely cooperative discovery.

# 16 C.F.R. § 2.7
## Compulsory Process in Investigations

**(a) In general.** When the public interest warrants, the Commission may issue a resolution authorizing the use of compulsory process. The Commission or any Commissioner may, pursuant to a Commission resolution, issue a subpoena, or a civil investigative demand, directing the recipient named therein to appear before a designated representative at a specified time and place to testify or to produce documentary material, or both, and in the case of a civil investigative demand, to provide a written report or answers to questions, relating to any matter under investigation by the Commission. For the purposes of this subpart, the term:

> **(1)** Electronically stored information ("ESI") means any writings, drawings, graphs, charts, photographs, sound recordings, images and other data or data compilations stored in any electronic medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form.

> **(2)** "Documentary material" includes all documents, materials, and information, including ESI, within the meaning of the Federal Rules of Civil Procedure.

> **(3)** "Compulsory process" means any subpoena, CID, access order, or order for a report issued by the Commission.

> **(4)** "Protected status" refers to information or material that may be withheld from production or disclosure on the grounds of any privilege, work product protection, or statutory exemption.

**(b) Civil Investigative Demands.** Civil Investigative Demands ("CIDs") shall be the only form of compulsory process issued in investigations with respect to unfair or deceptive acts or practices under section 5(a)(1) of the Federal Trade Commission Act (hereinafter referred to as "unfair or deceptive acts or practices").

> **(1)** CIDs for the production of documentary material, including ESI, shall describe each class of material to be produced with sufficient definiteness and certainty as to permit such material to be fairly identified, prescribe a return date providing a reasonable period of time within which the material so demanded may be assembled and made available for inspection and copying or reproduction, and identify the Commission's custodian to whom such

material shall be made available. Documentary material, including ESI, for which a CID has been issued shall be made available as prescribed in the CID. Such productions shall be made in accordance with the procedures prescribed by section 20(c)(11) of the Federal Trade Commission Act.

**(2)** CIDs for tangible things, including electronic media, shall describe each class of tangible thing to be produced with sufficient definiteness and certainty as to permit each such thing to be fairly identified, prescribe a return date providing a reasonable period of time within which the things so demanded may be assembled and submitted, and identify the Commission's custodian to whom such things shall be submitted. Submission of tangible things in response to a CID shall be made in accordance with the procedures prescribed by section 20(c)(12) of the Federal Trade Commission Act.

**(3)** CIDs for written reports or answers to questions shall propound with sufficient definiteness and certainty the reports to be produced or the questions to be answered, prescribe a return date, and identify the Commission's custodian to whom such reports or answers to questions shall be submitted. The submission of written reports or answers to questions in response to a CID shall be made in accordance with the procedures prescribed by section 20(c)(13) of the Federal Trade Commission Act.

**(4)** CIDs for the giving of oral testimony shall prescribe a date, time, and place at which oral testimony shall commence, and identify the hearing official and the Commission custodian. Oral testimony in response to a CID shall be taken in accordance with the procedures set forth in section 20(c)(14) of the Federal Trade Commission Act.

**(c) Subpoenas.** Except in investigations with respect to unfair or deceptive acts or practices, the Commission may require by subpoena the attendance and testimony of witnesses and the production of documentary material relating to any matter under investigation. Subpoenas for the production of documentary material, including ESI, shall describe each class of material to be produced with sufficient definiteness and certainty as to permit such material to be fairly identified, prescribe a return date providing a reasonable period of time for production, and identify the Commission's custodian to whom such material shall be made available. A subpoena may require the attendance of the witness or the production of documentary material at any place in the United States.

**(d) Special reports.** Except in investigations regarding unfair or deceptive acts or practices, the Commission may issue an order requiring a person, partnership, or corporation to file a written report or answers to specific questions relating to any matter under investigation, study or survey, or under any of the Commission's reporting programs.

**(e) Commission orders requiring access.** Except in investigations regarding unfair or deceptive acts or practices, the Commission may issue an order requiring any person, partnership, or corporation under investigation to grant access to their files, including electronic media, for the purpose of examination and to make copies.

**(f) Investigational hearings.**

    **(1)** Investigational hearings may be conducted in the course of any investigation undertaken by the Commission, including rulemaking proceedings under subpart B of part 1 of this chapter, inquiries initiated for the purpose of determining whether a respondent is complying with an order of the Commission or to monitor performance under, and compliance with, a decree entered in suits brought by the United States under the antitrust laws, the development of facts in cases referred by the courts to the Commission as a master in chancery, and investigations made under section 5 of the Webb–Pomerene (Export Trade) Act.

    **(2)** Investigational hearings shall be conducted by one or more Commission employees designated for the purpose of hearing the testimony of witnesses (the "hearing official") and receiving documents and information relating to any subject under investigation. Such hearings shall be under oath or affirmation, stenographically recorded, and the transcript made a part of the record of the investigation. The Commission may, in addition, employ other means to record the hearing.

    **(3)** Unless otherwise ordered by the Commission, investigational hearings shall not be public. For investigational hearings conducted pursuant to a CID for the giving of oral testimony, the hearing official shall exclude from the hearing room all persons other than the person being examined, counsel for the person being examined, Commission staff, and any stenographer or other person recording such testimony. A copy of the transcript shall promptly be forwarded by the hearing official to the Commission custodian designated under § 2.16 of this part. At the discretion of the hearing official, and with the consent of the person being examined (or, in the case of an entity, its counsel),

persons other than Commission staff, court reporters, and the hearing official may be present in the hearing room.

**(g) Depositions.** Except in investigations with respect to unfair or deceptive acts or practices, the Commission may order by subpoena a deposition pursuant to section 9 of the Federal Trade Commission Act, of any person, partnership, or corporation, at any stage of an investigation. The deposition shall take place upon notice to the subjects of the investigation, and the examination and cross-examination may proceed as they would at trial. Depositions shall be conducted by a hearing official, for the purpose of hearing the testimony of witnesses and receiving documents and information relating to any subject under investigation. Depositions shall be under oath or affirmation, stenographically recorded, and the transcript made a part of the record of the investigation. The Commission may, in addition, employ other means to record the deposition.

**(h) Testimony from an entity.** Where Commission compulsory process requires oral testimony from an entity, the compulsory process shall describe with reasonable particularity the matters for examination and the entity must designate one or more officers, directors, or managing agents, or designate other persons who consent, to testify on its behalf. Unless a single individual is designated by the entity, the entity must designate in advance and in writing the matters on which each designee will testify. The persons designated must testify about information known or reasonably available to the entity and their testimony shall be binding upon the entity.

**(i) Inspection, copying, testing, and sampling of documentary material, including electronic media.** The Commission, through compulsory process, may require the production of documentary material, or electronic media or other tangible things, for inspection, copying, testing, or sampling.

**(j) Manner and form of production of ESI.** When Commission compulsory process requires the production of ESI, it shall be produced in accordance with the instructions provided by Commission staff regarding the manner and form of production. All instructions shall be followed by the recipient of the process absent written permission to the contrary from a Commission official identified in paragraph (l) of this section. Absent any instructions as to the form for producing ESI, ESI must be produced in the form or forms in which it is ordinarily maintained or in a reasonably usable form.

**(k) Mandatory pre-petition meet and confer process.** Unless excused in writing or granted an extension of no more than 30 days by a Commission official identified

in paragraph (l) of this section, a recipient of Commission compulsory process shall meet and confer with Commission staff within 14 days after receipt of process or before the deadline for filing a petition to quash, whichever is first, to discuss compliance and to address and attempt to resolve all issues, including issues relating to protected status and the form and manner in which claims of protected status will be asserted. The initial meet and confer session and all subsequent meet and confer sessions may be in person or by telephone. The recipient must make available personnel with the knowledge necessary for resolution of the issues relevant to compliance with compulsory process. Such personnel could include individuals knowledgeable about the recipient's information or records management systems, individuals knowledgeable about other relevant materials such as organizational charts, and persons knowledgeable about samples of material required to be produced. If any issues relate to ESI, the recipient shall have a person familiar with its ESI systems and methods of retrieval participate in the meeting. The Commission will not consider petitions to quash or limit absent a pre-filing meet and confer session with Commission staff and, absent extraordinary circumstances, will consider only issues raised during the meet and confer process.

(*l*) **Delegations.** The Directors of the Bureaus of Competition, Consumer Protection, and Economics and the Office of Policy Planning, their Deputy Directors, the Assistant Directors of the Bureaus of Competition and Economics, the Associate Directors of the Bureau of Consumer Protection, the Regional Directors, the Assistant Regional Directors, the Chief Technology Officer, and the Deputy Chief Technology Officer are all authorized to modify and, in writing, approve the terms of compliance with all compulsory process, including subpoenas, CIDs, reporting programs, orders requiring reports, answers to questions, and orders requiring access. If a recipient of compulsory process has demonstrated satisfactory progress toward compliance, a Commission official identified in this paragraph may, at his or her discretion, extend the time for compliance with Commission compulsory process. The subpoena power conferred by section 329 of the Energy Policy and Conservation Act (42 U.S.C. 6299) and section 5 of the Webb–Pomerene (Export Trade) Act (15 U.S.C. 65) are specifically included within this delegation of authority.

# 16 C.F.R. § 2.10
## Petitions to Limit or Quash Commission Compulsory Process

**(a) In general.**

**(1) Petitions.** Any petition to limit or quash any compulsory process shall be filed with the Secretary within 20 days after service of the Commission compulsory process or, if the return date is less than 20 days after service, prior to the return date. Such petition shall set forth all assertions of protected status or other factual and legal objections to the Commission compulsory process, including all appropriate arguments, affidavits, and other supporting documentation. Such petition shall not exceed 5,000 words, including all headings, footnotes, and quotations, but excluding the cover, table of contents, table of authorities, glossaries, copies of the compulsory process order or excerpts thereof, appendices containing only sections of statutes or regulations, the statement required by paragraph (a)(2) of this section, and affidavits and other supporting documentation. Petitions to limit or quash that fail to comply with these provisions shall be rejected by the Secretary pursuant to § 4.2(g) of this chapter.

**(2) Statement.** Each petition filed pursuant to paragraph (a)(1) of this section shall be accompanied by a signed separate statement representing that counsel for the petitioner has conferred with Commission staff pursuant to § 2.7(k) of this part in an effort in good faith to resolve by agreement the issues raised by the petition and has been unable to reach such an agreement. If some of the issues in controversy have been resolved by agreement, the statement shall, in a nonargumentative manner, specify the issues so resolved and the issues remaining unresolved. The statement shall recite the date, time, and place of each conference between counsel, and the names of all parties participating in each such conference. Failure to include the required statement may result in a denial of the petition.

\*     \*     \*

**(4) Staff reply.** Commission staff may, without serving the petitioner, provide the Commission a statement that shall set forth any factual and legal response to the petition to limit or quash.

**(5) Extensions of time.** The Directors of the Bureaus of Competition, Consumer Protection, and Economics and the Office of Policy Planning, their

Deputy Directors, the Assistant Directors of the Bureaus of Competition and Economics, the Associate Directors of the Bureau of Consumer Protection, the Regional Directors, the Assistant Regional Directors, the Chief Technology Officer, and the Deputy Chief Technology Officer are delegated, without power of redelegation, the authority to rule upon requests for extensions of time within which to file petitions to limit or quash Commission compulsory process.

**(b) Stay of compliance period.** The timely filing of a petition to limit or quash any Commission compulsory process shall stay the remaining amount of time permitted for compliance as to the portion or portions of the challenged specifications or provisions. If the petition is denied in whole or in part, the ruling by the Commission shall specify new terms for compliance, including a new return date, for the Commission's compulsory process.

**(c) Disposition and review.** The Commission will issue an order ruling on a petition to limit or quash within 40 days after the petition is filed with the Secretary. The order may be served on the petitioner via email, facsimile, or any other method reasonably calculated to provide notice to the petitioner of the order.

**(d) Public disclosure.** All petitions to limit or quash Commission compulsory process and all Commission orders in response to those petitions shall become part of the public records of the Commission, except for information granted confidential treatment under § 4.9(c) of this chapter.