No. 25-5302

IN THE

# United States Court of Appeals for the District of Columbia Circuit

MEDIA MATTERS FOR AMERICA,

*Plaintiff-Appellee,*

v.

FEDERAL TRADE COMMISSION, *et al.*,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Columbia, No. 1:25-cv-01959-SLS
Hon. Sparkle L. Sooknanan, J.

## BRIEF FOR PLAINTIFF-APPELLEE
## MEDIA MATTERS FOR AMERICA

STEPHEN P. ANTHONY
RYAN K. QUILLIAN
DANA A. REMUS
KUNTAL V. CHOLERA
BRENDEN J. CLINE
BRIGID P. LARKIN
SARAH LEADEM
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C. 20001-4956
202-662-6000

NATHANIEL A.G. ZELINSKY
SAMANTHA P. BATEMAN
ELIZABETH D. COLLERY
JAMES I. PEARCE
WASHINGTON LITIGATION GROUP
1717 K St., NW, Suite 1120
Washington, D.C. 20006
202-521-8750
nzelinsky@washingtonlitigationgroup.org

*Counsel for Plaintiff-Appellee Media Matters for America*

*Additional counsel listed on inside cover*

February 17, 2026

KATHERINE M. PEASLEE
SUSMAN GODFREY LLP
401 Union Street, Suite 3000
SEATTLE, WA 98101
206-516-3880

JUSTIN A. NELSON
MATTHEW BEHNCKE
ALEXANDRA FOULKES GRAFTON
SUSMAN GODFREY LLP
1000 Louisiana Street, Suite 5100
Houston, TX 77002-5096
713-651-9366

*Counsel for Plaintiff-Appellee Media Matters for America*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES, AND CORPORATE DISCLOSURE STATEMENT

Plaintiff-Appellee Media Matters for America submits this Certificate as to Parties, Rulings and Related Cases, and Corporate Disclosure Statement:

## A.    Parties and Amici

With the exception of a coalition of media, research, and advocacy non-profits, including Press Freedom Defense Fund, the Center for Investigative Reporting, First Amendment Coalition, Public Knowledge, and the Electronic Frontier Foundation, a coalition of news organizations, and the Lawyers' Committee for Civil Rights Under Law, who have requested the parties' consent to participate in these proceedings as *amicus curiae* in support of Appellee, all parties, intervenors, and *amici* appearing before the district court and in this Court are listed in the government's brief.

## B.    Rulings Under Review

References to the rulings at issue appear in the government's brief.

## C.    Related Cases

This case has not previously been before this Court or another district court. Two cases involving similar issues and Media Matters were before this Court, *see Media Matters for Am. v. Paxton*, No. 24-7059 (D.C. Cir.) and *Media Matters for Am. v. Bailey*, No. 24-7141 (D.C. Cir.), and the United States District Court for the

District of Columbia, *see Media Matters for Am. v. Paxton*, No. 1:24-cv-00147 (D.D.C.), and *Media Matters for Am. v. Bailey*, No. 1:24-cv-00147 (D.D.C.).

**D.      Corporate Disclosure Statement**

Media Matters is a not-for-profit research center and media watchdog.  It has no parent company and no publicly-held company has a 10% or greater ownership interest in the entity.

February 17, 2026                    /s/ Nathaniel A.G. Zelinsky
                                     NATHANIEL A.G.  ZELINSKY
                                     WASHINGTON LITIGATION GROUP
                                     1717 K St., NW, Suite 1120
                                     Washington, D.C. 20006
                                     202-521-8750
                                     nzelinsky@washingtonlitigationgroup.org

                                     *Counsel for Media Matters for America*

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED
CASES, AND CORPORATE DISCLOSURE STATEMENT ............................. ii

GLOSSARY ............................................................................................ vi

TABLE OF AUTHORITIES ................................................................ vii

INTRODUCTION ................................................................................... 1

JURISDICTION ...................................................................................... 4

STATEMENT OF THE ISSUES .............................................................. 4

STATEMENT OF THE CASE .................................................................. 5

    A. Elon Musk And State Governments Target Media Matters ................... 5

    B. The FTC Issues A Retaliatory CID .......................................... 8

    C. The District Court Enjoins The FTC's Retaliation ................................ 9

    D. This Court Denies A Stay Pending Appeal ........................................... 13

SUMMARY OF ARGUMENT ............................................................... 14

STANDARD OF REVIEW ..................................................................... 17

ARGUMENT ......................................................................................... 17

  I. The District Court Had Authority To Issue Relief ...................................... 17

    A. The District Court Had Federal Question Jurisdiction .......................... 18

    B. The Government's Cause Of Action Argument Is Meritless ................ 30

    C. The Government Forfeited Its Exhaustion Argument ........................... 32

II.     Media Matters Is Likely To Prevail On Its First Amendment Claim.........34

        A.  Media Matters Is Likely To Prove Retaliatory Motive .........................35

        B.  Media Matters Is Likely To Prove A Deterrent Effect..........................50

III.    The Equities Strongly Favor Media Matters ...............................................56

CONCULSION ....................................................................................................58

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# GLOSSARY

App.　　　　　Appendix to Brief for Appellants

CID　　　　　Civil Investigative Demand

Dkt.　　　　　District Court Docket Entry

FTC　　　　　Federal Trade Commission

FTC Order　　Order, *In re: Civil Investigative Demand to Media Matters for America*, No. 251-0061 (FTC, July 25, 2025)

Gov. Br.　　　Brief for Appellants

Stay Op.　　　*Media Matters for Am. v. FTC*, No. 25-5302, 2025 WL 2988966 (D.C. Cir. Oct. 23, 2025) (per curiam)

# TABLE OF AUTHORITIES

Page(s)

CASES:

*Alexander v. Sandoval*,
   532 U.S. 275 (2001)..................................................................32

*Americans for Prosperity Found. v. Bonta*,
   594 U.S. 595 (2021)............................................................. 38, 51

*Anderson v. City of Bessemer City*,
   470 U.S. 564 (1985)..................................................................41

*Anderson v. Davila*,
   125 F.3d 148 (3d Cir. 1997)......................................................52

*Arch Coal, Inc. v. Acosta*,
   888 F.3d 493 (D.C. Cir. 2018)..................................................18

*Aref v. Lynch*,
   833 F.3d 242 (D.C. Cir. 2016).......................................35, 40, 50, 53

*Armstrong v. Exceptional Child Ctr., Inc.*,
   575 U.S. 320 (2015)..................................................................32

* *Axon Enter., Inc. v. FTC*,
   598 U.S. 175 (2023)............................... 14, 18, 19, 21-23, 25, 28, 29

*Bell v. Hood*,
   327 U.S. 678 (1946)..................................................................30

*Belle Fourche Pipeline Co. v. United States*,
   751 F.2d 332 (10th Cir. 1984)..................................................28

*Bello-Reyes v. Gaynor*,
   985 F.3d 696 (9th Cir. 2021)....................................................40

*Carr v. Saul*,
   593 U.S. 83 (2021)....................................................................34

*Authorities upon which Appellee chiefly relies are marked with an asterisk.*

vii

*CFPB v. Accrediting Council for Indep. Colls. & Schs.*,
854 F.3d 683 (D.C. Cir. 2017)................................................... 25, 47

*Constantine v. Rectors & Visitors of George Mason Univ.*,
411 F.3d 474 (4th Cir. 2005) ...................................................55

*Corr. Servs. Corp. v. Malesko*,
534 U.S. 61 (2001)..................................................................30

*Elgin v. Dep't of Treasury*,
567 U.S. 1 (2012).............................................................. 18, 20

*Free Enterprise Fund v. Pub. Co. Account. Oversight Bd.*,
561 U.S. 477 (2010)......................................... 22, 23, 28, 30

*FTC v. Claire Furnace Co.*,
274 U.S. 160 (1927)........................................................ 3, 26, 27

*Gonzalez v. Trevino*,
60 F.4th 906 (5th Cir. 2023) (en banc) (per curiam).................. 41, 44

*Gov't of Manitoba v. Bernhardt*,
923 F.3d 173 (D.C. Cir. 2019)..............................................32

*Hartman v. Moore*,
547 U.S. 250 (2006)................................................................52

*Herr v. U.S. Forest Serv.*,
803 F.3d 809 (6th Cir. 2015)..................................................34

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
791 F.3d 90 (D.C. Cir. 2015)..................................................33

*Jibril v. Mayorkas*,
101 F.4th 857 (D.C. Cir. 2024) ..............................................49

*John Doe Co. v. CFPB*,
849 F.3d 1129 (D.C. Cir. 2017) (per curiam)............................. 24, 25

*Keaveney v. SRA Int'l, Inc.*,
No. 1:13-cv-00855, 2017 WL 1842544 (D.D.C. May 3, 2017) ......................49

*Lacey v. Maricopa Cnty.*,
693 F.3d 896 (9th Cir. 2012) ................................................51

*League of Women Voters of U.S. v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016)...................................................................57

*McCarthy v. Madigan*,
   503 U.S. 140 (1992)...........................................................................34

*Media Matters for Am. v. Bailey*,
   No. 24-CV-147, 2024 WL 3924573
   (D.D.C. Aug. 23, 2024).................................. 6, 12, 36, 40, 41, 43

*Media Matters for Am. v. FTC*,
   No. 25-5302, 2025 WL 2988966 (D.C. Cir. Oct. 23, 2025)
   (per curiam) ("Stay Op.")...................... 13, 19, 22, 28, 33, 35, 41, 46

*Media Matters for Am. v. X Corp.*,
   No. 25-2463, 2025 WL 3688854 (9th Cir. Dec. 19, 2025)................8

*Media Matters for Am. v. X Corp.*,
   No. 25-cv-02397-VC, 2025 WL 1084715 (N.D. Cal. Apr. 10, 2025)...............7

* *Media Matters for America v. Paxton*,
   138 F.4th 563 (D.C. Cir. 2025) ........... 2, 7, 15, 17, 22, 26-28, 34, 41, 51, 52, 56

*Media Matters for Am. v. Paxton*,
   732 F. Supp. 3d 1 (D.D.C. 2024).................................... 6, 12, 41, 43

*Mullenix v. Luna*,
   577 U.S. 7 (2015).............................................................................53

*NAACP v. Claiborne Hardware Co.*,
   458 U.S. 886 (1982).........................................................................38

*Nat. Res. Def. Council, Inc. v. EPA*,
   824 F.2d 1146 (D.C. Cir. 1987).......................................................34

*Nat'l Rifle Ass'n of Am. v. Vullo*,
   602 U.S. 175 (2024)............................................................ 1, 40, 51

*Nat'l Taxpayers Union v. SSA*,
   376 F.3d 239 (4th Cir. 2004)...........................................................28

*Nieves v. Bartless*,
   587 U.S. 391 (2019).........................................................................39

ix

*PHH Corp. v. CFPB*,
 881 F.3d 75 (D.C. Cir. 2018) .......................................................... 45

*Reisman v. Caplin*,
 375 U.S. 440 (1964) ........................................................... 3, 26, 27

*Reps. Comm. for Freedom of the Press v. AT&T*,
 593 F.2d 1030 (D.C. Cir. 1978) ...................................................... 52

*Risch v. Royal Oak Police Dep't*,
 581 F.3d 383 (6th Cir. 2009) ......................................................... 46

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
 592 U.S. 14 (2020) .................................................................. 21

*Santos-Zacaria v. Garland*,
 598 U.S. 411 (2023) ................................................................. 33

*Sprint Nextel Corp. v. FCC*,
 508 F.3d 1129 (D.C. Cir. 2007) ...................................................... 45

*Stanford v. Texas*,
 379 U.S. 476 (1965) ................................................................. 38

\* *Thunder Basin Coal Co. v. Reich*,
 510 U.S. 200 (1994) ...................................................... 9, 18-20, 24

*Twitter, Inc. v. Paxton*,
 56 F.4th 1170 (9th Cir. 2022) ....................................................... 27

*United States v. Manafort*,
 897 F.3d 340 (D.C. Cir. 2018) ....................................................... 40

*United States v. Stanchich*,
 550 F.2d 1294 (2d Cir. 1977) ........................................................ 39

*United States v. Vazquez*,
 145 F.3d 74 (2d Cir. 1998) .......................................................... 44

*Walden v. Ga.-Pac. Corp.*,
 126 F.3d 506 (3d Cir. 1997) ......................................................... 46

*Washington Legal Clinic for the Homeless v. Barry*,
 107 F.3d 32 (D.C. Cir. 1997) ........................................................ 40

*Watson v. Boyd*,
    119 F.4th 539 (8th Cir. 2024) ............................................................40

*Wearly v. FTC*,
    616 F.2d 662 (3d Cir. 1980) ...............................................................28

*White v. Lee*,
    227 F.3d 1214 (9th Cir. 2000) ........................................................ 51, 52

*Ziglar v. Abbasi*,
    582 U.S. 120 (2017) ..................................................................... 15, 31

S TATUTES:

15 U.S.C. § 44 .........................................................................................38

15 U.S.C. § 57b-1 ....................................................................................10

15 U.S.C. § 57b-1(c)(2) ................................................................. 13, 37, 47

15 U.S.C. § 57b-1(e) ................................................................................19

15 U.S.C. § 57b-1(f) .................................................................................19

28 U.S.C. § 1292(a)(1) ...............................................................................4

28 U.S.C. § 1331 ................................................................................ 4, 9, 18

R EGULATIONS:

16 C.F.R. § 5.1 .........................................................................................43

5 C.F.R. § 2635.101 .................................................................................43

O THER A UTHORITIES:

Department of Justice Manual, § 1-8.100 ...................................... 43, 44

Oral Arg. Tr. *First Choice Women's Res. Ctrs., Inc. v. Platkin*,
    No. 24-781 (U.S., Dec. 2, 2025) .........................................................31

Order, *In re: Civil Investigative Demand to Media Matters for
    America* (FTC, July 25, 2025) ("FTC Order") .............................. 9, 34

*Transcript: FTC Chairman Andrew Ferguson Keynote*,
    Promarket (Apr. 17, 2025) ................................................................36

## INTRODUCTION

The First Amendment prohibits public officials from weaponizing "the power of the State to punish or suppress disfavored expression." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024). But in this case, that is precisely what happened. The Federal Trade Commission (FTC) wielded its investigatory authority to retaliate against a media organization. The district court warned the government's actions should "alarm all Americans" and issued a preliminary injunction. App.208. This Court should affirm.

Shortly after Elon Musk purchased Twitter—now "X"—in 2022, he welcomed extremist content onto the platform. Advertisers began to flee, wary of association with X's increasingly toxic milieu.

Appellee Media Matters for America is a nonprofit media watchdog. In November 2023, as part of its reporting about X, Media Matters published an article detailing how some mainstream companies' advertisements were still appearing alongside antisemitic and Nazi posts.

The article struck a nerve. Musk launched harassing lawsuits against Media Matters. Meanwhile, at the behest of Stephen Miller—the current White House Deputy Chief of Staff—Texas and Missouri issued intrusive Civil Investigative Demands (CIDs) to Media Matters.

In April and August of 2024, Judge Mehta found that the state CIDs constituted unconstitutional retaliation in violation of the First Amendment and preliminarily enjoined them. Missouri dropped its investigation in February 2025. In April 2025, another federal district court partially enjoined Musk's litigation. In May 2025, this Court affirmed the preliminary injunction against Texas in *Media Matters for America v. Paxton*, 138 F.4th 563 (D.C. Cir. 2025).

Undeterred, ten days before this Court decided *Paxton*, the FTC launched the next salvo, issuing an even broader CID to investigate so-called "advertiser boycotts." The effects of the federal CID on Media Matters have been severe. Media Matters has curtailed reporting, and other organizations have avoided collaborating with it.

After reviewing the evidence, the district court found that the FTC had likely committed "a straightforward First Amendment violation." App.208. The timing— coming on the heels of judicial decisions protecting Media Matters—suggested the FTC sought to revive the stalled retaliation campaign. The FTC's new Chairman had bragged about "standing up to the radical left." Senior staffers praised Musk's harassment campaign against Media Matters, which they derided as the "scum of the earth." And to this day, the FTC cannot provide a coherent rationale for why it needs the highly intrusive information it seeks.

On appeal, the government advances multiple legal theories that boil down to the notion that courts are powerless to stop retaliation. The individual doctrinal arguments are meritless, whether framed in terms of jurisdiction, causes of action, or the scope of the First Amendment. But the government's central proposition—courts cannot stop retaliation—is particularly disturbing. Once that door is opened, it will empower the government to target speakers of all persuasions. The Court should decline to take that dangerous step.

The FTC repeatedly protests that enforcing the First Amendment would somehow constitute an unprecedented imposition on the government. But the constitutional principles in this appeal are not groundbreaking. This Court had no difficulty upholding the preliminary injunction against a retaliatory CID in *Paxton*. And the FTC is wrong (at 1) when it suggests that an "unbroken" "line of cases" prohibit relief when the federal government abuses its authority. In *Paxton*, this Court already explained why the precedents the government cites—*FTC v. Claire Furnace Co.*, 274 U.S. 160 (1927), and *Reisman v. Caplin*, 375 U.S. 440 (1964)—do not apply to First Amendment retaliation cases.

The government's protests, moreover, ring particularly hollow. Two months ago, the United States appeared before the Supreme Court in *First Choice Women's Res. Ctrs., Inc. v. Platkin*, No. 24-781 (U.S.), supporting a plaintiff's standing to challenge a state subpoena on First Amendment retaliation grounds. The

government can hardly be heard to complain now, when Media Matters seeks to enforce its First Amendment rights.

The government separately asks this Court to suspend disbelief about the retaliatory nature of its CID, which followed on the heels of two retaliatory state CIDs. But the agency tellingly refuses to engage with the facts of this case. It ignores, for example, the substance of comments by public officials that the district court found so concerning. Instead, the government embraces a vision of unquestionable state power that threatens all Americans regardless of their partisan affiliation or ideological persuasion. This Court should enforce the First Amendment and affirm.

## JURISDICTION

The district court had federal question jurisdiction over Media Matters' constitutional claims pursuant to 28 U.S.C. § 1331. That court issued a preliminary injunction on August 15, 2025. App.256. The government filed a notice of appeal on August 18, 2025. App.257. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

1. Whether the district court had jurisdiction.

2. Whether Media Matters has a cause of action.

3. Whether the FTC forfeited its exhaustion argument.

4.  Whether the district court clearly erred in finding retaliation.

5.  Whether the district court clearly erred in finding the CID would deter a person of ordinary firmness from speaking.

6.  Whether the district court abused its discretion in balancing the equities.

## STATEMENT OF THE CASE

### A.  Elon Musk And State Governments Target Media Matters.

When Elon Musk purchased X, he modified the rules about violent posts and misinformation, laid off staff responsible for moderating the site, and reinstated accounts of white supremacists and conspiracy theorists.  App.19.  As a result, extremist content surged.  *Id.*

The changes caught the attention of advertisers, many of whom did not wish to be associated with X's toxic milieu and began pausing advertising on the platform. App.19-21.  So-called "advertiser boycotts"—companies choosing not to place their speech alongside extremist content—have drawn ire from those, such as current FTC Chairman Andrew Ferguson, who decry them as a form of "censorship."  App.27.

Media Matters for America is a nonprofit media watchdog that chronicled the increasingly disturbing content on X.  App.10, App.185-187.  In November 2023, one of Media Matters' articles about X went viral.  It detailed how advertisements for some companies, including Apple and IBM, were still appearing alongside pro-Nazi and antisemitic content.  App.50-52.

The article struck a nerve and, along with other reporting about X, has made Media Matters a target for Musk and his allies, who blame the organization for advertisers leaving the site. Musk immediately vowed to bring a "thermonuclear lawsuit" against Media Matters and launched litigation around the world. App.22. Musk's company also filed suit in the United States—not in California, as required by X's terms of service, but in the Northern District of Texas. App.24. Meanwhile, Stephen Miller—today, the White House Deputy Chief of Staff—called on "conservative state Attorneys General" to investigate Media Matters for its speech. In response, Texas and Missouri issued intrusive CIDs to Media Matters. App.23-24.

Multiple courts—including this one—intervened. In April and August 2024, the District Court for the District of Columbia preliminarily enjoined the state CIDs on First Amendment grounds. *See Media Matters for Am. v. Bailey*, No. 24-CV-147, 2024 WL 3924573, at *19 (D.D.C. Aug. 23, 2024) (Mehta, J.); *Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 30 (D.D.C. 2024) (Mehta, J.). The court found that the states had issued the CIDs in retaliation for Media Matters' "protected media activities," and issued injunctive relief to remedy "the ongoing deprivation of free speech rights." *Paxton*, 732 F. Supp. 3d at 28-29 (quotation marks omitted).

In February 2025, Missouri agreed to drop its retaliatory CID and dismissed its appeal. App.214. A few months later, in *Paxton*, this Court affirmed the

preliminary injunction against Texas. Particularly relevant here, *Paxton* squarely rejected Texas's theory that Media Matters could not seek relief in federal court to enjoin the state's retaliatory CID—a threshold jurisdictional argument analogous to the one the FTC advances here. *Paxton*, 138 F.4th at 579.

Like the FTC's brief before this Court, Texas argued that its CID could not cause Media Matters an injury until after the government moved to enforce it. *Id.* at 582. This Court rejected that theory, finding that Media Matters was "suffering ongoing injuries due to the campaign of retaliation." *Id.* at 583. Because of the Texas CID, outside groups had "limited their collaboration with Media Matters," and the organization had curtailed its reporting out of fear. *Id.* at 581.

In this context, Media Matters could sue to remedy those ongoing harms. *Id.* at 583. By contrast, Texas's flawed theory—that Media Matters could assert its constitutional rights only *after* Texas enforced the retaliatory CID—would mean that Media Matters would not receive "meaningful redress" for its ongoing First Amendment injuries. *Id.*

Separately, in April of 2025, another federal court largely enjoined Musk's global lawsuits, finding the suits were designed "to bully Media Matters." *Media Matters for Am. v. X Corp.*, No. 25-cv-02397-VC, 2025 WL 1084715, at *1 (N.D.

Cal. Apr. 10, 2025).[1]

### B. The FTC Issues A Retaliatory CID.

The multi-year retaliation campaign exerted a toll on Media Matters. By May 2025, however, the decisions described above had reduced some of the harms. That modest reprieve proved short lived. On May 20, 2025, just a few days before this Court decided *Paxton*, the FTC issued a sweeping new CID targeting Media Matters.

The federal CID is even broader than the state CIDs. It demands Media Matters provide all documents produced in the litigation with X; disclose intimate details regarding Media Matters' reporting; divulge communications with third parties; and reveal six years of financial statements, potentially exposing Media Matters' donors. App.71-75.

The federal investigation has breathed new life into the "culture of fear within Media Matters." App.204. Employees refrain from investigating "even tangentially-related public figures and events because they could be flashpoints for further retribution." *Id.* For example, the organization's reporters would normally report about the FTC itself, including the close relationship between the agency and

---

[1] In December 2025, the Ninth Circuit vacated the injunction on the narrow ground that, by contesting jurisdiction in Ireland, Media Matters had waived an anti-suit injunction with respect to that Irish litigation. The Ninth Circuit did not disturb the finding of harassment and directed the district court to determine whether to reissue the injunction barring X from initiating new foreign lawsuits. *Media Matters for Am. v. X Corp.*, No. 25-2463, 2025 WL 3688854 (9th Cir. Dec. 19, 2025).

X.  But reporters have not written about the agency because they fear further retaliation from the federal government.  App.190-194; App.204-205.  Meanwhile, outside organizations have limited cooperation with Media Matters.  App.199.

Media Matters engaged FTC staff in a meet-and-confer process, but the agency refused to alter any aspect of the CID.  App.174-177.  Media Matters filed a petition to quash before the FTC.  The agency denied the petition in its entirety in a decision by Chairman Andrew Ferguson—the same person who issued the CID.  *See* App.154; Order, *In re: Civil Investigative Demand to Media Matters for America*, No. 251-0061 (FTC, July 25, 2025) ("FTC Order"), https://tinyurl.com/4ayxjkvn.

### C.  The District Court Enjoins The FTC's Retaliation.

Media Matters filed this lawsuit, invoking the district court's federal question jurisdiction under 28 U.S.C. § 1331.  Media Matters explained that statements made by Chairman Ferguson and others, as well as the timing and nature of the CID, indicated the CID was part of the ongoing effort to retaliate against Media Matters for its reporting.  The district court agreed, and granted Media Matters a preliminary injunction on First Amendment grounds.  App.208-255.

Like Texas in *Paxton*, the FTC argued that the district court lacked jurisdiction to entertain a challenge to a non-self-executing CID.  The federal government couched its argument in terms of the framework adopted in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994).  Federal district courts "ordinarily hear" "challenges"

to federal agency action under Section 1331's "grant of jurisdiction." App.221 (quotation marks omitted). But under *Thunder Basin*, if Congress creates a "special statutory review scheme," Congress may implicitly narrow Section 1331. *Id.* (quotation marks omitted). The FTC argued that, when Congress authorized the agency to sue to enforce the CID in district court, Congress stripped the district court of its Section 1331 jurisdiction to hear Media Matters' claim.

The district court explained that this was not a *Thunder Basin* case. In the prototypical *Thunder Basin* scenario, Congress channels a regulated party's claims "to an administrative proceeding" "followed by review *in a court of appeals*." App.223 (quotation marks omitted, emphasis added). But the relevant statute, the FTC Act, does not speak to how Media Matters appeals a petition to quash—let alone provide for appellate review in the court of appeals, which is how Congress triggers *Thunder Basin*. App.229. Instead, the FTC Act authorizes the agency to sue in district court. *See* 15 U.S.C. § 57b-1. The question is thus not whether this case will end up in district court, but instead whether Media Matters must wait for the FTC to sue (if it ever does), all the while suffering the ongoing harms of the agency's retaliation.

The district court additionally explained that, even if the *Thunder Basin* framework applied, *Thunder Basin* would still permit Media Matters to proceed to district court to challenge the retaliatory CID. "Congress rarely allows claims about

agency action to escape effective judicial review." App.230 (quotation marks omitted). *Paxton* "already held that Media Matters' similar First Amendment injuries caused by the Texas CID were ongoing, such that it could not get meaningful redress by challenging the CID later." App.231 (quotation marks omitted). The only way for Media Matters to receive meaningful judicial relief—in *Paxton* and in this case—is to promptly sue in district court.

On the merits, the district court concluded the FTC committed "a straightforward First Amendment violation." App.208. In particular, based on the undisputed facts Media Matters presented, the court found that the organization was likely to show that "retaliatory animus was the but-for cause of the FTC's CID." App.247.

"Chairman Ferguson and his colleagues have made comments characterizing Media Matters and this investigative push in ideological terms." *Id.* (quotation marks omitted). For example, in a leaked memorandum campaigning for the agency chairmanship, Chairman Ferguson had vowed to target "the radical left," and "progressives" as part of a push to "investigate" so-called "advertiser boycotts." App.247. "These comments indicate at a minimum that Chairman Ferguson saw the FTC's investigation as having a partisan bent." *Id.*

A prominent outside adviser to the administration—who works with Chairman Ferguson and the FTC—called Media Matters and its employees "leftists"

who should be "throw[n] in the DC gulag," attacked "advertiser boycotts," and cheered on Musk's litigation. App.34-35, App.248 (quotation marks omitted). Meanwhile, Chairman Ferguson's handpicked senior staffers had called Media Matters "stupid and resentful Democrats" and the "scum of the earth," and celebrated Musk's legal attacks on Media Matters. App.248-249 (quotation marks omitted). As the Court explained, these "are precisely the sorts of comments that courts" find provide "evidence of retaliatory intent." App.249 (citing *Bailey*, 2024 WL 3924573, at *14; *Paxton*, 732 F. Supp. 3d at 28).

The suspicious "timing" of the FTC's CID—following "on the heels of other failed attempts to seek retribution"—suggested that the "CID was motivated by retaliatory animus." App.249. The agency issued the CID shortly after this Court "dismissed the appeal of the injunction against the Missouri CID in February 2025," and after "Musk's worldwide lawsuits were largely preliminarily enjoined in April 2025." App.250. That timing indicated that the government "wanted to continue the years' long pressure campaign." *Id.*

Moreover, Chairman Ferguson launched his "fast-moving investigation" into advertiser boycotts shortly after the incoming Administration made him Chairman of the FTC—suggesting "he was chomping at the bit to" follow through on his promise to " 'take investigative steps in the new administration under President Trump' to make 'progressives' like Media Matters 'give up.' " *Id.* (quoting

Chairman Ferguson).

Finally, the federal CID contained no explanation for the agency's investigation. When the FTC issues a CID, it must detail "the conduct" under investigation. 15 U.S.C. § 57b-1(c)(2). But the CID did not. Instead, in a subsequent letter—issued after Media Matters filed this lawsuit—the government claimed to be investigating whether advertisers "use certain lists promulgated by other industry participants that categorize or rate content publishers" "to coordinate the placement of ads." App.252 (quotation marks omitted). The "late-breaking" nature of the agency's rationale suggests it was a pretext to hide the CID's true retaliatory purpose. *Id.*

The FTC has additionally never explained why Media Matters likely possessed information regarding the use of lists to coordinate advertisement placement, let alone an *agreement* among advertisers. And the CID's sweeping scope—demanding everything from sensitive financial information to reporters' documents—bears no relationship to the agency's ostensibly narrow rationale. *Id.*

### D. This Court Denies A Stay Pending Appeal.

The FTC appealed and sought a stay pending appeal, which the Court denied. *See Media Matters for Am. v. FTC*, No. 25-5302, 2025 WL 2988966, at *1 (D.C. Cir. Oct. 23, 2025) (per curiam) ("Stay Op.").

Like the district court, the stay panel rejected the government's *Thunder Basin*

arguments.  *Id.* at *5.  The stay panel also concluded that the FTC was unlikely to prevail on its challenges to the district court's "preliminary factual determinations," which are given "deference" on appeal.  *Id.* at *6.  The panel stressed that the record offers "adequate support for finding a likelihood of retaliation at this preliminary stage."  *Id.* at *6.

Judge Walker dissented.  *Id.* at *11-*19.  The panel invited the Commission to move to expedite the appeal.  *Id.* at *11.  The FTC declined to do so.

## SUMMARY OF ARGUMENT

**I.A.**  The district court appropriately exercised federal question jurisdiction.

This is not a *Thunder Basin* case.  In the hornbook *Thunder Basin* scenario, a statutory scheme requires regulated parties to seek "review in a court of appeals following the agency's own review process."  *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185 (2023).  That is not the statutory structure Congress adopted here.  Media Matters can file a petition to quash before the FTC (which it did), but there is no way for Media Matters to seek review of the FTC's decision in a court of appeals.

In contrast to a quintessential *Thunder Basin* fight, everyone agrees this case will end up in district court.  The question is about timing, not forum: Can Media Matters sue *now* to stop ongoing First Amendment harms?  Or must it wait for the FTC to enforce the CID—which it may never do—suffering from retaliation in the interim?  Regardless, even if the *Thunder Basin* framework applied, the district court

still would have jurisdiction because Media Matters seeks to remedy a "here-and-now injury" to its First Amendment rights, which will be "effectively lost if review is deferred." *Id.* at 192 (quotation marks omitted).

The FTC repeatedly argues that Congress intended the agency to apply expertise in the petition-to-quash process. But this case has nothing to do with agency expertise. Media Matters filed a petition, the FTC had a chance to clarify the CID, and the agency doubled down on retaliation. The question is whether Congress intended to foreclose Media Matters' ability to seek judicial review. Congress did not.

The FTC places considerable stock in the notion that a non-self-executing CID causes no harm to the target until an agency enforces the CID in court. But as the district court rightly observed, *Paxton* rejected that argument. The FTC similarly relies on *Claire Furnace* and *Reisman*. But *Paxton* explained why those cases do not speak to matters involving "First Amendment retaliation," where the target of the CID suffers ongoing harms. *Paxton*, 138 F.4th at 583. It is thus the FTC—not Media Matters—that asks this Court to ignore precedent.

**I.B.** Media Matters possesses an equitable cause of action to enforce its First Amendment rights. The government's own precedent proves as much. *See, e.g., Ziglar v. Abbasi*, 582 U.S. 120 (2017). The FTC's argument otherwise—which has

no basis in law—is a plea for unrestrained state power.  The Court should reject that invitation.

**I.C.**  For the first time on appeal, the government argues that Media Matters failed to exhaust administrative remedies.  This Court should decline to address this forfeited argument.  But make no mistake: The FTC was fully aware of Media Matters' First Amendment retaliation claim.  The FTC cited this ongoing litigation in its decision denying the petition to quash.  The FTC's suggestion that Media Matters hid the ball—or that the government might have done anything differently—is meritless.

**II.A.**  Based on the developed record, the district court found that the agency issued its CID because of its retaliatory animus.  This Court reviews that factual finding deferentially, and the government comes nowhere close to proving clear error.  On appeal, the government couches its arguments as legal in the hope of securing *de novo* review.  But each is a request to reweigh evidence—precisely what the Court does not do when reviewing for clear error.

**II.B.**  The district court correctly determined that the CID—which demands extremely sensitive information—would deter an organization in Media Matters' position from speaking again.

The government offers no meaningful response.  Instead, the government suggests (at 51) that "a retaliatory investigation claim" is not "cognizable" under the

First Amendment. This breathtaking argument is wrong. The Court need look no further than *Platkin*, where the United States is supporting a party bringing a First Amendment retaliation claim to halt an allegedly retaliatory subpoena.

**III.** The equities favor preliminary relief. Without an injunction, Media Matters will suffer ongoing irreparable harm. The FTC will suffer no harm. Meanwhile, the public interest favors protecting a media organization against unlawful First Amendment retaliation.

## STANDARD OF REVIEW

A party seeking a preliminary injunction must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Paxton*, 138 F.4th at 573 (quotation marks omitted). This Court reviews "the District Court's weighing of those factors for abuse of discretion, its legal conclusions *de novo*, and factual findings for clear error." *Id.*

## ARGUMENT

### I. THE DISTRICT COURT HAD AUTHORITY TO ISSUE RELIEF.

The district court had authority to enter a preliminary injunction. It had jurisdiction under Section 1331, and Media Matters possessed an equitable cause of action to enforce its constitutional rights.

## A. The District Court Had Federal Question Jurisdiction.

**1.** Section 1331 provides that district courts "shall have original jurisdiction of all civil actions arising under the Constitution." 28 U.S.C. § 1331. That "statute is as clear as statutes get" and encompasses Media Matters' constitutional claims to halt the retaliatory CID. *Axon*, 598 U.S. at 205 (Gorsuch, J., concurring in the judgment).

This is not a circumstance in which the *Thunder Basin* exception to Section 1331 applies. Under *Thunder Basin*, courts presume that Congress has implicitly exempted "challenges to" "agency action" from Section 1331's plain text by enacting a "special statutory review scheme." *Id.* at 185 (majority op.). *But see id.* at 217 (Gorsuch, J., concurring in the judgment) (criticizing *Thunder Basin* exception as atextual).

To determine if "Congress intended that a litigant proceed exclusively through a statutory scheme of administrative and judicial review," courts ask whether "such intent is fairly discernible in the statutory scheme." *Arch Coal, Inc. v. Acosta*, 888 F.3d 493, 498 (D.C. Cir. 2018) (quotation marks omitted). The Supreme Court has found a "fairly discernible" scheme where a statute provides "*review in a court of appeals* following the agency's own review process." *Axon*, 598 U.S. at 185 (emphasis added); *see, e.g.*, *Thunder Basin*, 510 U.S. at 216; *Elgin v. Dep't of Treasury*, 567 U.S. 1, 17 (2012). In a *Thunder Basin* case, the "agency effectively

18

fills in for the district court, with the court of appeals providing judicial review." *Axon*, 598 U.S. at 185. If Congress channels cases to the court of appeals, a three-factor test determines whether a specific claim must be channeled or may proceed to district court. *See infra* pp. 20-21.

Describing the *Thunder Basin* framework demonstrates its inapplicability here. Congress did not enact a "comprehensive review process" for the FTC to adjudicate the CID and for "the court of appeals" to review the agency's determination. *Thunder Basin*, 510 U.S. at 208-209. The FTC Act channels everything to district courts. The statute authorizes the agency to "file[] in the district court" to enforce CIDs. 15 U.S.C. § 57b-1(e). Under the limited statutory scheme, the agency may also consider a CID recipient's petition to quash. But the agency's decision is not appealable by Media Matters to a court of appeals. *Id.* § 57b-1(f).

Thus, unlike a normal *Thunder Basin* dispute, everyone agrees this case will end up, one way or another, "in district court, not a court of appeals." Stay Op. at *5. The question is about timing, not forum: Can Media Matters sue now to vindicate its constitutional rights and remedy the ongoing First Amendment harms? Or may only the FTC sue, whenever (if ever) it decides to enforce the CID?

The FTC just wants to initiate litigation (perhaps to forum shop)—or maybe never sue, leaving Media Matters to suffer the FTC's retaliation campaign in the

meantime.  That is vastly different from *Thunder Basin* cases, where parties dispute which federal court—a district court in the first instance or a court of appeals following agency review—hears a matter.  *See, e.g.*, *Elgin*, 567 U.S. at 17; *Thunder Basin*, 510 U.S. at 208.

There is a particularly strong reason to conclude that Congress did not foreclose Media Matters' ability to seek judicial relief.  Under the *Thunder Basin* framework, Congress provides the regulated party an "alternative" path to judicial review, by way of the agency adjudication and an appeal to an Article III court.  App.229; *see Elgin*, 567 U.S. at 9.  But Media Matters has no "alternative" path.  App.229.  Instead, under the FTC's theory, the agency completely controls if this case will *ever* proceed to court.  There is no reason to believe "Congress meant to close the courthouse doors to CID recipients" who allege First Amendment retaliation and perversely empower a retaliatory agency to foreclose judicial review.  *Id.*; *see Thunder Basin*, 510 U.S. at 215, n.20 (foreclosing judicial review of constitutional claims raises serious constitutional concerns).

**2.**  Because this case is not the stuff of *Thunder Basin*, this Court can stop here.  Regardless, even if it did apply, *Thunder Basin* would still permit Media Matters to file its First Amendment claim in district court.

The Court balances three factors to determine whether a particular claim must be channeled under *Thunder Basin*: whether (1) "precluding district court

jurisdiction foreclose[s] all meaningful judicial review of the claim"; (2) "the claim [is] wholly collateral to the statute's review provisions"; and (3) "the claim [is] outside the agency's expertise." *Axon*, 598 U.S. at 186 (quotation marks omitted). Each factor cuts in favor of the district court having jurisdiction.

Start with the need for meaningful judicial review. When the FTC issued its CID, Media Matters experienced an immediate "here-and-now" First Amendment "injury." *Id.* at 191. The retaliatory CID undermined Media Matters' internal operations, chilled Media Matters' reporting, and caused partner organizations to curtail cooperation with Media Matters. App.190-194, App.199, App.204-205; *see* App.205-206 (detailing financial harms to Media Matters). These are not trivial concerns. The FTC's retaliation seriously injured Media Matters.

If Media Matters could not sue in district court immediately—and instead, must wait for the FTC to file suit—these considerable First Amendment harms would have "escape[d] effective judicial review." *Axon*, 598 U.S. at 186. Media Matters' First Amendment "rights" protect it against being "subject[ed] to an illegitimate proceeding," and those rights will be "effectively lost if review" is "deferred until after"—if ever—the FTC sued in district court. *Id.* at 191-192 (quotation marks omitted); *cf. Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) (loss of First Amendment rights "for even minimal periods" is "irreparable" (quotation marks omitted)).

This conclusion flows directly from *Paxton*, which permitted Media Matters to challenge the Texas CID because Media Matters would otherwise lack "meaningful redress" for its "ongoing injuries." *Paxton*, 138 F.4th at 583. The same is true here. With every passing day, Media Matters suffered "concrete and ongoing First Amendment injury." Stay Op. at *5. If Media Matters must wait for the FTC to sue, those harms would escape judicial review.

The remaining *Thunder Basin* factors—collateralism and competency—favor Media Matters. The collateralism factor asks whether the claim a party seeks to litigate in district court is collateral to agency proceedings that produce a final order "from which review might be sought." *Axon*, 598 U.S. at 193 (quoting *Free Enterprise Fund v. Pub. Co. Account. Oversight Bd.*, 561 U.S. 477, 490 (2010)).

As an initial matter, there is no ongoing FTC "enforcement action[]" that will produce "a merits decision" that Media Matters can appeal. *Id.* at 193. The petition-to-quash process, which Media Matters pursued to its conclusion, does not produce a reviewable order. The fact there is no further agency process—and thus nothing to which Media Matters' claim is collateral—reaffirms that this is not a *Thunder Basin* case. App.230. But to the extent the framework applies, the absence of ongoing agency proceedings from which Media Matters could appeal cuts strongly in favor of the district court having jurisdiction.

In addition, Media Matters' First Amendment retaliation claim is collateral to

the statutory review scheme because it is not a routine objection to "commonplace" agency "procedure[]" or a matter the agency "regularly adjudicate[s]." *Axon*, 598 U.S. at 189, 193-194. Instead, Media Matters has brought a "discrete" constitutional "claim" that challenges "the Commission['s] power to proceed at all" against Media Matters. *Id.* at 192-194 (quotation marks omitted).

The competency factor similarly favors the district court exercising jurisdiction over Media Matters' First Amendment claim. The FTC already had the opportunity to apply its expertise to clarify the CID in the petition-to-quash process. The next step is for this case to head to district court—not for the FTC to adjudicate something. The only question is whether the FTC can delay—perhaps indefinitely—Media Matters from vindicating its constitutional rights. App.230 n.4. Regardless, Media Matters' "constitutional claims are also outside the Commission's competence and expertise." *Free Enter. Fund*, 561 U.S. at 491. The FTC has no comparative advantage compared to a district court—indeed, the agency is at a disadvantage—in fairly deciding whether it has engaged in impermissible retaliation.

**3.** The government's arguments are unpersuasive.

The government (at 24) tries to brush aside the fact that this case does not involve the well-understood structure—an agency proceeding followed by review in the court of appeals—that is the hallmark of *Thunder Basin.* But that statutory

formula is what courts have found to provide a "fairly discernible" "intent" to narrow Section 1331. *Thunder Basin*, 510 U.S. at 207 (quotation marks omitted). In its absence, the Court should not find that Congress implicitly repealed Section 1331's crystal-clear grant of jurisdiction over constitutional claims.

The government (at 22-23) infers that *Thunder Basin* applies because Congress required the FTC to adjudicate petitions to quash. According to the government, Congress wanted the agency to apply its expertise before the matter heads to federal court. But Media Matters sought to clarify the CID through the petition-to-quash process. There is nothing more for the agency to adjudicate, and there is no mechanism for Media Matters to seek review of the FTC's decision denying the petition. This case is not about the FTC applying its expertise. The question is whether, after the FTC has ruled on a petition to quash, the FTC can continue to cause ongoing harm and retaliate without consequences. There is no reason to think Congress enacted that perverse result. *See Thunder Basin*, 510 U.S. at 215 n.20.

The government cites (at 24) one case which, it says, illustrates a statute in which Congress invoked *Thunder Basin* without providing for judicial review in the court of appeals. *See John Doe Co. v. CFPB*, 849 F.3d 1129, 1134 (D.C. Cir. 2017) (per curiam). But there the Court assumed—without meaningful analysis—that the *Thunder Basin* framework applied. The paucity of the government's precedent

proves this is not a *Thunder Basin* case.[2]

It also makes sense that Congress expressly authorized the FTC to enforce CIDs but did not speak to Media Matters' ability to sue to vindicate its constitutional rights. Because agencies do not possess inherent power to issue CIDs, Congress must affirmatively grant them authority. *CFPB v. Accrediting Council for Indep. Colls. & Schs.*, 854 F.3d 683, 690 (D.C. Cir. 2017). By contrast, the Constitution provides Media Matters with an inherent equitable cause of action to defend its First Amendment rights, and Congress had no need to reiterate that background rule. *See infra* pp. 30-32.

The FTC's concern (at 22-23) about bifurcated litigation is misplaced. Because all roads lead to the same place—the district court—the FTC could seek to consolidate an action to enforce the CID before the same district court. If there is any "claim-splitting," Gov. Br. 23, it is because the government wants to forum shop or delay enforcement in the hopes of frustrating judicial review.[3]

Moving to the three *Thunder Basin* factors, the government repeatedly argues

---

[2] *John Doe* is likely non-precedential. It appears in the Federal Reporter, but the order issued by this Court was not in the form for publication. *John Doe* is also of limited utility because—in analyzing the *Thunder Basin* factors—it incorrectly concluded that a "separation-of-powers injury" was not "by its very nature irreparable." *John Doe*, 849 F.3d at 1135. The Supreme Court refuted that holding in *Axon*, 598 U.S. at 191. Notably, then-Judge Kavanaugh dissented. *John Doe*, 849 F.3d at 1136 (Kavanaugh, J., dissenting).

[3] The district court also in no way suggested Media Matters' other First and Fourth Amendment claims were "premature." Gov. Br. 23.

that Media Matters will not suffer a "legal penalty"—and has no need for judicial review—until after the agency brings an "enforcement action."  Gov. Br. 20; *see id*. at 27-29.  This Court rejected that precise argument in *Paxton*.  This Court explained that ordinary CID recipients suffer "no injury" until after the agency sues to enforce a demand—which is why the typical CID recipient cannot seek immediate judicial review.  *Paxton*, 138 F.4th at 583 (quotation marks omitted).  But when an agency issues a retaliatory CID—as the FTC has done here—the CID can immediately injure the target, necessitating judicial review.  *Id*.  Consider what happened: After the FTC issued its CID, Media Matters curtailed its reporting out of fear, and outside organizations have ceased collaborating with it.  App.190-195, App.198-200.  These are not abstract harms.  They are real-world consequences of the government abusing its power.

The government attempts to distinguish *Paxton* because that case involved "a state official," and this case involves a "federal statutory scheme."  Gov. Br. 29 (emphasis omitted).  But the Court's analysis in *Paxton* concerned the nature of the First Amendment injuries Media Matters suffered.  *Paxton*, 138 F.4th at 583. It had nothing to do with whether the retaliatory CID came from a *state*.  This Court's central holding—that Media Matters suffered an ongoing First Amendment harm, which necessitated judicial review—remains just as true in this federal context.

Nor do *FTC v. Claire Furnace Co.*, 274 U.S. 160 (1927), and *Reisman v.*

*Caplin*, 375 U.S. 440 (1964), support the government's "no injury" theory. *Paxton* again lights the way. At this Court explained, *Claire Furnace* and *Reisman* "did not concern First Amendment retaliation." *Paxton*, 138 F.4th at 583; *see Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1178 (9th Cir. 2022) ("This case is different from *Reisman* because it involves the First Amendment."). As a result, the regulated parties in *Claire Furnace* and *Reisman* did not suffer ongoing "injury" stemming from the issuance of the government's CID. *Reisman*, 375 U.S. at 449. And because the parties did not suffer an injury from the CID's issuance, they possessed "an adequate remedy at law" if they later challenged the CIDs in a subsequent enforcement action. *Reisman*, 375 U.S. at 443; *see Claire Furnace*, 274 U.S. at 174.

By contrast, Media Matters suffered a First Amendment injury *now* because of the retaliatory CID's issuance. Media Matters' constitutional rights will be effectively lost if it cannot sue in district court. *Paxton*, 138 F.4th at 583. In other words (as *Paxton* already held), *Claire Furnace* and *Reisman* explain why recipients of CIDs in the ordinary case do not suffer injury—and must wait—until after the government sues to enforce the CID. *Paxton*, 138 F.4th at 583. But neither *Claire Furnace* nor *Reisman* governs a First Amendment retaliation case—like this one— where the target of a retaliatory investigation suffers an ongoing injury from the issuance of the CID and seeks to vindicate its First Amendment rights.

Indeed, the government cites (at 20) cases applying *Claire Furnace* and

*Reisman* that recognize an "immediate, irreparable injury"—namely the kind of injury that Media Matters faced from the issuance of the federal CID—*can* "justify" a district court providing pre-enforcement relief. *Belle Fourche Pipeline Co. v. United States*, 751 F.2d 332, 335 (10th Cir. 1984); *see also Wearly v. FTC*, 616 F.2d 662, 666 (3d Cir. 1980) (noting "preenforcement review" can be "necessary," and "the FTC Act" does "not proscribe preenforcement suits"). That describes this case.

To minimize Media Matters' ongoing harms, the government separately cites (at 30) four appellate decisions applying *Thunder Basin* to First Amendment claims. But none involve retaliatory investigations, and all predate *Axon*, in which the Supreme Court stressed that district courts should hear claims regarding a "here-and-now injury" where "the right[]" will be "effectively lost if review is deferred[]." *Axon*, 598 U.S. at 192 (quotation marks omitted).[4]

The government's argument (at 28-29) that—by nature—*Thunder Basin* imposes burdens on regulated parties misses the point. If Media Matters cannot access the district court, Media Matters will effectively lose its First Amendment rights. *See* Stay Op. at *4 (explaining "Media Matters" need not "suffer through" these irreparable harms); *Paxton*, 138 F.4th at 583; *cf. Free Enter.*, 561 U.S. at 490

---

[4] The government mischaracterizes (at 30) one decision as holding even "prior restraint claims" must be channeled under *Thunder Basin*. The regulated party did not press a "prior restraint claim," on appeal and the court did "not address" it. *Nat'l Taxpayers Union* v. *SSA*, 376 F.3d 239, 241 n.1 (4th Cir. 2004).

(plaintiffs lack meaningful relief if they must "bet the farm" by violating law to seek review in the court of appeals (quotation marks omitted)).

Finally, the government's analysis of the remaining two *Thunder Basin* factors—collateralism and competency—does not move the needle. On collateralism, the government argues that Media Matters' claim "implicates procedural or evidentiary matters," "such as the breadth of the CID" and the "agency's explanation for the CID," which the FTC should address in the petition-to-quash process. Gov. Br. 26 (quotation marks omitted). But, again, the petition-to-quash process concluded. The question is whether, after the FTC rules on the petition to quash, the agency may prevent Media Matters' First Amendment claim from receiving meaningful judicial review.

It also bears underscoring: Media Matters is not litigating standalone objections to the CID, as a routine CID recipient might. Instead, the CID's extraordinary breadth and shifting explanation are circumstantial proof, alongside other evidence, of the FTC's retaliatory motive. Moreover, contrary to the government's suggestion (at 26), the claim that an agency is engaged in unconstitutional retaliation concerns the FTC's "power to proceed at all" against Media Matters, "rather than" specific "actions taken in the agency proceedings." *Axon*, 598 U.S. at 192.

As to competency, the agency likewise argues (at 26) that it should be allowed

to apply its unique expertise in the petition-to-quash process. But that ignores what happened in this case: The agency had the chance to clarify the CID in the petition-to-quash process. There is no more expertise that the FTC could apply. The next step is to go to district court.

* * *

The government's *Thunder Basin* theory would bar victims of retaliatory federal CIDs from accessing federal courts—unless their retaliator allows it. This Court should not endorse the executive branch's jurisdiction stripping scheme. By contrast, rejecting the government's *Thunder Basin* arguments will not open the floodgates to routine CID challenges. Other doctrines—such as Article III's injury requirement or constraints on courts' equitable powers—will prevent most regulated parties from challenging a CID. But those doctrines leave open the courthouse door for this troubling scenario.

## B. The Government's Cause Of Action Argument Is Meritless.

Under settled precedent, Media Matters possesses a cause of action to seek an "injunction[] to protect" its "rights safeguarded by the Constitution." App.233 (quoting *Bell v. Hood*, 327 U.S. 678, 684 (1946)); *see Free Enter. Fund*, 561 U.S. at 491 n.2; *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001). Nevertheless, citing a mélange of precedent, the government argues (at 30-31) that Media Matters lacks a cause of action. This theory encapsulates the FTC's overarching view that nothing

limits its coercive power. The district court easily rejected this argument. App.232-238. This Court should too.

*First*, the government cites cases declining to create constitutional causes of action for damages. *See, e.g, Ziglar v. Abbasi*, 582 U.S. 120 (2017). That precedent disproves the government's claim. As it explains: Federal courts do not create implied causes of action for damages because they pose unique "economic and government concerns," but federal courts possess "traditional equitable powers" to enforce constitutional rights. *Id*. at 133-134; *see id*. at 144.

*Second*, *Reisman* and *Claire Furnace* do not indicate "injunctions against agency CIDs" are categorically unavailable in equity. Gov. Br. 31. Instead, *Reisman* and *Claire Furnace* illustrate a narrower proposition: Where a CID recipient suffers no ongoing injury, the regulated party will have an adequate remedy later and cannot receive equitable relief now. In contrast, Media Matters faces ongoing First Amendment harms, lacks an adequate legal remedy later, and thus merits equitable relief now. *See supra* pp. 26-28.

Justice Gorsuch explained this at oral argument in *Platkin*: Under "*Reisman* and *Claire Furnace*," "if there isn't a remedy at law," "equity can step in." Oral Arg. Tr. at 33:35-33:49, *First Choice Women's Res. Ctrs., Inc. v. Platkin*, No. 24-781 (U.S., Dec. 2, 2025) (italics added).

*Third*, the government relies (at 31) on *Armstrong v. Exceptional Child Ctr.*,

*Inc.*, 575 U.S. 320, 327 (2015). But "*Armstrong* itself held only that a statute"— the Medicaid Act—" 'implicitly preclude[d] private enforcement' of a *statutory* right." App.235 (quoting *Armstrong*, 575 U.S. at 328)). Similarly, the government cites *Alexander v. Sandoval*, 532 U.S. 275 (2001), but it held only that a private right of action was unavailable to enforce *a regulation*. *Id.* at 290-291. Those cases say nothing about a plaintiff's ability to enforce a *constitutional* right. And nothing in the FTC Act suggests Congress took the extraordinary step of displacing a *constitutional* cause of action.

### C.    The Government Forfeited Its Exhaustion Argument.

On appeal, the FTC raises a new claim (at 32-36) that Media Matters failed to exhaust administrative remedies. This Court should not address this forfeited argument—which, to be clear, is meritless.

Media Matters filed a petition to quash, identified the CID's concerning irregularities, and provided the agency ample opportunity to clarify or alter its demands. App.136-183. The agency takes issue with none of that. Rather, the FTC argues only that Media Matters failed to sufficiently allege First Amendment retaliation in the petition-to-quash process. The agency suggests (at 32) this omission somehow prevented it from ameliorating Media Matters' concerns.

"Absent exceptional circumstances, a party forfeits an argument by failing to press it in district court." *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179 (D.C.

Cir. 2019). The FTC knows how to make an exhaustion argument. It did not. There are no "exceptional circumstances" to excuse forfeiture.

The FTC (at 35-36) tries to downplay the newness of its claim—and the egregiousness of its forfeiture—by painting exhaustion as a refinement of its *Thunder Basin* claim. That does not wash. *Thunder Basin* is a jurisdictional limitation on a district court's "adjudicatory authority." *Santos-Zacaria v. Garland*, 598 U.S. 411, 416 (2023) (quotation marks omitted). By contrast, exhaustion is a claims-processing rule that "promote[s] the orderly progress of litigation." *Id.* (same). Exhaustion is a distinct inquiry the district court never addressed and which this Court should not confront in the first instance.

The FTC is similarly wrong (at 36) when it asks the Court to excuse forfeiture because exhaustion is "purely legal and requires no factfinding." Courts apply forfeiture to "purely legal" matters too. *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 101 (D.C. Cir. 2015). Regardless, exhaustion implicates factual questions—such as the futility of raising a retaliation claim—which merit district court analysis in the first instance.

The FTC suggests (at 36) the stay panel addressed exhaustion sua sponte, not-so-subtly inviting the merits panel to do the same. Not true. In its *Thunder Basin* analysis, the stay panel used the word "exhausted" to describe the fact that Media Matters had filed a petition to quash. Stay Op. at *5. The panel did not consider the

administrative-law doctrine of exhaustion.  Finally, contrary to the FTC's suggestion (at 36), forfeiture rules apply with full force in preliminary injunction appeals.  *See, e.g.*, *Paxton*, 138 F.4th at 584.

The Court should stop here.  But if the FTC re-raises exhaustion at the permanent-injunction stage, it will fail.  For one, a party has no obligation to exhaust claims before a "biased" adjudicator, or one that "predetermined the issue." *McCarthy v. Madigan*, 503 U.S. 140, 148 (1992); *cf. Herr v. U.S. Forest Serv.*, 803 F.3d 809, 823 (6th Cir. 2015) (Sutton, J.) ("The law does not force [plaintiffs] to take on hopeless causes.").  For another, Media Matters' retaliation claim also falls outside the FTC's area of "technical expertise."  *Carr v. Saul*, 593 U.S. 83, 92 (2021).

But perhaps most importantly:  The FTC's suggestion that it was somehow unaware of Media Matters' claim and would have done anything differently is baseless.  The agency's decision denying the petition to quash *cited this litigation*. FTC Order 3 n.5.  The FTC *had* every "opportunity to correct" itself.  *McCarthy*, 503 U.S. at 145.  It declined to do so.  *Cf. Nat. Res. Def. Council, Inc. v. EPA*, 824 F.2d 1146, 1151 (D.C. Cir. 1987).

## II. MEDIA MATTERS IS LIKELY TO PREVAIL ON ITS FIRST AMENDMENT CLAIM.

The FTC's arguments on the merits are just as weak.  To secure a preliminary injunction, Media Matters needed to demonstrate that it would likely prove: (1) it

engaged in protected First Amendment activity; (2) there is "a causal link between" that protected activity and the FTC's CID; and (3) the CID would "deter a person of ordinary firmness in" Media Matters' "position from speaking again." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (quotation marks omitted). The district court analyzed the "unusual and unprecedented array of facts in the record at this stage," and found Media Matters was likely to prevail. Stay Op. at *9. This Court reviews the trial court's factual findings for clear error, and should affirm.

### A. Media Matters Is Likely To Prove Retaliatory Motive.

**1.** The FTC mainly targets the court's finding of retaliatory animus, so we start there too. The district court relied on four categories of facts, each of which indicates the FTC issued its CID in retaliation for Media Matters' protected speech.

*First*, the timing suggests the FTC intended to revive the stalled retaliation campaign against Media Matters. App.250. When the FTC issued its CID in May 2025, Missouri had dropped its investigation in February; a federal court had blunted Musk's "worldwide lawsuits" in April; and this Court was days away from affirming the preliminary injunction against Texas. App.249-250. The FTC's investigation breathed new life into the lagging efforts to harass Media Matters.

*Second*, FTC Chairman Andrew Ferguson's incriminating statements betrayed the government's retaliatory purpose. Chairman Ferguson described his "investigative push in ideological terms." App.247 (quotation marks omitted). In a

leaked memorandum urging the incoming Administration to appoint him as Chairman, Ferguson bragged about his "track record of standing up to the radical left," while simultaneously vowing to "investigate advertiser boycotts." *Id.* (quotation marks, ellipses, and brackets omitted). In other public comments, Ferguson warned the FTC needed to "take investigate steps in the new administration" because "progressives" "were not going to give up just because of the election." *Id*. (quotation marks omitted). After being appointed to lead the FTC, Ferguson openly bragged that he is targeting "social media" "censorship" because— in his words—"censorship" benefits "the democrat party," "DNC interest groups," and "political agendas" with which Ferguson disagrees.[5]

Ferguson's "overt political messaging"—indeed, outright partisan animus— "is atypical" of a legitimate government investigation, to say the least. *Bailey*, 2024 WL 3924573, at *15. Tellingly, despite conservative figures promoting so-called advertiser "boycotts," such as one of MSNBC, there is no indication that the FTC has pursued anyone on the political right. Dkt. 22-1 at 27-28. Instead, Chairman Ferguson has done what he promised: target opponents on the left for their speech.

It was additionally notable that Chairman Ferguson announced his investigation into "tech" "censorship" shortly after taking office. App.250. That

---

[5] *Transcript: FTC Chairman Andrew Ferguson Keynote*, Promarket (Apr. 17, 2025), https://tinyurl.com/a5h3waht. *See* Dkt. 22-1 at 23 (citing same).

timing—when combined with his other statements—suggested "he was chomping at the bit to 'take investigative steps' " "to make 'progressives' like Media Matters 'give up.' " *Id*. (quoting Ferguson).

*Third*, others in Ferguson's orbit were even more explicit. Ferguson's handpicked staffers cheered on Musk's retaliatory lawsuits against Media Matters; called Media Matters' employees "stupid and resentful Democrats"; and derided the organization as the "scum of the earth." App.248-249. These were not minor figures. One was Ferguson's senior policy adviser. The other was the director of public affairs. App.33-34. Meanwhile, an outside adviser to the Trump Administration—who met with Ferguson and President Trump regarding antitrust issues, App.34-35—called Media Matters "leftists to throw in the DC gulag" and similarly celebrated Musk's legal campaign against Media Matters. App. 248.

*Fourth*, the FTC's justification (or lack thereof) for investigating Media Matters further reinforces the conclusion that the agency has an improper motive.

The CID initially contained no explanation of "the conduct" under investigation. 15 U.S.C. § 57b-1(c)(2). After Media Matters filed this lawsuit, the FTC amended the CID and claimed to be investigating so-called advertiser boycotts, specifically whether advertisers "unlawfully agreed to use certain lists" of websites to determine where to place ads. App.252. The "late-breaking nature of this explanation" suggests it is pretextual. *Id*. The FTC, meanwhile, has never explained

why there is any "reason to believe that Media Matters has information relating" to advertisers' use of lists—let alone *an unlawful agreement between advertisers* to engage in a boycott. *Id.* (quotation marks omitted).

Even more concerningly, "the sweeping scope of the FTC's CID"—which extends to every aspect of Media Matters' own operations and finances—bears no relationship to the FTC's purported goal of uncovering information about an *agreement between advertisers*. *Id.* The scope is particularly troubling because the FTC lacks any regulatory authority over nonprofits like Media Matters. *See* 15 U.S.C. § 44 (defining "[c]orporation" over which FTC has jurisdiction to mean organized for "profit"). Meanwhile, the government's intrusive demands—which on their own raise grave First Amendment concerns—could not be better crafted to inflict maximum pain on a non-profit media organization. *See Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 616 (2021); *Stanford v. Texas*, 379 U.S. 476, 485 (1965).

Finally, the FTC's belated justification for its investigation—that it is investigating an agreement among advertisers to boycott—should itself raise alarm. Under landmark Supreme Court precedent, the First Amendment protects the right to engage in politically motivated boycotts as a means of encouraging social change, *see NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 911 (1982), which readily encompasses discouraging social media sites from tolerating extremist content on

their platforms.  The FTC has offered no coherent explanation—none whatsoever—for why its investigation into "advertiser boycotts" is not just a naked effort to penalize protected First Amendment activity.

Moreover, because Musk and his allies blame Media Matters' coverage for companies not advertising on X, the FTC's proffered explanation regarding "advertiser boycotts" is impossible to disentangle from its retaliation campaign against Media Matters for pure advocacy.  Indeed, at the stay stage, the FTC justified issuing Media Matters a CID because its "website" allegedly "calls for an advertiser boycott."  Mot. for Stay at 19.  This is astounding—and it confirms that the FTC is simply targeting Media Matters for speech.

**2.**  The FTC asks this Court to suspend disbelief about its actions.  But this Court need not—and should not—"exhibit a naiveté from which ordinary citizens are free."  *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.).

**a.**  As a threshold matter, the government attempts five sleights-of-hand, each of which falls apart under even gentle scrutiny.

*First*, in a cursory footnote, the FTC tries to shift the goalposts on the substantive legal standard.  According to the FTC, the Court should apply a version of the special causation rule from *Nieves v. Bartless*, 587 U.S. 391 (2019), for

retaliatory arrest damages actions, and require Media Matters to show "there was no reasonable basis for the CID," Gov Br. 37 n.10.

This argument is so skeletal it is forfeited. *See Washington Legal Clinic for the Homeless v. Barry*, 107 F.3d 32, 39 (D.C. Cir. 1997). It is also wrong. *Nieves* "has no applicability in this context." *Bailey*, 2024 WL 3924573 at *12. The default First Amendment standard applies, and Media Matters merits relief if there is a "causal link" between its protected activity and the FTC's CID. *Aref*, 833 F.3d at 258; *see Watson v. Boyd*, 119 F.4th 539, 559 (8th Cir. 2024) (declining to extend *Nieves*); *Bello-Reyes v. Gaynor*, 985 F.3d 696, 701 & nn.5, 6 (9th Cir. 2021) (same).

*Second*, the government seeks to skirt clear error review by asking the Court to "weigh each piece of evidence in isolation." *United States v. Manafort*, 897 F.3d 340, 347 (D.C. Cir. 2018) (quotation marks omitted). But in applying "the clear error standard," a court considers "all of the evidence taken as a whole," *id.* (same). Moreover, in *Vullo*, the Supreme Court recently admonished a court considering a First Amendment claim not to view evidence "in isolation," or "break up" the "analysis into discrete parts." *Vullo*, 602 U.S. at 194 (majority op.); *id.* at 199 (Gorsuch, J., concurring).

*Third*, the government claims (at 41) its factual arguments are "legal" in hope of securing *de novo* review. But each is a thinly veiled request to "weigh[] the

evidence differently" than the trial court, something an appellate court should not do in this posture. *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985).

*Fourth*, the government largely ignores the preliminary injunction standard. Media Matters needed to show only likely success on the merits—which it did. *Paxton*, 138 F.4th at 563. As the stay panel reiterated, this appeal concerns a "tentative determination governing the litigation interim," not a final determination on the merits. Stay Op., at *9.

*Fifth*, the FTC seeks to diminish incriminating facts—which together paint a disturbing image—by invoking a talismanic presumption of regularity. *See* Gov. Br. 37-40. But the FTC never mentioned the presumption below—not once—and forfeited it. Regardless, presumptions can be overcome by evidence, such as highly irregular partisan statements by Chairman Ferguson and his staff. *See Bailey*, 2024 WL 3924573, at *15; *Paxton*, 732 F. Supp. 3d at 28.

Indeed, few "officials will admit that they abuse the coercive powers of government to punish and silence their critics," and "courts must be vigilant in preventing officers from concocting legal theories to" abuse their power. *Gonzalez v. Trevino*, 60 F.4th 906, 907 (5th Cir. 2023) (en banc) (per curiam) (Ho, J., dissenting from denial of en banc review).

**b.** The FTC's factual arguments contain no merit, and at minimum do not prove clear error.

Start with the timeline. The FTC argues (at 41) that, because three years passed between Media Matters' reporting about X in 2023 and when Chairman Ferguson issued the federal CID in 2025, the former was unrelated to the latter.

This makes no sense: Ferguson could not have joined the retaliation campaign in 2023. Ferguson did not become Chairman until 2025, at which point he promptly targeted Media Matters. Moreover, as the district court explained, the federal CID came on the heels of recent setbacks to the existing retaliation campaign. This implied the FTC sought to "continue the years' long pressure campaign" against Media Matters. App.250. The district court made a permissible factual inference. This Court should decline to reweigh the evidence.

The FTC (at 42) similarly argues that because the FTC issued its CID in May 2025, the federal CID could not constitute an effort to continue the "state investigations," which "had been enjoined by August 2024." But the FTC misleadingly omits critical intervening events between August 2024 and May 2025. The FTC CID came just weeks after a court blunted Musk's international lawsuits in April 2025. Meanwhile, when the FTC issued its demand, Missouri had recently dropped its investigation, and this Court was evaluating whether to uphold the injunction against Texas's investigation. The district court permissibly found this evidence to suggest the harassment campaign was floundering, and the CID was an attempt to restart it.

The government argues (at 42) that Media Matters must prove express "coordination" between the FTC, Musk, and the states to infer that the federal government sought to ape the others' harassment. Not so. The broad federal CID followed in the footsteps of broad state CIDs and targeted the same organization, *i.e.*, Media Matters, indicating the former was an effort to effectuate the same goals as the latter.

Nor does the district court's logic mean that Media Matters enjoys "immunity" for "*any* CID" issued after the state CIDs. Gov. 42-43 (quotation marks omitted). In this case, the suspicious timing of the sweeping federal CID—*coupled with other evidence* tying it to the harassment campaign—indicates the FTC sought to continue the retaliation campaign.

The FTC (at 44-46 & n.13) attempts to whitewash Chairman Ferguson's nakedly partisan statements, which provide strong evidence of his retaliatory animus. But it is profoundly troubling for the government to frame investigations in such terms. *Bailey*, 2024 WL 3924573, at *15; *Paxton*, 732 F. Supp. 3d at 28. Federal ethical rules require public servants to "act impartially" and avoid even an "appearance" of partiality. 5 C.F.R. § 2635.101(b)(8), (b)(14); *see* 16 C.F.R. § 5.1 (applying rules to FTC commissioners); *cf.* Department of Justice Manual,

§ 1-8.100.[6]  Ferguson's rhetoric targeting the "left" and "democrat party" is not normal.  It smacks of animus.  The district court did not clearly err in considering it.

The FTC argues Ferguson's statements are irrelevant because they do not "mention[] Media Matters" by name.  Gov. Br. 44.  This is facile.  Because "officials" rarely "admit" unconstitutional abuse, courts scrutinize circumstantial evidence.  *Gonzalez*, 60 F.4th at 907 (Ho, J., dissenting from denial of en banc review).  In this case, the district court did not clearly err in considering Ferguson's partisan statements regarding advertiser boycotts as evidence of hostility to Media Matters, whose reporting has made it a scapegoat to blame for advertisers leaving X.[7]

The government stresses (at 44) that Ferguson may only issue CIDs pursuant

---

[6] Note: Ferguson was an FTC Commissioner when he made partisan statements in 2024.  The ethics rules applied to him then—as they still apply today.

[7] In a footnote (at 46 n.13), the government suggests Ferguson's partisan statements support only "a Fifth Amendment selective enforcement claim," not a "First Amendment retaliation claim," because the statements do not "connect the CID to a particular Media Matters article."  This is too clever-by-half.  Whether the FTC targeted Media Matters for the 2023 article about X—or for some combination of that article and other reporting—the FTC is violating the First Amendment.  The government has not previously argued that Media Matters should have brought a Fifth instead of First Amendment claim, meaning it forfeited this theory on appeal.  Regardless, there is no reason evidence supporting one constitutional claim could not also support the other.  *Cf. United States v. Vazquez*, 145 F.3d 74, 82 n.5 (2d Cir. 1998).  The government is separately wrong when it asserts Media Matters "has not" identified "similarly situated entities that were not investigated."  Gov. Br. 46 n.13 (quotation marks omitted).  Below, Media Matters stressed the fact that the FTC has not pursued conservatives who advocated for boycotts.  Dkt. 22-1 at 27-28.

to a Commission resolution, implying other Commissioners were involved in the process and checked his retaliatory animus. This is misleading. It appears Ferguson relied on a blanket resolution from 2022 authorizing Commissioners to issue CIDs through 2032. App.88. That resolution did not limit Ferguson or require any input from "other Commissioners." Gov. Br. 44. The resolution was boilerplate that afforded Ferguson a blank check. That highlights the problem at the heart of this case: The FTC acts as if there are no meaningful limits on its powers.

It likewise does not matter that another Commissioner—also a named defendant in this case—voted with Ferguson to deny Media Matters' petition to quash. *See* Gov. Br. 44. Discovery may reveal that Commissioner shared Ferguson's animus. Regardless, the Commissioner's vote was irrelevant. Had that Commissioner voted to quash instead, the Commission would have deadlocked 1-1, and the retaliatory CID would have remained in place. *Sprint Nextel Corp. v. FCC*, 508 F.3d 1129, 1132 (D.C. Cir. 2007). Because President Trump removed Democratic Commissioners from the FTC, moreover, there were no minority members serving on the FTC who could "serve as a fire alarm" regarding the agency's unlawful retaliation. *PHH Corp. v. CFPB*, 881 F.3d 75, 185 (D.C. Cir. 2018) (Kavanaugh, J., dissenting) (quotation marks omitted); *see* App.39 (removed Commissioner calling CID "[b]izarre[]").

The government (at 46) pooh-poohs the deeply concerning statements by FTC

senior staffers and the Administration's outside adviser. But as the stay panel explained, "courts often have to rely on circumstantial evidence when assessing the subjective motives of government actors." Stay Op. at *9. Statements of those "hired by or" who "had discussed antitrust matters with Chairman Ferguson" provide evidence of the agency's hostility to Media Matters. *Id*. Indeed, those statements expressed *direct support* for Musk's ongoing harassment campaign. *Id*.[8] And the agency (at 46) is wrong when it argues a non-decisionmaker's statements are *per se* irrelevant.[9] Courts can and do rely on such statements as circumstantial evidence. *See, e.g.*, *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 393 (6th Cir. 2009) ("[D]iscriminatory remarks, even by a nondecisionmaker, can serve as probative evidence of pretext."); *Walden v. Ga.-Pac. Corp.*, 126 F.3d 506, 521 (3d Cir. 1997) (A non-decisionmaker's remarks may provide "evidence of the atmosphere in which" a "decision was carried out, and therefore can be relevant to the question of retaliation").

The government likewise cannot explain the concerning features of the CID.

---

[8] The FTC misleads (at 46 n.14) when it states that these "comments" did not "reference" "the 2023 Media Matters article." Among other things, the comments cheered on Musk's lawsuits against Media Matters, which were triggered by *the viral article*.

[9] The FTC (at 47) states that Media Matters "has not alleged" "these individuals had" "involvement in the issuance of the CID." But Media Matters does not concede that these individuals were uninvolved—the evidence of which the FTC controls.

Start with the failure to describe "the conduct" under investigation.  15 U.S.C. § 57b-1(c)(2).  The government asserts (at 49) the FTC's initial explanation—a cross reference to the boilerplate resolution from 2022 authorizing investigations—was legally sufficient.  That is wrong.  This Court has previously held that similar "perfunctory" explanations are woefully inadequate.  *CFPB v. Accrediting Council for Indep. Colleges & Schs.*, 854 F.3d 683, 690 (D.C. Cir. 2017).  The district court did not clearly err in concluding that the FTC's refusal to explain itself signaled the agency was hiding its true motive.

The government argues (at 49) it offered an explanation in response to the petition to quash, and protests that providing "additional detail" "hardly smacks of retaliation."  But that argument is a naked request to reweigh the evidence.  The district court did not clearly err when it concluded that the CID's "late-breaking" "explanation"—which the agency provided only after Media Matters filed this lawsuit—indicated pretext.  App.252.

The FTC (at 40, 48) defends the CID's sweeping scope as "no broader than the typical CID" and "far from unusual."  But the FTC did not raise this factual argument in briefing below.[10]  Regardless, the government fails to grapple with the

_____

[10] The government claims (at 40) that it raised this argument in response to a stray comment by the stay panel.  But the scope of the CID was a hotly contested fact in the district court.  The government had every opportunity to present evidence below on the normal scope of third-party CIDs.  It failed to do so.

district court's analysis. The problem is not just the CID's scope in the abstract. Rather, the "sweeping scope of the FTC's CID" is impossible to "square with the proffered" much narrower "reason" for it—*i.e.*, an alleged investigation into an agreement among advertisers to use certain lists. App.252.

The FTC's belated justifications for its demands fall flat. For example, the FTC now claims (at 48) it needs "Media Matters' financial documents" because they "could shed light on whether Media Matters expended funds on (or received funds for) coordinating activities."

But the FTC offers *no reason*—none—to think Media Matters spent money or was paid to coordinate amongst advertisers. Instead, the FTC blithely asserts that the agency need not "prove" its case "before" "investigating." Gov. Br. 50 (emphasis omitted). This misses the point: The government's failure to offer a coherent rationale is further proof that this intrusive CID—like the state CIDs before it—is meant to retaliate, not pursue legitimate investigatory ends.

The government similarly argues (at 48) that it wants materials from the ongoing litigation between Media Matters and X because that lawsuit also involved "advertising boycotts." But that rationale underscores the poor fit between the FTC's narrow stated purpose—remember, the agency now says it is investigating an *agreement* among advertisers *to use lists*—with its sweeping assault on *anything* related to advertisers exercising their First Amendment rights.

To the extent the FTC implies (at 50) it cannot explain itself because doing so might reveal "confidential" details of its investigation, it is notable that FTC never sought to provide information below pursuant to a protective order, *see Keaveney v. SRA Int'l, Inc.*, No. 1:13-cv-00855, 2017 WL 1842544, at *6 (D.D.C. May 3, 2017), or through *in camera* review, *see Jibril v. Mayorkas*, 101 F.4th 857, 866 (D.C. Cir. 2024). Media Matters does not concede the FTC could meet the standard for those extraordinary measures. The law, however, provides mechanisms to ameliorate a legitimate need for confidentiality.

Finally, the FTC cannot shield its retaliation against Media Matters because the agency issued additional CIDs "to a variety of entities" including "policy/advocacy groups." Gov Br. 38. The fact the agency targeted advocacy organizations who *also* engaged in protected speech (*i.e.*, by engaging in advocacy encouraging others not to advertise on certain websites), reinforces rather than disproves the conclusion that the FTC is targeting organizations *for speech*. And remember: The First Amendment protects not just advocating for but also engaging in boycotts to encourage social change. *See supra* pp. 38-39.

The government (at 39) accuses Media Matters of "wild speculation" for suggesting that the FTC's other CIDs may have been similarly improper. In the next breath, however, the government frets (at 55 n.17) that an advocacy organization has also alleged First Amendment retaliation. To be clear: Media Matters takes no

position on that case. But the more information that emerges, the more this looks like a war on protected speech all the way down. That should come as no surprise. It is precisely what Chairman Ferguson promised—namely to pursue entities on "the left," Media Matters being a prominent example, which he and likeminded allies blame for advertiser boycotts.

* * *

The FTC asserts it may demand whatever it wants from whomever it wants—no matter how sensitive the information or how flimsy the rationale—and no one can impugn the agency's motives. That is wrong, and the district court did not clearly err in finding that the FTC had a retaliatory purpose.

## B.     Media Matters Is Likely To Prove A Deterrent Effect.

**1.** The district court correctly found, App.239-246, that Media Matters is likely to prove that the FTC's actions—issuing a sweeping CID—would "deter a person of ordinary firmness" "from speaking again," *Aref*, 833 F.3d at 258 (quotation marks omitted).

This is commonsense. The FTC demands "sensitive materials," ranging from Media Matters' financials to confidential details about its reporting. App.239. Any entity would be deterred from speaking if it had to reveal that information—and that is doubly true for a journalistic organization like Media Matters. Moreover, Media Matters was actually deterred. For example, Media Matters declined to pursue

"particular stories" regarding the agency because of "the FTC CID." App.242. Media Matters' conduct "is not dispositive" but is probative of what would deter an ordinary person in this context. App.241 (quotation marks omitted).

The district court's analysis mirrors this Court's analysis in *Paxton*, 138 F.4th at 581, and how other courts have approached the deterrent effect of CIDs and subpoenas, *see, e.g.*, *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 917 (9th Cir. 2012) (en banc); *White v. Lee*, 227 F.3d 1214, 1229 (9th Cir. 2000); *cf. Americans for Prosperity*, 594 U.S. at 617 (explaining "deterrent effect" of forced donor disclosure "is real and pervasive").

**2.** The FTC's counterarguments hold no water.

**a.** The government asserts that (at 51) "it appears unlikely that a retaliatory investigation claim is even cognizable." It is unclear why the government raises this (massive) argument in response to the (narrower) question whether its CID would deter a person of ordinary firmness. Regardless, the FTC's suggestion that the First Amendment never applies when the government wields coercive investigatory tools is as baseless as it is breathtaking.

The First Amendment prohibits regulators from "wield[ing]" their "power"— such as the authority to issue CIDs, backed by the threat of court-ordered enforcement—"to punish or suppress" speech. *Vullo*, 602 U.S. at 187. In *Paxton*, 138 F.4th at 580, this Court underscored that the "bad faith use of investigative

techniques can abridge journalists' First Amendment rights," a principle this Court previously recognized in *Reps. Comm. for Freedom of the Press v. AT&T*, 593 F.2d 1030, 1064 (D.C. Cir. 1978). Other federal courts have entertained First Amendment claims involving retaliatory investigations. *See, e.g.*, *White*, 227 F.3d at 1229; *Anderson v. Davila*, 125 F.3d 148, 152 (3d Cir. 1997).

If that were not enough (it surely is), the United States is currently before the Supreme Court in *Platkin* supporting the standing of a plaintiff—there, a crisis pregnancy center—which seeks to challenge a state subpoena on First Amendment retaliation grounds. The government can hardly be heard to object here. And consider what the FTC's argument would mean. According to the FTC, officials can wield the government's coercive investigatory powers to target and harm disfavored speakers—say, a conservative radio host or late-night liberal comedian—and the Constitution would have nothing to say about it. That extraordinary proposition is as wrong as it sounds.

**b.** In arguing Media Matters has no First Amendment right against being subject to a retaliatory CID, the government chiefly relies on *Hartman v. Moore*, 547 U.S. 250 (2006), a case regarding the elements of a constitutional damages action, *id*. at 252. In footnote 9, *Hartman* noted that no party had argued that merely "conducting a retaliatory investigation with a view to promote a prosecution is a constitutional tort." *Id*. at 262 n.9.

The government relies on this footnote to conclude that plaintiffs in Media Matters' shoes cannot *ever* bring a First Amendment claim regarding retaliatory investigations. But damages actions, like the one discussed in footnote 9, pose unique policy concerns. *See supra* p. 31. The Court's reluctance to christen a new constitutional tort in dicta says nothing about whether the victim of ongoing retaliation from a CID can receive equitable relief to stop the harm.

The government's remaining cases primarily involve qualified immunity in Section 1983 damages actions. These are even further afield. The qualified immunity doctrine requires plaintiffs to identify on-point precedent establishing a constitutional right beyond doubt in analogous factual circumstances. *See Mullenix v. Luna*, 577 U.S. 7, 12 (2015). That demanding standard for damages cases does not apply to preliminary injunctions, which issue if the plaintiff has demonstrated likely success on the merits. App.244. As a result, cases granting qualified immunity to *bar damages* in discrete factual circumstances say nothing about whether the First Amendment permits Media Matters to seek *equitable relief*.

The government transmutes (at 52-53) these qualified immunity cases into a new rule that a plaintiff can allege a First Amendment retaliation claim only if it shows "extraordinary circumstances" and "unusual injury." This is made up. The test in First Amendment retaliation cases—which applies in full force here—is whether the government's action would "deter a person of ordinary firmness." *Aref*,

833 F.3d at 258 (quotation marks omitted). The Court should not remake constitutional law.

**c.** The government's remaining attempts to poke holes in the district court's findings fall flat. But note: The government has no rejoinder to the district court's basic conclusion that a reporter would be deterred from speaking if hit with a sweeping CID demanding sensitive information. The government's silence speaks volumes.

The government instead takes issue with the real-world harms Media Matters suffered. For example, the government asks (at 53) the Court to dismiss the fact that third parties have curtailed cooperating with Media Matters—which is evidence that an objectively reasonable person would be deterred—because "the same could occur in any federal investigation." That argument rebounds on the government. It underscores the highly coercive nature of a federal CID and demonstrates why the First Amendment is such a critical shield against abuse.

The government complains (at 53) that Media Matters' specific injuries might be attributable to "multiple causes"—*i.e.*, other elements of the ongoing retaliation campaign. That ignores the record. As the district court explained, Media Matters provided specific evidence regarding the harms attributable to the FTC CID, such as stories *regarding the FTC* that Media Matters "would have pursued but for the FTC CID." App.242; *see also* App.190-193 (detailing stories); App.199 (FTC CID led

to canceled partnership); App.204-205 (detailing harms, including financial harms)

The FTC also fundamentally misunderstands the inquiry. The Court need not quantify the precise amount of harm attributable to the FTC versus another retaliator. The question is whether the FTC's sweeping CID would deter an ordinary person— as it has deterred Media Matters.

The government (at 53) asserts that Media Matters' "voluntary reactions" cannot provide evidence that "the CID is *objectively* likely to chill speech." That is wrong. As the district court correctly noted, App.241, although not "dispositive," "the plaintiff's actual response to the retaliatory conduct provides some evidence of the tendency of that conduct to chill First Amendment activity." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005).

Finally, the government argues (at 53-54) that because Media Matters "by its own account" "is not subject to the Commission's enforcement authority," Media Matters cannot "assert that it faces a risk of enforcement." That is misleading. The FTC cannot enforce substantive antitrust law against nonprofits—although the agency does not rule out the possibility it might try. *See* Gov. Br. 48 n.15. The agency, however, *can* enforce CIDs against nonprofits, requiring them to divulge

sensitive information. It is that latter risk which raises the stakes and which would deter a person of ordinary firmness.[11]

## III.  THE EQUITIES STRONGLY FAVOR MEDIA MATTERS.

The remaining factors confirm injunctive relief was imperative. As the district court correctly recognized, Media Matters will suffer "irreparable injury" absent a preliminary injunction due to the "loss of First Amendment freedoms." App.253 (quoting *Paxton*, 138 F.4th at 585).

In contrast, the government suffers no meaningful harm from being barred from engaging in unconstitutional conduct. The FTC cannot credibly claim the preliminary injunction "undercuts" its "investigation." Gov. Br. 54. As the district court observed when it denied a stay pending appeal, the FTC has "yet to explain *why*" it has "reason to believe that Media Matters specifically has information relevant to" its "investigation." App.262 (quotation marks omitted).

But there is a deeper reason the FTC suffers no meaningful harm. If the FTC wants to enforce the CID against Media Matters, this case will end right back up in district court. The scenario in which the preliminary injunction matters to the FTC is if the government wants to delay and harm Media Matters in the interim.

---

[11] If the Court disagrees that Media Matters is likely to prevail on its First Amendment retaliation claim for any reason, it should permit the district court to address its remaining First and Fourth Amendment claim on remand, App.45-46, and decide whether to reissue the preliminary injunction on that basis.

Finally, it is of paramount public importance to stop this "unlawful" "action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).   As the district court warned, allowing this First Amendment violation to proceed threatens "the very foundations of our democracy."   App.263.

## CONCLUSION

The Court should affirm the preliminary injunction.

February 17, 2026

STEPHEN P. ANTHONY
RYAN K. QUILLIAN
DANA A. REMUS
KUNTAL V. CHOLERA
BRENDEN J. CLINE
BRIGID P. LARKIN
SARAH LEADEM
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C. 20001-4956
202-662-6000

JUSTIN A. NELSON
MATTHEW BEHNCKE
ALEXANDRA FOULKES GRAFTON
SUSMAN GODFREY LLP
1000 Louisiana Street, Suite 5100
Houston, TX 77002-5096
713-651-9366

KATHERINE M. PEASLEE
SUSMAN GODFREY LLP
401 Union Street, Suite 3000
SEATTLE, WA 98101
206-516-3880

Respectfully submitted,

/s/ Nathaniel A.G. Zelinsky
NATHANIEL A.G. ZELINSKY
SAMANTHA P. BATEMAN
ELIZABETH D. COLLERY
JAMES I. PEARCE
WASHINGTON LITIGATION GROUP
1717 K St., NW, Suite 1120
Washington, D.C. 20006
202-521-8750
nzelinsky@washingtonlitigationgroup.org

*Counsel for Plaintiff-Appellee Media Matters for America*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B)(i), I certify that Appellee's Response Brief contains 12,970 words. This Brief also complies with the requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared using Microsoft word 14-point Times New Roman, a proportionally spaced font.

February 17, 2026

/s/ Nathaniel A.G. Zelinsky
NATHANIEL A.G. ZELINSKY
WASHINGTON LITIGATION GROUP
1717 K St., NW, Suite 1120
Washington, D.C. 20006
202-521-8750
nzelinsky@washingtonlitigationgroup.org

*Counsel for Plaintiff-Appellee*
*Media Matters for America*

**CERTIFICATE OF SERVICE**

I hereby certify that, on February 17, 2025, I caused the foregoing to be electronically filed with the Clerk of the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. All counsel in this case are registered CM/ECF users and will be served by the appellate CM/ECF system.

February 17, 2025

/s/ Nathaniel A.G. Zelinsky
NATHANIEL A.G. ZELINSKY
WASHINGTON LITIGATION GROUP
1717 K St., NW, Suite 1120
Washington, D.C. 20006
202-521-8750
nzelinsky@washingtonlitigationgroup.org

*Counsel for Plaintiff-Appellee*
*Media Matters for America*