No. 25-5302

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

Media Matters for America,
*Plaintiff-Appellee,*

v.

Federal Trade Commission,
*Defendant-Appellant.*

Appeal from the United States District Court for the District of Columbia,
The Honorable Sooknanan, Judge Presiding (Case No. 1:25-cv-01959)

## BRIEF OF SEVENTEEN NONPROFIT MEDIA, RESEARCH, AND ADVOCACY ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF AFFIRMANCE OF PRELIMINARY INJUNCTION FOR PLAINTIFF-APPELLEE

Dated: February 23, 2026

Kendra K. Albert
Andrew F. Sellars
Albert Sellars LLP
769 Centre St, Suite 199
Boston, MA 02130
(617) 286-6886
kendra@albertsellars.law

Counsel for *Amici Curiae*

# CORPORATE DISCLOSURE STATEMENT

*Amici* CalMatters; The Center for Investigative Reporting, Inc.; Defending Rights & Dissent; the Electronic Frontier Foundation; the First Amendment Coalition; Free Press; Freedom of the Press Foundation; Local Independent Online News (LION) Publishers; MuckRock Foundation; the National Coalition Against Censorship; the Project On Government Oversight (POGO); Public Knowledge; and Reporters Without Borders, Inc. each certify that they do not have a parent corporation, and no publicly-held corporation owns 10% or more of its stock.

The Press Freedom Defense Fund is a project of The Intercept Media, Inc. The Intercept Media, Inc. does not have a parent corporation, and no publicly-held corporation owns 10% or more of its stock.

The Coalition for Independent Technology Research is a project of Aspiration, a California nonprofit organization. Aspiration does not have a parent corporation, and no publicly-held corporation owns 10% or more of its stock.

Dangerous Speech Project is a project of the New Venture Fund. The New Venture Fund does not have a parent corporation and no publicly-held corporation owns 10% or more of its stock.

Open Vallejo is a project of the Informed California Foundation. The Informed California Foundation does not have a parent corporation, and no publicly-held corporation owns 10% or more of its stock.

## CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES

Pursuant to D.C. Circuit Rules 26.1 and 28(a)(1), and Fed. R. App. P. 26.1, the undersigned counsel certifies as follows:

### A.    Parties and *Amici*

To the best knowledge of *amici curiae*, all parties, intervenors, and *amici* appearing before the district court and in this Court are listed in the Briefs for Appellants and Appellees.

### B.    Rulings Under Review

References to the rulings at issue appear in the Brief for Appellants.

### C.    Related Cases

To the best knowledge of *amici curiae*, this case has not previously been before this Court or another district court. Two prior cases before this Court that present highly similar issues were *Media Matters for Am. v. Paxton*, No. 24-7059 (D.C. Cir.) and *Media Matters for Am. v. Bailey*, No. 24-7147 (D.C. Cir.).

Dated: February 23, 2026

/s/ *Kendra K. Albert*

Kendra K. Albert
ALBERT SELLARS LLP
769 Centre St, Suite 199
Boston, MA 02130
(617) 286-6886
kendra@albertsellars.law

Counsel for *Amici Curiae*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ....................................... i

CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES .............................................................................. ii

TABLE OF CONTENTS.............................................................. iii

TABLE OF AUTHORITIES ........................................................ iv

GLOSSARY OF ABBREVIATIONS .............................................. ix

STATUTES AND REGULATIONS ................................................. x

STATEMENT OF IDENTITY, INTEREST IN CASE, AND SOURCE OF AUTHORITY TO FILE ................................................................. xi

STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS ............. xiv

ARGUMENT ........................................................................ 1

    I.    Nonprofit Media, Research, and Advocacy Organizations Face Substantial Risk from the Growing Trend of Vexatious Investigations.............................................................. 6

        a. Nonprofit Organizations Face Heightened Risk from Coercive Investigations by the Government. ............................. 6

        b. Opening and Prolonging Vexatious Investigations Has Become a Popular Tool for Coercion Across the Federal Government. ...... 14

    II.    Courts Must Provide a Mechanism for Halting Vexatious Investigations....................................................... 20

CONCLUSION ....................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*AFL-CIO v. FEC*, 333 F.3d 168 (D.C. Cir. 2003) ................................................................11

*Am. Ass'n of Univ. Profs. v. Rubio*, 802 F. Supp. 3d 120 (D. Mass. 2025),
    *appeal docketed,* No. 26-1141 (1st Cir. Feb. 10, 2026) ...................................... 13

*Am. Ass'n of Univ. Profs. v. Trump*, --- F. Supp. 3d ---, 2025 WL 3187762
    (N.D. Cal. Nov. 14, 2025), *order modified and appeal dismissed*, ECF No. 113–14
    (N.D. Cal. Feb. 13, 2026) ...................................................................................... 12

*Aref v. Lynch*, 833 F.3d 242 (D.C. Cir. 2016) ...................................................... 23

*Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485 (1984) ..................... 6

*Cox Broad. Corp. v. Cohn*, 420 U.S. 469 (1975) ................................................... 4

*Ctr. for Pub. Integrity v. Dep't of Defense*, 411 F. Supp. 3d 5 (D.D.C. 2019) ..................... 25

*Fed. Educ. Ass'n v. Trump*, 795 F. Supp. 3d 74 (D.D.C. 2025), *appeal docketed*,
    No. 25-5303 (D.C. Cir. argued Dec. 15, 2025) .......................................... 24

*Grosjean v. Am. Press Co.*, 297 U.S. 233 (1936) .................................................. 20

*In re 2025 Subpoena to Children's Nat'l Hospital*, No. 25-cv-3780, 2026 WL 160792
    (D. Md. Jan. 21, 2026) ....................................................................................... 16

*In re Administrative Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229 (D. Mass. 2025)
    .......................................................................................................................16, 24

*In re Omnicom Grp.*, No. C-4823 (F.T.C. Sept. 26, 2025) .................................18

*In re Search of One Device and Two Individuals*, 784 F. Supp. 3d 234 (D.D.C. 2025) ... 24

*In re Subpoena No. 25-1431-014*, --- F. Supp. 3d ---, 2025 WL 3252648
    (E.D. Pa. Nov. 21, 2025) .................................................................................... 21

*McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146 (2025) ............... 3

*Media Matters for Am. v. FTC*, 805 F. Supp. 3d 105 (D.D.C. 2025) ....................... 1, 6, 22

*Media Matters for Am. v. FTC*, No. 25-5302, 2025 WL 2988966
    (D.C. Cir. Oct. 23, 2025) (per curiam) ................................................. 1, 2, 11, 21, 23, 24

*Media Matters for Am. v. Paxton*, 138 F.4th 563 (D.C. Cir. 2025) ......... 3, 11, 13, 14, 20, 23

*Nat'l Council of Nonprofits v. Off. of Mgmt. and Budget*, 775 F. Supp. 3d 100 (D.D.C. 2025), *appeal docketed*, No. 25-5148 (D.C. Cir. argued Feb. 6, 2026) ..... 4, 13

*Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175 (2024) ............................................................. 5, 19

*Nat'l Treasury Emps. Union v. Vought*, 149 F.4th 762 (D.C. Cir. 2025), *vacated pending rehearing en banc*, 2025 WL 3659406 (D.C. Cir. Dec. 17, 2025) ..... 15

*President & Fellows of Harvard Coll. v. Dep't of Health & Human Servs.*, 798 F. Supp. 3d 77 (D. Mass. 2025), *appeal docketed*, No. 25-2230 (1st Cir. Dec. 31, 2025) ................................................................................. 21

*Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500 (D.C. Cir. 2016) ..................................... 13

*QueerDoc, PLLC v. Dep't of Justice*, --- F. Supp. 3d ---, 2025 WL 3013568 (W.D. Wash. Oct. 27, 2025) ................................................................................. 16

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) .................................................................5

*Rameses Sch. of San Antonio v. Comm'r of Internal Rev.*, 93 T.C.M. (CCH) 1092 (2007) .7

*Reporters Comm. for Freedom of the Press v. AT&T*, 593 F.2d 1030 (D.C. Cir. 1978)....1, 19

*Rhode Island v. Trump*, --- F. Supp. 3d ---, 2025 WL 3251113 (D.R.I. Nov. 21, 2025), *appeal docketed,* No. 26-1070 (1st Cir. Jan. 21, 2026) ................................................. 12

*Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819 (1995) ...................... 20

*SEC v. Romeril*, 15 F.4th 166 (2d Cir. 2021) ....................................................................... 2

*Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333 (D.D.C. 2020) ................ 22

*United States v. Calandra*, 414 U.S. 338 (1974) ................................................................. 22

*United States v. Morton Salt Co.*, 338 U.S. 632 (1950) ............................................... 20, 25

*United States v. Oregon*, No. 25-cv-1666, 2026 WL 318402 (D. Or. Feb. 5, 2026) ....... 24

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, 784 F. Supp. 3d 127 (D.D.C. 2025), *appeal docketed,* No. 25-5277 (D.C. Cir. July 28, 2025) .................................................................................... 9

*Zerilli v. Smith*, 656 F.2d 705 (D.C. Cir. 1981) .................................................................11

## Statutes

I.R.C. § 501(c) ................................................................................7

N.Y. Not-for-Profit Corp. L. § 204 ................................................7

## Other Authorities

Brian Schwartz, Richard Rubin, & Joel Schectman, *Trump Team Plans IRS Overhaul to Enable Pursuit of Left-Leaning Groups*, WALL ST. JOURNAL (Oct. 15, 2025) ..................7

Byron Tau, *How an AM Radio Station in California Weathered the Trump Administration's Assault on Media*, ASSOC. PRESS (Dec. 15, 2025) ..............................17

*Commissioner Gomez: Investigations Without Action Threaten Free Press*, INSIDERADIO (June 10, 2025) ......................................................15

Connie Matthiessen, *Funders Push Back as the Trump Administration Targets Philanthropy*, INSIDE PHILANTHROPY (Sept. 18, 2025) ...................12

David Callahan, *Philanthropy in the Crosshairs*, THE NATION (Nov. 17, 2025) ..............12

Devlin Barrett, *Justice Dept. Official Pushes Prosecutors to Investigate Geroge Soros's Foundation*, NEW YORK TIMES (Sept. 25, 2025) .....................................12

Doug Bock Clark, *How Paul Newby Made North Carolina a Blueprint for Conservative Courts*, PROPUBLICA (Oct. 30, 2025) ...............................................14

Eleanor Klibanoff, *AG Ken Paxton's Campaign Against Immigrant-Serving Groups Gets Boost from Court Rulings*, TEX. TRIBUNE (Dec. 9, 2025) ..........................8, 13

Georgia Gee, *The "Trash" School*, THE INTERCEPT (June 4, 2024)....................................10

*GuideStar*, CANDID (last visited Feb. 23, 2026) ..................................................7

*How Police Guns End Up in the Hands of Criminals*, REVEAL (July 13, 2024) ..................10

Jacob L. Nelson, *Is Journalism's Trust Problem About Money, Not Politics?*, NIEMANLAB (June 26, 2024)...........................................................5

Jessica Washington, *Trump Doesn't Need an Executive Order to Kill Progressive Nonprofits*, THE INTERCEPT (Apr. 25, 2025) .................................. 4

Jon Brodkin, *FCC Chair Brendan Carr Is Letting ISPs Merge—As Long As They End DEI Programs*, ARS TECHNICA (May 19, 2025)........................................17

Jonathon Penney, Chilling Effects: Repression, Conformity, and Power in the Digital Age (2026) ...........................................................................................19

Kenneth P. Vogel, Kate Conger, & Ryan Mac, *Under Siege from Trump and Musk, a Top Liberal Group Falls into Crisis*, New York Times (July 25, 2025)................................. 2

Kristen Eddy et al., *What Is News?*, Pew Research Ctr. (May 13, 2025) ........................ 4

*Letter to Chairman Brendan Carr, FCC, from Vandana Venkatesh, Verizon* (May 15, 2025) ........................................................................................................17

*Letter to the Faculty Senate of the University of Virginia from President Emeritus James E. Ryan* (Nov. 14, 2025) ...............................................................................................16

Lisa Macpherson & Elise Phillips, *Is Free Speech the New Price of Merger Approval from the FTC?,* Pub. Knowledge (June 17, 2025) ............................................................. 3

Michael Mechanic, *It Sure Looks Like Trump is About to Weaponize the IRS*, Mother Jones (Oct. 16, 2025) ........................................................................................... 8

Miles Hilton, *Blacklight, Our Privacy Inspector Tool, Now Tracks X and TikTok Pixels*, The Markup (Feb. 9, 2026)....................................................................................10

Molly Redden, *Trump's War on Big Law Means It's Harder to Challenge the Administration*, ProPublica (Aug. 6, 2025).................................................................. 9

Motion to Intervene and For Return of Property, *In re Searches Related to Hannah Natanson*, 26-sw-00054 (E.D. Va. Jan. 21, 2026) ................................................... 23

Nasser Eldroos & Rachel Levinson-Waldman, *"Continuous Vetting" of All Visa Holders is Impossible, but the Threat Alone Chills Free Speech*, Brennan Ctr. for Justice (Sept. 25, 2025) ..................................................................................................19

Nonprofit Impact Matters, Nat'l Council of Nonprofits (2019).................................. 8

Resolution Agreement Between The United States of America and Columbia University (July 23, 2025) .........................................................................................18

Rosalie C. Westenkow & Edward L. Carter, *Journalism as a Public Good: How the Nonprofit News Model Can Save Us from Ourselves*, 26 Comm'n L. & Pol'y 1 (2021) ....7

*Statement on the Importance of Law School Clinics and the Dangers of Political Retaliation*, N.Y.C. Bar Ass'n (Aug. 1, 2025) ................................................................. 9

Tara Suter, *FCC Opens Probe Into ABC's "The View" After James Talarico Interview: Reports*, THE HILL (Feb. 8, 2026)................................................17

Tess Legg, Jenny Hatchard, and Anna B. Gilmore, *The Science for Profit Model—How And Why Corporations Influence Science and the Use of Science in Policy and Practice*, PLOS ONE (June 23, 2021) ...........................................................5

THE 2025 INN INDEX, INST. FOR NONPROFIT NEWS (Oct. 2025) .........................................8

Tony Maquiling, *Student Orgs, Human Rights Clinic Named in Trump's Demand Letter to Harvard*, HARV. L. RECORD (Apr. 15, 2025) ................................9

## Rules

Fed. R. Civ. P. 45 ........................................................................22

Fed. R. Crim. P. 17 ......................................................................22

Fed. R. Crim. P. 41 ......................................................................22

## Regulations

16 C.F.R. § 2.10 ..........................................................................23

26 C.F.R. § 56.4911-2....................................................................7

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| CID | Civil Investigative Demand |
| FCC | Federal Communications Commission |
| FTC | Federal Trade Commission |

## STATUTES AND REGULATIONS

Relevant statutes and regulations are reproduced in the Addendum that accompanies the Appellants' Opening Brief.

**STATEMENT OF IDENTITY, INTEREST IN CASE,
AND SOURCE OF AUTHORITY TO FILE**

*Amici curiae* are seventeen nonprofit media, research, and advocacy organizations who, as a part of their mission, publish information on matters of public concern. Like Appellee Media Matters, such organizations rely on third-party support to do their work, including from donors, grantors, sources, and collaborators. *Amici* write to address how the threat of speech-retaliatory investigations by federal agencies impacts their work and jeopardizes their operation, and why prompt judicial supervision is necessary to prevent such retaliatory interrogation.

The Press Freedom Defense Fund is a project of the Intercept Media, Inc., a nonprofit news organization that publishes *The Intercept*, an award-winning news website with a reputation for in-depth investigations.

CalMatters is a nonprofit, nonpartisan news organization covering California policy and politics.

The Center for Investigative Reporting, Inc. is the nation's oldest nonprofit investigative newsroom, and runs the news outlets *Mother Jones*, *Reveal*, and *CIR Studios*.

The Coalition for Independent Technology Research works to advance, defend, and sustain the right to study the impact of technology on society.

The Dangerous Speech Project is an independent research team that studies

violence-inciting rhetoric and seeks the best ways to counter it while protecting freedom of speech.

Defending Rights & Dissent is a national civil liberties organization that defends First Amendment rights through grassroots mobilization, policy expertise, and advocacy journalism.

The Electronic Frontier Foundation is a nonprofit civil liberties organization that has worked for 35 years to ensure that technology supports freedom, justice, and innovation for all people.

The First Amendment Coalition is a nonprofit, nonpartisan organization that defends free speech, a free press, and the people's right to know.

Free Press advocates to promote internet access, protect dissent, preserve journalism, and advance racial justice. In August 2025, it received a third-party subpoena *duces tecum* from the plaintiff in *X Corp. v. Media Matters for America*, in the U.S. District Court for the Northern District of Texas. Free Press objected to that subpoena based, in part, on the First Amendment issues discussed in this brief.

Freedom of the Press Foundation is a nonprofit organization dedicated to protecting and defending press freedom and public interest journalism.

Local Independent Online News (LION) Publishers is a nonprofit that strengthens the local news industry by helping independent news publishers build more sustainable businesses.

MuckRock Foundation is a nonprofit advancing government transparency and

civic accountability by providing public records tools and support to journalists, researchers, and the public.

The National Coalition Against Censorship is an alliance of over 60 national nonprofit groups dedicated to protecting freedom of expression. The positions advocated in this brief do not necessarily reflect the views of its member organizations.

Open Vallejo is an award-winning, independent, nonpartisan newsroom serving the public interest.

The Project On Government Oversight (POGO) is a nonpartisan, independent watchdog that investigates, exposes, and champions reforms on systemic corruption, abuse of power, and waste.

Public Knowledge is a nonprofit organization that promotes freedom of expression, an open internet, and access to affordable communications tools and creative works.

Reporters Without Borders, Inc. (RSF USA) is the U.S. affiliate of the independent international nonprofit organization Reporters sans frontières (RSF) that defends the right of every human being to have access to free and reliable information.

*Amici* file this brief pursuant to Federal Rule of Appellate Procedure 29(a)(2) and Circuit Rule 29(b). Both Appellants and Appellees have consented to *amici* filing this brief.

## STATEMENT OF AUTHORSHIP AND
## FINANCIAL CONTRIBUTIONS

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici curiae* certify that no party or party's counsel authored this brief in whole or in part, that no party or party's counsel provided any money that was intended to fund the preparation or submission of this brief, and no party or person—other than the *amici curiae* or their counsel—contributed money that was intended to fund the preparation or submission of this brief.

# ARGUMENT

"[A]ll investigative techniques are subject to abuse and can conceivably be used to oppress citizens and groups, rather than further proper law enforcement goals." *Reporters Comm. for Freedom of the Press v. AT&T*, 593 F.2d 1030, 1064 (D.C. Cir. 1978). If such abuse seemed speculative when this Court wrote those words, it is no longer. This is the experience of Media Matters. Before this action, the Federal Trade Commission (FTC) had been conspicuously silent on "what, if any, law Media Matters was being investigated for possibly violating, or what conduct of Media Matters is under investigation." *Media Matters for Am. v. FTC*, No. 25-5302, 2025 WL 2988966 at *10 (D.C. Cir. Oct. 23, 2025) (per curiam) [hereinafter Stay Order]. Instead, the Commission opened an investigation, kept it open, and argues that Media Matters should have no opportunity for judicial oversight unless the FTC itself goes to court. *See Media Matters for Am. v. FTC*, 805 F. Supp. 3d 105, 112 (D.D.C. 2025) ("According to the FTC, a recipient of a CID that violates the First Amendment may only challenge the CID if the FTC chooses to bring suit itself."); App't Br. at 15. Under such a rule, the FTC could hang a Subpoena of Damocles over any organization. Forever.

This strategy has an obvious outcome: it coerces rather than investigates. A nonprofit organization like Media Matters lacks the resources to withstand an open-ended discovery dispute with the nation's largest consumer regulator. *Media Matters*, 805 F. Supp. 3d at 129 (detailing the FTC's "sweeping and burdensome CID calling

for sensitive materials"). And the FTC can depend upon that fact to extract concessions that it could never achieve—indeed, would be prohibited from achieving—were it to litigate on the merits. *See SEC v. Romeril*, 15 F.4th 166, 172 (2d Cir. 2021). As to Media Matters, there are signs that this tactic has already succeeded. *See* Kenneth P. Vogel, Kate Conger, & Ryan Mac, *Under Siege from Trump and Musk, a Top Liberal Group Falls into Crisis*, NEW YORK TIMES (July 25, 2025) (describing how Media Matters has spent $15 million in legal fees in response to its recent wave of litigation).[1]

In denying the Commission's request for a stay, this Court emphasized that it did so based in part on the "presumably unique fact pattern of this case." Stay Order, 2025 WL 2988966 at *2. What Media Matters has experienced may be extraordinary, but it is not unique. It is instead part of a concerning trend in regulatory action from the Executive Branch. Across a variety of contexts, agencies issue discovery demands and keep open the specter of litigation at every opportunity, achieving concessions with limited judicial oversight. *See* Section I(b), *infra*. Universities, hospitals, and media organizations have all faced wide-ranging, potentially indefinite investigation across multiple agencies, including the FTC. *See* Lisa Macpherson & Elise Phillips, *Is Free Speech the New Price of Merger Approval from the FTC?,* PUB. KNOWLEDGE (June 17,

---

[1] https://www.nytimes.com/2025/07/25/us/politics/media-matters-musk-crisis.html

2025).[2] The best response for organizations that face such overreach is to ask a court to limit agency abuse, the very action that the FTC hopes to foreclose.

It is vital that the targets of administrative investigations who experience "concrete and felt acts of retaliation" for "having exercised their protected rights of free speech," *Media Matters for Am. v. Paxton*, 138 F.4th 563, 570 (D.C. Cir. 2025) (emphasis omitted), have a remedy that does not rely on the good will of the coercing agency. Indeed, that is the specific reason that Article III courts oversee certain kinds of agency action. *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 155 (2025) ("[T]his Court has long recognized a 'basic presumption of judicial review' of agency action." (quoting *Weyerhaeuser Co. v. U.S. Fish and Wildlife Serv.*, 586 U.S. 9, 22 (2018)).

This is especially true for nonprofit publishers targeted by investigations. To begin, nonprofits are highly regulated, subject to special scrutiny by state and federal authorities and thus especially vulnerable to the coercive investigative techniques at issue. *See* Section I(a), *infra*. Nonprofits also do what they do with tight budgets, and rely on foundations, donors, or government grants to finance their work. *See Nat'l Council of Nonprofits v. Off. of Mgmt. and Budget*, 775 F. Supp. 3d 100, 114 (D.D.C. 2025) (noting that "even a temporary pause in funding" to nonprofits "would destroy their ability" to function), *appeal docketed,* No. 25-5148 (D.C. Cir. argued Feb. 6, 2026).

_____

[2] https://publicknowledge.org/is-free-speech-the-new-price-of-merger-approval-from-the-ftc/ [https://perma.cc/H5VR-DNSV]

Most third-party donors and supporters wish to avoid antagonizing the government, and thus investigations that look like government retaliation can cut off essential third-party support, destroying the financial basis of an organization. *See* Jessica Washington, *Trump Doesn't Need an Executive Order to Kill Progressive Nonprofits*, THE INTERCEPT (Apr. 25, 2025) (describing how "[t]hreats from senior administration officials to foundations and nonprofits' tax-exempt status have heightened donors' concerns about giving to causes that might be perceived as opposing Trump and singled out for retribution . . . . ").[3]

Harm to information-producing nonprofits threatens the public's access to information. "[I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government," or, for that matter, whether to do business with specific companies, "he relies necessarily upon the press to bring to him in convenient form the facts of those operations." *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 491 (1975). The "convenient form" of the modern American's information diet includes news from a multiplicity of sources, with a mix of institutional press and other publishing organizations. *See* Kristen Eddy et al., *What Is News?*, PEW RESEARCH CTR. (May 13, 2025).[4] Nonprofit research, media, and advocacy organizations like Media Matters and *amici* are an

---

[3] https://theintercept.com/2025/04/25/trump-nonprofits-philanthropy-donors/ [https://perma.cc/P4UQ-YGLS]
[4] https://www.pewresearch.org/journalism/2025/05/13/what-is-news/

essential part of that diet, regularly producing reliable, high-quality information for the public, without the real or perceived bias that can be ascribed to their for-profit counterparts. *See* Jacob L. Nelson, *Is Journalism's Trust Problem About Money, Not Politics?*, Nieman Lab (June 26, 2024);[5] Tess Legg, Jenny Hatchard, and Anna B. Gilmore, *The Science for Profit Model—How And Why Corporations Influence Science and the Use of Science in Policy and Practice*, PLOS One (June 23, 2021).[6] If nonprofits cannot financially survive a government investigation, Americans will know less.

Even if targeted organizations remain solvent, there is still harm to the public from selective, retaliatory investigations. For while disfavored organizations find their speech suppressed due to risk of punishment, litigation expense, and a loss of support, those whose speech the agency *supports* will continue their work unabated. Unchecked, speech-based investigations distort the marketplace of ideas by allowing favored speakers to "fight freestyle" while targeted organizations must "follow Marquis of Queensbury rules" lest they be spent out existence or lose the support that allows them to operate. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 392 (1992). This is why courts halt "government officials from wielding their power to selectively punish or suppress speech[.]" *Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 198 (2024).

*Amici* want to ensure that the judiciary continues to serve its important check

---

[5] https://www.niemanlab.org/2024/06/is-journalisms-trust-problem-about-money-not-politics/
[6] https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0253272 [https://perma.cc/6S32-J4C8]

against executive overreach, especially in matters of constitutional rights. It is not lost on *amici* that the FTC's claimed reason for the CID (offered only after this litigation began) was that it sought to investigate those "inviting, participating in, or facilitating boycotts . . . of advertising placed on . . . publishers." *See Media Matters*, 805 F. Supp. 3d at 117. Such a claim could be levied against any organization that critiques a business that sells advertising. But more importantly, such a theory is an affront to the First Amendment. Criticism is not a moral harm or grounds for an antitrust inquiry; it is the very essence of public debate. *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 503–04 (1984) ("The First Amendment presupposes that the freedom to speak one's mind is not only an aspect of individual liberty—and thus a good unto itself—but also is essential to the common quest for truth and the vitality of society as a whole.").

## I. Nonprofit Media, Research, and Advocacy Organizations Face Substantial Risk from the Growing Trend of Vexatious Investigations.

While any organization may face find itself the target of a bogus investigation, nonprofits experience more significant compliance obligations than their for-profit counterparts, and must navigate them with fewer resources. If the open-ended and coercive discovery tactics of the FTC are allowed to go without intervention, the threat to nonprofits may become existential.

### a. Nonprofit Organizations Face Heightened Risk from Coercive Investigations by the Government.

Nonprofit media, research, and advocacy organizations produce and

disseminate vital public information, informing audiences, causes, and issues that are often underserved in the broader information ecosystem. *See, e.g.*, Rosalie C. Westenkow & Edward L. Carter, *Journalism as a Public Good: How the Nonprofit News Model Can Save Us from Ourselves*, 26 COMM'N L. & POL'Y 336 (2021). But they do so under significant resource constraints and subject to heightened regulatory scrutiny. Nonprofits must provide federal and state tax authorities with more information about their inner workings than for-profit entities. They are subject to more limits on their speech, *see* 26 C.F.R. § 56.4911-2, more limits to their purposes, *see* I.R.C. § 501(c), N.Y. Not-for-Profit Corp. L. § 204, more stringent requirements as to who can obtain their benefits, *Rameses Sch. of San Antonio v. Comm'r of Internal Rev.*, 93 T.C.M. (CCH) 1092 (2007), and often times, more public scrutiny of their budgeting and decision-making, *see GuideStar*, CANDID (last visited Feb. 23, 2026).[7]

These requirements are consistent with the goal of ensuring that nonprofit status benefits the public, not individuals. But each obligation creates a possible avenue for political retaliation. There is now reporting that the Internal Revenue Service will be reorganized to facilitate investigations similar to those at issue here. Brian Schwartz, Richard Rubin, & Joel Schectman, *Trump Team Plans IRS Overhaul to Enable Pursuit of Left-Leaning Groups*, WALL ST. JOURNAL (Oct. 15, 2025);[8] Michael

---

[7] https://www.guidestar.org/
[8] https://www.wsj.com/politics/policy/trump-irs-investigations-left-leaning-groups-democratic-donors-612a095e

Mechanic, *It Sure Looks Like Trump is About to Weaponize the IRS*, MOTHER JONES (Oct. 16, 2025).[9] At least one state has begun such a campaign under state corporate regulation. Eleanor Klibanoff, *AG Ken Paxton's Campaign Against Immigrant-Serving Groups Gets Boost from Court Rulings*, TEX. TRIBUNE (Dec. 9, 2025).[10]

And only the very largest nonprofits can finance any sort of a prolonged legal battle. A 2019 study by the National Council of Nonprofits reports that among 501(c)(3) charitable nonprofits other than private foundations, 97% have annual budgets of less than $5 million, and 88% spend less than $500,000 annually. NONPROFIT IMPACT MATTERS, NAT'L COUNCIL OF NONPROFITS at 17 (2019).[11] According to the Institute for Nonprofit News, the median member nonprofit news organization generates $532,000 in gross annual revenue. THE 2025 INN INDEX, INST. FOR NONPROFIT NEWS (Oct. 2025),[12] This may keep the lights on, but it provides no war chest for a dispute with a federal regulator, no matter how meritorious the nonprofit's claims may be.

Nonprofits have historically relied on *pro bono* counsel and law school clinics

---

[9] https://www.motherjones.com/politics/2025/10/wall-street-journal-irs-trump-audits-criminal-investigations-liberal-democrat-groups-weaponization/ [https://perma.cc/7QT3-CJBW]

[10] https://www.texastribune.org/2025/12/09/texas-ken-paxton-nonprofit-immigrant-investigations/ [https://perma.cc/4R3G-GT5R]

[11] https://www.nonprofitimpactmatters.org/site/assets/files/1/nonprofit-impact-matters-sept-2019-1.pdf [https://perma.cc/CQJ9-SSFM]

[12] https://inn.org/research/inn-index/2025-index/about-the-index/ [https://perma.cc/338P-XBJR]

to help close these resource gaps, but the chilling tactics of the present administration have halted many of those resources. The targeting of law firms for support of progressive causes has led many of the largest firms to back away from support those perceived as disfavored by the current administration. *See Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, 784 F. Supp. 3d 127, 151 (D.D.C. 2025) ("The Order [targeting WilmerHale for disfavored legal work] shouts through a bullhorn: If you take on causes disfavored by President Trump, you will be punished!"), *appeal docketed,* No. 25-5277 (D.C. Cir. July 28, 2025); Molly Redden, *Trump's War on Big Law Means It's Harder to Challenge the Administration*, PROPUBLICA (Aug. 6, 2025) (gathering extensive examples of major firms backing off of work in support of causes adverse to the current administration).[13] Universities whose law clinics have supported politically disfavored causes have found themselves answering for such support before the "Joint Antisemitism Task Force" and the House Committee on Education and the Workforce. *See* Tony Maquiling, *Student Orgs, Human Rights Clinic Named in Trump's Demand Letter to Harvard*, HARV. L. RECORD (Apr. 15, 2025) (targeting a law school clinic as part of the sweeping investigation brought against Harvard University);[14] *Statement on the Importance of Law School Clinics and the Dangers of Political Retaliation*, N.Y.C. Bar Ass'n (Aug. 1, 2025)

---

[13] https://www.propublica.org/article/trump-law-firms-accountability-environment-police-lgbtq [https://perma.cc/9BTX-429Y]

[14] https://hlrecord.org/student-orgs-human-rights-clinic-named-in-trumps-demand-letter-to-harvard/ [https://perma.cc/E9ZC-SLY7]

(condemning a Congressional committee's interrogation of a university chancellor based on the school's law clinic representing Mahmoud Khalil).[15] Nonprofits may find fewer friends given the present chill across the legal sector, further stretching their resources.

Vexatious regulatory investigations also harm the substantive work of nonprofit media, research, and advocacy organizations. Such organizations frequently partner with each other and work with sensitive outside sources to produce reporting that they could not create on their own. *See, e.g.*, Miles Hilton, *Blacklight, Our Privacy Inspector Tool, Now Tracks X and TikTok Pixels*, THE MARKUP (Feb. 9, 2026) (investigative tools developed between a nonprofit and university computer engineering students);[16] *How Police Guns End Up in the Hands of Criminals*, REVEAL (July 13, 2024) (reporting done by nonprofit in partnership with another nonprofit and a for-profit news outlet);[17] Georgia Gee, *The "Trash" School*, THE INTERCEPT (June 4, 2024) (nonprofit partnered with university students to help inform local residents about their reporting).[18] Advocacy organizations coordinate

---

[15] https://www.nycbar.org/press-releases/statement-on-the-importance-of-law-school-clinics-and-the-dangers-of-political-retaliation/ [https://perma.cc/PMA9-G9UU]

[16] https://themarkup.org/blacklight/2026/02/09/blacklight-update-tiktok-x-twitter [https://perma.cc/LZG7-QKFQ]

[17] https://revealnews.org/podcast/how-police-guns-end-up-in-the-hands-of-criminals/ [https://perma.cc/F7TP-NDMC]

[18] https://theintercept.com/2024/06/04/gainesville-florida-alachua-school-toxic-contaminated/ [https://perma.cc/56KU-DLBA]

their partners with broader strategic plans that, if revealed externally, would "frustrate those groups' decisions as to 'how to organize themselves, conduct their affairs, and select their leaders', as well as their selection of a 'message and the best means to promote that message.'" *AFL-CIO v. FEC*, 333 F.3d 168, 177 (D.C. Cir. 2003) (cleaned up) (quoting *Eu v. S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214, 230, 231 n.21 (1989)). The CID at issue here goes right to heart of such collaboration, a clear "effort to probe into editorial decisionmaking and journalistic actions surrounding the publication of the disfavored article" that illustrates the request's bad faith nature. Stay Order, 2025 WL 2988966 at *7. It jeopardizes the privacy of existing information sources and deters new ones from coming forward. *Id.* at *10; *see Zerilli v. Smith*, 656 F.2d 705, 713 (D.C. Cir. 1981) ("Even when the information is crucial to a litigant's case, reporters should be compelled to disclose their sources only after the litigant has shown that he has exhausted every reasonable alternative source of information."). This harm from "reduced collaboration" is especially salient for *amici* and their partner organizations. *Paxton*, 138 F.4th at 572.

And for nonprofits that rely on foundations and grants to do their work, this coercive targeting presents an even greater danger. Alongside these increasingly popular coercive investigation techniques, *see* Section I(b) *infra*, the current administration has begun to deter politically disfavored nonprofits by targeting their funders. The Department of Justice is reportedly directing prosecutors to launch pretextual investigations into Open Society Foundations, one of the largest

supporters of nonprofit organizations in the United States. Devlin Barrett, *Justice Dept. Official Pushes Prosecutors to Investigate Geroge Soros's Foundation*, NEW YORK TIMES (Sept. 25, 2025).[19] In response to critical coverage by *The Nation* magazine, the Vice President threatened two major foundations who he (mistakenly) believed had provided financial support to the outlet. Connie Matthiessen, *Funders Push Back as the Trump Administration Targets Philanthropy*, INSIDE PHILANTHROPY (Sept. 18, 2025).[20] As a result of the threats, and in sharp contrast to the first Trump Administration, "most liberal grant-makers have either stayed on the sidelines . . . or brought only a small fraction of their resources" to organizations that directly challenge or interrogate the federal government. David Callahan, *Philanthropy in the Crosshairs*, THE NATION (Nov. 17, 2025).[21] Such pullback has happened on top of the aggressive and unlawful terminations of grants that have been facilitated by the Executive Branch directly. *See, e.g.*, *Rhode Island v. Trump*, --- F. Supp. 3d ---, 2025 WL 3251113 (D.R.I. Nov. 21, 2025) (museum and library grants), *appeal docketed*, No. 26-1070 (1st Cir. Jan. 21, 2026); *Am. Ass'n of Univ. Profs. v. Trump*, --- F. Supp. 3d ---, 2025 WL 3187762 (N.D. Cal. Nov. 14, 2025) (university research grants), *order modified and appeal dismissed*, ECF No. 113–14 (N.D. Cal. Feb. 13, 2026); *Nat'l Council of*

---

[19] https://www.nytimes.com/2025/09/25/us/politics/justice-trump-george-soros-foundation.html
[20] https://www.insidephilanthropy.com/home/funders-push-back-as-the-trump-administration-targets-philanthropy [https://perma.cc/CJ5A-TEHV]
[21] https://www.thenation.com/article/society/philanthropy-foundations-soros-kirk-open-society [https://perma.cc/BAR5-F3AT]

*Nonprofits*, 775 F. Supp. 3d 100 (across-the-board freeze of federal funds).

To say, therefore, that a recipient of a vexatious CID "incurs no penalty . . . for failing to comply with a CID before a court orders enforcement," App't Brief at 7, is to miss what happens when a nonprofit must tell its partners and funders "the government is looking into us." The public withholds information. Collaborators stay away. Foundations take their money elsewhere. Pro bono attorneys stop picking up the phone. And the expenses inherent in responding to an investigation—to impose a litigation hold, to advise key staff on when and how to discuss the investigation, to reconsider plans in light of the threat—must come from already-spartan budgets. *See* Klibanoff, *supra* (one nonprofit targeted by an apparently politically motivated state investigation spent $400,000 in dispute of investigations). Such is the consequence of this style of coercive investigation: "law firms cower, institutional leaders in higher education meekly appease the President, media outlets from huge conglomerates to small niche magazines mind the bottom line rather than the ethics of journalism." *Am. Ass'n of Univ. Profs. v. Rubio*, 802 F. Supp. 3d 120, 196 (D. Mass. 2025) (internal footnotes omitted), *appeal docketed,* No. 26-1141 (1st Cir. Feb. 10, 2026).

This necessarily presents a significant injury. "The loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *Paxton*, 138 F.4th at 585; *accord. Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). And those who dislike a nonprofit's scrutiny may weaponize the

threat of government investigation. Doug Bock Clark, *How Paul Newby Made North Carolina a Blueprint for Conservative Courts*, PROPUBLICA (Oct. 30, 2025) (when a nonprofit journalist was investigating a recent story, he received a reply from the communications director of the North Carolina Republican Party, saying "I'm sure you're aware of our connections with the Trump Administration and I'm sure they would be interested in this matter[.] I would *strongly* suggest dropping this story").[22] Targeting research, journalism, and advocacy organizations for regulatory investigation "places a special burden on information-gathering, for in such cases the ultimate, though tacit, design is to obstruct rather than to investigate, and the official action is proscriptive rather than observatory in character." *Paxton*, 138 F.4th at 580 (emphasis omitted) (quoting *Reporters Comm.*, 593 F.2d at 1064).

### b. Opening and Prolonging Vexatious Investigations Has Become a Popular Tool for Coercion Across the Federal Government.

The FTC is not acting alone in sidestepping limits on its authority through coercive tactics. Indeed, the actions of the federal government over the past year show that this technique—launching an investigation (however dubious), keeping the investigation open, and using this regulatory surveillance to extract concessions it could not accomplish through the law—has become increasingly popular. Indefinite investigation provides the government a way to compel behavior while

---

[22] https://www.propublica.org/article/paul-newby-north-carolina-supreme-court [https://perma.cc/C9ZT-8626]

limiting opportunities for targets to contest the lawfulness of its actions. It is contrary, therefore, to the rule of law, and requires prompt judicial superintendence. *See Nat'l Treasury Emps. Union v. Vought*, 149 F.4th 762, 820 (D.C. Cir. 2025) (Pillard, J., dissenting) (condemning actions by government defendants to "seek effective immunity from meaningful oversight in the federal courts of even the most consequential actions by agencies" in a manner that is "corrosive of the rule of law"), *vacated pending rehearing en banc*, 2025 WL 3659406 (D.C. Cir. Dec. 17, 2025).

This shift in tactics has been highlighted by those in a position to know, such as FCC Commissioner Anna Gomez, who, in dissenting from the recent actions of her agency, has observed that: "[u]nfortunately, because they are just enforcement proceedings and investigations that are being open, not final decisions, you're not going to see a court review. And I would be surprised if it gets the point where you actually see final action that is reviewable by a court." *Commissioner Gomez: Investigations Without Action Threaten Free Press*, INSIDERADIO (June 10, 2025).[23] Targets, too, have observed that the discovery of information seems to not be the point. Former President of the University of Virginia James Ryan reflected on recent investigations into his university that "the timing of the DOJ letters, the ever expanding scope of their inquiries, and their willingness to give us extension after

---

[23] https://www.insideradio.com/free/commissioner-gomez-investigations-without-action-threaten-free-press/article_c6d9fd43-a7e6-4273-8d7f-479caaeb8d22.html [https://perma.cc/UY5D-B3CK]

extension made me wonder more than once if the DOJ was not actually interested in our response[.]" *Letter to the Faculty Senate of the University of Virginia from President Emeritus James E. Ryan* (Nov. 14, 2025).[24]

Courts have also noted the use of investigatory powers to deter legal activity, including in cases where the Department of Justice has tried to use legal process to pressure healthcare providers to cease providing gender-affirming care, not through any direct legal claim, but through extensive inquiries made through an unrelated subpoena power. Courts quashed those efforts. *See, e.g.*, *In re 2025 Subpoena to Children's Nat'l Hospital*, No. 25-cv-3780, 2026 WL 160792 at *7 (D. Md. Jan. 21, 2026) ("[t]he Government fails to place before the court any information, record, or evidence supporting or pertaining to investigation" that would justify subpoena); *QueerDoc, PLLC v. Dep't of Justice*, --- F. Supp. 3d ---, 2025 WL 3013568 at *6 (W.D. Wash. Oct. 27, 2025) (an investigation into a telehealth provider who "cannot, by definition, commit the violations being investigated"); *In re Administrative Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 239 (D. Mass. 2025) ("It is abundantly clear that the true purpose of issuing the subpoena is to interfere with the Commonwealth of Massachusetts' right to protect [gender-affirming care] within its borders, to harass and intimidate [the hospital] to stop providing such care, and to dissuade patients from seeking such care."). As Commissioner Gomez highlighted,

---

[24] https://www.insidehighered.com/sites/default/files/2025-11/Jim%20Ryan%20letter.pdf [https://perma.cc/R28N-F4GV]

the FCC has employed this coercive technique on multiple fronts, including an

indefinite investigation into KCBS after it broadcast the fact that immigration agents

were operating in the region. Byron Tau, *How an AM Radio Station in California

Weathered the Trump Administration's Assault on Media*, Assoc. Press (Dec. 15, 2025)

("KCBS demoted a well-liked anchor and dialed back on political programming,

people said. For months, reporters were dissuaded from pursuing political or

controversial topics and instead encouraged to focus on human interest stories,

according to the current and former staffers.");[25] *see also* Tara Suter, *FCC Opens Probe

Into ABC's "The View" After James Talarico Interview: Reports*, The Hill (Feb. 8, 2026).[26]

It also held open the merger between Verizon and Frontier Communications until

Verizon dropped its internal policies to improve diversity and inclusion in the

workforce, despite no apparent authority to regulate internal employment matters

in this way. *Letter to Chairman Brendan Carr, FCC, from Vandana Venkatesh, Verizon*

(May 15, 2025);[27] Jon Brodkin, *FCC Chair Brendan Carr Is Letting ISPs Merge—As Long

As They End DEI Programs*, Ars Technica (May 19, 2025).[28]

And when agencies do resolve legal disputes, they still find ways to keep an

---

[25] https://www.ap.org/news-highlights/spotlights/2025/how-an-am-radio-station-in-california-weathered-the-trump-administrations-assault-on-media/ [https://perma.cc/DBP5-LCQQ]
[26] https://thehill.com/homenews/media/5728540-equal-time-rule-fcc-the-view/ [https://perma.cc/VDA7-YB2L]
[27] https://www.fcc.gov/ecfs/document/105150776713979/1
[28] https://arstechnica.com/tech-policy/2025/05/fcc-chair-brendan-carr-is-letting-isps-merge-as-long-as-they-end-dei-programs/ [https://perma.cc/CEY7-QXWQ]

investigation open. The multi-agency investigation into Columbia University for alleged antisemitism resulted in a settlement that required Columbia to appoint a "Resolution Monitor" to conduct ongoing and continual audits into admissions actions at the university and report back to the federal government for the next three years. *See* Resolution Agreement Between The United States of America and Columbia University §§ 40–42 (July 23, 2025).[29] The FTC itself adopted this tactic another matter, approving the acquisition of Interpublic Group of Companies by Omnicom Group only after Omnicom agreed to not refuse advertisements on the basis of perceived "misinformation" or a lack of "adherence to journalistic standards," and appoint a "Monitor" (reviewed and approved by the FTC) with both open-ended discovery power and a duty to report to the Commission for the next five years. *In re Omnicom Grp.*, No. C-4823, slip op. at 3, 5–6 (F.T.C. Sept. 26, 2025).

The common theme is that, no matter how pretextual, an investigation will be kept open indefinitely, be that by never taking the steps that would bring it before a court, pressuring for settlements where the information production never ends, or simply declaring the target is now subject to perpetual surveillance (as in a recent move by the Department of State). *See* Nasser Eldroos & Rachel Levinson-Waldman, *"Continuous Vetting" of All Visa Holders is Impossible, but the Threat Alone Chills Free*

---

[29] https://president.columbia.edu/sites/president.columbia.edu/files/content/July%202025%20Announcement/Columbia%20University%20Resolution%20Agreement.pdf.

*Speech*, Brennan Ctr. for Justice (Sept. 25, 2025), (detailing State's announcement of a plan to engage in "continuous vetting" of all 55 million visa holders in the United States through the use of artificial intelligence).[30]

This regulatory approach reforges the tools of regulatory discovery into a sword that an agency can indefinitely hang over the head of a target. These investigations "probe at will without relation to law enforcement needs and that expose for the sake of exposure," a danger that this Court cautioned of nearly fifty years ago. *Reporters Comm.*, 593 F.2d at 1047 n.52 (emphasis omitted).

Without intervention, these investigative tactics accomplish that which is most abhorrent to the First Amendment: viewpoint discrimination. *See Vullo*, 602 U.S. at 187. This investigatory pressure is sometimes labeled a "chilling effect," but the pressure leads to more than self-censorship. "[C]hilling effects predominantly involve not just a deterrent effect, but a shaping effect—people speaking, acting, or doing in a way that conforms to, or is in compliance with, perceived norms, not simply self-censoring to avoid a legal harm." Jonathon Penney, Chilling Effects: Repression, Conformity, and Power in the Digital Age 11 (2026). Investigations instigated by the government facilitate the risk of additional sanction at any moment, which shapes the target's conduct into the future. As such, without means to challenge them, such investigations enable "an egregious form of content

---

[30] https://www.brennancenter.org/our-work/research-reports/continuous-vetting-all-visa-holders-impossible-threat-alone-chills-free [https://perma.cc/38V5-D858]

discrimination" where "the violation of the First Amendment is all the more blatant." *Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995). The unifying theme of the actions is that they single someone out and chill them from action—and in so doing, allow others with views the government finds more favorable to go about their business. Exposing nonprofits to this additional expense and burden "is bad not because it takes money from the pockets" of those already trying to do so much more with so much less, but "because, in the light of its history and of its present setting, it is seen to be a deliberate and calculated device . . . to limit the circulation of information to which the public is entitled in virtue of the constitutional guaranties." *Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936).

## II. Courts Must Provide a Mechanism for Halting Vexatious Investigations.

When an agency engages in information gathering "whose ultimate, though tacit, design is to obstruct rather than to investigate, and the official action is proscriptive rather than observatory in character," *Paxton*, 138 F.4th at 580 (emphasis omitted) (citing *Reporters Comm.*, 593 F.2d at 1064), courts must intervene to ensure the rights of the investigation target are protected. *See United States v. Morton Salt Co.*, 338 U.S. 632, 640 (1950) ("It is expected that this combination of duty and power" granted to agencies "will result in earnest and eager action," but "[t]o protect against mistaken or arbitrary orders, judicial review is provided."). Conversely, if one is the government and seeks to continue to coerce behavior through investigation, the primary object must be to keep courts from scrutinizing

their activity. It is no surprise, therefore, that the FTC argues first and foremost that courts cannot review its behavior. App't Brief at 15. Similar efforts have been made to deter judicial review of other coercive investigations in other contexts. This was true in investigations brought by the Department of Justice against hospitals who provide gender-affirming care. *In re Subpoena No. 25-1431-014*, --- F. Supp. 3d ---, 2025 WL 3252648 at *9 (E.D. Pa. Nov. 21, 2025) (the government's argument "would leave the Department of Justice's administrative subpoena power untethered to any check and place it beyond meaningful judicial review"). It was tried against universities who refused to submit to federal oversight and saw their grants terminated. *President & Fellows of Harvard Coll. v. Dep't of Health & Human Servs.*, 798 F. Supp. 3d 77, 112–13 (D. Mass. 2025) (rejecting the argument that certain plaintiffs lacked standing because their only harm was a "subjective chill"), *appeal docketed*, No. 25-2230 (1st Cir. Dec. 31, 2025). As this Court has already observed, "[a]llowing the party that has issued a demand that is causing concrete and ongoing First Amendment injury to dictate when, if ever, judicial review could commence could deprive parties of all meaningful judicial review of constitutional claims." Stay Order, 2025 WL 2988966 at *5.

For nonprofit organizations especially, courts' timely intervention is essential. It is essential to keep funders, counsel, and the broader support community from shying away. *See* Section I(a), *supra.* But it is also essential to prevent the inherent distortion in output that flows from having the government looking through the first

draft. *See Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333, 381 (D.D.C. 2020) ("In response to the knowledge that [government agents] are monitoring [the news outlet] and network coverage and reaching out to individual journalists directly with questions about coverage, journalists and editors have already refrained from engaging in certain speech and are likely to continue doing so."). "It should alarm all Americans" to see the government engage in such retaliatory surveillance, "[a]nd that alarm should ring even louder when the Government retaliates against those engaged in newsgathering and reporting." *Media Matters*, 805 F. Supp. 3d at 111. It is why courts preserve an equitable claim under the First Amendment "where cognizable constitutional claims are at stake," as plaintiffs "must be able to proceed in an Article III forum under some cause of action." *Turner*, 502 F. Supp. 3d at 372.

This need is especially salient for a CID, as unlike other forms of government discovery, the only other avenue for recourse is with the very party engaged in retaliation. Standard civil and criminal subpoenas of course have mechanisms to quash or modify the scope before a court. *See* Fed. R. Civ. P. 45(d)(3); Fed. R. Crim. P. 17(c)(2); *United States v. Calandra*, 414 U.S. 338, 346 (1974) (for grand jury subpoenas, "judicial supervision is properly exercised" to quash or modify improper subpoenas "to prevent the wrong before it occurs"). Even when organizations have information improperly seized through a search warrant, they have a vehicle for raising those issues to someone other than law enforcement. Fed. R. Crim. P. 41(g); *see* Motion to Intervene and For Return of Property, *In re Searches Related to Hannah Natanson*,

26-sw-00054 (E.D. Va. Jan. 21, 2026) (challenging seizure of journalist work product for a Washington Post reporter). But, if the Appellant prevails, a challenge to an FTC CID would only ever be heard by the FTC itself. 16 C.F.R. § 2.10. Absent court intervention, agencies would be left to "issue sweeping demands that inflict concrete and 'ongoing injuries' that suppress speech and journalism—for example, a demand for all sources used either by certain reporters or for specific stories—while simultaneously closing the courthouse doors to relief as long as the agency chooses not to take additional enforcement steps." Stay Order, 2025 WL 2988966 at *4 (quoting *Paxton*, 138 F.4th at 583). The FTC claims that judicial supervision would unduly "halt federal investigations based on minimal and speculative evidence of purported retaliation," App't Br. at 2–3, but it would do no such thing. It only provides a neutral forum by which a party can argue that the agency's actions were unlawful speech retaliation, under the standards developed for assessing those claims. *See Paxton*, 138 F.4th at 584; *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016).

To accept the FTC's argument would also mean that courts would be forced to watch from the sidelines as agencies engage in even the most obvious and bad faith forms of vexatious investigation. The Commission seems untroubled by this, gesturing to the "presumption of regularity that attaches to government action," App't Brief at 2. To appeal to a presumption of regularity in 2026 asks far too much, as numerous courts on the front lines of these new regulatory tactics have observed. *See, e.g.*, *United States v. Oregon*, No. 25-cv-1666, 2026 WL 318402 at *11

(D. Or. Feb. 5, 2026) ("The presumption of regularity that has been previously extended to [the Government] that it could be taken at its word—with little doubt about its intentions and stated purposes—no longer holds."); *Fed. Educ. Ass'n v. Trump*, 795 F. Supp. 3d 74, 92 (D.D.C. 2025) ("In just six months, the President of the United States may have forfeited the right to such a presumption of regularity."), *appeal docketed*, No. 25-5303 (D.C. Cir. argued Dec. 15, 2025); *In re Search of One Device and Two Individuals*, 784 F. Supp. 3d 234, 244 n.10 (D.D.C. 2025) ("Blind deference to the government? That is no longer a thing. Trust that had been earned over generations has been lost in weeks.").

As the federal government uses its investigative powers in ways that appear untethered from its power to enforce, all evidence points to one tactic that has consistently protected those at risk—promptly going to court. *See, e.g., In re Administrative Subpoena*, 800 F. Supp. 3d at 229. This is the essential role of Article III courts, and why they must act to halt the "existing and continuing First Amendment harms" that flow from retaliatory investigations aimed at speech suppression. Stay Order, 2025 WL 2988966 at *4.

But such protections cannot exist if the government decides when—or worse yet, whether—courts can scrutinize its conduct in the first place. And without those protections, nonprofit media, research, and advocacy organizations in particular will be chilled from producing the types of information needed for an "informed public[,] 'a structural necessity in a real democracy.'" *Ctr. for Pub. Integrity v. Dep't of Defense*,

411 F. Supp. 3d 5, 12 (D.D.C. 2019) (quoting *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004)). Even when it first sanctioned broad investigatory powers of agencies, the Supreme Court warned of a situation where "the Government pursues a policy of accumulating penalties while avoiding a judicial test by refusing to bring action to recover them." *Morton Salt*, 338 U.S. at 654. Such a time is upon us.

## CONCLUSION

For these reasons, *amici* respectfully request that this Court affirm the issuance of the preliminary injunction by the district court.

Dated: February 23, 2026

Respectfully submitted,

*/s/ Kendra K. Albert*

Kendra K. Albert
Andrew F. Sellars
ALBERT SELLARS LLP
769 Centre St, Suite 199
Boston, MA 02130
(617) 286-6886
kendra@albertsellars.law

Counsel for *Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of the Federal Rules of Appellate Procedure and the Circuit Rules. The document contains 6,405 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f).

This document complies with the typeface and type style requirements of the Federal Rules. The document has been prepared in a proportionally spaced typeface using Microsoft Word, in the font Crimson Pro.

Dated: February 23, 2026

/s/ *Kendra K. Albert*

Kendra K. Albert
ALBERT SELLARS LLP
769 Centre St, Suite 199
Boston, MA 02130
(617) 286-6886
kendra@albertsellars.law

Counsel for *Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 23, 2026, I caused the foregoing Brief of *Amici Curiae* to be electronically filed with the Clerk of the Court using CM/ECF, which will automatically send email notification of such filing to all counsel of record.

Dated: February 23, 2026

*/s/ Kendra K. Albert*

Kendra K. Albert
ALBERT SELLARS LLP
769 Centre St, Suite 199
Boston, MA 02130
(617) 286-6886
kendra@albertsellars.law

Counsel for *Amici Curiae*